## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **MICHAEL WILLIAMS,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:15-CV-1701L** |
| | § | |
| **CITY OF IRVING, CRAIG LACKEY, CALIBER HOME LOANS** | § | |
| | § | |
| **Defendants** | § | |

### PLAINTIFFS' FIRST AMENDED COMPLAINT

1.      Plaintiff Michael Williams ("Williams") complains of Defendants City of Irving, Texas ("The City"), Irving Police Department ("IPD"), Dispatcher Stephanie Barnes ("Barnes") and Detective Eric Curtis ("Curtis") as follows:

2.      This is a proceeding for declaratory relief and for money damages against Defendants, to redress the deprivation of rights secured to the plaintiff by the Civil Rights Act of 1871 (42 U.S.C. §1983 and 42 U.S.C. §1985), of the Fourteenth Amendment to the Constitution of the United States and for state law claims pertaining to the Texas Tort Claims Act, negligent hiring/negligent retention and intentional infliction of emotional distress.

3.      This violation of a clear and established constitutional right defeats the Official and Qualified immunity defense.

### PARTIES

1.      Plaintiff, Michael Williams, is an individual who resides at 7604 Acorn Lane; Frisco, Texas 75034.

2.      Defendant, City of Irving, Texas, is a municipality organized under Texas Local Government Code Annotated, Chapter 5 and Subchapter A. The City of Irving may be served by

serving the City Attorney's Office at 825 W. Irving Blvd., Irving, TX 75060; Phone: (972) 721.2541 or Fax: (972) 721.2750; jmcclain@cityofirving.org.

3. Defendant, Craig Lackey, Esq., (Texas Bar #: 00785372) is an attorney at the Perkins-Coie Law Firm who can be served at his place of employment at 500 N. Akard Street Suite 3300, Dallas, TX. 75201; Phone: (214) 965-7700 or CLackey@perkinscoie.com.

## JURISDICTION AND VENUE

4. This action is brought pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988, and the Fourth and Fourteenth Amendments to the United States Constitution; equal protection of the laws. Jurisdiction is conferred on this Court by 28 U.S.C. §1343(3) providing for jurisdiction in this Court of suits authorized by 42 U.S.C. §1983, 42 U.S.C. §1988, and 28 U.S.C. §133l.

5. Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law, pursuant to 28 U.S.C. § 1367. Venue is proper in the Dallas Division of the Northern District of Texas as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## FACTUAL ALLEGATIONS

6. On December 21, 2013, Plaintiff made a non-emergency phone call to the Irving Police Department to report on-going terroristic threats made towards him and his family by a group of White coworkers at his place of employment, Caliber Home Loans or 'Caliber" located at 370I Regent Blvd. in the City of Irving, Texas.

## DISPATCHER STEPHANIE BARNES

7. Police Dispatcher Stephanie Barnes ("Barnes") took Plaintiffs phone call. During this non-emergency phone call, Barnes, picking up on the fact that Plaintiff was preparing to make a

terroristic threat report against a group of White co-workers, used her job at the IPD to trick the Plaintiff into revealing personal and professional information about himself.

8.     Among the information she obtained from Plaintiff was personal information about Plaintiff and his family, the names of the people whom Plaintiff was accusing of threatening Plaintiff and his family and the name of the company for whom they all worked.

9.     After Plaintiff's phone call with Barnes ended, Barnes spent the next 24 hours sending and receiving phone calls to and from Caliber Senior Managers and Caliber Security. During those phone calls Barnes made many defamatory statements regarding Plaintiff and exchanged private information about Plaintiff and his family with Caliber Senior Managers and Caliber Security.

10.     The defamatory statements made by Barnes to Caliber Senior Management and Caliber Security included allegations of Plaintiff being insane, delusional, violent and inclined to commit an act of terrorism on the general staff at Caliber. Barnes, under the color of authority led the company into believing that plaintiff was a danger to the safety of the general workforce at Caliber. During the phone call, at no time did Barnes ask plaintiff if he needed a doctor, if he had any history of mental illness, if he felt suicidal, or request a squad car to go by Plaintiffs home to conduct a welfare check; which is common police policy in such a circumstance as described by Barnes.

11.     Barnes, through very inciteful language and under the color of authority convinced Caliber into providing her with confidential and private information about Plaintiff such the confidential contents of his employee file, co-workers comments about plaintiff, contents of Plaintiffs private and personal email accounts (which had been "hacked" and stolen), medical information, doctor's names, and information regarding Plaintiffs in-laws, details of Plaintiffs marriage and subsequent divorce, overdue bills, details about plaintiffs ex-spouse and personal house expenses.

12.     Barnes providing Caliber Senior Managers with enough information that she got from Williams to guide them in developing an alibi and destroying electronic records that would be critical to a criminal investigation.

13.     Because of Barnes defamatory statements Plaintiff was constructively fired from his job and his reputation and career irreparably damaged. Plaintiff's access badge was deactivated blocking him from entering the building where he worked; his remote computer access was deactivated disallowing him from working; his chain of command was told about the defamatory statements made by Barnes irreparably damaging Plaintiffs reputation and career. And the people who were threatening and harassing Plaintiff were never brought to justice; which creates fear in the life of the Plaintiff and Plaintiffs family to this day.

## DETECTIVE ERIC CURTIS

14.     After Plaintiff completed the online Terroristic Threats Police report, the case was assigned to Detective Eric Curtis of the IPD. Det. Curtis responded to the police report with the exact same custom that Barnes responded to the phone call.

15.     Curtis, aware that no law exists requiring competent investigation, commences a sham investigation designed to obstruct, defeat and impede the police report with the intent of denying the plaintiff equal protection of the laws.

16.     Curtis spoke with Barnes first, read her reports and listened to the tapes she made with plaintiff and Caliber management.

17.     Curtis then contacted Michelle Greenstreet, who was Executive Vice President of Human Resources when the police report was made.

18.     Curtis, during the criminal investigation, spoke with the attorney for the Caliber, Craig Lackey, providing Lackey with the contents of plaintiff's police report and enough information

for Lackey to locate and destroy electronic evidence of ongoing harassment Plaintiff mentioned in his police report.

19.     Curtis accepted the false story from Lackey that Plaintiff made the police report only after sending numerous emails complaining about his pay and not receiving and end of year pay bonus. This fabrication on the part of Lackey was intended to obstruct a criminal investigation and could have been easily verified as false had Curtis requested a copy of the emails Lackey was referring to.

20.     Curtis accepted the second fabrication from Lackey that Caliber paid an outside computer forensics firm to analyze the suspects' computers at Caliber for any sign of Plaintiffs personal information on their computers.

21.     This was the second fabrication by Lackey to Curtis which could have been easily verified as false had Curtis requested the name of the computer forensics company and a physical copy of the report that company made.

22.     Curtis never made any attempts to corroborate any material statements Lackey told him in relation to his statements to police detective Curtis.

23.     Craig Lackey, on more than one occasion, intentionally made false or misleading material statements to the police during a criminal investigation.

24.     The tapes of these conversations between Lackey and Curtis should have been available through the Pubic Information Act but were either hidden or destroyed by the IPD.

25.     Detective Curtis without speaking to neither the Plaintiff, nor the alleged assailants in the Terroristic Threats Police report, closed the case made by Plaintiff.

26.     On 03/05/2014, Plaintiff went to the IPD to meet with Det. Curtis, in person. Det Curtis confirms that he spoke with Barnes. But more importantly, Curtis confirms that he listened to

the tapes of Barnes and the related phone calls and that everything Barnes did was a common practice of the Irving Police Department.

## DISCUSSIONS WITH CITY OF IRVING POLICY MAKERS PRIOR TO ANY COURT INVOLVEMENT

27. In an attempt to determine whether the actions described in this complaint were committed on behalf of employees of the Irving police department as individuals or whether these actions were being sanctioned by the City of Irving policy makers, in good faith, Williams took the following steps in 2014, one year prior to filing any cases with any court:

A. Williams visits the Irving Police Department in person and speaks with Les Moore, the Legal Advisor for the City of Irving who has been with the City of Irving for over 25 years in his capacity. He was very uncooperative and advised me that the acts on the part of Barnes was "alright to do." **(See Exhibit B).**

B. Williams visits the Irving Police Department in person and speaks with Detective Eric Curtis, this time Williams was recording, and Eric Curtis also confirmed Les Moore's [position regarding Barnes actions, but unlike with Moore, Curtis was caught on tape. **(See Exhibit D).**

C. Williams wrote emails and made an appointment to speak with then Irving City attorney, Candace Chappell, and attempted to have a sit down with her on the matter. Even though Williams had an appointment she was there when Williams arrived, therefore he left her a full packet and complaint detailing everything that happened. Ms. Chappell's inaction reveals her ratification and sanctioning of the activities of Barnes and Curtis; and acting as City attorney she was the spokesperson for the city's position on the matter. **(See Exhibit C).**

D. Williams wrote emails to the Irving Chief of Police Bruce Jolly describing the events in detail. **(See Exhibit A).**

28. All pleas for assistance from the City of Irving fell on deaf ears and resulted in even more retaliation on behalf of City of Irving personnel and that is the lawsuit was filed. This is exactly an occasion in which a federal court needs to take action.

29. After Plaintiff filed suit in Justice Court 4 in Frisco, Texas new audio tapes of Barnes conversations with Caliber Management surfaced through Irving City Attorney Jason McClain.

30.     On May 27th, 2014, the Internal Affairs investigation concluded that Plaintiffs allegations against Barnes were SUSTAINED and that she was not operating in accordance with Irving PD policies and procedures. **(See Exhibit E).**

31.     On June 16th, 2014 Plaintiff received a letter from Irving PD Interval Affairs stating that the investigation against Detective Curtis was UNFOUNDED. **(See Exhibit F)** Although Barnes and Curtis both worked for the same police department in the same building guided by the same General Orders, the audio tapes of Barnes speaking with Caliber Senior Management were turned over to Plaintiff (albeit not without a tremendous struggle), but Plaintiff was told in an email from Jason McClain that the audio tapes of Curtis speaking with Caliber Senior Management were NOT available.  We believe this evidence of a cover-up to protect Detective Curtis and the IPD.

32. At all relevant times, Defendants were acting under the color of law and under the color of authority as police captains, police officers; detectives, employees, and agents or servants of the City of Irving, Texas; and the County of Dallas, Texas; and as agents of the State of Texas.

## THE BOLO

33.     A BOLO is an all-points bulletin (APB) or broadcast issued by American or Canadian law enforcement agencies to its personnel, or to other law enforcement agencies. It contains information about a dangerous suspect who is to be arrested or a person of interest, for whom law enforcement officers are to look. **(See Exhibit G)**

34.     In retaliation for Williams filing his internal affairs investigation and speaking with policy makers at the City of Irving, Defendant Curtis in conspiracy with Williams's former employer Caliber Home Loans, created and distributed a bogus police BOLO which resulted in Williams being falsely arrested by the Frisco Police Department. The BOLO contained false and defamatory remarks on behalf of Caliber regarding the basis of Williams's termination and false and defamatory remarks on

behalf of Eric Curtis regarding Williams mental health and the sham and slipshod investigation on behalf of the Irving police.

