IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL WILLIAMS, | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 3:15-CV-1701-L-BH |
| v. | § | ECF |
| | § | |
| CITY OF IRVING, TEXAS, | § | |
| Defendant. | § | |

## CITY OF IRVING'S SUMMARY JUDGMENT MOTION

The City of Irving files this summary judgment motion seeking dismissal of Michael Williams' claims. It is filed pursuant to Federal Rule of Civil Procedure 56(b), Northern District of Texas Local Rule 56.3 and the Court's December 12, 2017 Order. (doc. 73). Each of the matters required by Local Rule 56.3 are set forth in the City of Irving's Summary Judgment Brief. This motion and that brief are supported by an appendix prepared pursuant to Local Rule 56.6.

### I. Summary of Williams' claims on which summary judgment is sought

Williams files two federal and numerous state law claims against the City. First, he alleges under 42 U.S.C. §1983 that the City violated his constitutional right to Equal Protection when it "adopted an open and widely implemented unconstitutional policy" of (1) refusing to protect the black community from criminal elements in the white community; (2) retaliating against black people when they demand equal protection; and (3) retaliating against black people when they file federal lawsuits. (doc. 55, p. 10). Williams next alleges that the City violated 42 U.S.C. §1985(2) when it conspired to obstruct justice in Williams' other litigation and to provide a pretext for unnamed others to maliciously prosecute and/or murder Williams. (doc. 55, p. 15, ¶18). Finally, Williams alleges eight common law intentional tort and three negligence tort claims against the City. (doc. 55, Counts 3-13). The City seeks summary judgment on all of Williams' claims.

## II. Grounds for summary judgment

Williams' first claim fails because he cannot meet any of the elements required for municipal liability under §1983. Specifically, Williams cannot demonstrate the existence of (1) an official policy or custom, of which (2) a policymaker had actual or constructive knowledge, or (3) a constitutional violation whose "moving force" is that policy or custom. Williams' 1985(2) conspiracy claim fails because he cannot establish that that: (1) two or more persons conspired to obstruct justice in a state court proceeding, or that (2) race or class-based animus motivated the conspirators. Finally, the City is immune from all of Williams' state law tort claims.

## III. Factual background

On December 20, 2013, Williams called the Irving Police Department ("PD") and spoke to Dispatcher Stephanie Barnes about how to file a harassment complaint against his co-workers at Caliber Home Loans ("CHL"). (App. p. 3). During this sixteen minute call, Williams told Barnes an increasingly bizarre story about his new co-workers' escalating hostility towards Williams. (App. p. 3). Specifically, Williams alleged, among other things, that his co-workers intercepted his emails to obtain all of his and his family's personal information; they stood around him and casually discussed shooting him; and that they told him they would shoot his wife and send her shoes back to her native Columbia. Williams told Barnes that his supervisors were aware his co-workers' actions and that the supervisors endorsed and laughed about the threats. (App. p. 3).

Williams was rambling and inconsistent during his call with Barnes – he mentioned he had talked to a bounty hunter; he became angry with Barnes and then apologized "for the way [he] acted earlier;" and at various times said he was divorced, or going through a divorce or reconciled and no longer divorcing. (App. p. 4). Finally, Williams recounted his fears about coming home to a massacre now or in the future and that his co-workers could drive by and "shoot up" his house. (App. p. 4). Williams was so concerned that he no longer allowed his son to sleep in rooms facing

the front of the house. (App. p. 4). Barnes told Williams that he could file an on-line harassment report and encouraged him to do so. (App. p. 4). Barnes gave Williams the website address to use for filing a report, and the call was concluded. (App. p. 4).

Barnes ran a criminal history check on Williams and discovered that his record included several offenses including larceny, fraud, dangerous drugs, disorderly conduct, injury to a child, obstruction of police, and robbery. (App. p. 4). Barnes also contacted Williams' employer due to her concerns about Williams' behavior and the totality of the circumstances of Williams' call. (App. p. 4). It took Barnes several phone calls to contact the appropriate CHL personnel, but she was finally spoke to a CHL manager and communicated her concerns about possible safety issues at Williams' place of employment. (App. p. 4).

On January 9, 2014, Williams filed an on-line report alleging work place harassment by his co-workers at CHL. (App. p. 135). On January 21, 2014, Irving PD sought and received additional information from Williams regarding his allegations. (App. p. 135). Specifically, Williams' complaint was too voluminous for the area provided in the on-line report, so an Irving officer e-mailed Williams and asked him to e-mail the full complaint back to the officer. (App. p. 135). Once Williams met this request, an official complaint was completed, given an incident number and assigned to Detective Eric Curtis to investigate. (App. p. 135).