35.    The bogus BOLO also contained illegally released words and pictures from the contents of Williams's confidential employment file at Caliber Home Loans; which were obtained illegally and without subpoena by Eric Curtis under the color of authority.

36.    The bogus BOLO also contained a fabricated mental health history and a felony criminal history on Williams that was total and absolute fiction. A fabrication dreamt up and published to police radio waves throughout the United States by racist police officers at the Frisco and Irving police departments.

37.    The first part of the BOLO was written by the Irving PD and accuses plaintiff of the crimes of Larceny, Fraud, Dangerous Drugs, Disorderly Conduct, Obstruct Police Officer, Robbery, Injury to a Child and Traffic; **all of which are untrue!**

38.    The second part of the BOLO was written by Caliber and includes the defamatory statements from Craig Lackey as well as plaintiffs' illegally obtained photo from his Caliber Human Resources file.

39.    The fake BOLO is full of statements from THE City of Irving which are false or show a reckless disregard for whether the statements were true or false. The BOLO contains a litany of serious felonies for which Plaintiff has never been charged, let alone convicted of, in his life. The BOLO is *topped-off* with Plaintiffs Human Resources photo straight from his personnel file from Caliber. The statements about Plaintiff and the pictures accompanying the statements came from Calibers personnel file on Plaintiff.

### FRISCO POLICE DEPARTMENT FRAUDULENTLY ARRESTS WILLIAMS BASED UPON THE CITY OF IRVING'S FAKE BOLO

40.  **On June 17th, 2015,** Plaintiff Williams was **parked, with the motor off,** at the car wash on Main Street in Frisco, Texas, two blocks from where he owns his home. Plaintiff had

committed no traffic violation nor was there a warrant for his arrest, nor an APB issued for someone who matched his description.

41.     Suddenly two (2) Frisco Police cruisers pulled into the car wash parking lot and placed plaintiff under arrest, He was taunted, ridiculed and insulted.  His car was illegally searched and seized by the Frisco PD.  Drugs and drug paraphernalia were later found in the gas tank area of plaintiff vehicle by a car tow company that had impounded plaintiff vehicle.  Plaintiff is convinced that these drugs were planted by the Frisco PD while he was falsely imprisoned and his car seized. Many Freedom of Information Act requests were made for the video that shows what happened to Plaintiffs car while he was in custody.  Although the video exists the Frisco PD refuses to release it.

42.    In the audio portion of the dash cam video, at section **2:22:012**, you can hear Vargas explain to the dispatcher that he recognized plaintiff from a system that publishes BOLO's to police cars across the nation.

43.    It was later discovered that the officers were reading the fake BOLO information through the police broadcasting apparatus.  This reveals that the Caliber defamation was published to every police car in the State of Texas and probably throughout the nation. *(See Exhibit P: Williams's Frisco arrest)* Williams was later released with no plausible explanation.

44.    Plaintiff formally requested Frisco PD internal affairs to investigation what happened, what was the probable cause that triggered plaintiffs arrest, where did the officers received the information from that compelled them to stop, frisk, question, arrest and confiscate Plaintiffs vehicle.  The Frisco Internal Affairs group investigated for two months, in which Plaintiff cooperated fully.  After the investigation was complete the Frisco PD destroyed all evidence of the investigation and refused to speak with Plaintiff on the matter ever again.  the Frisco PD was covering up for the Irving PD and Caliber.

## **COUNT ONE**

**CONSTITUTIONAL AND CIVIL RIGHTS PURSUANT TO 42 U.S.C. §1983 VIOLATION
OF FOURTEENTH AMENDMENT EQUAL PROTECTION RIGHTS
(AGAINST ALL DEFENDANTS)**

45.    Plaintiff incorporates and re-alleges Paragraphs 1 through 37 as if here quoted and verbatim and set forth herein at length.

**THE CONSTITUTIONAL VIOLATION**

46.   Section 1983 was historically known as the "Ku Klux Klan Law" because one of its primary purposes was to provide a civil remedy against the abuses that were being committed by the Ku Klux Klan operating within or receiving support from law enforcement and/or the legal and political communities.  Williams has witnessed the "Ku Klux Klan" being very much alive and active in the police division of the City of Irving.  To establish county/municipality liability under § 1983 . . . a plaintiff must demonstrate a policy or custom which caused the constitutional deprivation." Colle v. Brazos County, Tex., 981 F.2d 237, 244 (5th Cir. 1993).

47.   Plaintiff Williams was deprived of his constitutional right to equal protection under the law by established policies, customs and traditions created, taught to its employees and maintained by a Texas municipality; the City of Irving, Texas.

**THE POLICY**

48.   Today, in 2017, the Defendant City of Irving has adopted an unconstitutional policy of refusing to enforce the law that protects members of the Black community from criminal elements within the White community.

49.   The Defendants further adopted an open and widely implemented unconstitutional policy of *retaliating* against Black people when they demand the equal protection they are constitutionally entitled to.

50.   The Defendants further adopted an open and widely implemented unconstitutional policy of retaliating against Black people who dare file federal lawsuits, and who single-out high-

ranking investigators, officers, policy makers and police personnel, by name, who are secretly and under the color of authority, using City resources to reinvigorate and revive the traditional goals of the "Ku Klux Klan", one of which is the use of violence and intimidation and *bullying* to deny the African-American community equal protection under the law. The incidents, though did not result in actual physical contact, are acts of violence and terrorism on behalf of the City of Irving policy.

51. It is these policies that caused the deprivation of Williams's constitutional rights in this case.

52. Under *Monell v. Department of Social Serv.,* 436 U.S. 658 (1978), a municipal government can be held liable under Section 1983 if a plaintiff can demonstrate that a deprivation of a federal right occurred because of a "policy" of the local government's legislative body or of those local officials whose acts may fairly be said to be those of the municipality.

**DISPATCHER BARNES**

53. The actions of Barnes under the color authority and as pleaded in paragraphs 12-19 was a practice and/or policy adopted by The City of Irving policy makers to deprive Williams, and those similarly situated, of his fourteenth amendment right, while simultaneously conspiring with the White suspects at Caliber Home Loans to destroy evidence and warn them of pending investigation and discovery.

4. The actions on the part of Barnes as pleaded in paragraphs 12-19 was, in addition to a deprivation of rights, also a retaliatory act and added a punitive effect to Williams's exercise of his fourteenth amendment rights and makes an example of Williams to the Black community of what will happen to them should they dare call the police and complain against members of the White community.

5. Dispatcher Barnes is a supervisor of dispatchers, she trains others to commit these acts, she was trained to carry out these acts by the City of Irving as part of her training.

**ERIC CURTIS**

6.　The actions of Curtis under the color authority and as pleaded in paragraphs 20 - 29 was a practice and/or policy adopted by The City of Irving policy makers to deprive Williams, and those similarly situated, of his fourteenth amendment right, while simultaneously conspiring with the White terroristic threats suspects at Caliber Home Loans to destroy evidence and warn them of pending investigation and discovery.

7.　The drafting and distribution of a fraudulent BOLO with a fraudulent criminal history on Williams is a criminal act and takes the violation of Williams's fourteenth amendment rights to an alarmingly and unconscionably high level.  There was no probable cause, Williams had committed no act, that would trigger the drafting and distribution of such a document about himself.

8.　The BOLO was an attempt on the part of the Defendants to orchestrate a violent street encounter between Williams and police officers, which would likely result in Williams being murdered by police officers.  The BOLO was created to provide the pretext needed by police officers to murder Williams. This is a regular practice with the City of Irving to carry out retaliation against its African-American citizens in this manner and it and similar tactics happens regularly.

9.　Detective Eric Curtis is a supervisor of detectives, he trains others to commit the same acts he committed, he was likewise trained to carry out these acts by the City of Irving as part of his training.

**MORE VIOLENCE**

10.　In addition to the deprivation of Williams's fourteenth amendment rights, the actions of both Barnes and Curtis sought to encourage and facilitate further violence to be heaped upon Williams on a national level.  The BOLO was distributed across state lines, which triggers R.I.C.O. charges against the City of Irving, and would follow Williams throughout the United States.

*11.*    Defendant Curtis admitted to Plaintiff Williams in a recorded meeting that Defendant Barnes was acting to a city of Irving policy when she called Plaintiff Williams's employer and committed the acts pleaded in paragraphs 2-19.

## THE POLICY MAKERS

*12.*    The Supreme Court has stated more than once that the identity of the policymaker is a question of law.  Accordingly, for purposes of Rule 12(b)(6), the Fifth Circuit Court in *Groden v. City of Dallas, No. 15-10073 (5th Cir. **2016**),* has held that a plaintiff is not required to single out the specific policymaker in his complaint; instead, a plaintiff need only plead facts that show that the defendant or defendants acted pursuant to a specific official policy, which was promulgated or ratified by the legally authorized policymaker.

13. The facts show that the policy makers for the City of Irving ***promulgated or ratified*** the actions of Barnes and subsequently the actions of Curtis and thus this policy was attributable to the City of Irving.  See Paragraphs 11 – 30.

14.    In an email message Plaintiff reported the actions of Barnes as well as Curtis to Captain Bruce Jolly a senior policy maker within the IPD and the senior manager over the Curtis and Barnes.  Jolly took no actions to correct the situation and refused to reinvestigate Williams's claims or concerns in any way.

15.    The idea that Irving PD Internal Affairs Investigators only gave Barnes one day's suspension for her actions shows a ratification and promulgation of Barnes actions on behalf of the policy makers at the City of Irving.

The condoning of the actions of Curtis by the Internal Affairs group (See Exhibit a), the refusal to prosecute Curtis and Barnes by then City attorney Candace Chappell (See Exhibit a), the refusal to refer the case to the Internal Affairs group by City of Irving Legal advisor Les Moore (See Exhibit a) and then Irving Chief of Police Larry Boyd and Internal Affairs manager, Michael Goff,

(See Exhibit a) are all evidence that everything pleaded in this complaint was done with the full knowledge and cooperation of the policymakers of the City of Irving and thus constitutes a "practice" and "policy" on behalf of the City of Irving.

During all this commotion, Williams's right to file a police report, his claims of terroristic threats on behalf of the Hate Group at Caliber, and his right to have those claims investigated were denied. To this day no credible investigation has ever taken place and the suspects have been allowed to roam free from prosecution and placing the public in danger.