Williams' complaint assigned to Curtis was even more fantastic than Williams' allegations to Barnes. Specifically, Williams supplemented his initial allegations with new claims that his co-workers, whom Williams refers to as a "Nazi-minded hate group," called him Trayvon and mimicked shooting him with a pistol; that they would violently slam computer components on desks around Williams; that they stood in front of Williams and discussed whether they should toss a grenade on the playground at his son's school or "set up a sniper's nest to pick his kid off"; that they discussed in front of Williams how far a particular co-worker could be from Williams' wife

and still shoot her in the spine and make her head explode; and that one co-worker on an elevator with Williams asked another whether he should fire Williams and then shoot him in the head or shoot him in the head and then fire him while the other employee responded they should just shoot Williams in the head. (App. pp. 15-18).

Williams, who lives in Frisco, also alleged that on December 22, 2013, his employer contacted the Frisco Police Department, gave them Williams' home address and reported that Williams "was in the house dead or bleeding to death or the victim of a robbery." (App. pp. 17-18). As a result of this call, Williams claimed that the Frisco Swat Team surrounded his house and tried to break down his door "like a drug raid in the worst part of the world" while he and his son were inside. (App. pp. 17-18). Williams did not reveal in his Irving police report how the interaction with the Frisco PD ended. (App. p. 18).

Despite the fantastic nature of Williams' allegations, Curtis initiated a thorough investigation. (App. p. 10). First, Curtis reviewed Barnes' reports of her conversations with Williams and her conversations with CHL personnel. (App. p. 10). Those records conveyed Barnes' concerns about Williams' behavior and allegations as well as CHL's unawareness of any problems at Williams' workplace. (App. p. 10). Next, Curtis requested records from the Frisco PD to determine whether they had in fact stormed Williams' house as alleged by Williams. (App. pp. 10-11). Those police records indicate that CHL personnel called Frisco PD to request a welfare check on Williams as they had been unable to contact him via text or phone for approximately eighteen hours after learning of Williams' troubling call to Irving PD. (App. p. 11). Frisco PD unsuccessfully called Williams and then sent two officers to his house. (App. p. 11). No one answered their knock at Williams' door and Williams' neighbors did not know his location. (App. p. 11). With no evidence of an offense, the Frisco officers left the scene. (App. p. 11). Fifteen minutes later, Williams called Frisco PD to ask why they had been at his house. (App. p. 11).

Williams said that he was not at home but his neighbors called and told him of the police presence. (App. p. 11). Williams assured Frisco PD that he was fine, so Frisco PD told Williams to call his employer and closed its inquiry. (App. p. 11).

In early February 2014, Curtis separately interviewed Michele Greenstreet, CHL's Director of Human Resources, and Craig Lackey, CHL's General Counsel. (App. p. 11). Both individuals reported that CHL had no idea of issues within Williams' workplace before being made aware of his call to Irving PD. (App. p. 11). Greenstreet reported that she requested a welfare check on Williams by Frisco PD because no one could contact Williams and CHL was concerned for his well-being. (App. p. 11). Both Greenstreet and Lackey stated that Williams submitted a personnel complaint to CHL on December 23, 2013 and that CHL initiated a thorough investigation of that complaint. (App. p. 11). CHL's investigation included an outside forensic review of all the accused employees' computers and other electronic devices, interviews of Williams and the accused co-workers, and interviews of any other employees who may have heard or seen any of the conduct alleged by Williams. (App. p. 11). After a three-week investigation, CHL found no evidence to support Williams' claims. (App. p. 11). Greenstreet reported that although Williams claimed to have evidence to support his allegations he repeatedly refused or failed to turn anything over to CHL. (App. p. 11). Therefore, CHL closed its investigation on Williams' claims with no finding of wrongdoing. (App. p. 11). Both Lackey and Greenstreet reported to Curtis that since the CHL investigation had been completed, Williams had returned to work. (App. p. 11).