Defendants, acting under the color of law and to a well-practiced police custom, intended to defeat, block, nullify and/or make void the police report filed by Plaintiff. Thus, Plaintiff was not allowed to freely and fully file a police report and enjoy the protections and use of the criminal justice process and Due Process the same as White citizens. The police decided and adjudicated the case based upon race; and this happens routinely.

By acting as aforedescribed, Defendants acted with malice and/or egregious and reckless disregard for Plaintiff's rights. As a direct and proximate result of the Defendants' violations of Plaintiffs constitutional rights, Plaintiff has suffered severe and substantial damages. These damages include lost salary, lost employee benefits, lost raises, diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and emotional distress and other compensatory damages, in an amount to be determined by a jury and the Court.

**COUNT TWO**
**CONSTITUTIONAL AND CIVIL RIGHT PURSUANT TO 42 U.S.C. §1985(2)**
**OBSTRUCTING JUSTICE; INTIMIDATING PARTY, WITNESS, OR JUROR**
**(AGAINST ALL DEFENDANTS)**

16.    Plaintiff incorporates and re-alleges Paragraphs l through 37 as if here quoted and verbatim and set forth herein at length.

17.     Plaintiff contends that the Defendants, collectively, have violated provisions of 42
        U.S.C. 1985(2) Conspiracy to Interfere with Civil Rights at:

> *"or if two or more persons conspire for the purpose of impeding, hindering, obstructing,
> or defeating, in any manner, the due course of justice in any State or Territory, with
> intent to deny to any citizen the equal protection of the laws, or to injure him or his
> property for lawfully enforcing, or attempting to enforce, the right of any person, or class
> of persons, to the equal protection of the laws;"*

18.     The City of Irving conspired with Craig Lackey, In-House Legal counsel for Caliber to

        obstruct, intimidate and deter Williams's determination to seek justice in both his cases

        against the City of Irving and his case against Caliber Home Loans and to provide a

        pretext to "Klansmen" disguised as police officers, detectives, prosecutors and

        investigators that could be used to justify the malicious prosecution and/or murder of

        Williams.

19.     This conspiracy manifested itself in the form of a BOLO that was distributed to police

        cars, prosecutors and other law enforcement agencies.  The creation a distribution of

        this BOLO has caused irreparable and incalculable damages.

20.     As a direct and proximate result of the Defendants' violations of Plaintiffs

        constitutional rights, Plaintiff has suffered severe and substantial damages. These

        damages include lost salary, lost employee benefits, lost raises, diminished earnings

        capacity, lost career and business opportunities, litigation expenses including attorney

        fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and

        emotional anguish and emotional distress and other compensatory damages, in an

        amount to be determined by a jury and the Court.

### COUNT THREE
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST ALL DEFENDANTS)

21.     Plaintiff incorporates and re-alleges Paragraphs 1 through 37 as if here quoted and

verbatim and set forth herein at length.

22.     The standard for review of extreme and outrageous conduct is set out in Feltmeier v. Feltmeier, 207 Ill. 2d 263, 274 (2003): "so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community."

23.     The results of the IPD Internal Affairs Group investigation, which sustained Plaintiffs complaints of mistreatment, stated that Dispatcher Barnes' conduct was Prejudicial to Good Order and a Violation of the Irving Police Department Standards of Conduct, but turned right around and nullified that policy by giving Barnes only one day's suspension. This suggests that although Barnes' conduct was a custom within the IPD, Barnes' conduct was so outrageous that it went beyond the bounds of decency and was indeed intolerable to a civilized society.

24.     At one point, Barnes admits to a Caliber Senior Officer that during the phone call she had with the Plaintiff, she succeeded in intentionally "tricking" the Plaintiff into providing information that she (Barnes) was not entitled to and was intending to use against him with his employer.

25.     In a reckless disregard for Plaintiffs son, ex-wife and Plaintiffs confidentiality and safety, Barnes raced ahead of the police report process and contacted Caliber building security, Caliber Chief Operating Officer and Caliber Human Resources Director and gave Plaintiffs name, work department, job title and my racial makeup. She also provided the racial makeup of Plaintiffs ex- wife. Barnes carried out these acts prior to any police report being filed or even a positive identification of Plaintiff being made.

26.     Barnes proceeded to tell Caliber staff that they should be afraid for their lives and the lives of the other employees at the organization because the Plaintiff was mentally unstable, violent and delusional; while at the same time never attempting to seek medical or psychological assistance for the Plaintiff nor did she send a police squad car to Plaintiffs' home.

27.    55. Barnes knew, based on the telephone conversation that Plaintiff had a family to support, a career and reputation to maintain. She knew that reporting this information to his employer in this manner would result in a financial hardship, loss of employment and severe emotional distress to Plaintiff and Plaintiffs family.

28.    56.    By acting as aforedescribed, Defendant Barnes acted with malice and/or egregious and reckless disregard for Plaintiff's rights. As a direct and proximate result of these actions Plaintiff has suffered mental and emotional anguish, severe emotional distress, hypertension and high blood pressure as evidenced by medical records from doctors.

29.    As a direct and proximate result of the Defendants' violations of Plaintiffs constitutional rights, Plaintiff has suffered severe and substantial damages. These damages include lost salary, lost employee benefits, lost raises, diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and emotional distress and other compensatory damages, in an amount to be determined by a jury and the Court.

**COUNT FOUR**
**INVASION OF PRIVACY**
**(AGAINST ALL DEFENDANTS)**

30.    Plaintiff incorporates and re-alleges Paragraphs 1through 37 as if here quoted and verbatim and set forth herein at length.

31.    When Defendant Barnes, under the color of authority, "tricked" as she stated, plaintiff into providing her with his private information (name, address, age and place of employment) that was not required for her to fulfill her role as dispatcher in this case, she unreasonably invaded plaintiff's privacy.

32.    Under the color of authority, Barnes, motivated by racist police profiling, illegitimately obtained from Plaintiffs employer private and embarrassing information such as

confidential information from Plaintiffs employee file, co-worker's comments, contents of Plaintiffs private and personal email accounts, medical information, doctor's names, and information regarding Plaintiffs in- laws, details of Plaintiffs marriage and subsequent divorce, overdue bills and personal house expenses.

33.     Barnes used the police process and facilities to publicly disclose Plaintiffs private affairs in the form of police reports and dispatcher notes which are electronically published to police squad cars nationwide and are a permanent record in Plaintiffs police profile and could appear in investigations and background checks regarding Plaintiff.

34.     Barnes created a pretext or a setting for Caliber to openly discuss and share Plaintiffs private affairs with other employees and coworkers of the organization whereas this setting would have otherwise never existed.

35.     Barnes actions were an unreasonable and malicious intrusion on plaintiff's solitude, seclusion and private affairs. Billings v. Atkinson, 489 S. W.2d 858, 860 ([ex.1973). The Texas Constitution guarantees the sanctity of the home and person from unreasonable intrusion. Texas State Employees Union v. Texas Department of Mental Health & Mental Retardation, 746 S.W.2d 203, 205 ([ex.1987). The fact that this information was not required at all under these circumstances makes the acquisition of the information highly offensive to a reasonable person and there was no legitimate reason for obtaining and/or disclosing the information.

36.     As a direct and proximate result of the Defendants' violations of Plaintiffs constitutional rights, Plaintiff has suffered severe and substantial damages. These damages include lost salary, lost employee benefits, lost raises, diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and emotional distress and other compensatory damages, in an amount to be determined by a jury and the Court.

## COUNT FIVE
## DEFAMATION OF CHARACTER (SLANDER)
## (AGAINST ALL DEFENDANTS)

37.    Plaintiff incorporates and re-alleges Paragraphs I through 37 as if here quoted and verbatim and set forth herein at length.

38.    In a defamatory fashion, Barnes maliciously contacted Caliber building security, Caliber Chief Operating Officer and Caliber Human Resources Director and gave Plaintiffs name. work department, job title and racial makeup. Barnes carried out these acts prior to any police report being filed or even a positive identification of Plaintiff being made.

39.    Barnes proceeded to defame Plaintiff by telling Caliber building security, Caliber Chief Operating Officer and Caliber Human Resources Director that they should be afraid for their lives and the lives of the other employees at the organization because the Plaintiff was mentally unstable, violent and delusional; while at the same time never attempting to seek medical or psychological assistance for the Plaintiff nor did she dispatch a police squad car to Plaintiffs' residence; so these remarks were clearly malicious defamation and not honest opinions.

40.    A career in Information Technology strongly relies upon references from past employers and co- workers.  As a direct and proximate result of the Defendants' violations of Plaintiffs constitutional rights, Plaintiff has suffered severe and substantial damages. These damages include lost salary, lost employee benefits, lost raises, diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and emotional distress and other compensatory damages, in an amount to be determined by a jury and the Court.

## COUNT SIX
## DEFAMATION OF CHARACTER (LIBEL)
## (AGAINST ALL DEFENDANTS)

41.     Plaintiff incorporates and re-alleges Paragraphs 1 through 37 as if here quoted and verbatim and set forth herein at length.

42.     In the Irving PD document entitled "Detailed History for Police SEQ##l31210325 as of 03/18/2014 09:41:59" Barnes writes the following "While speaking to RP (Reporting Party) it was obvious that he was mentally unstable". Barnes continues, "...He first stated he had not notified HR (Human Resources) and then said he did and they were helping the employees harass him". Both statements were false. Barnes continues, "He has a large amount of bills and has been having marital problems as well." Despite Plaintiff's recent divorce he and his ex-spouse were on good terms at that time. Barnes continues to write, "They found emails he had sent to himself concerning neurologists. other issues that were concerning and purchasing handguns."

43.     Barnes had never received evidence that Plaintiff was interacting with neurologists nor was did Plaintiff ever purchase any handguns. Despite having no evidence of any of these allegations she wrote these statements in a highly suggestive, prejudicial and defamatory manner.

70.     These erroneously and maliciously inaccurate statements were published to every police officer in the United States. Should law enforcement stop Plaintiff in traffic or run an investigatory check on his name, driver's license number or social security number these defamatory statements would prejudice the officers towards him.

71.     The type of work Plaintiff does require a high security clearance and an FBI background check that includes fingerprinting prior to hiring and a more detailed background check when being considered for promotions and certain high-profile projects. The creation and distribution of these documents constitute Libel.

### COUNT SEVEN
### ABUSE OF PROCESS
### (AGAINST ALL DEFENDANTS)

72.     Plaintiff incorporates and re-alleges Paragraphs 1 through 37 as if here quoted and verbatim and set forth herein at length.

73.     Plaintiff contends that Defendants Barnes and Curtis, working in concert and under the color of authority, perverted the legal process in a way that was not authorized by the legal process. They raced ahead of the filing of the police report and warned the suspects of pending investigation and discovery.

44.     Defendants Curtis legitimized and furthered the actions of Barnes, which were a violation of Constitutional and State law and what the Irving PD Internal Affairs Group referred to as "Prejudicial to Good Order and a Violation of the Irving Police Department Standards of Conduct."