Finally, Curtis attempted to interview Williams regarding his claims. (App. p. 11). An interview was scheduled for noon in mid-February. (App. p. 11). Williams called at 11:20 a.m. and cancelled the interview without explanation. (App. p. 11). Thereafter, Williams did not respond to Curtis' calls to reschedule. (App. p. 11). Based on Barnes' reports, the Frisco PD documents, the interviews with Greenstreet and Lackey and Williams' refusal or inability to produce anything to

support his claims, Curtis closed the investigation and determined that Williams' claims were unfounded. (App. pp. 11-12). However, in mid-March Williams appeared unannounced at Irving PD and demanded an appointment with Curtis. (App. p. 27). Curtis met with Williams in the lobby of police headquarters. (App. p. 27). Williams quickly became angry and disruptive as Curtis tried to explain that Williams' allegations were not supported by evidence. (App. p. 27). Williams repeatedly and forcefully stated he had evidence, including recordings, to prove his allegations. (App. p. 27). Williams' disruption was such that Curtis had to repeatedly direct him to leave the building but not before Curtis agreed to meet Williams the next day to review all of Williams' evidence. (App. p. 27). Williams eventually left police headquarters but did not show up to meet with Curtis the next day. (App. pp. 27-28).

Because of Williams' erratic behavior documented in Curtis' investigation and his behavior at the police department, Curtis created an informational bulletin ("BOLO") on Williams for use by other police officers who may encounter him. (App. p. 28). This BOLO documented Curtis' findings in his investigation, listed Williams' criminal history, and provided a picture of Williams. (App. pp. 28, 30). The listed criminal history, which included larceny, fraud, dangerous drugs, disorderly conduct, obstructing a police officer, robbery and injury to a child is exactly as it is stated in his computerized criminal history. (App. p. 28). Importantly, the BOLO is for informational purposes only to give other officers who may encounter Williams a fuller picture of Williams. (App. p. 28). The BOLO explicitly states that there is no arrest warrant out for Williams based on the information in the BOLO. (App. p. 28). Finally, the BOLO is stored on a platform accessible only by Irving police officers. (App. p. 28). Curtis also sent a copy of it to Frisco PD because Williams lives in Frisco. (App. p. 28). It is not uncommon to provide such information to police officers where a subject lives, and Curtis has frequently done the same thing with individuals of all races. (App. p. 28). After sending the BOLO to Frisco PD, Curtis did not have further contact with

Frisco officers regarding Williams. (App. p. 28). Curtis did not have any involvement in any of Williams' subsequent arrests by Frisco PD over the years. (App. p. 28).

On May 1, 2014, Irving PD initiated an investigation of Barnes' handling of Williams' initial call to Irving police on December 20, 2013. (doc. 55, p. 55). On May 9, 2014, Williams filed a complaint against Curtis related to his investigation of Williams' criminal complaint. (doc. 55, p. 47). Irving PD investigated both complaints and determined that Barnes had violated its policy on conduct prejudicial to good order while Curtis had not violated any policies or procedures. (doc. 55, pp. 51, 57). Therefore, Williams' complaint against Barnes was sustained while his complaint against Curtis was unfounded. (doc. 55, pp. 51, 57). Thereafter, Assistant Chief Jeff Spivey suspended Barnes from work without pay for one day. (doc. 55, p. 54).

## IV. Procedural background

Williams originally filed this suit on May 15, 2015 against the City, Irving PD, Barnes, Curtis, Bruce Jolley and CHL employee, Craig Lackey. (doc. 3). The Court dismissed Lackey from the suit on September 9, 2016. (doc. 35). The Court dismissed the federal claims against Barnes, Curtis and Jolley on February 7, 2017. (doc. 40). In response to Defendants' Rule 12(b)(6) Motion to Dismiss, Williams filed an Amended Complaint on July 31, 2017 that dismissed Irving PD, Barnes, Curtis, and Jolley from this suit. (doc. 55). Thus, the City is the only remaining Defendant.

## V. Prayer

The City respectfully requests that the Court dismiss Williams' claims against it as the City is entitled to summary judgment as a matter of law. The legal grounds supporting this contention are set forth in the City's Summary Judgment Brief. Based on the facts and law presented to the court in the City's motion and brief, the City respectfully moves for summary judgment on all of Williams' claims against it.

Respectfully submitted,

**CITY ATTORNEY'S OFFICE
CITY OF IRVING, TEXAS**

By: */s/ Jason McClain*
    **JASON McCLAIN**
    Senior Assistant City Attorney
    SBOT No. 00797032
    jmcclain@cityofirving.org
    825 West Irving Boulevard
    Irving, Texas 75060
    Telephone: 972.721.2541
    Facsimile: 972.721.2750

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

On March 20, 2018, I electronically filed this document with the clerk of court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system. This system sent a "Notice of Electronic Filing" to the parties of record or their attorneys who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Jason McClain*
**JASON McCLAIN**
Senior Assistant City Attorney