45.     Defendant, through Bruce Jolly further abused the process by legitimizing the actions of Barnes and Curtis by ignoring pleas from the Plaintiff to correct the misinformation, assign another detective to the case and launch a new investigation. Capt. Jolly, fully aware of the actions of Barnes and Curtis, refused to take any action to correct the processes.

46.     This perverted use of the process had the ulterior motive of protecting alleged White law breakers, as a class, while punishing African-American citizens, as a class, for exercising the right to equal protection.

47.     As a direct and proximate result of the Defendants Barnes, Jolly and Curtis abuse of the process, Plaintiff has suffered severe and substantial damages. These damages include lost salary, lost employee benefits, lost raises, diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and emotional distress and other compensatory damages, in an amount to be determined by a jury and the Court.

### COUNT EIGHT
### NEGLIGENCE

48.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

49.   Pleading further, and in the alternative if necessary, the City of Irving, through their improper handling of Plaintiff Williams were negligent and their actions and inactions violated the standard of care and fell below the applicable standard of care due to Plaintiff Williams.  Those failures included one or more of the following acts or omissions:

     a.   Failure to provide truthful, accurate and confirmed information to IPD criminal investigators.

     b.   Failure to follow written policy as it related to the handling of Williams's call to police.

     c.   Failure to properly investigate plaintiffs' claims of receiving terroristic threats while working.  More specifically, failure to review the surveillance footage with plaintiff that caught the terroristic threats on surveillance footage.

     d.   Illegally obtaining unauthorized and personal information about plaintiff from Caliber Home Loans and distributing this illegally obtained and highly personal information in a defamatory fashion.

     1.   The acts and/or omissions of Defendant constitute negligence. This conduct was therefore a proximate cause of injuries and damages sustained by Plaintiffs.

     2.   At all relevant times, Barnes and Curtis were an agents or employees of the City of Irving carrying out sanctioned and ratified policies of the City of Irving and with full knowledge and support of the policy makers.

     3.   Barnes's and Curtis's improper conduct was performed within the course and scope of their duties with The City of Irving.

     4.   As described above, the conduct by Defendants, including Barnes and Curtis constitutes a violation of *"18 U.S.C. § 1510: US Code - Section 1510: Obstruction of criminal investigations"* as well as several other federal crimes and common law torts.   Accordingly, the limitation on recovery of exemplary damages set forth in Tex. Civ. Prac. & Rem. Code § 41.008(b) does not apply. See Tex. Civ. Prac. & Rem. Code § 41.008(c)(3).

5.   As a direct result of Defendants negligence plaintiff has suffered, including but

not limited to injury to character and reputation, mental anguish, loss of past and future income,

seniority, cost of living increases, benefits, and loss of earning capacity and medical expenses. In

all reasonable probability, plaintiff will continue to suffer for the rest of his life.

COUNT NINE
NEGLIGENCE PER SE:
LIABILITY FOR INJURIES RESULTING FROM VIOLATION OF
PENAL STATUTE OR ORDINANCE
(AGAINST ALL DEFENDANTS)

**6.**   Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all

purposes the same as if set forth herein verbatim

7.   Defendants conduct as described in the aforementioned paragraphs, violated the

following penal statutes and ordinances in the following ways:

- Sec. 39.02. Abuse of Official Capacity
- Sec. 39.03. Official Oppression
- Title 18, U.S.C., Section 241 Conspiracy against Rights
- Abuse of Process
- Sec. 38.05.  Hindering Apprehension or Prosecution
- Racqueteering

**SEC. 39.02. ABUSE OF OFFICIAL CAPACITY**

**SEC. 39.02. ABUSE OF OFFICIAL CAPACITY**. *(a)  A public servant commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he intentionally or knowingly:*
*(1)       violates a law relating to the public servant's office or employment; or*
*(2)       misuses government property, services, personnel, or any other thing of value belonging to the government that has come into the public servant's custody or possession by virtue of the public servant's office or employment.*

8.   The Caliber-IPD's Joint Venture/Conspiracy created and distributed the BOLO and

the subsequent use of the police broadcasting apparatus to distribute the fake BOLO for the

purpose of retaliating against Williams was a violation of *"Sec. 39.02. Abuse of Official Capacity."*  This

law was designed to prevent public officials and employees from abusing governmental property and

services to retaliate against, intimidate or oppress members of the public who do not have access to these powerful governmental resources.

9.   The Caliber-IPD Joint Venture/Conspiracy used the city's police broadcasting apparatus and access to the City of Frisco's Police detectives and Collin County Prosecutors to retaliate against Plaintiff, in violation of *"Sec. 39.02. Abuse of Official Capacity."* This law was designed to prevent public officials and employees from abusing governmental property and services to retaliate against, attack or to oppress members of the public who do not have access to these governmental resources.

## Sec. 39.03. Official Oppression

### Sec. 39.03.  Official Oppression
*1.   (a)  A public servant acting under color of his office or employment commits an offense if he:*
*i.   (1)  intentionally subjects another to mistreatment or to arrest, detention, search, seizure, dispossession, assessment, or lien that he knows is unlawful;*
*ii.   (2)  intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power, or immunity, knowing his conduct is unlawful; or*
*iii.   (3)  intentionally subjects another to sexual harassment.*
*2.   (b)  For purposes of this section, a public servant acts under color of his office or employment if he acts or purports to act in an official capacity or takes advantage of such actual or purported capacity*

10.   The publishing of the fake BOLO, and the defamatory statements by Caliber and the IPD subjected Plaintiff to, and subsequently resulted in plaintiff's mistreatment, arrest, detention, search, seizure, dispossession and/or assessment in violation of *"Sec. 39.03. Official Oppression."*

### Title 18, U.S.C., Section 241 Conspiracy against Rights:
*1.   If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or*

*2.   If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—*

11. The Caliber-IPD Joint Venture/Conspiracy violated *"Title 18, U.S.C., Section 241 Conspiracy against Rights"* when they attempted to intimidate plaintiff in the course of plaintiff making his police report for terroristic threats and subsequently retaliated against him with the publishing of

the BOLO, the delivery of that BOLO to the Frisco PD and subsequently to the Collin County DA, knowing the BOLO was false, then the subsequent illegal firing of plaintiff.

      12. Based upon information and belief, Caliber and the IPD conspired, along with several others in law enforcement *and even higher*, to carry out traditional Ku-Klux-Klan style intimidation intended to make an example out of plaintiff, *put plaintiff in his place*, and add a punitive affect to plaintiffs decision to report these crimes and commence several investigations to intimidate him from ever attempting to freely exercise his state and federal rights to report discrimination, terroristic threats and racial profiling ever again.

**ABUSE OF PROCESS**

      13. It was an *"Abuse of Process"* for the Caliber-IPD Joint Venture/Conspiracy to create a fake BOLO with fraudulent or unconfirmed information and use the police broadcast system as a means of retaliating against Plaintiff.

**SEC. 38.05. HINDERING APPREHENSION OR PROSECUTION**
    *1. (a) A person commits an offense if, with intent to hinder the arrest, prosecution, conviction, or punishment of another for an offense or, with intent to hinder the arrest, detention, adjudication, or disposition of a child for engaging in delinquent conduct that violates a penal law of the state, or with intent to hinder the arrest of another under the authority of a warrant or capias, he:*
    i.    *(1) harbors or conceals the other;*
    ii.    *(2) provides or aids in providing the other with any means of avoiding arrest or effecting escape; or*
    iii.    *(3) warns the other of impending discovery or apprehension.*

      14. The defamatory statements told and published by the Caliber-IPD Joint Venture/Conspiracy, the refusal to turn over the video surveillance camera of the suspects making the actual death threats hindered the arrest, prosecution, conviction, or punishment of suspects in a felony Terroristic Threats investigation.

      15. The false statements made by Lackey to police served as a huge and effective hindrance to the investigation and prevented the apprehension and prosecution of the suspects and

were done intentionally and with malice and constitute a violation of "*Sec. 38.05. Hindering*

*Apprehension or Prosecution.*"

### RACKETEERING
### FEDERAL RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS ACT (RICO)

*A 'pattern of racketeering activity' requires at least two acts of racketeering activity. 18 U.S.C. § 1961 (5). The acts must "amount to or pose a threat of continued criminal activity." H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 238-39 (1989). This continuity requirement can be established by showing either closed-ended or open-ended continuity. At minimum, the predicate acts for close- ended continuity must span a period of "at least one year." Open-ended continuity, however, does not require that the acts span for a certain period of time. Rather, the racketeering acts must "include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business." See H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 242 (1989).*

16.  Plaintiff, as an African American and citizen of the United States, belonged to a protected group intended to be protected by these statutes.

17.  As a result of defendants conduct in violation of the statute, plaintiff has suffered, including but not limited to injury to character and reputation, mental anguish, loss of past and future income, seniority, cost of living increases, benefits, and loss of earning capacity and medical expenses. In all reasonable probability, plaintiff will continue to suffer for the rest of his life.

### COUNT TEN
### GROSS NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

18.  Plaintiff incorporates and re-alleges Paragraphs 1 through 42 as if here quoted and verbatim and set forth herein at length.

19.  Plaintiff adopts and incorporates, by reference, all preceding paragraphs and further pleads that Defendants acts and omissions constitute gross negligence. The acts or omissions, when viewed objectively from Defendants standpoint at the time they occurred, involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and Defendants had actual, subjective awareness of the risk.

20. The above acts and omissions involved an extreme degree of risk, and Defendants had actual and subjective awareness of this extreme degree of risk. These acts of gross negligence proximately caused Plaintiffs' damages.

21. In addition to the foregoing pleadings in Count 10, Negligence Per Se, and pleading in the alternative, the conduct of Defendant was with malice, as that term was defined at common law; Defendant acted with reckless disregard for the rights of others, thus injuring Plaintiff and his son. *See Shannon v. Jones*, 76 Tex. 141, 13 S.W. 477, 478 (1890) (defining malice as a reckless disregard for the rights of others).

22. In addition, and pleading in the alternative, if Texas Civil Practice and Remedies Code § 41.001(7) is deemed to require proof that Defendant had actual, subjective intent to harm plaintiff on the occasion in question before liability attaches, then the Legislature's act of deleting § 41.001(7)(B) of the definition of "malice" (that allowed proof of gross negligence) violates the "Open Courts" provision of the Texas Constitution by eliminating a common law right arbitrarily in light of the purposes of the statute leaving only an impossible condition before liability will attach. *See* TEX. CONST. ART. I § 13. In the past, §41.001(7) passed constitutional muster because section (B) was included. *See St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 506 (Tex. 1997) ("Considering the Legislature's pronouncement that "malice" need not be directed toward a specific individual in the context of exemplary damages, it does not follow that in the context of peer review, the committee must necessarily act with malice toward a specific individual for that individual to prove his or her case). With the elimination of section (B) in 2003, the statute now violates the Texas Constitution if it requires an actual subjective intent to harm or injure the specific patient involved before liability attaches.

23. In addition to the foregoing, and pleading in the alternative, the conduct of Defendant in allowing the acts and omissions in Negligence and Negligence Per Se respectively, was with malice, as that term is defined in Texas Civil Practice and Remedies Code § 41.001.

24. As a direct and proximate cause of Defendants' negligence plaintiff has suffered, including but not limited to injury to character and reputation, mental anguish, loss of past and future income, seniority, cost of living increases, benefits, and loss of earning capacity and medical expenses. In all reasonable probability, plaintiff will continue to suffer for the rest of his life.

25. As a direct and proximate cause of their actions, they are liable to plaintiff for punitive and exemplary damages and plaintiff seeks such damages against Defendant.

**COUNT ELEVEN**
**INTRUSION ON PHYSICAL OR MENTAL SOLITUDE OR SECLUSION**
**(AGAINST ALL DEFENDANTS)**

26. Plaintiff repeats and re-alleges each allegation of the foregoing paragraphs as if fully set forth herein.

27. Defendant made a public disclosure of private information by distributing, publishing and disclosing facts regarding plaintiffs' employment information, physical and mental health condition, financial status and disciplinary actions being taken against him at work.

28. This was highly offensive because it revealed on on-going pattern of unreasonable investigation, shadowing and surveillance that was being carried out by Defendants against plaintiff.

29. This information was never requested by anyone, not even the police, and the retrieval, disclosure, distribution and publishing of the information was unreasonable, unjustified, unwarranted and of no legitimate concern to the public.

30. The information disclosed was highly personal and substantial. *(See Valenzuela v. Aquino, 853 S. W.2d 512, 513 (Tex. 1993))*

31. On account of defendant's wrongful acts, plaintiff suffered ridicule, embarrassment, vexation, humiliation, loss of sleep, and mental stress, all of plaintiff's damages in a sum within the jurisdictional limits of this court.

32. Defendant's actions were oppressive, malicious, outrageous, willful, wanton, reckless, and abusive, for which plaintiff seeks punitive damages in an amount within the jurisdictional limits of this court.

33. As a direct and proximate cause of Defendants' intrusive acts, plaintiff has also suffered, including but not limited to injury to character and reputation, mental anguish, loss of past and future income, seniority, cost of living increases, benefits, and loss of earning capacity and medical expenses. In all reasonable probability, plaintiff will continue to suffer for the rest of his life.

### COUNT TWELVE
### UNREASONABLE INVESTIGATION, SHADOWING, AND TRAILING
### (AGAINST ALL DEFENDANTS)

34. Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

35. After obtaining the knowledge alleged in the foregoing paragraphs above, Defendant, through its authorized officers, agents, servants, employees, and representatives acting within the scope of their employment and authority, decided to conduct a campaign to intimidate, malign, and otherwise severely injure Plaintiff and his good name, character, and reputation in order to carry out the City of Irvings policy or practice of retaliation against citizens who complain of abuse or police corruption.

36. Defendant(s), through its authorized officers, agents, servants, employees, and representatives acting within the scope of their employment and authority violated plaintiffs right to

privacy and invaded his seclusion, solitude, and private affairs by, but not limited to, the following means, instrumentalities and methods:

37. Illegally obtaining plaintiffs human resources files, photos and medical information and distributing it in the form of a BOLO and passing that BOLO to other courts and Grand Jury proceedings.

38. After he police investigation was closed conducting a continuing investigation of plaintiff in a manner that with reasonable foreseeability would, and did, violate plaintiffs right to privacy, subject him to harassment and intimidation, and invade plaintiffs' seclusion, solitude, and private affairs.

39. On account of defendant's wrongful acts, plaintiff suffered ridicule, embarrassment, vexation, humiliation, loss of sleep, and mental stress, all of plaintiff's damages in a sum within the jurisdictional limits of this court.

40. Defendant's actions were oppressive, malicious, outrageous, willful, wanton, reckless, and abusive, for which plaintiff seeks punitive damages in an amount within the jurisdictional limits of this court.

## COUNT THIRTEEN
## CIVIL CONSPIRACY

41. Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

42. Pleading further and in the alternative, the Defendants have entered into a civil conspiracy with each other and have agreed to use unlawful means to accomplish an unlawful purpose to Plaintiffs' detriment.

43. Plaintiff was and continues to be damaged as a direct and proximate result of the civil conspiracy between and by and amongst the Defendants.

44. Plaintiff has suffered, and will continue to suffer substantial injury as a result of Defendants' civil conspiracy, including but not limited to injury to character and reputation, mental anguish, loss of past and future income, seniority, cost of living increases, benefits, and loss of earning capacity and medical expenses. Plaintiff will continue to suffer for the rest of his life.

### JURY DEMAND

78. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff MICHAEL WILLIAMS demands a jury on all issues so triable.

### PRAYER

For these reasons, plaintiff respectfully prays that this Court award him all relief to which he is entitled under law or equity.

Respectfully Submitted,

*/s/Michael Williams*
Michael Williams, **Pro Se**
creativityandmagic@hotmail.com
7604 Acorn Lane
Frisco, Texas 75034
Telephone: 818-926-0929

### CERTIFICATE OF SERVICE

This is to certify that on July 29, 2017, I filed the foregoing with the Clerk of Court which will send notification of such filing to Defendant's to wit:

Jason D. McClain, Esq., Sr. Assistant City Attorney; City Attorney's Office at 825 W. Irving Blvd., Irving, TX 75060; Phone: (972) 721-2541 or Fax: (972) 721.2750; jmcclain@cityofirving.org

Defendant, Craig Lackey, Esq., (Texas Bar #: 00785372) at 500 N. Akard Street Suite 3300, Dallas, TX. 75201; Phone: (214) 965-7700 or CLackey@perkinscoie.com.

*/s/Michael Williams*
Michael Williams

# EXHIBIT A

**Michael Williams**

---

**Subject:**                    FW: REMINDER: Follow-up Required for Your Online Police Report T14000034

-----Original Message-----
From: Michael Williams [mailto:creativityandmagic@hotmail.com]
Sent: Friday, March 07, 2014 4:31 PM
To: bjolley@cityofirving.org
Cc: Michael Williams
Subject: Fw: REMINDER: Follow-up Required for Your Online Police Report T14000034

Good Evening Captain Bruce Jolly,

My name is Michael Williams.  I filed a police report regarding the series of  Terroristic Threats described below.  The incident was assigned the police report # of 14-1763 and was given to Detective Curtis of the Criminal Investigations Divisions.  I would like the case reassigned to a different detective.  And I would like the opportunity to meet with that detectives to discuss the evidence regarding the allegations below.

Detective Curtis has shown bias in investigating the case.  He has not met with me regarding the evidence obtained.  I would like the opportunity to present evidence to a detective who is not bias as soon as possible

Thank You Sir,

Michael Williams
1.818.9265.0929

-----Original Message-----
From: Michael Williams
Sent: Tuesday, January 21, 2014 7:41 AM
To: IPDCoplogicAdmin@cityofirving.org
Cc: sbromley@cityofirving.org
Subject: Re: REMINDER: Follow-up Required for Your Online Police Report
T14000034

Hello Mr. Bromley,

Sorry it took so long but here is the series of event I wanted you to review in connection with this case:

I started working as a "Business Intelligence Developer III" at Caliber Home Loans located at 3701 Regent Blvd in Irving, Texas on 08/05/2013.

At Caliber Home Loans, employees are blocked from accessing their personal email addresses.  Websites such as Hotmail, Gmail, Yahoo or any of the email systems are not accessible from Caliber Home Loan workstations.

I have evidence that between 08/05/2013 and 08/09/2013 I emailed from my Hotmail email address to my Caliber email address several documents that allowed me respond to personal emergencies, pay household bills etc . .I worked from 8 am until 9 - 10pm at night.

These documents contained everything from my home address, HR and Insurance paperwork, SS#'s of family members, password lists, Banking, Credit Card and Immigration Information, Spouses work information, W2 forms, Day Care Providers, school teachers and account numbers to pay utility bills; even court documents concerning a divorce I had recently went through. Also my sons DOB, full name, and the hours and location where he attends school.

During 08/05/2013 and 08/13/2013, the very first week of my starting at Caliber, I began to hear many strange conversations and remarks swirling around me. And these remarks were coming from the Network Security Team section which was in the very next aisle to the right of the BI Team, my Team, aisle.

I heard a small group of guys mention the actual street name I grew up on, the name of the school I am in the process of enrolling into. My mother's full name, my sisters full name, my brother's and fathers full name. Then I heard the same group of guys mention my middle name (which is unique). I constantly heard references to the Country where my wife was born (Colombia). I them mention words from my password list. I kept hearing the same people making reference to the Spanish. I kept hearing references to child support and divorce; things I recently went through. Even my salary earnings from 2012. And the tone was always hostile. Then one day, I heard these same guys debating about the proper pronunciation of my wife's full maiden name (there are probably only three people in America with that first and last name combined). It was like someone was saying, "Hey, look over here." Then I started identifying who was making these remarks. It was always these three people, Robert Murray, Mike Schultz, Shawn X from the help desk; and later the Shawn guy was replaced by Kenneth Baugh; then shortly thereafter came Shannon Eernisse.

These guys used their privileges as Network Security Administrators to intercept my emails and copy documents from my computer to theirs for the purpose of being able to find out where me and my family lives.

On or about, 08/11/2013, Shawn X walked by my desk, looked at me and said, "Trayvon!", then reshaped his hand as to mimic a pistol, pointed the gun at me and made a shooting motion.

On the same day, Shawn was setting up a computer in the cubicle behind me for Manny Madrigal (a new employee). He said, laughing, "Michael, if you complain to HR, no one will listen." I said nothing. Then as he removed each piece of computer equipment from their boxes he would "slam" each piece of equipment onto the desk behind me. He removed the mouse and "banged" it violently onto the desk. He removed the keyboard and "banged" it violently onto the desk; you'd think he was breaking that keyboard in half. He removed the mouse pad and "flung" it onto the desk. Likewise with the computer monitor; kicking and stomping the empty boxes.
Week Two: Specific Incidents of Terroristic Threats On 8/13/2013. I sent an email to Manju Darbe, a co-worker, requesting the name of the Day Care provider in Irving where she takes her children. The same day Manju replied with an email from her Caliber email address to my Caliber email address with the name of the Day Care Provider, which was "Kids-R-Kids". Approximately one week later, I enrolled my six year old son in that school.

One day between 08/19/2013 and 08/22/2013, Mike Schultz, Robert Murray and Shawn, were loitering at the cubicle next to me, arms folded and looking directly at me and made the following statements.

Mike said, "his kid makes him vulnerable" Robert said, "his kids goes to school right here, right here on Regent, at 'Kids-R-Kids' (pointing in the direction of 'Kids-R-Kids' on Regent Blvd.). You know I studied explosives in the Marines, we could just pass by on lunch and toss a grenade on the playground, or setup a snipers nest to pick his kid off.

In August 2013, they acknowledged knowing where my son attended school.
Then in November 2013, they made this threat.
Week Three: On-going discussions regarding guns Robert and Kenneth boasting about being trained as snipers in the Marines.
Robert boasted about how he can hit a spine from a far away distance and make her head explode.

On Wednesday, 12/11/2013, Robert Murray, Kenneth Baugh and Mike Schultz were assembled at the cubicle of Tammy Walker, gossiping and staring at me as usual. Robert Murray lowered his voice and said, her name is *******, (they struggled over how to pronounce it) and she works at Wal-Mart and she goes in Sunday at 10 am.  Mike Schulz said something back to him which I could not hear.

Then Kenneth Baugh said, lets catch her leaving work and shoot her in the Wal-Mart parking lot then send her shoes to Colombia.  They need shoes in third world countries.  Mike Shultz said, her and the kid.  Kenneth Baugh said, we'd make Maurice (Maurice Pipkin: Chief Security Officer and their
manager) look real good.  Robert Murray starts boasting, as usual, about he was a marksman in the United States Marine Corps. He went into how far away he could be from her and hit her spine and make her head explode.  After that they went into a tirade against immigrants from other countries; or as they put it Third World countries.

Six days later, on Tuesday, 12/17/2013, I was exiting the elevator on the fourth floor as Robert Murray and Kenneth Baugh were entering the same elevator.  They both gave me a menacing stare, and somewhat blocking my way, and as I was passing Robert Murray said, "should we shoot him in the head and then fire him, or should we fire him first and then shoot him in the head."  Kenneth Baugh said, "shoot him in back of the head. . . the back".

Radha Thompson, Brian Schmidt and Maurice Pipkin did not start this Hate Group on this path, but once they saw them carrying out these attacks on me, they were amused by it and encouraged them to continue.  They (Radha, Brian and Maurice) probably did not imagine it would go so far as the death threats, but it did.

I met with a Therapist, spoke with an attorney and met with a security specialists and among the handful of recommendations was to  file a police report with the Irving Police Department.

On Saturday, 12/21/2013, after first visiting the Frisco PD, where I live, I called the Irving PD to see what is the process for filing a police report for a Terroristic Threat. I spoke with Officer Stephanie Barnes #C1661.
Officer Barnes started asking me questions to get me talking about the situation.  She became personally interested in the story and began to give me legal advice.  I told her that I was not calling for legal advice, I just wanted to know how to file the complaint. She said that she needed to know the details of the issue to know how to file the complaint.  I told her a synopsis of the story.

Officer Barnes preempted my police report and called the Caliber security, then Caliber security notified the VP of Human Resources, Michelle Greenstreet.

The next day, Sunday, 12/22/2013, while me and my 6-year old son were in my home we heard someone pounding on the door, trying to break it down, like a drug raid in the worst part of the World was in process.  My home was surrounded by what appeared to be Frisco SWAT Team members.

I waited until they left and used the landline in my home to call the Frisco Police Department (FPD).  They told me that someone by the name of Michelle Greenstreet called them and said she believed that I was in the house dead or bleeding to death or the victim of a robbery.  And she gave the police my home address and requested that the police go by the house to investigate.
So when the police came they were led to believe there may be a robbery or homicide in progress at my home.  And they approached the house as such.
Michelle Greenstreet made up a lie to the police in order to get the police to come to my home on a Sunday afternoon; three days before Christmas 2013.
That proves that the highest level of managers at Caliber knew full well what my call to the Police was about.

At this point I had never complained to my managers nor Human Resources about the threats that were made towards me.  Calibers response to the Irving PD call is evidence that Caliber Home Loans knew that death threats had been made towards me and my family.  They probably had already developed a whole series of steps to take to counter my complaint or to cover-up these threats.  I was due at work the next day, why  not just wait until I return?

My wife is listed as an emergency contact person, why didn't they call her before calling the police? Everything I am alleging in this police report they already knew.

Are we to believe that every time an employee is unavailable on a Sunday (their off day), the President of the HR Department sends the police to their home? Why not try to call my emergency contact person that is in every employees HR file?

All of this has been a very traumatic experience for me and my family and as a result of all of this my family and I are in fear for our lives and at the
same time too traumatized to write about it.  Sometimes I am afraid to
press charges and other times I am enthusiastic about it.

These are a group of ex-Military personnel with guns and who are also, Nazi-minded people. They are definitely a Hate Group.

What makes this threat imminent is that the frequency and relentlessness of the death threats towards my son, wife and family.  And the fact that these people have all of my personal contact information, including social security numbers.  Even if I were to sell my house and move they would be able to find me and my family. So the threat is always imminent; it never goes away.  Since these people have acquired my information there have been many unexplained successful and unsuccessful logins to me and my wife's banking and utility accounts.

We never know when or where we will be shot or murdered.  Our lifestyles have changed and we are always in fear for our lives and safety and confused about the law and our protection in public.  I was advised to purchase a gun and carry a concealed weapon, but I do not want to have a gun in the house around my 6 year old son.

-----Original Message-----
From: TxIrvingPd@coplogic.com
Sent: Tuesday, January 21, 2014 6:28 AM
To: creativityandmagic@hotmail.com
Subject: REMINDER: Follow-up Required for Your Online Police Report
T14000034


We're sorry the following problem was found during review
of your submitted report T14000034:

You may email it to sbromley@cityofirving.org. I will review it and
determine if there is an offense.

Using the link below you will be logged back into your online report
to make the needed changes or add additional information. All of the
information you originally entered will still be there. You will
start at the initial page and be able to change the report type if
needed or make any of the above changes requested as you go through
the report process. At the end, you will be able to print a new
temporary copy of the corrected report including changes you have made.
Feel free to call us at 972-273-1010 if you have any questions.

This link will be valid for 8 days.

https://secure.coplogic.com/dors/changereport/104409600/b9e2fd0e118d161b67d9dc8c1a355015

Thank you,

Online Officer
Irving Police Department

# EXHIBIT B

# RE: Request for Information

## Les Moore <LMoore@cityofirving.org>

Thu 1/05/2014 8:32 PM

To:'Michael Williams' <creativityandmagic@hotmail.com>;

Good afternoon Mr. Williams,
There are no documents responsive to your request for procedures specific to the investigation of Terroristic Threats.  The investigative processes are generally similar for most criminal offenses.
Les Moore

---

**From:** Michael Williams [mailto:creativityandmagic@hotmail.com]
**Sent:** Thursday, May 01, 2014 1:25 PM
**To:** Les Moore
**Cc:** Michael Williams
**Subject:** Re: Request for Information

Hi Les,

This is  Michael Williams.  I have been reviewing the cache of documents included in the "Police General Orders packet" that you provided to me, Thank You.  I have been reading the document entitled "2013 Patrol SOP" that describes how investigations should be handled by detectives.

Although it includes investigatory procedures for various alleged offenses, it does not include investigatory procedures for alleged "Terroristic Threats."  Could you direct me to, or send me the documentation that includes investigatory procedures for Terroristic Threats?

Kind Regards,

Michael Williams

**From:** Michael Williams
**Sent:** Friday, April 25, 2014 11:02 AM
**To:** LGilmette@cityofirving.org
**Cc:** lmoore@cityofirving.org
**Subject:** Re: Request for Information

Hello Mr. Moore,

I would like to know how I may follow-up with the Internal Affairs Investigation I initiated involving Dispatcher Stephanie Barnes.

Thank You,

Michael Williams

**From:** Michael Williams
**Sent:** Saturday, April 12, 2014 9:35 AM

**To:** LGilmette@cityofirving.org
**Cc:** lmoore@cityofirving.org
**Subject:** Re: Request for Information

Hello All,

For the sake of clarity, I am in the process of studying a series of police reports that were made by an Irving dispatcher and an investigation conducted by an Irving Police Detective and an Internal Affairs investigation I have recently requested.

I am seeking from your office whatever tools, documentation and/or resources (whatever person, places or things) necessary to determine whether or not these activities were conducted properly and according to established Police/Department/City guidelines, procedures and policies.

I want to all tools, documentation and/or resources required to make these determinations independently.

Specifically, but not limited to:

1. Policies and Procedures related to how Police Criminal Investigators are conducted from beginning to end.
2. Policies and Procedures related to how Police Dispatchers are responsible for.
3. Policies and Procedures related to how Interval Affairs Investigators are conducted from beginning to end.

Thank You,

Michael Williams

**From:** Michael Williams
**Sent:** Friday, April 11, 2014 11:07 AM
**To:** LGilmette@cityofirving.org
**Cc:** lmoore@cityofirving.org
**Subject:** Re: Request for Information

Hello Ms. Gilmette,

I would like, if possible for you email me a pdf version of the documentation/manuals that reside within the Irving Police Department that describes the roles and responsibilities of the following job roles within the Irving Police Department:

1. Police Criminal Investigators
2. Police Dispatchers
3. Interval Affairs Investigators

My research has revealed that this information is contained within two sets of documents and contains roles and responsibilities for all police department employees, I believe.

Thank You,

Michael Williams
1-818-926-0929

**From:** Michael Williams
**Sent:** Thursday, April 10, 2014 12:58 PM

**To:** creativityandmagic@hotmail.com
**Subject:** FW: Request for Information

---

**From:** Lauren Gilmette [mailto:LGilmette@cityofirving.org]
**Sent:** Friday, April 04, 2014 11:10 AM
**To:** 'creativityandmagic@hotmail.com'
**Subject:** Request for Information

Attached is information responsive to your request

Lauren Gilmette
Police Administration
Irving Police Department
972-721-2555
lgilmette@cityofirving.org

# EXHIBIT C

# RE: Barnes Investigation

## Dallas Public <Dallas.Public@ic.fbi.gov>

Sat 21/06/2014 8:20 AM

To: Michael Williams <creativityandmagic@hotmail.com>;

```
Due to the large number of e-mails being received that contain "attachments"
which are sometimes infected with a computer virus, the Dallas Division of
the FBI will no longer open attachments within e-mails.  "Attachments' will
be left un-opened and deleted.  It is requested all information you wish to
provide be contained within the text body of the e-mail.  Thank you.
```

**From:** Michael Williams [mailto:creativityandmagic@hotmail.com]
**Sent:** Friday, June 20, 2014 10:59 AM
**To:** Dallas Public
**Cc:** Michael Williams
**Subject:** Re: Barnes Investigation

**Friday, June 20, 2014**

**To:**

> **FBI Dallas**
> One Justice Way
> Dallas, TX 75220
> Phone: (972) 559-5000
> Fax: (972) 559-5600
> E-mail: fbi.dallas@ic.fbi.gov

**From:**

> Michael Williams
> 7604 Acorn Ln.
> Frisco, Texas 75034
> 1.818.926.0929

**RE:** Prosecution of Attorney Craig Lackey and Detective Eric Curtis

Hello FBI,

I have attached a copy of two(2) complaints I have drafted regarding Attorney Craig Lackey and Detective Eric Curtis who conspired to violate 2 –3 possible Federal Criminal Statutes .  I submitted this draft to the Irving City Attorneys Office about 4 months ago.  Please review and tell me what you think.

I did not include the actual exhibits at this point, but will submit exhibits upon demand.

The arrest and prosecution of Attorney Craig Lackey and Detective Eric Curtis on Federal Conspiracy charges would be a preventative arrest.  The arrest and prosecution of these two people would save innocent lives and careers.  Please read

everything about what happened to me and let know what you think.

Michael Williams
1.818.926.0929

**From:** Oscar Escobar
**Sent:** Friday, June 20, 2014 10:27 AM
**To:** Michael Williams
**Subject:** RE: Barnes Investigation

I discussed your matter with a supervisor in my office and he recommends that this matter be taken up with a federal agency.  The federal government are the ones who will follow up complaints dealing with law enforcement agencies whom you feel have not acted in accordance with procedure.  If you still are not satisfied with that agency you of course have the right to have an attorney assist with this matter.

Inv. O.R. Escobar #418
Organized Crime Division
Dallas County District Attorney's Office
Office: 214-653-3812
Cell: 972-655-6141
Fax: 214-653-3868
Email: oscar.escobar@dallascounty.org

---

**From:** Michael Williams [creativityandmagic@hotmail.com]
**Sent:** Friday, June 20, 2014 7:24 AM
**To:** Oscar Escobar
**Subject:** Re: Barnes Investigation

Hello Detective Escobar,

I was wondering if you had the opportunity to review the information that I sent to you last week.  I would like to discuss the situation and determine if the allegations or able to be prosecuted.

Michael Williams

**From:** Michael Williams
**Sent:** Friday, June 13, 2014 12:10 PM
**To:** Oscar Escobar
**Subject:** Re: Barnes Investigation

**Friday, June 13, 2014**

**To:**

        Dallas County District Attorney's Office
        Detective Oscar Escobar
        oscar.escobar@dallascounty.org

**From:**

        Michael Williams
        7604 Acorn Ln.
        Frisco, Texas 75034
        1.818.926.0929

**RE:** Prosecution of Attorney Craig Lackey

Hello Detective Escobar,

It was nice speaking with you the other day.  I have attached a copy of two(2) complaints I have drafted regarding Attorney Craig Lackey and Detective Eric Curtis who conspired to violate 2 –3 possible Federal Criminal Statutes .  I submitted this draft to the Irving City Attorneys Office about 4 months ago.  Please review and tell me what you think.

I did not include the actual exhibits at this point, but will submit exhibits upon demand.

The arrest and prosecution of Attorney Craig Lackey and Detective Eric Curtis on Federal Conspiracy charges would be a preventative arrest.  The arrest and prosecution of these two people would save innocent lives and careers.  Please read everything about what happened to me.

Michael Williams
1.818.926.0929

**From:** Michael Williams
**Sent:** Friday, June 13, 2014 7:01 AM
**To:** Michael Goff
**Subject:** Re: Barnes Investigation

Sir!

I have tried numerous times to get the City Attorneys Office to help me on the Detective Eric Curtis and Attorney Craig Lackey cases, but they refused to do so.

On or about March 15th, 2014, I went, in person, to the Irving City Attorneys Office to speak with Assistant City Attorney Candace Chappell.  She refused to see me because she said I did not have an appointment.  Nevertheless, I dropped of a packet with the security guard that contained all the information concerning Detective Eric Curtis and Attorney Craig Lackey.

On or about April 1st, 2014, I called Candace Chappell to see if she had read the information concerning Detective Eric Curtis and Attorney Craig Lackey contained in the packets and to see if I could be of any assistance to her investigation.  In that telephone call (which was recorded) she stated to me that she had not read any of the material included in the packet.  I asked her when could she review the material and get back to me.  She stated that she would review in within 7 days and get back with me.

On or about April 15th, 2014, which was 14 days later, I called Candace Chappell (that phone call was recorded as well) and asked her if she had reviewed the material concerning Detective Eric Curtis and Attorney Craig Lackey .  She stated that she had but the Internal Affairs Group was investigating it.  I informed her that the Internal Affairs Group WAS NOT investigating Attorney Craig Lackey, because Craig Lackey is not a police officer and therefore Internal Affairs does not have the jurisdiction to investigate Craig Lackey for Federal Criminal Charges.  DID SHE THINK POLICE INTERNAL AFFAIRS HAD THE JURISDICTION TO INVESTIGATE CRAIG LACKEY, A PRIVATE ATTORNEY?

I informed here that Internal Affairs was investigating Detective Eric Curtis and Dispatcher Stephanie Barnes.  She replied by saying "Oh, OK."  She she then told me to go to the Dallas District Attorneys Office to have Craig Lackey investigated.  She did not give me any information other than that.

What was beyond doubt is that Assistant City Attorney Candace Chappell was assisting in covering up the large-scale corruption that we all know is being systematically carried out within the Irving Police Department.

The point is, the City Attorneys are now helping the Police Internal Affairs Group, but they refused to help me in any way.

The investigation of Attorney Craig Lackey and Detective Eric Curtis is about 2- 4 hours worth of work.  99% of the evidence is in the form of police records.  Internal Affairs Group has had the cases for two months and refuses to provide an update to me on the matter.

This press release below does not answer any of my questions; which is evidence that the Internal Affairs Group is not working for The People, as it should be.  By law, and by police procedures I am entitled to know the status of an Internal Affairs Investigation that has been launched on my behalf.

Michael Williams

**From:** Michael Goff
**Sent:** Wednesday, June 11, 2014 2:31 PM
**To:** 'Michael Williams'
**Subject:** Complaint update

Mr. Williams,
        As you have filed multiple lawsuits, the city attorneys are reviewing the everything you have provided and will get back with me.

**Lt. Michael Goff | Internal Affairs**
**Badge 777**
City of Irving |Police Department
305 N. O'Connor Rd. Irving, TX 75061
P: (972) 721-2471
mgoff@cityofirving.org | CityofIrving.org
**From:** Michael Williams
**Sent:** Monday, June 09, 2014 5:00 PM
**To:** Michael Goff
**Subject:** Re: Barnes Investigation

Hello Lieutenant Goff,

When you say, "The Dallas County District Attorney would take jurisdiction on the State charges" what exactly should I do to ensure that this actually happens?  Seeing that I have not heard from you regarding the case against Mr. Lackey, I assume you mean I should contact the Dallas County District Attorney myself to "drive" the investigation.

If you are not the person to speak with on this matter could you please direct me to the proper unit that can answer this question for me?

Thank You,

Michael Williams
**From:** Michael Goff
**Sent:** Tuesday, May 13, 2014 12:37 PM
**To:** 'Michael Williams'
**Subject:** RE: Barnes Investigation

Mr. Williams,

Capt. Timpf is hopeful that the Barnes investigation will be concluded by tomorrow. Please keep me informed if Officer Curtis is named as a co-conspirator in your Colin County case against Mr. Lackey so I can add it to my file. I noticed you included Ms. Chappell in your complaint. None of the allegations in the complaint are within her jurisdiction. The Dallas County District Attorney would take jurisdiction on the State charges.

Regards,
Lt Goff

**From:** Michael Williams [mailto:creativityandmagic@hotmail.com]
**Sent:** Friday, May 09, 2014 6:53 AM
**To:** Michael Goff
**Cc:** cchappell@cityofirving.org
**Subject:** Re: Barnes Investigation

Hello Mr. Goff,

While Captain Timpf is obtaining the packet from Supervisor Johnson, please accept this request for investigation that I am filing with Internal Affairs regarding Detective Eric Curtis.

The packet consists of 14 files.  One (1) main complaint narrative, one(1) Exhibit list in the form of a spreadsheet and 12 exhibits in a zipped file format.

Please write me back to confirm that you are able to open and unzip the files and that the investigation of Detective Eric Curtis is underway.

Michael Williams

**From:** Michael Goff
**Sent:** Thursday, May 08, 2014 1:36 PM
**To:** 'Michael Williams'
**Subject:** RE: Barnes Investigation

Mr. Williams,
        I spoke to Captain Timpf and he said Kim Johnson has not given him the packet yet. I will send you an update tomorrow afternoon.

**From:** Michael Williams [mailto:creativityandmagic@hotmail.com]
**Sent:** Thursday, May 08, 2014 1:32 PM
**To:** Michael Goff
**Cc:** Michael Williams
**Subject:** Re: Barnes Investigation

Hello Mr. Goff,

Any word from Captain Timpf yet?

Michael Williams

Sent from my iPhone, please excuse the typo's.

On May 7, 2014, at 9:05 AM, "Michael Goff" <MGoff@cityofirving.org> wrote:

    Mr. Williams,

I will check with Captain Timpf.

---

**From:** Michael Williams [mailto:creativityandmagic@hotmail.com]
**Sent:** Wednesday, May 07, 2014 8:49 AM
**To:** Michael Goff
**Cc:** Michael Williams
**Subject:** Re: Barnes Investigation

Hello Lt. Goff,

I was wondering about the investigation of Stephanie Barnes that we spoke about last week. I wonder if it was concluded.

And any and all other information I would be entitled to know.

Michael Williams

Sent from my iPhone, please excuse the typo's.

On Apr 28, 2014, at 11:24 AM, "Michael Goff" <MGoff@cityofirving.org> wrote:

No, sir. Kim Johnson is the dispatch Manager.

---

**From:** Michael Williams [mailto:creativityandmagic@hotmail.com]
**Sent:** Monday, April 28, 2014 11:10 AM
**To:** Michael Goff
**Subject:** Re: Barnes Investigation

Thank You Lt. Goff for the update. The Dispatch Manager conducting the investigation wouldn't be Judy Morse would it?

Michael Williams

**From:** Michael Goff
**Sent:** Monday, April 28, 2014 8:17 AM
**To:** mailto:creativityandmagic@hotmail.com
**Subject:** Barnes Investigation

Mr. Williams,
         The dispatch manager is still conducting her investigation. I hope that it will be concluded this week. You may contact me here if you have any further questions.

Regards,

**Lt. Michael Goff | Internal Affairs**
**Badge 777**
City of Irving |Police Department
305 N. O'Connor Rd. Irving, TX 75061
P: (972) 721-2471
mgoff@cityofirving.org | CityofIrving.org

# Exhibit D

Curtis Tapes

# Exhibit E

May 27, 2014

Mr. Michael Williams
7604 Acorn Lane
Frisco, TX. 75034

Mr. Williams,

Thank you for bringing the incident involving Dispatcher Stephanie Barnes to our attention. We depend on citizens like you to help us in our effort to constantly improve our department.

It has been determined that Dispatcher Barnes was not professional during her interaction with you and that her response to your call was not in accordance with policy. This determination was based on information provided by you, supporting evidence, and interviews with Dispatcher Barnes.

 Your allegations were investigated through Dispatcher Barnes' chain of command and the following complaints were **SUSTAINED:**
- Conduct Prejudicial to Good Order, and
-Violation of the Irving Police Department Standards of Conduct.

Discipline was handled by her chain of command.

There were no sustained criminal violations.

If you have any questions or need any further information, please feel free to contact me at any time. My telephone number is (972) 721-3510.

Sincerely,



Michael Braly
Sergeant
Internal Affairs
Irving Police Department

Larry Boyd
Chief of Police


IRVING
T E X A S

# MEMO

**To:**       Larry Boyd, Chief of Police

**From:**     —. Jon Timpf, Captain, Technical Services Division

**Date:**     May 20, 2014

**Subject:**  Michael Williams Complaint

I have reviewed all of the audio and written records related to the complaint made by Michael Williams against Dispatcher 3 Stephanie Barnes in the course of events on December 20 - 22, 2013. Based on this review I believe that Stephanie Barnes took actions that were prejudicial to good order. The complaint should be sustained. This belief is based on:

1. Despite the indications that Williams made allegations that were "farfetched" and that they certainly suggested that he was delusional in his interpretations of the events at his job, there was no reason to suspect that he posed a danger to any person. He continued to insist that he was the person in danger. While his allegations were far beyond what could be expected even in an exceptionally hostile environment, they did not indicate that he might become violent, and it ought to have been considered that serious and overt instances of racial harassment can and do occur. Notwithstanding the possibility that there might have been merit to Williams' claims, police departments regularly deal with individuals who are paranoid or do not interpret reality rationally. While Williams did have difficulty keeping a consistent thought, he did not seem to pose a threat to anyone nor could he have been described as incoherent. Allegations such as the interception of email seem ridiculous, but within the context of an IT professional, it might have been plausible.

2. Stephanie, rightly sensing that William's allegations were odd, initially seemed to be annoyed by Williams. She instructed Williams to make a report of harassment by the online reporting portal. This call was misdiagnosed as a harassment which is not possible since Williams was not claiming that the threats were by telephone or in writing and, therefore, did not meet the criterion for online reporting. Conversely, Williams seemed a bit put out while speaking with Stephanie and shunned any advice that she had and insisted that a report should be made. Based on what Williams was telling Stephanie, a crime had been committed and a report should have been made. The details supported a terroristic threat offense which could have been taken over the telephone and referred to an investigator for follow up.

3. When the initial call with Williams ended, there is an open recording and a dial tone and Stephanie can be heard saying that Williams was, "crazier than hell," and that he was, "truly one of those that would go postal on these people." These offline statements indicate a state of mind that would carry through a series of calls in which she made conclusions about her conversation with Williams and shared them with building security personnel and human resources employees of Caliber Mortgage where Williams was employed. These

statements would then be used by security and human resources to justify going through Williams' email, discontinuing his building and computer access, sending Frisco Police to his home, and sending him for a psychological evaluation. In evaluating the appropriateness of Stephanie's actions the considerations should be:

    a. Was Stephanie's evaluation of Williams reasonable?
    b. If the evaluation was reasonable, were her actions then reasonable?
    c. Are these actions the roll of a police dispatcher?
    d. Did she or should have she included her supervisor on the course of action?
    e. If Williams did pose the security threat that Stephanie apparently believed, should other actions have been initiated to include a broader intelligence dissemination to inform police officers of the safety concerns.

**Evaluation:** The conclusion that Williams posed a risk of "going postal" was not reasonable. There were no statements by Williams that he had any violent inclinations. To the contrary, his stated concerns were for the safety of his wife and himself. Stephanie's seemingly urgent telephone calls to the security department and to the Human Resources Department of Caliber Mortgage indicate that she truly believed that Williams may have returned to the business with violent intentions. This conclusion is not supported by the conversation. I called Michelle Greenstreet who was the head of Human Resources of Caliber Mortgage at the time of this incident. She contacted Frisco Police Department to request a welfare check on Williams. She told me that the contact by the police department to the building security set into motion a situation in which the CIO, CEO, the general counsel and she "huddled" over the weekend to develop a response to the situation. She said they were concerned for the welfare of Williams and for the employees at the business. She said that the situation was odd to her because there had been no signals or inclinations that would have indicated to those around Williams that he might pose a threat to anyone. She said that based on the information given (Williams' state of mind, going through a divorce) and the fact that it was the holiday weekend (typically an emotional time) they were concerned about the welfare of all involved. She said that usually there are advance signs that portend such situations. She said that in hindsight the situation was handled correctly and that it really could not be handled any other way, but that the information then believed to be known was "worlds apart" from the actual situation.

Had Stephanie's conclusions been reasonable, her actions would not have been appropriate without directly consulting with the communications supervisor at a minimum. Because of the great weight and influence that the police department can carry, statements by police employees can have considerable consequences on the community and on individuals. Even if there had been a credible threat, calling a person's employer with insinuations of potential violence in today's environment is an action that should be taken in consultation with supervisors and possibly the police legal advisor. There is no evidence that she consulted with any supervisor.

Had the situation with Williams been as serious as Stephanie believed, any action should have included a consultation with the police patrol personnel who would have been the first responders on any incident that occurred at Caliber Mortgage. This did not occur. In fact, on the first day that Williams called, she referred him to the online reporting system and did not complete any documentation until the following day.

**Conclusion:** Stephanie's evaluation of the situation was unreasonable, and the actions that she took were inappropriate. At a minimum this caused a reaction on the part of Caliber Mortgage that

brought adverse consequences on Williams. Moreover, the totality of the actions that she took does not appear consistent with her assertion that she believed that Williams was a violent risk.

**Recommendation:** I recommend a chief's reprimand and a one eight hour day suspension. Stephanie is a senior or lead dispatcher and therefore she serves as an example and a resource for less tenured dispatchers. Senior dispatchers can be left to supervise the dispatch office and would be expected to take actions consistent with good order that would protect not only the police department, but also the rights of individuals. Supervisors are expected to use forethought and caution in their decision-making and model prudent and temperate behavior. Stephanie rushed to a faulty conclusion and recklessly provoked a reaction by building security and the Human Resources Department of Caliber Mortgage. This reaction adversely affected Williams unjustifiably and reflects poorly on the department.

After reviewing all the related information regarding this complaint and meeting with Stephanie to see if there was any information she would like to present that would help better explain or mitigate her actions, I agree that her conduct was inexcusable and the response she had to the information relayed to her by Mr. Williams was inappropriate.

During my meeting with Stephanie I stressed that while she may have had honorable intentions, she should have immediately notified a supervisor, sergeant, or watch commander before taking the steps of notifying anyone associated with Mr. Williams's employer. She understands her actions were outside of policy and that she has put the department in a precarious situation should Mr. Williams choose to litigate this matter.

It is for these reasons that I agree with Captain Timpf and believe that a 1 Day (8 Hour) suspension is appropriate.

Jeff Spivey #623
Assistant Chief
Administrative Services Bureau

CALIBER 000470

(City of Irving 0018)

IRVING POLICE DEPARTMENT
# NOTICE OF INVESTIGATION

| | |
|---|---|
| **Date Filed:** 5/1/2014    **Time Filed:** | **AIM Control #:** |

**Initiated by:** Letter   **Related to:** Other   **Complainant Jailed?** No   **Citation Issued?** No

**Reported to:** Lt. Goff   **I.D. Number:** 777   **Rank/Title:** -Select Rank-

---

**Complainant:** <u>Williams</u>      <u>Michael</u>      _____
Last       First       Middle

**Affidavit Attached?** Yes ☐ No ☒

**Residence Address:** 7604 Acorn Lane    **Phone:** (818) 926-929

**Business Address:** 3701 Regent Bl #400 - Caliber Home Loans    **Phone:** (214) 874-4955

**Complainant Signature:** _____    **Date Signed:** _____

---

**Employee:** Stephanie Barnes **ID Number:** 1661    Technical Services Division    Communications

**Division Commander:** Captain Timpf **Platoon/Section Commander:** Kimberly Johnson

---

**Date of Incident:** 12/20/2013    **Time of Incident:**    **IPD Report Number:** 13-28570

**Location of Incident:** 3701 Regent Bl #400/Caliber Home Loans (CHL) Irving, Tx.
7604 Acorn Lane, Frisco, Tx.

**Narrative (include details of incident, including witnesses):** Dispatcher Barnes failed to initiate steps for a report to be made regarding Mr. Williams' phone call on 12/20/13. Barnes used poor judgment in assessment of the situation and in the course of that used derogatory words describing Mr. Williams.

---

**Alleged Policy or Procedure Violation(s):**
Irving Police Department General Orders 804.05 DERELICTION OF DUTY

T. For conduct prejudicial to good order.

---

**Employee Acknowledgement**

In accordance with Chapter 614, Texas Government Code and/or Irving Police Department Disciplinary Policy, I acknowledge that I received a copy of this complaint from

_Oliver C1632_ on this _1_ day of _May_, 20_14_, at _2253_ hours.

_SL Barnes_            _Shantelle Oliver_
**Employee Signature**             **Supervisor Signature**

---

**Recommendation of Investigating Supervisor:**

☐ Sustained Complaint (See attached Notice of Disciplinary Action)

☐ Sustained Counseling      ☐ Letter of Counseling Attached

☐ Unfounded    ☐ Exonerated    ☐ Not Sustained (See Attached Documents)

**Signature of Investigating Supervisor:**

Spell Check

CALIBER 000494

(City of Irving 0042)

# EXHIBIT F

June 16, 2014

Mr. Michael Williams
7604 Acorn Lane
Frisco, TX. 75034

Mr. Williams,

Your complaint against Officer Eric Curtis has been reviewed and there is no indication that Officer Curtis has violated any Federal laws, State laws, or City of Irving Policies or Procedures. Your case was investigated to the best of our abilities with the evidence presented by you. The case is "Closed" and will remain so unless you provide further pertinent evidence. Your complaint is **UNFOUNDED**.

Please note that Ms. Chappell, the City of Irving Chief Prosecutor, does not have jurisdiction in any of these allegations.

Due to pending litigation, if you have any questions or need any further information, please feel free to contact Senior Assistant City Attorney Jason McClain at 972-721-2541. He will forward information to me as needed.

Sincerely,

Michael Goff
Lieutenant
Internal Affairs
Irving Police Department

Larry Boyd
Chief of Police

# Exhibit G

**BOLO (CENSURED)**