**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **MICHAEL WILLIAMS** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:15-cv-01701-L-BH** |
| | § | **ECF** |
| **CITY OF IRVING, TEXAS, et al.** | § | |
| **Defendants.** | § | |


**CITY OF IRVING'S
SUMMARY JUDGMENT APPENDIX**

TO THE HONORABLE JUDGE OF SAID COURT:

     Pursuant to FED. R. CIV. P. 56(b) and Local Rule 56.6, and in addition to the pleadings and other documents on file with this court, Defendants rely upon the following evidence in support of their Motion for Summary Judgment:

**Appendix Exhibit**                                                  **Page No.**

1.     Affidavit of Bruce Jolley ................................................................. 1

2     Affidavit of Stephanie Barnes .......................................................... 3

         Exhibit A- Incident Report 13-28570 ....................................... 6

3.     Affidavit of Eric Curtis.................................................................... 10

         Exhibit A– Incident Report 14-1763........................................ 13

         Exhibit B – Incident Report 14-1763 – Supplement 1 ............... 19

         Exhibit C – Post-Run / Call Report .......................................... 22

4.     Affidavit of Eric Curtis.................................................................... 27

         Exhibit A – Michael Williams BOLO ....................................... 29

5.     Affidavit of Bruce Jolley ................................................................. 31

| Appendix Exhibit | Page No. |
|---|---|

6. Affidavit of Lesley D. Moore ........................................................... 33

      Exhibit A – Section 501.05 of the Irving Police Department
           General Orders........................................................... 35

      Exhibit B – Section 800 of the Irving Police Department
           General Orders........................................................... 38

7. Affidavit of Kuruvilla Oommen ....................................................... 51

8. Affidavit of Jason McClain .............................................................. 53

      Exhibit A – Deposition Transcript of Michael Williams – 1/3/18 ............ 55

9. Certified Copy of Chapter 29-Police, of the City of Irving Code
      of Civil and Criminal Ordinances ................................................. 84

10. Certified Copy of City of Irving Home Rule Charter ....................................... 94

11. Affidavit of Scott Bromley .............................................................. 135

12. Exhibit A – Incident Report T14000034 ...................................... 137

13. Exhibit B – Email Interactions with Williams........................... 139

14. Exhibit C – Incident Report 14-1763....................................... 145

Respectfully submitted,

**CITY ATTORNEY'S OFFICE**
**CITY OF IRVING, TEXAS**

By:     _/s/ Jason McClain_
       **JASON McCLAIN**
       Senior Assistant City Attorney
       SBOT No. 00797032
       jmcclain@cityofirving.org
       825 West Irving Boulevard
       Irving, Texas 75060
       Telephone: 972.721.2541
       Facsimile: 972.721.2750

**ATTORNEY FOR CITY OF IRVING**

## <u>CERTIFICATE OF SERVICE</u>

On March 20, 2018, I electronically filed this document with the clerk of court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system. This system sent a "Notice of Electronic Filing" to the parties of record or their attorneys who have consented in writing to accept this Notice as service of this document by electronic means:

Michael Williams, Pro Se
7604 Acorn Lane
Frisco, Texas 75034
(818) 926-0929
creativityandmagic@hotmail.com

*/s/Jason McClain*
**JASON MCCLAIN**
Senior Assistant City Attorney

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL WILLIAMS | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:15-CV-1701-L-BH |
| | § | ECF |
| CITY OF IRVING, TEXAS, et al. | § | |
| Defendants. | § | Referred to U.S. Magistrate Judge |

## AFFIDAVIT OF BRUCE JOLLEY

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, a notary public in and for the State of Texas, on this day personally appeared Bruce Jolley, who is personally known to me, and who, after being duly sworn according to law, upon oath deposed and said:

"My name is Bruce Jolley; I am over eighteen years of age, of sound mind, and am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct. I am currently employed as an Assistant Chief in the Irving Police Department for the City of Irving.

In late 2013 and early 2014 I was a Police Captain. My job duties included the supervision of the Criminal Investigation Division, which included approximately 80 employees. I was three levels of supervision over Curtis. My job did not include involvement in the day-to-day investigations of detectives like Curtis. I did not communicate with Barnes, Lackey or anyone at Caliber Home loans about Williams' allegations or the investigation of those allegations. I may have had a conversation about the investigation with Curtis but any such conversation would have been in passing and did not involve me substantively directing the course of the investigation or the final classification of the investigation.

I may have received an e-mail from Williams requesting that the investigation of his complaint be assigned to a different detective – I do not recall receiving any such e-mail though. In any event, such a request is not considered by my level of supervision. I would have forwarded the request to Curtis' immediate supervisor for resolution.

**AFFIDAVIT OF BRUCE JOLLEY**

In any event, I played no role in the substantive decision-making process regarding the course of the investigation or the investigation's final classification. Finally, I never took any actions with regard to Williams based on his race. I did not treat Williams any differently than I would have any other similarly situated person of another race.

Further affiant sayeth not."

BRUCE JOLLEY

THE STATE OF TEXAS § 
§ 
COUNTY OF DALLAS §

Before me, the undersigned notary, on this day personally appeared BRUCE JOLLEY, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on August 9, 2016.

NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

REBECCA LYNN MADDUX
NOTARY PUBLIC
STATE OF TEXAS
COMM. EXP. 01-26-2017
NOTARY ID 1043705-7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **MICHAEL WILLIAMS** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:15-CV-1701-L-BH** |
| | § | **ECF** |
| **CITY OF IRVING, TEXAS, et al.** | § | |
| **Defendants.** | § | **Referred to U.S. Magistrate Judge** |

## AFFIDAVIT OF STEPHANIE BARNES

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, a notary public in and for the State of Texas, on this day personally appeared Stephanie Barnes, who is personally known to me, and who, after being duly sworn according to law, upon oath deposed and said:

> "My name is Stephanie Barnes; I am over eighteen years of age, of sound mind, and am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct. I am currently employed as a Police Dispatcher in the Irving Police Department for the City of Irving.
>
> My job duties as a Police Dispatcher include taking emergency and non-emergency calls for assistance from the public and determining how best to process the calls for optimum response. This requires that I prioritize calls based on the severity of the issue reported and determine what, if any, immediate action is required.
>
> On December 20, 2013, Michael Williams called the Irving Police Department and spoke to me about how to file a complaint against his co-workers at Caliber Home Loans ("CHL"). During the course of this approximately sixteen minute call, Williams told me an increasingly hard-to-believe story about his new co-workers' escalating hostility towards him. Specifically, Williams alleged, among other things, that his co-workers intercepted his emails to obtain all of him and his family's personal information; they stood around and casually discussed shooting him while he was present; and that they told him they would shoot his wife and send her shoes back to her native Columbia. Williams told me that his supervisors were not only aware his co-workers' actions, but that the supervisors endorsed the threats and laughed about them.

Williams was rambling and inconsistent during his call– he mentioned he had talked to a bounty hunter; he became angry and then apologized "for the way [he] acted earlier"; and at various times said he was divorced, or going through a divorce or reconciled and no longer divorcing. Finally, Williams recounted his fears about coming home to a massacre now or in the future and that his co-workers could drive by and "shoot up" his house. Williams was so concerned that he no longer allowed his son to sleep in rooms facing the front of the house. I told Williams that he could file an on-line harassment report and encouraged him to do so. I gave Williams the website address to use for filing a report and the call was concluded. This is the standard process for such harassment complaints, and I have directed numerous other callers with similar complaints to use the on-line reporting process. There is no difference between a complaint taken by a dispatcher and a complaint filed via the on-line process – both are evaluated by an intake officer and assigned to a detective for investigation if appropriate.

After the call, I ran a criminal history check on Williams and discovered that his record included several offenses including larceny, fraud, dangerous drugs, disorderly conduct, injury to a child, obstruction of police and robbery. I also contacted Williams' employer due to my concerns about Williams' behavior and the totality of the circumstances including the content of his communications to me, the inconsistencies in his story, the time of year since holiday seasons can be particularly emotional and simply wanting to err on the side of caution. It took me several phone calls to contact the appropriate CHL personnel, but I was able to speak with Tiffani Siskin, a CHL manager, and communicate my concerns about possible safety issues at Williams' place of employment. I never communicated with Eric Curtis about the scope, progress or outcome of his investigation of Williams' complaints against his co-workers. I played no role in Curtis' investigation and never discussed it with him. I also never communicated whatsoever with Craig Lackey or any of the co-workers Williams accused of harassment. The only contact I had with any CHL employee was the afore-mentioned conversations with Siskin on December 20, 2013 and December 21, 2013. Finally, I never communicated with Bruce Jolley regarding anything related to Williams' complaints or the investigation of those complaints. I never took any actions with regard to Williams based on his race. I did not treat Williams any differently than I would have any other similarly situated person of another race.

Attached to is Incident Report number 13-28570, which is the report I created detailing my telephone interaction with Williams on December 20, 2013 and my telephone calls with Siskin on December 20 and 21, 2013. This information is kept by the Irving Police Department in the regular course of business and it was in the regular course of business that I, with knowledge of the information set forth, made the Incident Report. This record was made at or near the date and time reflected on the photographs. The attached records are exact duplicates of the original records.

Further affiant sayeth not."

STEPHANIE BARNES

THE STATE OF TEXAS    §
                      §
COUNTY OF DALLAS      §

Before me, the undersigned notary, on this day personally appeared STEPHANIE BARNES, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on August 9, 2016.



NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

# EXHIBIT

# A

COI 00006

# Incident Report
# Irving Police Department



305 N O'Connor Rd

Irving TX 75061

(972) 721-2437

**13-28570**

Reported Date
**12/21/2013**
Report Type
**INFO ONLY**
Officer
**BARNES,STEPHANIE**

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Seq No |
|---|---|---|---|---|---|---|
| **Irving Police Department** | | 13-28570 | ORIG | 12/21/2013 | 18:56 | 131210325 |

| Status | Report Type |
|---|---|
| **REPORT SUSPENDED/CLOSED** | **INFORMATION ONLY** |

| Location | | City | Rep Dist | Area | Beat |
|---|---|---|---|---|---|
| **3701 REGENT BL #400** | | **Irving** | **6503** | **PD2** | **65** |

| From Date | From Time | To Date | To Time | Officer |
|---|---|---|---|---|
| **12/20/2013** | **18:00** | **12/21/2013** | **19:00** | **C1661/BARNES,STEPHANIE** |

| Assignment | Entered By | Assignment |
|---|---|---|
| **TECHNICAL SERVICES/DISP/JAIL** | **C1661** | **TECHNICAL SERVICES/DISP/JAIL** |

| RMS Transfer | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|
| **Successful** | **C1424** | **12/21/2013** | **23:32:51** |

| # Offenses | Statute Code | Description | Complaint Type |
|---|---|---|---|
| **1** | **IC0060** | **INFORMATION REPORT** | |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| SUS | SUS | 1 | WILLIAMS,MICHAEL | B | M | 01/20/1963 |
| RP | RP | 1 | SISKIN,TIFFANY | W | F | 11/17/1970 |
| OP | OP | 1 | WILLIAMS,ISAURA | B | F | 01/08/1982 |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| OP | 1 | I | WILLIAMS,ISAURA | 6049276 | B | F | 01/08/1982 |
| RP | 1 | I | SISKIN,TIFFANY | 6049272 | W | F | 11/17/1970 |
| SUS | 1 | I | WILLIAMS,MICHAEL | 6049274 | B | M | 01/20/1963 |

## Summary Narrative

Reporting called to state that she is concerned about the emails she found belonging to an employee.

| Report Officer | Printed At | |
|---|---|---|
| **C1661/BARNES,STEPHANIE** | **05/14/2014 16:29** | Page 1 of 3 |

COI 00007

## OTHER PERSON 1: WILLIAMS,ISAURA

| Involvement | Invl No | Type | Name | | MNI | Race |
|---|---|---|---|---|---|---|
| OTHER PERSON | 1 | Individual | WILLIAMS,ISAURA | | 6049276 | BLACK |

| Sex | DOB | Age | Juvenile? |
|---|---|---|---|
| FEMALE | 01/08/1982 | 31 | No |

## REPORTING PARTY 1: SISKIN,TIFFANY

| Involvement | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|
| REPORTING PARTY | 1 | Individual | SISKIN,TIFFANY | | 6049272 |

| Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|
| WHITE | FEMALE | 11/17/1970 | 43 | No | 5'07" | 150# | BLONDE/STRAWBERRY | GREEN |

| Type | Address | City | State |
|---|---|---|---|
| HOME | 1013 GLEN COVE DR | PLANO | TEXAS |

| ZIP Code |
|---|
| 75075 |

| Type | ID No | OLS |
|---|---|---|
| (DL or State ID Card)Operator License | 07667669 | TEXAS |

| Phone Type | Phone No |
|---|---|
| Cell | (972)467-3067 |

| Employer/School | Position/Grade |
|---|---|
| CALIBER FUNDING | MANAGER |

## SUSPECT 1: WILLIAMS,MICHAEL

| Involvement | Invl No | Type | Name | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|
| SUSPECT | 1 | Individual | WILLIAMS,MICHAEL | | 6049274 | BLACK | MALE |

| DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|
| 01/20/1963 | 50 | No | 5'10" | 178# | BLACK | BROWN |

| Type | Address | City | State |
|---|---|---|---|
| HOME | 7549 STONEBROOK PKWY APT 2109 | FRISCO | TEXAS |

| ZIP Code |
|---|
| 75034 |

| Type | Address | City | State |
|---|---|---|---|
| HOME | 7604 ACORN LANE | FRISCO | TEXAS |

| ZIP Code |
|---|
| 75034 |

| Type | ID No | OLS |
|---|---|---|
| (DL or State ID Card)Operator License | C5118953 | CALIFORNIA |

| Type | ID No |
|---|---|
| Social Security Number | 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 |

| Phone Type | Phone No |
|---|---|
| Cell | (818)926-0929 |

| Employer/School | Position/Grade | Employed From Date |
|---|---|---|
| CALIBER FUNDING | IT | 08/01/2013 |

| Location | City | State |
|---|---|---|
| 3701 REGENT BL | Irving | TEXAS |

## Narrative

Michael Williams called on 122013 trying to make a harassment report. I spoke with him for several minutes and it was obvious that something was not right with him. He was referred to make an online report. He was rambling about hiring an attorney and that he was being harassed, stalked and wanted to make a report of a terroristic threat. After speaking to him he stated that his co-workers were threatening to shoot him and kill him. He said that his coworkers must have hacked into his information because they knew his home address and all the information about his wife, like where she worked and the hours and what she drove. He said he sends himself emails to remind himself of things he needs to do. I tried to talk to him and asked him if he had contacted his HR department and he became irrate and told me no. Then later in the conversation he stated that he had spoken to his boss and that his boss was part of the problem and was allowing the tormenting to continue. He said that he has worked for the company for 4 months and that his co-workers have been threatening him from the beginning. On thursday 12-19-13 he said he was getting off the elevator and 2 of them said "we will just shoot him now and get it over with". He said others had threatened to shoot and kill his wife and ship her shoes back to Columbia in a box. He was rambling and not making sense and just kept talking about shooting and and how IT do not act like this and that the workers hated him from the beginning. He went from going through a divorce 4 months ago to being married again. He told me that he was in his 50's and his wife was at least 20 years younger than him. He was not sure if he should tell her what was going on because he did not want to scare her. He was afraid that if he did not get this all on record that they would one day in a year or five just show up and shoot up his house,

| Report Officer | Printed At | |
|---|---|---|
| C1661/BARNES,STEPHANIE | 05/14/2014 16:29 | Page 2 of 3 |

COI 00008

**Narrative**

"there would be a masacre". He said that he has a small son and that his bedroom window faces the front of the house. He said management did tell the suspects to stop but now they stand around his desk with their arms crossed and talk about him, not to him. He also stated that when management got involved they removed him from teh area so he would not be around the other employees but that is when they started coming to his desk and talking. "management endorses it, laughing".

He also states that his personal information especially his emails were pulled by IT and then the information was shared with other employees. He says he has recordings of the incidents but his attorney told him he could not record other people. He said they during his divorce he was writing his biography for court purposes and would email it back to himself to work on later.

We spoke for a while and he filled me in on more details and it was clear that either something was seriously wrong at his place of employment or he was mentally unstable.

I called secuirty at the building where he works and they stated they had not had any problems with the subject and were unaware of any complaints involving other employees either. The security manager called Williams' boss, Tiffany, RP1 and told her about the situation. His boss checked and there have been no issues with this employee, nor have any complaints been filed by him or about him. She then checked his email to see if other employees had been harassing him. Tiffany called me back today to state that she found no evidence of harassment in the emails and no personal interactions between Williams and the other co-workers. She stated that after reviewing his emails she is concerned for his mental safety and the safety of the workers at the company. She did find emails he had sent himself and the contents of the emails were disturbing. They contain information about doctors, information about extreme debt and his marital status and information on obtaining guns, specifically hand guns.

The company has suspended his access to the building for the safety of the other employees and is going to require a release from a psycologist before allowing him to return to the building. Tiffany stated that they are going to get him help so that this does not affect his job. She stated that after reading the emails she is not sure if he is having a mental breakdown or using the alleged harassment for monetary gain since he owes debts. He has made no attempt to handle the matter with his employer and she is leaning more towards this being a mental issue with Williams. I am not sure if Williams completed a harassment report online or not.

I was able to find a DL out of CA for the subject and also ran a CCH that revealed he does have a history that included drugs and violence. His history includes dangerous drugs, robbery, injury to a child and several other charges. I also ran him through TLO and noticed that he has 7 leins that he is involved in and 5 judgements against him. He stated on the phone that his wife was 34. I found one female that is 31 listed that is associated with him. Her name is Williams,Isaura 01/08/82.

All of his address information was obtained by his phone number.

This report was completed due to the instability of SUS1 and the concern for safety of the employees at Caliber Funding where they work.

COI 00009

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **MICHAEL WILLIAMS** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:15-CV-1701-L-BH** |
| | § | **ECF** |
| **CITY OF IRVING, TEXAS, et al.** | § | |
| **Defendants.** | § | **Referred to U.S. Magistrate Judge** |

## AFFIDAVIT OF ERIC CURTIS

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, a notary public in and for the State of Texas, on this day personally appeared Eric Curtis, who is personally known to me, and who, after being duly sworn according to law, upon oath deposed and said:

"My name is Eric Curtis; I am over eighteen years of age, of sound mind, and am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct. I am currently employed as a Detective in the Criminal Investigation Division of the Irving Police Department.

My job duties include investigating criminal complaints in order to determine their validity. My job requires that I attempt to prove or disprove allegations of wrongdoing through the accumulation of evidence. This necessarily involved a great deal of discretion.

On or about January 23, 2014, I was assigned to investigate the attached Incident Report No. 14-1763. This report states Michael Williams' allegations of workplace harassment against him by a group of his co-workers. Although these allegations seemed to be far-fetched, I initiated a thorough investigation of Williams' claims. First, I reviewed Dispatcher Stephanie Barnes' reports on her conversations with Williams and Tiffani Siskin who worked for Caliber Home Loans ("CHL") the same entity that employed Williams. Those records conveyed Barnes' concerns about Williams' behavior and allegations. Barnes' conversations with Siskin did not affect how I investigated or finally classified Williams' allegations.

Next, I requested records from the Frisco PD to determine whether they had in fact stormed Williams' house as alleged by Williams in Report No. 14-1763. The Frisco PD records indicate that CHL personnel called Frisco PD to request a welfare check

on Williams because CHL personnel had been unable to get ahold of Williams via text or phone for approximately 18 hours after learning of Williams' call to Irving dispatch. Frisco PD unsuccessfully called Williams and then sent two officers to his house. No one answered the officers' knock at Williams' door, and his neighbors did not know Williams' location. With no evidence of an offense, the Frisco officers left the scene. Approximately fifteen minutes later, Williams called Frisco PD to ask why they had been at his house. Williams said that he was not at home but his neighbors called and told them of the police presence. Williams assured Frisco PD that he was fine, so Frisco PD told him to call CHL and closed its inquiry. These records flatly contradict the information presented by Williams in Report No. 14-1763. Williams' untruthfulness regarding the Frisco PD visit damaged his credibility with me and called into question his veracity on the other allegations in his police report – especially since all of the allegations share the same "over-the-top" quality.

In early February 2014, I separately interviewed Michele Greenstreet, CHL's Director of Human Resources, and Craig Lackey, CHL's General Counsel. Both individuals reported that CHL had no knowledge of alleged harassment within Williams' workplace before being made aware of his call to Irving PD. Greenstreet reported that she requested a welfare check on Williams by Frisco PD because no one could contact Williams and CHL was concerned for his well-being. Both individuals stated that Williams submitted a complaint to CHL on December 23, 2013 and that CHL initiated a thorough investigation of that complaint. CHL's investigation included an outside forensic review of all the accused employees' computers and other electronic devices, interviews of Williams and the accused, and interviews of any other employees who may have heard or seen some of the outrageous conduct alleged by Williams. After a three-week investigation, CHL could not find any evidence to support Williams' claims. Greenstreet reported that although Williams claimed to have evidence to support this allegations he repeatedly refused or failed to turn over that evidence. CHL closed its investigation on Williams' claims with no finding of wrongdoing. Both Lackey and Greenstreet reported that since the investigation had been completed, Williams had returned to work.

Finally, I attempted to interview Williams regarding his claims. An interview was scheduled for noon in mid-February. Williams called at 11:20 a.m. and cancelled the interview without explanation. Thereafter, Williams did not respond to my calls to reschedule. In mid-March, Williams appeared unannounced at the Irving police department and demanded a meeting with me. Williams became angry and disruptive as I explained my findings that Williams' allegations were not supported with evidence. Williams repeatedly and forcefully stated he had evidence, including recordings, to prove his allegations. Therefore, in an effort to give Williams every opportunity to prove his claims, I agreed to meet Williams the next day to review all of his evidence. Williams did not show up to that meeting.

Based on Barnes' reports, the Frisco PD documents, which demonstrate Williams' untruthfulness, the interviews with Greenstreet and Lackey and Williams' refusal or

inability to produce anything to support his claims, I closed the investigation and determined that Williams' claims were unfounded.

I never communicated with Barnes about the course, scope or final classification of my investigation. Any conversation I may have had with Bruce Jolley about my investigation would not have been substantive regarding the course, scope or final classification of my investigation. I did not have any communication with any of Williams' co-workers that he accused of harassment. The only CHL employees I communicated with were Greenstreet and Lackey. My communications with them while the investigation was active were strictly investigatory interviews. Neither had any improper role in determining the course, scope or final classification of my investigation. I never took any actions with regard to Williams based on his race. I did not treat Williams any differently than I would have any other similarly situated person of another race.

Attached is Incident Report No. 14-1763, which is the report detailing Williams' harassment allegations. Also attached is the supplement to that report, which details my investigation and the final classification of unfounded on Williams' allegations. This information is kept by the Irving Police Department in the regular course of business and it was in the regular course of business that Irving police employees, created the Incident Report and supplement. These records were made at or near the date and time reflected on the records. The attached records are exact duplicates of the original records. Also attached are reports I obtained from the Frisco Police Department detailing the welfare check Frisco officers performed at Williams' residence on December 22, 2013. I relied on the information in these reports in my investigation of Williams' allegations.

Further affiant sayeth not."

_____
ERIC CURTIS


THE STATE OF TEXAS     §
                      §
COUNTY OF DALLAS    §

      Before me, the undersigned notary, on this day personally appeared ERIC CURTIS, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

      Given under my hand and seal of office on August 9, 2016.

REBECCA LYNN MADDUX
NOTARY PUBLIC
STATE OF TEXAS
COMM. EXP. 01-26-2017
NOTARY ID 1043705-7

_____
NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

**AFFIDAVIT OF ERIC CURTIS**

# EXHIBIT

# A

COI 00013

# Incident Report
# Irving Police Department

**14-1763**



305 N O'Connor Rd

Irving TX 75061

(972) 721-2437

Reported Date
01/23/2014
Report Type
TERR THR
Officer
BROMLEY,THOMAS

## Administrative Information

| Agency | Report No | Supplement No | Reported Date | Reported Time | CAD Seq No |
|---|---|---|---|---|---|
| Irving Police Department | 14-1763 | ORIG | 01/23/2014 | 14:27 | 140110937 |

| Status | Report Type |
|---|---|
| REPORT PENDING/INVESTIGATE | TERRORISTIC THREATS |

| Location | City | Rep Dist | Area | Beat |
|---|---|---|---|---|
| 3701 REGENT BL | Irving | 6503 | PD2 | 65 |

| From Date | From Time | To Date | To Time | Officer |
|---|---|---|---|---|
| 08/20/2013 | 09:00 | 12/17/2013 | 09:00 | 712/BROMLEY,THOMAS |

| Assignment | Entered by | Assignment | RMS Transfer | Approving Officer |
|---|---|---|---|---|
| PATROL DIVISION | 712 | PATROL DIVISION | Successful | 366 |

| Approval Date | Approval Time |
|---|---|
| 01/23/2014 | 16:46:47 |

| # Offenses | Statute Code | Description | Complaint Type |
|---|---|---|---|
| 1 | 16020009 | TERRORISTIC THREAT F | |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| VIC | VIC | 1 | WILLIAMS,MICHAEL DURRELL | B | M | 01/20/1963 |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| VIC | 1 | I | WILLIAMS,MICHAEL DURRELL | 6052817 | B | M | 01/20/1963 |

## Summary Narrative

By the victim being placed in fear for his life due to threats from his coworkers.

COI 00014

## COMPLAINANT/VICTIM 1: WILLIAMS,MICHAEL DURRELL

| Involvement | | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|---|
| COMPLAINANT/VICTIM | | 1 | Individual | WILLIAMS,MICHAEL DURRELL | | 6052817 |

| Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|
| BLACK | MALE | 01/20/1963 | 51 | No | 5'10" | 175# | BLACK | BROWN |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 7604 ACORN LN | | FRISCO | TEXAS |

| Type | | ID No |
|---|---|---|
| Social Security Number | | 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 |

| Phone Type | Phone No |
|---|---|
| Cell | (818)926-0929 |

| Employer/School | Location |
|---|---|
| CALIBER HOME LOANS | 3701 REGENT BL |

| City | State |
|---|---|
| Irving | TEXAS |

## Narrative

Initially VIC tried to report this as a harassment via online reporting but after reading his narrative it was apparent that there was more to this report than that. When I sent his online report back to him for clarification he stated that that he had tried to write a more complete narrative and it would not fit in the space provided by CopLogic. Because of this I asked VIC to email me his story.

VIC did so and I shared it with Sgt Rowan to get his opinion and to see if he wanted an investigator to contact VIC directly or a report to be taken first. Sgt Rowan asked me to take the report and send it on to CID.

I called VIC and let him know that a report was being done and that an investigator would be in contact with him sometime within the next couple of weeks.

Because VIC's story is involved and lengthy I decided instead of rewriting all his narrative from our email conversation to copy and paste his email in it's entirety:

"I started working as a "Business Intelligence Developer III" at Caliber Home Loans located at 3701 Regent Blvd in Irving, Texas on 08/05/2013.

At Caliber Home Loans, employees are blocked from accessing their personal email addresses. Websites such as Hotmail, Gmail, Yahoo or any of the email systems are not accessible from Caliber Home Loan workstations.

I have evidence that between 08/05/2013 and 08/09/2013 I emailed from my Hotmail email address to my Caliber email address several documents that allowed me respond to personal emergencies, pay household bills etc . .I worked from 8 am until 9 - 10pm at night.

These documents contained everything from my home address, HR and Insurance paperwork, SS#'s of family members, password lists, Banking, Credit Card and Immigration Information, Spouses work information, W2 forms, Day Care Providers, school teachers and account numbers to pay utility bills; even court documents concerning a divorce I had recently went through. Also my sons DOB, full name, and the hours and location where he attends school.

During 08/05/2013 and 08/13/2013, the very first week of my starting at Caliber, I began to hear many strange conversations and remarks swirling around me. And these remarks were coming from the Network Security Team section which was in the very next aisle to the right of the BI Team, my Team, aisle.

I heard a small group of guys mention the actual street name I grew up on, the name of the school I am in the process of enrolling into. My mother's full name, my sisters full name, my brother's and fathers full name. Then I heard the same group of guys mention my middle name (which is unique). I constantly heard references to the Country where my wife was born

| Report Officer | Printed At | |
|---|---|---|
| 712/BROMLEY,THOMAS | 05/14/2014 16:34 | Page 2 of 5 |

**COI 00015**

## Narrative

(Colombia). I them mention words from my password list. I kept hearing the same people making reference to the Spanish. I kept hearing references to child support and divorce; things I recently went through. Even my salary earnings from 2012. And the tone was always hostile. Then one day, I heard these same guys debating about the proper pronunciation of my wife's full maiden name (there are probably only three people in America with that first and last name combined). It was like someone was saying, "Hey, look over here." Then I started identifying who was making these remarks. It was always these three people, Robert Murray, Mike Schultz, Shawn X from the help desk; and later the Shawn guy was replaced by Kenneth Baugh; then shortly thereafter came Shannon Eernisse.

These guys used their privileges as Network Security Administrators to intercept my emails and copy documents from my computer to theirs for the purpose of being able to find out where me and my family lives.

On or about, 08/11/2013, Shawn X walked by my desk, looked at me and said, "Trayvon!", then reshaped his hand as to mimic a pistol, pointed the gun at me and made a shooting motion.

On the same day, Shawn was setting up a computer in the cubicle behind me for Manny Madrigal (a new employee). He said, laughing, "Michael, if you complain to HR, no one will listen." I said nothing. Then as he removed each piece of computer equipment from their boxes he would "slam" each piece of equipment onto the desk behind me. He removed the mouse and "banged" it violently onto the desk. He removed the keyboard and "banged" it violently onto the desk; you'd think he was breaking that keyboard in half. He removed the mouse pad and "flung" it onto the desk. Likewise with the computer monitor; kicking and stomping the empty boxes.
Week Two: Specific Incidents of Terroristic Threats
On 8/13/2013. I sent an email to Manju Darbe, a co-worker, requesting the name of the Day Care provider in Irving where she takes her children. The same day Manju replied with an email from her Caliber email address to my Caliber email address with the name of the Day Care Provider, which was "Kids-R-Kids". Approximately one week later, I enrolled my six year old son in that school.

One day between 08/19/2013 and 08/22/2013, Mike Schultz, Robert Murray and Shawn, were loitering at the cubicle next to me, arms folded and looking directly at me and made the following statements.

Mike said, "his kid makes him vulnerable" Robert said, "his kids goes to school right here, right here on Regent, at 'Kids-R-Kids' (pointing in the direction of 'Kids-R-Kids' on Regent Blvd.). You know I studied explosives in the Marines, we could just pass by on lunch and toss a grenade on the playground, or setup a snipers nest to pick his kid off.

In August 2013, they acknowledged knowing where my son attended school. Then in November 2013, they made this threat.
Week Three: On-going discussions regarding guns
Robert and Kenneth boasting about being trained as snipers in the Marines. Robert boasted about how he can hit a spine from a far away distance and make her head explode.

On Wednesday, 12/11/2013, Robert Murray, Kenneth Baugh and Mike Schultz were assembled at the cubicle of Tammy Walker, gossiping and staring at me as

## Narrative

usual. Robert Murray lowered his voice and said, her name is *******, (they struggled over how to pronounce it) and she works at Wal-Mart and she goes in Sunday at 10 am. Mike Schulz said something back to him which I could not hear.

Then Kenneth Baugh said, lets catch her leaving work and shoot her in the Wal-Mart parking lot then send her shoes to Colombia. They need shoes in third world countries. Mike Shultz said, her and the kid. Kenneth Baugh said, we'd make Maurice (Maurice Pipkin: Chief Security Officer and their manager) look real good. Robert Murray starts boasting, as usual, about he was a marksman in the United States Marine Corps. He went into how far away he could be from her and hit her spine and make her head explode. After that they went into a tirade against immigrants from other countries; or as they put it Third World countries.

Six days later, on Tuesday, 12/17/2013, I was exiting the elevator on the fourth floor as Robert Murray and Kenneth Baugh were entering the same elevator. They both gave me a menacing stare, and somewhat blocking my way, and as I was passing Robert Murray said, "should we shoot him in the head and then fire him, or should we fire him first and then shoot him in the head." Kenneth Baugh said, "shoot him in back of the head. . . the back".

Radha Thompson, Brian Schmidt and Maurice Pipkin did not start this Hate Group on this path, but once they saw them carrying out these attacks on me, they were amused by it and encouraged them to continue. They (Radha, Brian and Maurice) probably did not imagine it would go so far as the death threats, but it did.

I met with a Therapist, spoke with an attorney and met with a security specialists and among the handful of recommendations was to file a police report with the Irving Police Department.

On Saturday, 12/21/2013, after first visiting the Frisco PD, where I live, I called the Irving PD to see what is the process for filing a police report for a Terroristic Threat. I spoke with Officer Stephanie Barnes #C1661. Officer Barnes started asking me questions to get me talking about the situation. She became personally interested in the story and began to give me legal advice. I told her that I was not calling for legal advice, I just wanted to know how to file the complaint. She said that she needed to know the details of the issue to know how to file the complaint. I told her a synopsis of the story.

Officer Barnes preempted my police report and called the Caliber security, then Caliber security notified the VP of Human Resources, Michelle Greenstreet.

The next day, Sunday, 12/22/2013, while me and my 6-year old son were in my home we heard someone pounding on the door, trying to break it down, like a drug raid in the worst part of the World was in process. My home was surrounded by what appeared to be Frisco SWAT Team members.

I waited until they left and used the landline in my home to call the Frisco Police Department (FPD). They told me that someone by the name of Michelle Greenstreet called them and said she believed that I was in the house dead or bleeding to death or the victim of a robbery. And she gave the police my home address and requested that the police go by the house to investigate. So when the police came they were led to believe there may be a robbery or

COI 00017

## Narrative

homicide in progress at my home. And they approached the house as such. Michelle Greenstreet made up a lie to the police in order to get the police to come to my home on a Sunday afternoon; three days before Christmas 2013. That proves that the highest level of managers at Caliber knew full well what my call to the Police was about.

At this point I had never complained to my managers nor Human Resources about the threats that were made towards me. Calibers response to the Irving PD call is evidence that Caliber Home Loans knew that death threats had been made towards me and my family. They probably had already developed a whole series of steps to take to counter my complaint or to cover-up these threats. I was due at work the next day, why not just wait until I return? My wife is listed as an emergency contact person, why didn't they call her before calling the police? Everything I am alleging in this police report they already knew.

Are we to believe that every time an employee is unavailable on a Sunday (their off day), the President of the HR Department sends the police to their home? Why not try to call my emergency contact person that is in every employees HR file?

All of this has been a very traumatic experience for me and my family and as a result of all of this my family and I are in fear for our lives and at the same time too traumatized to write about it. Sometimes I am afraid to press charges and other times I am enthusiastic about it.

These are a group of ex-Military personnel with guns and who are also, Nazi-minded people. They are definitely a Hate Group.

What makes this threat imminent is that the frequency and relentlessness of the death threats towards my son, wife and family. And the fact that these people have all of my personal contact information, including social security numbers. Even if I were to sell my house and move they would be able to find me and my family. So the threat is always imminent; it never goes away. Since these people have acquired my information there have been many unexplained successful and unsuccessful logins to me and my wife's banking and utility accounts.

We never know when or where we will be shot or murdered. Our lifestyles have changed and we are always in fear for our lives and safety and confused about the law and our protection in public. I was advised to purchase a gun and carry a concealed weapon, but I do not want to have a gun in the house around my 6 year old son."

No further at this time.

# EXHIBIT

# B

COI 00019

# Incident Report
# Irving Police Department

**14-1763**



305 N O'Connor Rd

Irving TX 75061

(972) 721-2437

Reported Date
02/25/2014
Report Type
TERR THR
Officer
CURTIS,ERIC

## Administrative Information

| Agency | Report No | Supplement No | Reported Date | Reported Time | CAD Seq No |
|---|---|---|---|---|---|
| Irving Police Department | 14-1763 | 0001 | 02/25/2014 | 17:42 | 140110937 |

| Status | Report Type |
|---|---|
| REPORT SUSPENDED/CLOSED | TERRORISTIC THREATS |

| Location | | City | Rep Dist | Area | Beat |
|---|---|---|---|---|---|
| 3701 REGENT BL | | Irving | 6503 | PD2 | 65 |

| From Date | From Time | To Date | To Time | Officer |
|---|---|---|---|---|
| 08/20/2013 | 09:00 | 12/17/2013 | 09:00 | 739/CURTIS,ERIC |

| Assignment | Entered by | Assignment |
|---|---|---|
| CRIMINAL INVESTIGATIONS/PERSONS | 739 | CRIMINAL INVESTIGATIONS/PERSONS |

| RMS Transfer | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|
| Successful | 526 | 02/27/2014 | 11:08:27 |

## Narrative

I was assigned the follow-up investigation into this report.

I read the report and found some of the claims by Victim Williams to be a bit farfetched. He claimed that co-workers had intercepted his emails to get information on him. He said that the co-workers would stand near his desk and talk about shooting his wife (or ex-wife) and sending her shoes to Columbia where she is from. They would bang computers on a computer that was being set-up next to him to annoy him. They made comments about being Marine Corp snipers and shooting his wife and son in the spine to watch their head explode. They would talk about shooting him as he would walk by.

I looked at the dispatch notes and the report written by Dispatcher Barnes (13-28570). He told Barnes that fellow employees were harassing him and threatening to shoot and kill him. When she asked if he had contacted his Human Resources Department to file a complaint he became irate and told her no. He then said that he had spoken with his supervisor and that it was part of the problem. He said that they were threatening to shoot his wife and send her shoes back to Columbia where she is from. He told her he was divorced, then said he was married. Barnes contacted Caliber Funding's security because she was concerned for the safety of the fellow employees after listening to Williams.

Williams' supervisor, Tiffany Siskin, checked his computer and emails and found no evidence of these threats being made to Williams. They suspended Williams pending an internal investigation.

On 02/11/14, I contacted Frisco PD and obtained copies of the dispatch call notes from the Check Well Being that they conducted on 12/22/13. They were contacted by Michelle Greenstreet who stated that she was his employer and asked that they checked on Williams because he had made claims to the Irving Police Department that he was being threatened by employees with the company and that his email was being hacked. Also mentioned that he was going through a divorce and she had been told by Dispatcher Barnes that he was incoherent. Greenstreet had been trying to contact Williams to check on him but he was not answering his phone. At 1800 hours, Frisco PD officers went to his home and tried to contact Williams but no one answered the door. They checked with neighbors who stated that they'd not seen him for several days.

At 1812 hours, Williams called Frisco PD, asking why they were at his house. He told them that he wasn't at home but that his neighbors and ex-wife told him they were there. The officers contacted Williams and told him to contact his employer.

At 2043 hours, he called back and told Frisco PD that the call was a prank and there was no reason for his office to request a welfare check. He told them that it was "BS".

I contacted Michelle Greenstreet who called Frisco PD. She stated that she was the Human Resources Manager

COI 00020

until approximately two weeks ago and she had conducted the investigation into Williams' complaint.

She stated that because of the call that Williams had made to Irving PD, she and other supervisors were concerned about Williams' well-being. They attempted to call him for approximately eighteen hours prior to contacting Frisco PD about a welfare check. She also made the decision to look at his email to see if they found any threatening messages. Nothing was found on the computer except an email written by Williams referring to getting a concealed handgun and a list of neurologists. She stated that at the time, they were concerned about his mental well-being and they were going to refer him to a psychologist before he would be allowed back to work.

On 12/23/13, she received an email from Williams outlining his complaints against his co-workers. At this time, they felt that he wasn't distraught and they decided to launch an investigation into his complaints. Since everyone involved worked in IT, she decided to hire an outside forensic computer examiner to come in and image all of the computers belonging to the people involved. She also interviewed all of the employees that were accused and everyone that sat around Williams. After a three week investigation she found no evidence of harassment on anyone's computers and nothing in any of the interviews. She stated that Williams told her that he had recordings of the harassment but he would never produce these recordings. Since he would never produce these recordings, the investigation was closed. She stated that they decided not to require him to see a psychologist after the investigation but that one was available through their employee assistance program if he chose to use it. As far as she knows, he's still employed at the company but that everyone is very cautious around him because of the complaints that he's made.

She said that the company general counsel, Craig Lackey (214-874-4106), is familiar with the investigation. He is still employed by the company.

On 02/12/14, I spoke with Lackey. He also stated that when Williams made his accusations, they launched a full investigation into them. They hired an outside computer forensic examiner to image all of the computers of everyone involved, including Williams. The only thing they found on any of the computers was Williams sending an email to himself about a concealed handgun. They interviewed all of the accused and witnesses and no one could substantiate anything that Williams claimed. He said that some of the accused didn't even know who Williams was. He said that prior to the accusations, Williams was always sending emails complaining about his pay and not receiving an end-of-year bonus. Lackey said that he didn't receive a bonus because he'd only worked for the company for a few months and they don't typically give a bonus to new employees. He also said that Williams claimed to have recordings of the harassment but never produced them. He said that since they closed the complaint, there have not been any more issues with Williams.

At approximately 1120 hours, I received a phone message from Williams. He was cancelling our appointment for today at noon because he was sick. He said that he would call me later to reschedule. That afternoon, I called Williams about rescheduling his appointment. He has not returned my call.

Based on the report filed by Barnes, the interviews with Greenstreet and Lackey, the story that Williams depicts in his email and Williams failure to come in for the interview that he requested, there is nothing to substantiate this story. I do not believe that Williams was harassed by his fellow employees as he claims. The report will be unfounded.

COI 00021

# EXHIBIT

# C

COI 00022

# Post-Run/Call Report

| Date/Time Recvd | CFS Number | Call Type | Location | Premise |
|---|---|---|---|---|
| 12/22/2013 17:34:59 | 13108360 | WELFARE: WELFARE C | 7604 ACORN LN | MERIT HOMES |

**Call Taker:** PEREZ, CANDY    **Call Source:** P: PHONE
**Reporting Party:** MICHELLE GREENSTREET - C/

**RP Home Phone:** 2144056092

| Remark Date/Time | User |
|---|---|

**12/22/2013 17:36:47**    by PEREZ, CANDY
**Remark:** CHECKING ON MICHAEL WILLIAMS B/M 50 YOA
EMPLOYER ADVISES HE HAS BEEN A GOOD EMPLOYEE AND THEN FRIDAY AT APROX 9PM, HE
CALLED THE IRVING PD AND CLAIMED HE WAS BEING THREATENED BY EMPLOYEES W/CO, WIFES
LIFE WAS THREATENED AND HIS EMAIL WAS BEING HACKED.

**12/22/2013 17:37:41**    by PEREZ, CANDY
**Remark:** IRVING DISPATCH ADVISED DURING THE CALL HE HAD BECOME VERY INCOHERENT, SAID WAS
GOING THRU A DIVORCE AND HAD BEEN TERRORISTIC THREATS TO HIS FAMILY
IRVING PD CONTACTED SECUIRTY AT THE COMPANY
RP IS HR FOR THE MORTGAGE CO SUBJ WORKS FOR

**12/22/2013 17:38:56**    by PEREZ, CANDY
**Remark:** THEY HAVE BEEN TRYING TO CONTACT HIM SINCE FRIDAY AND THEY HAVE BEEN UNABLE TO,
HAVEN'T BEEN ABLE TO FIND ANYTHING IN HIS EMAIL THAT WAS OUT OF THE ORDINARY
EXCEPT A LIST OF NEUROLOGIST  AND...

**12/22/2013 17:39:09**    by PUCKETT, RYANN
**Remark:** IBRS
**Name:** WILLIAMS,MICHAEL     **DOB:** 01/20/63
**Race:** B **Sex:** M **Hgt:**    **Wgt:**   **Hair:**   **Eye:**
**OLN:** 34739496

**12/22/2013 17:39:41**    by PEREZ, CANDY
**Remark:** FOUND A 'TO DO LIST'
- CONCELED HAND GUN (AT BOTTOM OF LIST)
- TAKE OUT DRY CLEANING
- LIST OF NEUROLOGISTS
- TRAFFIC TICKETS
AND SEVERAL OTHER THINGS

**12/22/2013 17:40:09**    by PEREZ, CANDY
**Remark:** LIST WAS DATED FRIDAY 11/15/13

HAS NOT SEEN ANYTHING IN HIS EMAIL THREATING HIMSELF OR ANYONE ELSE. HE IS AN INFO
TECH PERSON SO THEY HAVE SINCE SHUT OFF ALL OF HIS ACCESS AS OF YESTERDAY

**12/22/2013 17:41:48**    by PEREZ, CANDY
**Remark:** NO IMMIDATE ACCESS TO VEH INFO WILL SEE IF CAN FIND.
SUBJ TOLD IRVING DISPATCHER THAT HE IS GOING THRU A DIVORCE AND PROBLEM WITH HIS IN
LAWS
RP HAS NO INFO OTHER THEN MARRIED AND 1 DEPENDANT
HAS ONLY BEEN EMPLOYED W/THEM 4 MOS SO NO FURTHER

**12/22/2013 17:43:33**    by PEREZ, CANDY

COI 00023

**Remark:** NO EMERGENCY CONTACTS LISTED W/CO

RP WOULD LIKE SUBJ TO CONTACT HIS SUPERVISORS SUPERVISOR: BRETT JOHNSON @ 520-360-3753
RP ALSO REQ CALL WITH OUTCOMOE

12/22/2013 17:46:34    by PEREZ, CANDY
**Remark:** RP DID FIND INFO SHOWING HE HAS A CHILD, 6 YO
NO INFO ON WIFE ON FILE

12/22/2013 17:56:05    by BOONE, KIA
**Remark:** per ibrs - phone numbers for michael williams are 214-407-7556 cell
818-926-0929  home

12/22/2013 17:58:58    by BOONE, KIA
**Remark:** attempted both numbers to see if subj is at home and both rang and went to voicemail

12/22/2013 18:00:19    by LOVELL, JOSHUA
**Remark:** Knocked on the door and attempted several calls to numbers for the subject. No one answered the door or phone. There was no sign of an offense and the neighbors stated that they had not seen him for several days. NR

## Units

| Unit ID | OfficerName | Dispatch | Enroute | Arrive | Clear | Quarters | Resp. Time | TimeSpent |
|---------|-------------|----------|---------|--------|-------|----------|------------|-----------|
| 242 | J. LOVELL | 17:39:32 | 17:39:47 | 17:47:56 | 18:04:21 | | 0:00:08:24 | 0:00:24:49 |
| 249 | M. CHOATE | 17:39:32 | 17:39:47 | 17:48:44 | 17:59:15 | | 0:00:09:12 | 0:00:19:43 |
| | E. COX | | | | | | | |

## Agency Information

| Agency ID | Agcy CFS No | Dispo | Report Rqd | Queue Date/Time | Call Type | Grid | District |
|-----------|-------------|-------|------------|-----------------|-----------|------|----------|
| FPD | 13108360 | NR | No | 12/22/2013 17:36:47 | WELFARE | 4090 | 151 |

Parameters used:
CFSNo: 13108360

COI 00024

# Post-Run/Call Report

| Date/Time Recvd | CFS Number | Call Type | Location | Premise |
|---|---|---|---|---|
| 12/22/2013 18:11:53 | 13108368 | FOLLOWUP: FOLLOW U | 7604 ACORN LN | MERIT HOMES |

| Call Taker: | PEREZ, CANDY | Call Source: | O: OFFICER |
|---|---|---|---|

**Reporting Party:** MICHAEL WILLIAMS
7604  ACORN LN
FRISCO, TX 75034

**RP Home Phone:** 8189260929

| Remark Date/Time | User |
|---|---|
| 12/22/2013 18:12:47 | by PEREZ, CANDY |

**Remark:** CONT BY PHONE
WANTS TO KNOW WHY WE WERE OUT AT HIS HOUSE.
HE IS NOT AT HOME BUT IS ON HIS WAY BACK HOME AND HIS NEIGHBORS AND EX WIFE TOLD HIM
WE WERE THERE

| 12/22/2013 18:14:53 | by DEFARIA, DOLORES |
|---|---|

**Remark:** HOLDING FOR 242 - ON ANOTHER CALL

| 12/22/2013 18:30:49 | by LOVELL, JOSHUA |
|---|---|

**Remark:** Contacted RP and informed him to call his employer. Clr NR

## Units

| Unit ID | OfficerName | Dispatch | Enroute | Arrive | Clear | Quarters | Resp. Time | TimeSpent |
|---|---|---|---|---|---|---|---|---|
| 242 | J. LOVELL | 18:15:23 | | | 18:15:23 | | | 0:00:00:00 |
| | J. LOVELL | | | | | | | |

## Agency Information

| Agency ID | Agcy CFS No | Dispo | Report Rqd | Queue Date/Time | Call Type | Grid | District |
|---|---|---|---|---|---|---|---|
| FPD | 13108368 | NR | No | 12/22/2013 18:12:47 | FOLLOWUP | 4090 | 151 |

Parameters used:
CFSNo: 13108368

COI 00025

# Post-Run/Call Report

| <u>Date/Time Recvd</u> | <u>CFS Number</u> | <u>Call Type</u> | <u>Location</u> | <u>Premise</u> |
|---|---|---|---|---|
| 12/22/2013  20:03:20 | 13108393 | FOLLOWUP: FOLLOW U | 7604 ACORN LN | MERIT HOMES |

**Call Taker:** PUCKETT, RYANN      **Call Source:** O: OFFICER

**Reporting Party:** MICHAEL WILLIAMS
7604  ACORN LN
FRISCO, TX 75034

**RP Home Phone:** 8189260929

| Remark Date/Time | User |
|---|---|
| 12/22/2013  20:05:10 | by PUCKETT, RYANN |

**Remark:** contact by phone
req to speak with 242
ref cfs 8368 / 8360

| 12/22/2013  20:05:36 | by PUCKETT, RYANN |
|---|---|

**Remark:** did adv rp it would be abt 30 mins as 242 is on lunch and he stated that would be fine

| 12/22/2013  20:43:33 | by LOVELL, JOSHUA |
|---|---|

**Remark:** RP called back stating that the original welfare call was a prank and his work had no reason to request a welfare check. I explained to him the process for a welfare check and he stated that he just wanted us to know that it was "bs". No offense. NR

## Units

| Unit ID | OfficerName | Dispatch | Enroute | Arrive | Clear | Quarters | Resp. Time | TimeSpent |
|---|---|---|---|---|---|---|---|---|
| 242 | J. LOVELL | 20:37:37 | 20:37:50 | 20:37:54 | 20:43:37 | | 0:00:00:17 | 0:00:06:00 |

## Agency Information

| Agency ID | Agcy CFS No | Dispo | Report Rqd | Queue Date/Time | Call Type | Grid | District |
|---|---|---|---|---|---|---|---|
| FPD | 13108393 | NR | No | 12/22/2013  20:05:10 | FOLLOWUP | 4090 | 151 |

Parameters used:
CFSNo: 13108393

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL WILLIAMS, | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 3:15-CV-1701-L-BH** |
| | § | **ECF** |
| CITY OF IRVING, TEXAS, | § | |
| **Defendant.** | § | |

## <u>AFFIDAVIT OF ERIC CURTIS</u>

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, a notary public in and for the State of Texas, on this day personally appeared Eric Curtis, who is personally known to me, and who, after being duly sworn according to law, upon oath deposed and said:

> "My name is Eric Curtis; I am over eighteen years of age, of sound mind, and am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct. I am currently assigned as a Detective in the Criminal Investigation Division of the Irving Police Department. Detective is an assignment within the Irving Police Department. My rank within the department is as a Police Officer.
>
> In late 2013 and continuing through to the present, I have reported to a sergeant who reported to a lieutenant, who reported to a captain, who reported to an Assistant Chief who reported to the Chief of Police. My captain at this time was Bruce Jolley. I am subject to and required to adhere to the City's Ordinances as promulgated by the City Council and the department's General Orders as promulgated by the Chief of Police. I am not responsible for making policy in my position within the Irving Police Department.
>
> In mid-March Williams appeared unannounced at Irving PD and demanded an appointment with me. I met with Williams down in the lobby of police headquarters. Williams quickly became angry and disruptive as I tried to explain that Williams' allegations were not supported by evidence. Williams repeatedly and forcefully stated he had evidence, including recordings, to prove his allegations. Williams' disruption was such that I had to repeatedly direct him to leave the building but not before I agreed to meet Williams the next day to review all of Williams' evidence. Williams eventually left police headquarters but did not show

up to meet with me the next day. Because of Williams' erratic behavior documented in my investigation and his behavior at the police department, I created an informational bulletin ("BOLO") on Williams for use by other police officers who may encounter Williams. This BOLO documented my findings in his investigation, listed Williams' criminal history, and provided a picture of Williams. The listed criminal history, which included larceny, fraud, dangerous drugs, disorderly conduct, obstructing a police officer, robbery and injury to a child is exactly as it is stated in the computerized criminal history ("CCH"). Importantly, the BOLO is for informational purposes only to give other officers who may encounter Williams a fuller picture of Williams. The BOLO explicitly states that there is no arrest warrant out for Williams based on the information in the BOLO. When I created this BOLO I was not aware of any state or federal court proceeding in which Williams was involved. Finally, the BOLO is stored on a platform accessible only by Irving police officers. I also sent a copy of it to Frisco PD because Williams lives in Frisco. It is not uncommon to provide such information to police officers where a subject lives, and I have frequently done the same thing with individuals of all races. After sending the BOLO to Frisco PD, I did not have further contact with Frisco officers regarding Williams. I did not have any involvement in any of Williams' subsequent arrests by Frisco PD over the years."

Attached as Exhibit A is the BOLO referenced above. This information is kept by the Irving Police Department in the regular course of business and it was in the regular course of business that I in my capacity as an Irving police employee, created the BOLO. This record was made at or near the date and time reflected on the record. The attached record is an exact duplicate of the original record."

ERIC CURTIS

THE STATE OF TEXAS §
§
COUNTY OF DALLAS §

Before me, the undersigned notary, on this day personally appeared ERIC CURTIS, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on March 15, 2018.

NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

RORY LYNNE KNIBBS
My Notary ID # 130188125
Expires April 13, 2019

**AFFIDAVIT OF ERIC CURTIS**

# EXHIBIT
# A

COI 00029

# Irving Police Department

For Law Enforcement Use Only





## BOLO

## Mental Health Consumer

Create Date: 03/13/2014
Modified Date: 03/13/2014
**Report No:** 14-1763

**WILLIAMS, MICHAEL , D**
**AKA:**
Male / Black 01/20/1963       51 Yrs
Black / Brown  5' 10" / 175 Lbs
CA DL C5118953
**Status:** Mental Health Consumer
**LKA:** 7604 Acorn Ln , Frisco TX
**CCH:**
Larceny, Fraud, Dangerous Drugs, Disorderly Conduct, Obstruct Police
Officer, Robbery, Injury to a Child, Traffic
**Scars, Marks, Tattoos:**



Williams was working at Caliber Home Loans, 3701 Regent Blvd.  Williams made a harrasment report, claiming that other IT employees were threatening to kill him and his family.  He also made a complaint with the HR department.  During the investigation, a forensic exam was performed on the computers of everyone that Williams implicated, including his computer.  The only thing found on any of the computers was Williams research on obtaining a Concealed Handgun License.

Williams came to the CJC and was told that his report had been closed.  He became very angry and began screaming in the CJC lobby.  Williams was told to leave the building.

Williams was terminated by Caliber after complaints of inappropriate outbursts, comments and gestures towards other employees.  The company knows that Williams is unstable and that he is a threat to come back to the location.

This BOLO is for information purposes only and there is not an active warrant for Williams based on this.

Criminal Investigation Division
Phone: 972-721-3539    Fax: (972) 721-3607
Case Investigator(s):  Eric Curtis #739   ecurtis@cityofirving.org
For Law Enforcement Use Only

COI 00030

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **MICHAEL WILLIAMS** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:15-CV-1701-L-BH** |
| | § | **ECF** |
| **CITY OF IRVING, TEXAS, et al.** | § | |
| **Defendants.** | § | |

## <u>AFFIDAVIT OF BRUCE JOLLEY</u>

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, a notary public in and for the State of Texas, on this day personally appeared Bruce Jolley, who is personally known to me, and who, after being duly sworn according to law, upon oath deposed and said:

"My name is Bruce Jolley; I am over eighteen years of age, of sound mind, and am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct. I am an Assistant Chief in the Irving Police Department.

In late 2013 and early 2014 I was a Police Captain. At that time, I reported to an Assistant Chief who, in turn, reported to Chief of Police Larry Boyd. Like all ranks within the Irving Police Department, I am subject to the City's Ordinances as promulgated by the City Council and the Irving Police Department's General Orders as promulgated by the Chief of Police. Similarly, I am required to follow the lawful directions issued to me by my superior officers. As a Captain and an Assistant Chief, I was not and am not responsible for setting policy within the City of Irving generally or the Irving Police Department specifically.

At no time in my career have I been aware of any custom or practice within the Irving Police Department in which members of the department have (1) refused to protect the black community from criminal elements in the white community; (2) retaliated against black people when they demand equal protection; or (3) retaliated against black people when they file federal lawsuits."

_____
BRUCE JOLLEY

THE STATE OF TEXAS §
§
COUNTY OF DALLAS §

Before me, the undersigned notary, on this day personally appeared BRUCE JOLLEY, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on March 20, 2018.

_Janie Wahl_
NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **MICHAEL WILLIAMS,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:15-CV-1701-L-BH** |
| | § | **ECF** |
| **CITY OF IRVING, TEXAS,** | § | |
| **Defendant.** | § | |

## AFFIDAVIT OF LESLEY D. MOORE

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, a notary public in and for the State of Texas, on this day personally appeared Lesley D. Moore, who is personally known to me, and who, after being duly sworn according to law, upon oath deposed and said:

"My name is Lesley D. Moore; I am over eighteen years of age, of sound mind, and am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct. I am the Police Legal Advisor for the Irving Police Department. I have been in this position since 2002. In my time in this position, I have always reported to the Chief of Police. I am subject to and required to adhere to the City's Ordinances as promulgated by the City Council and the department's General Orders as promulgated by the Chief of Police. I am not responsible for making policy in my position within the Irving Police Department.

Attached as Exhibit A are section 501.05 and sections 801-805.03 of the Irving Police Department's General Orders. This information is kept by the Irving Police Department in the regular course of business and it was in the regular course of business that this information was promulgated by the Chief of Police. These records were made at or near the dates reflected on the records. The attached records are duplicates of the original record."

_____
**LESLEY D. MOORE**

THE STATE OF TEXAS     §
                      §
COUNTY OF DALLAS       §

 Before me, the undersigned notary, on this day personally appeared LESLEY D. MOORE, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

 Given under my hand and seal of office on March 13, 2018.



NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

JANICE WAHL
NOTARY PUBLIC
STATE OF TEXAS
COMM. EXP. 06-24-2019
NOTARY ID 7393-0

# EXHIBIT
# A

COI 00035

**\*501.05     Notice of Investigation**

A.     Employees will be notified as soon as practical on the Notice of Investigation form of all administrative investigations or complaint allegations that could result in formal discipline. The decision to use the written notification process for complaints is governed by an objectively reasonable belief that formal disciplinary action would be possible if the allegations contained within the complaint were sustained. If there is doubt about the outcome, the supervisor should always err on the side of issuing the Notice of Investigation.

B.     The following types of incidents require written notice:

1.     Complaints involving allegations of criminal offenses constituting a Class B misdemeanor or greater and those Class C misdemeanors involving family violence or moral turpitude

2.     Suspected substance abuse

3.     Corruption or brutality

4.     Intentional violations of rules, regulations, or policies and repeated minor complaints

5.     The acts alleged constitute civil rights violations

6.     The acts alleged would bring into question the employee's moral character, honesty or integrity

7.     Regardless of the circumstances, any inquiry regarding an employee's use or attempted use of deadly force or other incident described in G.O. 303.08

\*8.     Any written complaint by a citizen that alleges a policy violation or any complaint that requires formal discipline, if sustained

C.     Professional Standards will be updated within 48 hours as to the status of all complaints in which a Notice of Investigation was issued.

D.     If an investigation of a complaint cannot be completed within 14 days of the Notice of Investigation being signed by the officer, the Chief's office will be notified and a deadline will be established for the conclusion of the investigation; any subsequent extensions will be approved by the Chief's office.

\*E.     Complaints in which a Notice of Investigation was issued will be forwarded to the Professional Standards.

F.     Recommendations of formal discipline are documented using the Notice of Disciplinary Action form. The Notice of Investigation form cannot be substituted to recommend formal discipline.

**COI 00036**

**\*501.06        Letter of Counseling Form**

A.      The Letter of Counseling form is used to document infractions not requiring formal discipline.

B.      The employee receiving the Letter of Counseling will acknowledge the existence of the report and its recommendation by signing it. The issuing supervisor will provide a copy of the Letter of Counseling form to the affected employee.

\*C.     The Letter of Counseling form will be reviewed by the employee's chain of command, up to and including the Division Commander.  If the Counseling form is sustained, the Division Commander will forward the original to Professional Standards.

**501.07        Notice of Disciplinary Action Form**

A.      The Notice of Disciplinary Action is used to recommend formal discipline against an employee at the conclusion of an investigation.

B.      The employee receiving the Notice of Disciplinary Action will acknowledge the existence of the report and its recommendation by signing it. The issuing supervisor will provide a copy of the Notice of Disciplinary Action form to the affected employee.  The employee's entire Chain of Command will review the form.

C.      If formal discipline is sustained, the form and its supporting documentation will be permanently maintained in the employee's disciplinary record.

D.      If formal discipline is not included in the final disposition, Professional Standards will retain the form and its supporting documentation in the manner authorized by state law and Department policy.

**\*501.08        Employee Notification and Investigation Procedures (TPRP 2.07)**

A.      In instances where an employee is the subject of a complaint that requires written notification, the employee will be notified on the Notice of Investigation form of the nature of the complaint within a reasonable time after receipt of the complaint.  The employee should sign the Notice of Investigation form before the supervisor orders the employee to respond to the allegations in writing.

\*B.     The immediate supervisor or the supervisor responsible for investigating the complaint is responsible for completing the Notice of Investigation form, notifying the employee, and making the appropriate entries into the Blue Team Software.

C.      The complaint will be investigated by the Division the employee is assigned to, unless it is a criminal offense. The Bureau Commander may request that any complaint be assigned to Professional Standards for investigation.

\*D.     The investigating supervisor, upon receipt of the complaint, will complete the Notice of Investigation form through the "Alleged Policy or Procedure Violation(s)" section.

    1.      If the complaint is originated internally, the supervisor completing the Notice of Investigation form will list him/herself as the complainant and sign on the signature line in the complainant's section.

**COI 00037**

# EXHIBIT
# B

COI 00038

| **800.00  CODE OF CONDUCT** |
| --- |

| Approved: *[signature: Larry Boyd]* **Chief of Police** | **Date: January 4, 2016** |
| --- | --- |

**TPCA Recognition Program Standard(s): 2.01, 2.02, 2.12, 2.14, 2.15, 2.16, 2.17, 2.19, 2.20, 2.21, 2.28**

## 801.00    AUTHORITY AND PURPOSE

### 801.01    Purpose

The purpose of this policy is to provide employees of this agency with guidelines that govern their conduct.

### 801.02    Policy

The Code of Conduct of the Irving Police Department is designed to promote efficiency, discipline, and good public relations by setting forth policies governing the conduct of all employees of the Police Department.

### 801.03    Code of Ethics (TPRP 2.02)

A.   As officers of the Irving Police Department, we understand the importance of our image to the community, and each other, and hold in high esteem those ideals set forth in the International Association of Chief's of Police Code of Ethics:

"As a law enforcement officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression of intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all men to liberty, equality, and justice.

"I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others.  Honest in thought and deed in both my personal and official life.  I will be exemplary in obeying the laws of the land and the regulations of my department. Whatever I see or hear of a confidential nature that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

"I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions.  With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

COI 00039

"I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession-law enforcement."

### 801.04      Authority

A.   The Code of Conduct of the Irving Police Department is promulgated by the Chief of Police by authority of the Code of Civil and Criminal Ordinances of the City of Irving, Section 29-4, the Civil Service Act, Chapter 143, Texas Local Government Code, and the Personnel Policies of the City of Irving.

B.   The Department policy should not be construed as a creation of a higher legal standard of safety or care in an evidentiary sense with respect to third party claims. Violations of this order will form only the basis for Departmental administration sanctions.

### 801.05      SCOPE

A.   The provisions of the Code of Conduct apply to and are to be observed by all employees of the Police Department, unless specified otherwise.

B.   Employees of the Police Department are to read and comply with the Code of Conduct, General Orders, Civil Service policies and regulations, City of Irving Personnel Policies and all other orders, policies, and directives issued by the Department or the City.

C.   Violations of the Code of Conduct, the City of Irving Personnel Policies, the Civil Service Rules and Regulations, Department policies, procedures, or orders, or any violation of the ordinances of the City of Irving, and/or laws of the State of Texas or the United States will subject the offender to disciplinary action.

    1.   Disciplinary action may be in the form of a verbal or written reprimand, suspension, reduction in rank or position, or discharge from employment.

    2.   All disciplinary action is based on the preponderance of the evidence and just cause, and is to be administered in accordance with the Civil Service Rules and Regulations as well as the Personnel Policies of the City of Irving.

D.   Supervisors will take corrective action whenever they learn of any violations of the Department's policies, procedures, or rules.

    1.   If the violation is criminal in nature, the supervisor may relieve the employee from duty, take custody of any credentials issued, take custody of any other items issued by the Department (if warranted), and instruct the employee to report to the office of their Division Commander the following business day at 9:00 a.m.

    2.   A written report is to be submitted to the Chief of Police by the supervisor.

E.   Employees in their probationary period may be discharged from employment by the Chief of Police without disciplinary action when they fail to meet minimum standards of employee performance or when they violate the Code of Conduct, City of Irving Personnel Policies, Civil Service Rules and Regulations, Departmental policies, procedures, or orders or any violation of the ordinances of the City of Irving, and/or laws of the State of Texas or the United States. Civil Service employees in their probationary period have no right of appeal. The decision of the Chief of Police will be final in these

COI 00040

cases. New officers who must attend a basic training academy necessary for initial certification by TCOLE will serve a probationary period of eighteen (18) months from date of appointment. New officers who are not required to attend a basic academy will serve a probationary period of 12 months. General Government Employees serve a probationary period of six (6) months and may be discharged pursuant to the Personnel Policies of the City of Irving.

### 801.06    ATTEMPTS AND CONSPIRACY

A.    Any employee who, by act or conduct, attempts to violate or conspires with any person to violate the City of Irving Personnel Policies for Civil Service employees, the Civil Service Rules and Regulations, Departmental policies, procedures, or orders, or any attempted violation of the ordinances of the City of Irving, and/or laws of the State of Texas or the United States will be subject to the same discipline as though the actual violation had been accomplished.

*Revised 04/01/09*

**COI 00041**

## 802.00      LATE FOR WORK

### 802.01      Purpose

The purpose of this policy is to provide employees of this agency with guidelines for reporting to work when scheduled.

### 802.02      Policy

It is the policy of this agency that employees will report for duty at their scheduled time and place, and be prepared to commence their work day.

### 802.03      Duty Hours

A.      Employees are assigned to work and are compensated for either a forty (40) or eighty (80) hour work period.  They will report for duty at the scheduled time and place in the proper attire.

### 802.04      Late for Work

A.      Employees who fail to report for duty at their scheduled time, place, and/or not properly attired for duty will be considered to be late for work.

      1.      Scheduled time includes training that is scheduled by the Department.

B.      Employees will not receive compensation for time they have not worked.

C.      Failure to compensate an employee for time missed will not be construed as disciplinary action.

D.      Disciplinary action may be exercised by a supervisor in addition.

### 802.05      Supervisors' Responsibility

A.      Supervisors will monitor their subordinates and take appropriate corrective action based upon the subordinate's excuse for lateness and the number of previous occurrences.

B.      Supervisors will have the discretion to dock a subordinate for actual time missed within the first fifteen (15) minutes of lateness. (See G.O. 203.10 for procedure.)

C.      Loss of pay is mandatory for actual time missed after the first fifteen (15) minutes of lateness.

### 802.06      Employees' Responsibility

A.      Reporting to work on time and in the proper attire

B.      Questioning the immediate supervisor if unsure of duty time or attire

C.      Checking the posted schedule or detail in advance

COI 00042

*Revised 01/01/08*

COI 00043

## 803.00    CIVIL, CRIMINAL, JUDICIAL, AND INVESTIGATIVE ACTIONS

### 803.01    Purpose

It is the purpose of this policy to provide employees with guidelines governing investigative actions.

### 803.02    Policy

The policy of this agency is that employees will conduct themselves professionally and in accordance with all laws and policies when involved in matters involving civil, criminal, judicial and investigative actions.

### 803.03    Procedures

A.    Employees must be present and available to testify in any court or grand jury when officially notified to appear.  In criminal cases outside of Dallas County and in all civil cases, employees will respond to a subpoena only.

B.    Employees that are unable to answer an official notification must be excused by the court or grand jury prior to the scheduled appearance date.  Such excused absence must be obtained by reporting the reason in accordance with the employee's Division Standard Operating Procedure.

C.    Employees are to notify their supervisor if court attendance or judicial proceedings necessitate their being absent from duty.

D.    Employees are not to remove, destroy, alter, or cause the removal or destruction or alteration of any report, document, record, or evidence without authorization.

E.    Employees are to notify the Chief of Police in writing whenever they file or have been filed against in a civil suit involving any matter related to their employment with the Police Department.

F.    Employees are to notify their supervisor in writing whenever they are subpoenaed or volunteer to testify for the defense in any criminal or civil trial or hearing or against the City or Department in any hearing or trial upon receipt of the subpoena or of their intention to testify prior to their appearance as a witness.

G.    Officers are not to render aid or assistance in civil cases, except to prevent an immediate breach of the peace or to quell an existing disturbance.

COI 00044

## 804.00 PROFESSIONAL CONDUCT AND PERSONAL BEARING (TPRP 2.12)

### 804.01      Purpose

It is the purpose of this policy to establish required standards of conduct for agency employees.

### 804.02      Policy

It is the policy of this agency that employees will conduct themselves professionally and portray themselves in a positive manner.

### 804.03      Required Standards of Conduct (TPRP 2.16))

A.    The following standards are to be adhered to:

1. It is the duty of all officers within the City of Irving to preserve the public peace and to protect life and property.

2. Officers are to carry their badges and identification credentials on-duty and off-duty while away from their residences. Officers on special assignment may be exempted from this requirement with Division Commander approval.

3. With the exceptions listed, when an officer is off-duty, he may (optional) be armed with a departmentally approved weapon. If armed, the officer must be currently qualified with that weapon as set forth in General Order 302.00.

   Exceptions - An officer <u>must</u> be armed with a Department approved weapon when:

   a. In uniform

   b. In a city vehicle

   c. Performing police related off-duty employment

4. Officers in civilian attire are to carry a weapon concealed and in a manner that it will not cause alarm by the public.

5. Employees on suspension are to surrender their badge and/or identification credentials, and any other city owned property as requested, to their Division Commander prior to serving suspension.

6. Employees that are relieved of duty by a supervisor will surrender their badge and/or identification credentials, and any other city owned property as requested, to the supervisor upon the supervisor's order to do so.

7. Officers must have prior approval from their Division Commander before initiating undercover investigation.

8. Uniformed employees are to report for duty in the proper uniform and carry equipment as prescribed by Departmental policies and directives.

COI 00045

9. Uniforms are to be clean, pressed, and not noticeably patched, torn, or worn. Footwear, leather goods, and metal equipment will be well polished.

10. Employees are to conduct themselves at all times, both on and off-duty, in such a manner as to reflect favorably on the Department. Additionally, conduct unbecoming an officer will include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department, or that which impairs the operation or efficiency of the Department, employee, or officer.

11. Employees are to have a telephone where they may be reached and will report in writing to their supervisor within 24 hours any changes of telephone numbers or residence addresses.

12. Employees working hours are regulated by the Chief of Police, who has the authority to call any employee to return to duty.

13. Employees unable to report for duty are to notify their supervisor or watch commander at least one hour prior to their reporting time and will advise the supervisor where they can be contacted.

14. Employees are required to report to work as scheduled including assigned training, and work their full shift.

15. Employees are to devote their time and attention while on duty to the business of the Police Department.

16. Employees are not to willfully misrepresent any matter, sign or give any false statement or report, commit perjury or give false testimony before any court, grand jury, board, commission, official hearing, or Departmental hearing or investigation.

**804.04          Prohibited Conduct (TPRP 2.28, 2.19)**

A. The following conduct is prohibited:

1. Officers are not to make any arrest, search, or seizure which they know or should know is not in accordance with law and/or Departmental policy.

2. Officers are not to undertake any investigation or other official action which is not part of their regular duties without obtaining approval of their supervisor unless immediate police action is required to protect life or property.

3. Whenever there is a possible risk of compromising an undercover investigation, employees should not acknowledge or address an officer attired in civilian clothes unless that officer initiates communication.

4. Uniformed personnel are not to report for duty in civilian clothes without prior approval of their Division Commander.

5. Uniformed personnel are not to wear unauthorized items on the uniform.

6. Uniformed employees are not to carry an umbrella while performing any job function.

COI 00046

7. Employees are not to interfere with cases being handled by officers of the Department or by any other governmental agency unless:

   a. Ordered to intervene by superior or;

   b. An injustice would result from failure to take immediate action.

8. Employees are not to engage in any of the following:

   a. Interfering with the service of lawful process

   b. Interfering with the attendance or testimony of witnesses

   c. Attempting to have any notice to appear or traffic citation reduced, voided, or stricken from the calendar without approval of their Division Commander

   d. Recommending a dismissal, reduction of charges, or other disposition of a pending criminal case except by written approval of their Division Commander

   e. Taking any action which interferes with the efficiency or integrity of the Department or having knowledge of such interference and fails to inform a superior

9. Employees are not to become personally involved in any criminal investigation concerning themselves or any member of their family. The employee will report the offense to the proper authority for investigation.

10. Officers are not to make arrests in their own disputes or disputes involving family members except under grave circumstances which would justify them in using measures of self defense.

11. Uniformed employees are not to wear the uniform or any part of it off-duty, except while traveling to and from work or with the permission of their supervisor.

12. Employees are not to use another employee's badge or police credentials, nor will they permit their badge or police credentials to be used by another.

13. Employees are not to use any tobacco product in view of the public or within a city vehicle or facility in the course of their duty. Chewing tobacco or use of snuff while in uniform or on-duty is prohibited.

14. Employees are not to borrow money or accept gifts or favors from any known or suspected violator of the law.

15. Employees are not to recommend professional services or businesses to persons contacted in the line of duty.

16. Employees are not to solicit special privileges nor use their position for personal gain or advantage, or for the advantage of others.

17. Employees are not to endorse any product or service nor provide any commercial testimony when such endorsement or testimony alludes to their position or employment with the Police Department.

COI 00047

18. Employees are not to use Departmental material or resources for personal gain or advantage.

19. Employees are not to use the City of Irving address to receive personal mail or for personal use.

20. Employees are not to knowingly enter or frequent a house of prostitution, gambling house, or establishment where the laws of the United States, the state, or local jurisdiction are being violated except for the purpose of official police business.

21. Employees are not to engage in disruptive "horse play" or the playing of pranks on duty.

22. Employees are not to publicly criticize or ridicule the Department, its policies or other employees by speech, writing, or other expression, when such speech, writing, or other expression is defamatory, obscene, unlawful, undermines the efficiency of the Department, interferes with the maintenance of discipline, or is made with reckless disregard for truth or falsity.

23. Supervisors are not to place themselves under financial obligation to a subordinate.

24. Employees are not to use or handle weapons in a careless or imprudent manner.

25. Officers are not to hold a deputation or commission from any other law enforcement agency.

26. Employees are not to wear a Departmental uniform while on suspension. Further, officers are advised that while on suspension their possession of a firearm is restricted to that of any other citizen.

27. No expenditure of money is to be made or liability incurred, in the name of the City of Irving, or the Police Department, unless authorized by the Chief of Police.

28. No employee shall establish an inappropriate social relationship with a known victim, witness, suspect, or defendant in a case investigated by the Department, while such case is being investigated or prosecuted as a result of such investigation.

*Revised 10/1/10*

**804.05     DERELICTION OF DUTY (TPRP 2.14, 2.20)**

The following constitutes dereliction of duty and are cause for disciplinary action:

A. Failure to obey orders promptly or willful disobedience of orders or repeated violation of any policy, procedure, or rule of the Department.

B. Failure to make a prompt and proper report of offense/incident investigated, observed or reported.

C. Failure to deliver to the Property Section any property found by, confiscated by, or relinquished to, employees of this Department without undue delay and in any event before the tour of duty is ended.

COI 00048

D.  Sleeping while on duty or sleeping while on outside employment wearing a police department uniform.

E.  Violation of any federal law or state law, city ordinance, rule, regulation, or policy of the City government or the Civil Service.

F.  Failure to provide name and identification number to any person upon request.

G.  Being absent without leave (Absence without leave means either a failure to report for duty at the proper time and place or the leaving of a place of duty without proper authorization.)

H.  Using or being under the influence of intoxicants on-duty or off-duty when wearing a Departmental uniform.

I.  Using or being under the influence of a controlled substance or any drug when not properly prescribed, or being under the influence of a properly prescribed medication when it would affect their judgment or physical condition while on-duty.

J.  Using unnecessary force against or harassment of any person.

K.  Showing disrespect or discourtesy towards any person.

L.  Using indecent, profane, or harsh language in the performance of official duties or in a public place.

M.  Accepting, agreeing to accept, or soliciting a bribe. (A bribe under this rule is defined as a gift, sexual favor, money, or thing of value, testimonial, appointment, personal advantage, or the promise or solicitation of either, bestowed or promised for the purpose of obtaining special privileges or personal gain by the donor or other person.)

N.  Exhibiting cowardice or failure to perform police duties because of danger.

O.  Failure to seek information from a supervisor or senior employee when in doubt as to the nature of police duties.

P.  Failure to properly disclose information or evidence, for or against any person, concerning a criminal or administrative matter.

Q.  Failure to answer or respond to a properly dispatched call and take necessary action.

R.  For acts of incompetence.

S.  For neglect of duty.

T.  For conduct prejudicial to good order.

U.  For improper or negligent handling or willful damage of City property, fixed or moveable.

V.  Using any racial, ethnic, religious, or sexual slur or making any comment which would deride or condemn any racial, ethnic, or religious group.

*Revised 11/01/12*

COI 00049

**805.00    PROTECTION OF PERSONS, THEIR RIGHTS, AND THEIR PROPERTY (TPRP 2.17)**

**805.01       Purpose**

The purpose of this policy is to notify employees of our duty to protect people their rights and their property.

**805.02       Policy**

It is the policy of this agency that we provide services to the citizens of Irving that include the protection of citizens, their rights, and their property and specifically prohibits discrimination, oppression and favoritism.

**805.03       Procedures**

A.    Persons

1.    Officers are to protect the rights of all persons.

2.    Officers are not to falsely arrest, imprison, or direct any malicious prosecution against any person.

3.    Employees are not to use verbal abuse, excessive force, unnecessary violence, or willfully mistreat any person.

4.    Employees who negligently lose or damage property belonging to another may be required to make restitution.

5.    Employees are not to discriminate against any individual on the basis of race, color, religion, sex, national origin, age, handicap or any other basis.

B.    Persons in Custody/Suspects

In addition to the above standards, the following standards regarding persons in custody and suspects will be adhered to:

1.    Prisoners are not to be taken to any location other than the police station unless prior approval of a supervisor is obtained.  Prisoners will be taken to the police station without delay.

2.    Employees are not to place weapons or objects adaptable for use as weapons or permit such items to remain unattended in any location normally accessible to a prisoner or suspect.

3.    Employees are not to enter any weapons restricted area of the jail or any other area designated as a weapons restricted area with any weapon or objects adaptable for use as weapons.  Restricted area entrances will have signs posted prohibiting weapons.

   a.    Irving Police Officers and Detention Officers trained and issued Oleoresin- Capsicum and a TASER may carry these weapons into the secured areas of the Irving Jail.

COI 00050

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **MICHAEL WILLIAMS,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:15-CV-1701-L-BH** |
| | § | **ECF** |
| **CITY OF IRVING, TEXAS,** | § | |
| **Defendant.** | § | |

## AFFIDAVIT OF KURUVILLA OOMMEN

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, a notary public in and for the State of Texas, on this day personally appeared Kuruvilla Oommen, who is personally known to me, and who, after being duly sworn according to law, upon oath deposed and said:

"My name is Kuruvilla Oommen; I am over eighteen years of age, of sound mind, and am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct. I am the City Attorney for the City of Irving. I have been with the Irving City Attorney's Office since 2007.

I am familiar with the duties and responsibilities of Candace Chappell's position in the Irving City Attorney's Office. Ms. Chappell is a Senior Assistant City Attorney over the Municipal Prosecution Section. Ms. Chappell has been in this same position since before 2013. She has never been the Irving City Attorney. Instead, Ms. Chappell's position reports directly to the City Attorney and is subject to the City Attorney's policies, procedures and directions. Ms. Chappell's position does not have any authority or responsibility to create policy in any area for the City of Irving."

_Kuruvilla Oommen_
Kuruvilla Oommen

THE STATE OF TEXAS        §
                          §
COUNTY OF DALLAS          §

      Before me, the undersigned notary, on this day personally appeared Kuruvilla Oommen, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

      Given under my hand and seal of office on March 19, 2018.



NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

JANICE WAHL
NOTARY PUBLIC
STATE OF TEXAS
COMM. EXP. 06-24-2019
NOTARY ID 7393-0

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL WILLIAMS, | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 3:15-CV-1701-L-BH** |
| | § | **ECF** |
| CITY OF IRVING, TEXAS, | § | |
| **Defendant.** | § | |

## <u>AFFIDAVIT OF JASON McCLAIN</u>

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, a notary public in and for the State of Texas, on this day personally appeared Jason McClain, who is personally known to me, and who, after being duly sworn according to law, upon oath deposed and said:

"My name is Jason McClain; I am over eighteen years of age, of sound mind, and am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct. I am a Senior Assistant City Attorney for the City of Irving. I represent the City in this case.

In my duties as counsel for the City, I am familiar with Williams' other litigation against the City, and his cases involving other entities with some of the same facts and circumstance as this case. Specifically, Williams' previous state court litigation against the City was filed on December 23, 2014. His federal litigation against Caliber Home Loans was filed on July 17, 2015, and his state court litigation against Caliber was filed on March 17, 2017.

Attached as Exhibit A is a copy of Williams' condensed deposition transcript. This deposition was taken on January 3 2018 and was attended by Williams, the undersigned and the Honorable Judge Irma Carrillo Ramirez. The exhibits to the deposition are not included in the interests of space as the exhibits are either already filed with the Court or provided in other summary judgment affidavits."

_____
Jason McClain

THE STATE OF TEXAS  §
                    §
COUNTY OF DALLAS    §

Before me, the undersigned notary, on this day personally appeared Jason McClain, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on March 19, 2018.

_Janice Wahl_

NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS



JANICE WAHL
NOTARY PUBLIC
STATE OF TEXAS
COMM. EXP. 06-24-2019
NOTARY ID 7393-0

**AFFIDAVIT OF JASON McCLAIN**

# EXHIBIT
# A

COI 00055

## Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE NORTHERN DISTRICT OF TEXAS
   DALLAS DIVISION
3  MICHAEL WILLIAMS,       )
4       Plaintiff,          )
                            ) CIVIL ACTION NO.
5  v.                       ) 3:15-CV-1701-L-BH
                            )   ECF
6                           )
   CITY OF IRVING, TEXAS,   )
7  et al.                   )
8       Defendants.         )
9  ***************************************************
10
         ORAL DEPOSITION OF
11
         MICHAEL WILLIAMS
12
         January 3, 2018
13
   ***************************************************
14
15
16      ORAL DEPOSITION OF MICHAEL WILLIAMS, produced as a
17  witness at the instance of the Defendant City of Irving,
18  Texas, and duly sworn, was taken in the above-styled and
19  -numbered cause on the 3rd day of January, 2018, from
20  1:43 p.m. to 4:10 p.m., before Jennifer L. Campbell, CSR
21  in and for the State of Texas, reported by machine
22  shorthand, at the Earle Cabell Federal Building and
23  Courthouse, 1100 Commerce Street, Courtroom 1566,
24  Dallas, Texas, pursuant to the Federal Rules of Civil
25  Procedure.

## Page 2

1      A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
   Mr. Michael Williams (Pro Se)
4  7604 Acorn Lane
   Frisco, Texas 75034
5  (818) 926-0929
   creativityandmagic@hotmail.com
6
7  FOR THE DEFENDANT CITY OF IRVING, TEXAS:
   Mr. Jason McClain
8  IRVING CITY ATTORNEY'S OFFICE
   825 West Irving Boulevard
9  Irving, Texas 75060
   (972) 721-2541
10 (972) 721-2750 fax
   jmcclain@cityofirving.org
11
12 ALSO PRESENT:
   Honorable Irma C. Ramirez
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

         INDEX

Appearances. . . . . . . . . . . . . . . . . . . . . 2
MICHAEL WILLIAMS
    Examination by Mr. McClain . . . . . . . . . .4
Reporter's Certificate. . . . . . . . . . . . . . .111
         EXHIBITS
NO.      DESCRIPTION              PAGE
Exhibit 1  Plaintiffs' First Amended Complaint    6
Exhibit 2  Plaintiffs' Second Amended Complaint   12
Exhibit 3  Irving Police Department BOLO          69

         REPORTER'S NOTE
Quotation marks are used for clarity and do not
necessarily reflect a direct quote.

## Page 4

1      (Federal Rule of Civil Procedure 30(b)(5)
2       on-the-record statement waived by
3       agreement of all parties.)
4           MICHAEL WILLIAMS,
5  having been first duly sworn, testified as follows:
6           EXAMINATION
7  BY MR. McCLAIN:
8      Q. Mr. Williams, you know me, right? We've met
9  before. Jason McClain. I represent the City of Irving
10 in this matter.
11     A. Well, I met you, but I don't know you.
12     Q. Okay. We've met before.
13     A. (Gesturing.)
14     Q. You understand that we're here today to take
15 your deposition?
16     A. Yes.
17     Q. And you understand that you were just placed
18 under oath?
19     A. Yes.
20     Q. That your testimony that you give here today in
21 this deposition is just like you were giving testimony
22 in front of a jury?
23     A. Yes.
24     Q. Do you understand that you are expected to give
25 full, complete, and honest answers to my questions?

COI 00056

## Page 5

1  A. Yes.
2  Q. We're obviously recording all the testimony
3  here, so it's important that we dont have uh-huhs or
4  huh-uhs that are difficult to record. So if anytime you
5  kind of lapse into that normal human behavior and do
6  that instead of saying yes or no, I may ask you as a
7  follow-up was that a yes or was that a no. I'm not
8  trying to be rude; I'm just trying to make sure we have
9  a clean record. Do you understand that?
10  A. Yes.
11  Q. If we can also agree that we will not talk over
12  one another during the course of the deposition. I know
13  that you may have ready answers to some of my questions
14  that you want to give the information or I may have a
15  follow-up question before you've given your answer, but
16  to the extent we can agree not to speak over each other,
17  it'll make this lady's life a lot easier. Can we agree
18  to that?
19  A. Yes.
20  Q. If you don't understand a question I'm asking,
21  will you ask me to repeat it, please?
22  A. Yes.
23  Q. Mr. Williams, are there any medications or
24  other substances that you're on today that affect your
25  ability to give full, complete, and honest answers?

## Page 6

1  A. No.
2  Q. Are you suffering from any condition that would
3  affect your ability to give full, complete, and honest
4  answers?
5  A. No.
6  Q. Is there any other reason why you can't do that
7  today?
8  A. No.
9  Q. I don't anticipate this being a real long
10  deposition, especially with our late start, but if at
11  any time you need a break, just let me know. I'll be
12  happy to do that. If we're in the middle of a question,
13  I may have you answer that question that's before you
14  but then we can take a break, okay?
15  A. Yes.
16  (Exhibit 1 marked.)
17  Q. (BY MR. McCLAIN) Okay. I'm showing you what's
18  been marked as Exhibit No. 1. Do you recognize this
19  document?
20  A. I mean, I -- at a glance.
21  Q. I'm not trying to play games with you.
22  A. I'm not either, but --
23  Q. This is -- this just appears to be your First
24  Amended Complaint in this matter; is that correct?
25  A. Well, that's what it says. I mean, what I'm

## Page 7

1  trying to say is I can't -- when you say "this
2  document," it's like 100 pages. I can't say that the
3  content of this is what I provided. I mean . . .
4  Q. And I represent to you today that this is your
5  First Amended Complaint in this matter. And you'll
6  notice the top of the header, it says "Document 55,
7  filed July 29th, 2017." If I represent to you that this
8  is your first amended complaint that's on file with this
9  court, do you have anything to disagree with that?
10  A. At this point, no.
11  Q. Okay. Going down to the "Parties" subsection
12  there on page 1.
13  A. Okay.
14  Q. The parties this lists, the folks that are
15  involved in this lawsuit, number one, it has you as the
16  Plaintiff, correct?
17  A. Yes.
18  Q. And do you still reside at 7604 Acorn Lane in
19  Frisco?
20  A. Yes.
21  Q. The second party listed is the Defendant City
22  of Irving, Texas, correct?
23  A. Yes.
24  Q. That's who I represent.
25  And then the third party listed on the next

## Page 8

1  page is Defendant Craig Lackey, an attorney. Do you see
2  that?
3  A. Yes.
4  Q. So those are the parties that we're dealing
5  with in this lawsuit. It's you as the Plaintiff suing
6  the City of Irving and Mr. Lackey; is that correct?
7  A. Well, he's been released.
8  Q. Right. Yeah, and I'll get to that. That was
9  going to be my follow-up question.
10  But for right now, according to these
11  parties, the lawsuit participants are you, the City of
12  Irving, and Mr. Lackey.
13  A. Based on this document I'm looking at, that's
14  what it says.
15  Q. Okay. And now going on to Mr. Lackey. He has
16  previously been dismissed from this lawsuit; is that
17  correct?
18  A. Yes.
19  Q. You guys reached an out-of-court settlement?
20  A. Yes.
21  Q. What were the terms of that settlement?
22  A. I don't remember.
23  Q. Did you receive some sum of money?
24  A. Probably.
25  Q. But you don't -- as we sit here today, you

COI 00057

## Page 9

1 can't remember how much?
2 **A. No.**
3 Q. Do you have any documents related to that
4 dismissal, or did you sign a release or a settlement
5 agreement or nothing? Or anything, I should say?
6 **A. Not with me.**
7 Q. Okay. Do you have that in your possession at
8 home --
9 **A. Probably.**
10 Q. So with Mr. Lackey dismissed from the
11 lawsuit -- you do agree Mr. Lackey's been dismissed from
12 the lawsuit.
13 **A. He's dismissed. Sure. Sure.**
14 Q. With him dismissed from the lawsuit, we're just
15 receiving you as a plaintiff against the City of Irving
16 defendant, correct?
17 **A. That's a mistake, but -- that's an error.**
18 Q. Okay.
19 **A. But I see what you're driving at. What you're**
20 **saying is I'm mistaken and didn't list all of the**
21 **defendants in my first amended complaint. I made two**
22 **mistakes. I mean, based on what I'm looking at. I**
23 **accidentally did not include the other defendants in**
24 **this First Amended Complaint, and I accidentally did not**
25 **exclude Lackey from this. So that appears to be the**

## Page 10

1 **situation, but it was a mistake; it was a error.**
2 Q. And when you say you mistakenly excluded the
3 other defendants from this case, who are you referring
4 to?
5 **A. Stephanie Barnes, Eric Curtis, and Bruce**
6 **Jolley, probably those three. Yeah. That's about it.**
7 **That was a error.**
8 Q. Looking at paragraph 13 --
9 **A. Okay.**
10 Q. -- which is on page 4.
11 **A. Sure.**
12 Q. You state: "Because of Barnes' defamatory
13 statements, Plaintiff was constructively fired from his
14 job."
15         Was that at Caliber Home Loans?
16 **A. Yes.**
17 Q. And is it your assertion here that because of
18 Barnes' defamation Caliber Home Loans fired you?
19 **A. It set in motion a series of events that led to**
20 **a firing. But it set in motion a series of events**
21 **that -- that's why I say "constructively." Career**
22 **damage.**
23 Q. You say "constructively fired" here in
24 paragraph 13, but you were actually fired, correct?
25 Caliber Home Loans terminated your employment.

## Page 11

1 **A. They terminated the employment. Well, it --**
2 **well -- well, would you say that? Would you say that?**
3 **We were -- some form of that. Some form -- I'm -- it**
4 **was -- we separated.**
5 Q. Well, in your lawsuit against Caliber Home
6 Loans, you allege that they fired you in February
7 of '14, I believe, correct?
8 **A. Something like that. I don't remember the**
9 **exact date.**
10 Q. And it wasn't -- it wasn't a statement that we
11 agreed we're going to go our separate ways. You allege
12 that they fired you, right?
13 **A. You could say that. I would say that.**
14 Q. You did --
15 **A. I didn't want -- I wasn't -- I didn't want to**
16 **leave. I did not want to leave, but I was on**
17 **administrative leave. They placed me on administrative**
18 **leave.**
19 Q. And then on February 28th, 2014, were you
20 summoned to HR meeting with Brett Johnson and an HR
21 person and fired?
22 **A. I was placed on administrative leave.**
23 Q. So you're saying you weren't fired on
24 February 28th by Caliber Home Loans?
25 **A. I was on administrative leave. And so I didn't**

## Page 12

1 get the notice that I was actually fired until March.
2 But on -- yeah, yeah. So to be, you know, precise, on
3 that date at that meeting in February the
4 twenty-whatever-that-was, I was summoned to the meeting,
5 and I was placed on administrative leave, okay, with
6 pay, okay? Then about a month later, I received a
7 letter in the mail saying that I was terminated or
8 fired. Maybe it's two weeks later. I don't know
9 exactly, you know what I'm saying? I don't know exactly
10 the date, but something like that.
11 Q. Do you still have that termination letter from
12 Caliber?
13 **A. Probably. I should. I should.**
14         (Exhibit 2 marked.)
15 Q. (BY MR. McCLAIN) Showing you what's been
16 marked as Exhibit No. 2.
17 **A. Sure.**
18 Q. This is a document entitled "Plaintiffs Second
19 Amended Complaint" in a case styled Michael Williams
20 versus Caliber Home Loans --
21 **A. Sure.**
22 Q. -- et al. If you'll look at paragraph 47,
23 which is on page 13.
24 **A. Okay. Page 13?**
25 Q. Yes, sir.

Page 13

1   A. 47?
2   Q. Yes, sir.
3   A. Okay.
4   Q. What does it say there?
5   A. It said, "On February 28th, 2014, Plaintiff was
6   summoned to an HR meeting with Brett Johnson and an HR
7   person and fired."
8   Q. Okay. Doesn't say you were put on admin leave,
9   does it?
10  A. No.
11  Q. All right. So at least in this lawsuit you're
12  representing that you were fired on February 28th,
13  correct?
14  A. I -- this semantics. It's semantics. It's
15  semantics, really. I wasn't -- I didn't work past that
16  day.
17  Q. Right. I understand you want to qualify it,
18  but what you said here is "fired," right?
19  A. That's what I said. That's what I wrote, yeah.
20  Q. Okay. In this lawsuit, what do you allege --
21  what do you accuse Caliber Home Loans of doing? Why did
22  they fire you?
23  A. Wait. You -- say that question again.
24  Q. Sure. Why did Caliber Home Loans fire you,
25  according to your lawsuit against them?

Page 14

1   A. Discrimination.
2   Q. Discrimination on the basis of?
3   A. Race.
4   Q. Race?
5   A. And retaliation.
6   Q. Okay.
7   A. Based on my -- based upon my -- how would you
8   put that? Based upon my exercising my right to complain
9   about receiving death threats at work.
10  Q. Okay. So your race, retaliation. Any other
11  reasons you state in this lawsuit why they fired you?
12  A. I'm sorry?
13  Q. Are there any other --
14  A. There are probably many other reasons that I
15  stated, but they revolved around that. I probably went
16  into detail, but --
17  Q. Well, you also made a age discrimination
18  complaint, correct?
19  A. Yeah, but -- that too. That too.
20  Q. And you also made a disability claim as well,
21  correct?
22  A. That too.
23  Q. So according to this lawsuit, you were fired
24  from Caliber Home Loans because of your race, in
25  retaliation for your previous complaints, because of

Page 15

1   your age, and because of your disability, correct?
2   A. Well, I was fired from Caliber Home Loans
3   because of -- your dispatcher put in motion a series of
4   events that led them to use these reasons for firing me.
5   Q. So she put in motion a series of events which
6   led to them firing you because of your race.
7   A. Yes.
8   Q. And because of your age.
9   A. Yes.
10  Q. And because of your protected activities.
11  A. Yes.
12  Q. And because of your disability.
13  A. Those things sort of came into play as well.
14  But she -- I think if she hadn't have done what she did
15  the outcome would have been different.
16  Q. How are her statements related to your race?
17  A. I'm sorry?
18  Q. How are her statements to your employer related
19  to your race? You were always African-American before
20  and after --
21  A. Wait. When you say how were her statements to
22  my employer related to my race?
23  Q. You're saying she put into series -- a series
24  of events that led to your termination because of your
25  race, among other things.

Page 16

1   A. Right.
2   Q. I'm missing that middle part there. How did
3   her statements make them fire you, in part, because of
4   your race?
5   A. Well, it's because if some -- I'm trying to --
6   I'm not trying to be evasive to you, right? And race is
7   a dicey thing, you know. It's like if something happens
8   in an organization with one group, they may triage that;
9   but with another group, not only will they not triage
10  it, but they'll pile on -- "they," meaning the employer,
11  will pile on these other things, too, will -- it stacks
12  up the other things. I don't know if you understand
13  what I'm saying.
14      You know, I believe from being in the
15  industry for as long as I have, over two decades, two
16  and a half decades, and being in a lot of organizations
17  and being in IT as long as I have and based on my
18  experience and what I've seen day out and day -- day in
19  and day out, if a white lady would call the police and
20  say, Somebody in the parking lot threatened to shoot me,
21  two black guys in the parking lot threatened to shoot
22  me, it would be happening -- it would happen -- it
23  would -- there would be an investigation. The guys who
24  she alleged would be dealt with. In this -- by the
25  police and by the organization.

COI 00059

## Page 17

1      In my scenario, it's flip-flopped. It was
2  different. I called the police requesting help because
3  two people were -- two white guys were threatening to
4  shoot me, and it was -- and I was -- and I was made the
5  suspect.
6      This is a long way of answering your
7  question. Your question was: How did her calling the
8  organization trigger all those things that you just
9  mentioned? Because after that, they started finding
10 reasons to fire me. After -- after -- the police called
11 the organization, said I was going to blow up the
12 building. They didn't say I was going to blow up the
13 building. She didn't say I was going to blow up the
14 building, but she said things that put everybody on high
15 alert, and I mean, the -- she called the highest people
16 in the -- the highest officers in the company. This is
17 the best way I can describe it to you.
18     Q.  Okay. Well, they knew you were African-
19 American before she called, right?
20     A.  No.
21     Q.  They didn't know that?
22     A.  No. And I'm going to -- I'm going to tell you
23 what I mean. I know you don't -- so you say --
24     Q.  It's all right. I'll just take — I'll just
25 take a yes or no on that one.

## Page 18

1      A.  No.
2      Q.  That's fine.
3      A.  Okay. The answer is no, they didn't know I was
4  African-American. They never heard of me until she
5  called.
6      Q.  Okay.
7      A.  They didn't know who I was before she called.
8      Q.  During the course of your lawsuit against
9  Caliber Home Loans, did anyone from Caliber make any
10 statement or admission that they terminated you because
11 of Stephanie Barnes and her conversations?
12     A.  Say that one more time.
13     Q.  Sure. You had a lawsuit with these guys,
14 right?
15     A.  Yes.
16     Q.  Caliber Home Loans.
17     A.  Absolutely.
18     Q.  That lawsuit's been dismissed, correct?
19     A.  No. It's -- well, it has, but it's in -- it's
20 in the Fifth Circuit Court of Appeals right now.
21     Q.  Okay. So -- well, the federal court case was
22 dismissed, correct?
23     A.  Yes.
24     Q.  And you refiled it down in the state court.
25     A.  Yes.

## Page 19

1      Q.  And it was dismissed there, too.
2      A.  Yes.
3      Q.  And now it's on appeal up at the Fifth Court of
4  Appeals --
5      A.  Yes.
6      Q.  -- in the state court.
7      Okay. Your federal court case that was
8  dismissed, during the course of that case, did anyone
9  from Caliber Home Loans make a statement that they fired
10 you because of Stephanie Barnes' comments?
11     A.  We did not have a case based on merit. We did
12 not have a hearing based on merit. It was all about me
13 not filing a fee. So we never had a opportunity to get
14 into that type of questioning. Do you understand what
15 I'm saying?
16     Q.  Uh-huh. So is the -- I understand that there
17 may be a reason for the answer being no, but is the
18 answer no, no one from Caliber Home Loans made a
19 statement that Stephanie Barnes was the reason you were
20 fired?
21     A.  No one said that specifically. But in
22 documentation to the EEOC and in documentation to the --
23 to the Irving Police Department, the statement is made
24 that when we met with Michael what we found out was
25 worlds apart from what Stephanie Barnes said.

## Page 20

1      MR. McCLAIN:  Object to the last part of
2  that as nonresponsive.
3      THE WITNESS:  Okay.
4      Q.  (BY MR. McCLAIN)  And that's just -- that's
5  just a lawyer thing.
6      So during the course of the case, no one
7  from Caliber Home Loans said that Stephanie Barnes was
8  the reason you were terminated, correct? I'm going to
9  get to your second part here in a second, but no one
10 made that statement during the course of your case; is
11 that correct?
12     A.  That question is irrelevant. That question
13 is -- that question can't be answered because they never
14 had a chance to.
15     Q.  Well --
16     A.  I mean, they never said the sky is blue either.
17 I mean, you know, we never got into a situation where,
18 you know, that type of questioning went on. I don't
19 want it to go into the record that they never said it
20 and somebody reading it would think they had the
21 opportunity to say it and didn't say it.
22     Q.  Well, and you can certainly make that
23 clarification when we file the motions. But as we sit
24 here today, you can't point to anyone in Caliber Home
25 Loans that ever made the statement they fired you

COI 00060

## Page 21

1  because of Stephanie Barnes; is that correct?

2  **A. I'm not sure.**

3  Q. Do you know of someone that said that?

4  **A. I'm not sure.**

5  Q. You're not sure that you know?

6  **A. I'm not sure that I know that somebody said**

7  **that or not.**

8  Q. But as we sit here today, you can't identify

9  someone who said that.

10  **A. I can't recall.**

11  Q. You had mentioned documents to the EEOC and the

12  Irving Police Department. These are Caliber Home Loan

13  documents to the EEOC; is that correct?

14  **A. Just a second ago I mentioned documents to the**

15  **EEOC, right? So these were documents from -- coming**

16  **from Caliber to EEOC and/or --**

17  Q. Okay.

18  **A. -- your man and/or the -- Eric Curtis. It was**

19  **either to them -- it was -- see, I don't want to**

20  **speculate.**

21  Q. Have you seen any sort of official position

22  statement or response to your allegations that the --

23  that Caliber Home Loans submitted to the EEOC?

24  **A. Say that one more time.**

25  Q. Have you ever seen any official position

## Page 22

1  statement or response from Caliber Home Loans to the

2  EEOC regarding your allegations?

3  **A. I'm not trying to be evasive. I don't recall**

4  **because -- I'm going to tell you why I don't recall. Do**

5  **you want me to tell you why or just --**

6  Q. No.

7  **A. -- we'll leave it at that?**

8  Q. I don't recall is fine.

9        If you had seen any sort of position

10  statement or official response from Caliber to the EEOC,

11  would you have that in your possession?

12  **A. Say that one more -- I'm not -- say that again.**

13  Q. If you have -- during the course of your

14  previous lawsuit, did you obtain discovery information

15  from Caliber Home Loans regarding your allegations?

16  **A. No.**

17  Q. Okay.

18  **A. No. And that's a big issue. No. That's a big**

19  **issue.**

20        **I'd like go back to one question you asked**

21  **me, if you don't mind.**

22  Q. Perhaps.

23  **A. You asked me a second ago did somebody -- what**

24  **evidence do I have that Stephanie Barnes is**

25  **responsible --**

## Page 23

1  Q. No, no. I asked did anyone from Caliber Home

2  Loans make a statement that Stephanie Barnes was

3  responsible for your termination.

4  **A. Well, they did make a statement that because of**

5  **Stephanie Barnes they put me on administrative leave and**

6  **took my badge away and locked me out of the building and**

7  **a number of other things that I don't recall exactly**

8  **what they were, but it was really on that day that I was**

9  **really fired. It was really on that day that I was**

10  **fired. The rest of it is just pretense and going**

11  **through the motions. But I know -- I know what you're**

12  **saying.**

13  Q. According to your previous lawsuit, it

14  wasn't those other days was the real story. According

15  to your previous lawsuit, the statement you made to the

16  Court was you were fired February 28th, correct?

17  **A. Yeah. I wasn't technically fired, but I was --**

18  Q. Well --

19  **A. I gotcha.**

20  Q. What you said to the Court was fired, plain as

21  day, right?

22  **A. I agree with you that that's what I said.**

23  Q. Okay. Stephanie Barnes's conversations with

24  Caliber Home Loans occurred in December of 2013,

25  correct?

## Page 24

1  **A. Yes.**

2  Q. You were fired March 28th, 2014, correct?

3  **A. I don't recall the exact date, but if you -- if**

4  **you have that there, we'll go with it.**

5  Q. We've already read it, right? February 28th,

6  2014.

7  **A. Yeah, you said March something. That was a**

8  **accident you said. You said March 28th. Okay.**

9  **February 28th.**

10  Q. February 28th. I apologize.

11  **A. Okay. So the answer to your question is yes.**

12  Q. Okay. So her statements to Caliber occurred

13  December 2013.

14  **A. Uh-huh.**

15  Q. You were fired February 28th, 2014. In that

16  intervening period, you said you had been placed on

17  administrative leave. Were you taken off of

18  administrative leave and returned to work between

19  December 2013 and when you were fired February 28th,

20  2014?

21  **A. Well, I was placed on administrative leave**

22  **twice. It was one -- once I was placed on**

23  **administrative leave immediately after she made the**

24  **phone call.**

25  Q. Correct.

COI 00061

## Page 25

1    **A. Okay. Then I was placed on administrative**
2 **leave a second time in February 28th.**
3    Q. So obviously, then, you returned to work off of
4 administrative leave from the first time.
5    **A. Yes.**
6    Q. Okay. You know approximately when you returned
7 to work?
8    **A. I don't want to speculate.**
9    Q. Okay. If you don't -- if you don't remember,
10 you don't remember.
11    **A. I don't remember.**
12    Q. That's fine.
13    At some point after December 2013 you
14 returned to work off of administrative leave, correct?
15    **A. Yes.**
16    Q. And you were then, you said, put back on
17 administrative leave late February 2014, correct?
18    **A. (Moving head up and down.)**
19    Q. Did you ever reach any sort of out-of-court
20 settlements with anyone related or associated with
21 Capital [sic] Home Loans other than Craig Lackey?
22    **A. No.**
23    Q. On Exhibit 2, which is your lawsuit against
24 Caliber Home Loans, it's entitled -- this one here, sir.
25 It's entitled "Michael Williams versus Caliber Home

## Page 26

1 Loans, et al, Defendants," but you don't list out who
2 the "et al" are. Do you remember who else you sued in
3 that lawsuit?
4    **A. Craig Lackey. Well, it was supposed to be**
5 **Craig Lackey -- supposed to be Caliber, Craig Lackey,**
6 **Tiffany Siskin, Greenstreet with Michelle Greenstreet,**
7 **and Brett Johnson. Originally. And I guess those are**
8 **the original defendants.**
9    Q. Okay. You list a number of employees --
10    **A. Sure.**
11    Q. -- that you say constituted a hate group. Were
12 any of those individuals defendants in this case?
13    **A. No. No.**
14    Q. Okay. Are you currently married?
15    **A. I'm not married.**
16    Q. Previously married?
17    **A. Yes.**
18    Q. And who were -- what was your wife's name?
19    **A. Isaura. That's I, as in India, -s-a-u-r-a.**
20 **Last name same as mine.**
21    Q. And from when to when were you married?
22    **A. We got married in -- I think it was on or about**
23 **February 2007 until 11/1 -- or 10/1/2012.**
24    Q. Okay. So you were divorced before these issues
25 came up.

## Page 27

1    **A. That's true.**
2    Q. Okay. Where does your wife live?
3    **A. She lives close to me in Frisco. You want the**
4 **address or . . . ?**
5    Q. Please.
6    **A. Seventy -- I think it's 7549 Stonebrook**
7 **Parkway, No. 110, 75034.**
8    Q. I don't know why I'm frantically writing it
9 down because she gets it all anyway.
10    **A. Right.**
11    Q. Not trying to be preye here. What was your
12 relationship with your wife during the course of these
13 events that we're talking about now?
14    **A. That's a hard question to answer. It's -- and**
15 **I'm not trying to be evasive either. We have a son**
16 **together. We have a disabled child together, you know.**
17 **So it's not a clean break. That's number one.**
18    **Number two, she's new to the United States,**
19 **and she's still dependent on me for a lot of things as**
20 **far as, you know, I'm totally funding -- I didn't just**
21 **throw her away. I was completely funding where she**
22 **lived. You know, I bought her furniture and everything**
23 **like that.**
24    **So what was the relationship like? It was**
25 **like that. I mean, she lives like two blocks away from**

## Page 28

1 me, you know. So we were not -- we were not on a
2 nonspeaking basis.
3    Q. And the reason I ask is because you make
4 allegations of mental anguish as one of your remedies
5 for relief in this case.
6    **A. Yeah.**
7    Q. Is your ex-wife a person that you would rely
8 upon to demonstrate that you suffered mental anguish as
9 a result of the allegations in this suit?
10    **A. The question you just asked me is: What's**
11 **the -- what -- say that again.**
12    Q. Is she a person that you would rely upon to
13 prove up your mental anguish damages?
14    **A. I have to think about that. I would have to**
15 **think about that. I would have to think about that. I**
16 **can't answer that and say -- and if so, to what degree,**
17 **you know. So I have to think about that.**
18    Q. Well, for my purposes, that's a yes.
19    **A. Ooh, probably, because I used to tell her -- I**
20 **called her at work one day. And she may not even**
21 **remember, but -- because -- this has been so many years**
22 **ago that she may not remember, but yeah, you should put**
23 **that as a yes.**
24    Q. Okay. You said you have a son and a disabled
25 child.

COI 00062

## Page 29

1  A. No.

2  Q. That's one son who's disabled.

3  A. Yes.

4  Q. Okay. What's his name?

5  A. T-a-r-e-k. Same last name as mine.

6  Q. Is he the one who came with you to the small

7  claims, small-claims court?

8  A. Yeah, you met him.

9  Q. Yeah.

10  A. You met him.

11  Q. Yeah, I met him. How old is he now?

12  A. Ten.

13  Q. Ten?

14      And what's your custody situation with him?

15  A. Well, I have expanded -- I have excellent

16  visitation schedule, you know. I have excellent

17  visitation schedule. But she's -- I don't know the

18  legal terms of that, but she's the -- he lives with her.

19  Q. Okay.

20  A. But he lives with me every week, too. So he's

21  at my house every week, he's with her house every week.

22  We have a fifty-fifty.

23  Q. Is that the -- is that the time split,

24  approximately fifty-fifty?

25  A. Yes, approximately.

## Page 30

1  Q. Do you have a set -- a set, like, every other

2  weekend or every other week?

3  A. Well, technically, it's like this: I get him

4  every Thursday.

5  Q. Okay.

6  A. Okay. I get him every Thursday and I think --

7  and half of Friday every week.

8  Q. Okay.

9  A. Okay. Then every other week I have him

10  starting from Thursday to Monday. You know what I mean?

11  Q. Uh-huh.

12  A. And we swap week -- we swap -- in the summers,

13  I have him for a full 60 days, okay? And I have him

14  every other Christmas, odd-number Christmases, odd-

15  number Thanksgivings, odd-number -- you know, the major

16  holidays.

17  Q. Right. Right.

18  A. She has him the even numbers.

19  Q. Can you just kind of briefly run me through

20  your job history?

21  A. Briefly run through my job history?

22  Q. How about this: Let's go back -- let's go back

23  ten years.

24  A. Oh, ten years? Well, you know, I'm a software

25  engineer, and I've been one for 23 -- twenty -- I've

## Page 31

1  been working as one, paid, since '96, since 1996, my

2  first pay job. And I was studying it for about two

3  years before that.

4      You know, I started -- I don't know how

5  deep you want me to go with that because the IT industry

6  is -- is a big industry. Of course, you know, I started

7  out as a data -- I started out working the help desk;

8  from the help desk, I went to working as a database

9  administrator; and as a -- from a database

10  administrator, I went into software development.

11      And now, in the last ten years, I've been

12  doing mostly business intelligence. You know, I've been

13  leading teams, I've been managing teams, I've been

14  training, doing corporate training. That's --

15  Q. Let me --

16  A. Excuse me.

17  Q. Sorry. Let me put it like this.

18  A. Okay.

19  Q. When did you start at Caliber?

20  A. August 8th, 2013. No, August 5th -- yeah,

21  8/5/2013.

22  Q. Okay. So you worked there approximately --

23  approximately six months, little over six months. Where

24  were you before Caliber?

25  A. Oh, here we go. Where was I before Caliber?

## Page 32

1  Oh, I think I was at Ambit Energy; then before that, I

2  was at Bank of America; before that, I was at Myspace;

3  before Myspace, I think I was at Disney; before Disney,

4  I was at NBC; before NBC, I was at UCLA. There you have

5  it.

6  Q. All right. UCLA out in California.

7  A. Yes. I came to Los Angeles -- I came to Dallas

8  with -- Bank of America transferred me here in 2011.

9  Q. So in Texas since 2011.

10  A. Right.

11  Q. Before that, you were in California.

12  A. Right.

13  Q. Your whole life or . . . ?

14  A. Thirty-five years. So . . .

15  Q. Good enough. Thirty-five years in California.

16  Good enough.

17  A. Yeah. Yeah. Yeah, yeah, yeah, yeah. Yeah.

18  Q. And BOA is the one that moved you to Texas?

19  A. Right.

20  Q. Going back to Exhibit 1, which is your law --

21  your complaint in this case, going to focus in on

22  page 4.

23  A. Okay.

24  Q. Paragraph -- this is the section where you're

25  talking about Detective Eric Curtis.

COI 00063

## Page 33

1   A. Yeah.

2   Q. And paragraph 15 says that, "Curtis, aware that

3   no law exists requiring competent investigation,

4   commences a sham investigation designed to obstruct,

5   defeat, and impede the police report with the intent to

6   denying Plaintiff equal protections of the law,"

7   correct?

8   A. Yes.

9   Q. How do you know that was his intent?

10  A. How? Because -- what leads me to believe that

11  it is his intent is at least four different things. He

12  did not -- he never interviewed me, who was the victim.

13  And this is a felony, terroristic threats,

14  investigation, which constitutes a hate crime. He

15  never -- he never interviewed -- he closed the case with

16  never interviewing the victim, which was me. That's

17  number one.

18          Number two, he closed the case with never

19  interviewing the suspects. He never interviewed the

20  suspects, number two.

21          Number three, even though they're running

22  criminal investigation -- they're running criminal

23  investigation about me, they wanted to know all my debts

24  that I had, but I haven't seen any evidence that they

25  ran those same inquiries against the suspects. That's

## Page 34

1   number three.

2           There's a long list of things that lead me

3   to believe that was his intent, and I can keep going if

4   you want me to.

5   Q. Please.

6   A. Number -- and the next thing is --

7   Q. Number 4?

8   A. Okay. Next -- number 4 is he created a BOLO

9   with -- about me with -- that was totally fraudulent.

10  Number -- that's number that's -- okay. That's

11  number four.

12          Then in that BOLO, there were about five

13  things that make me believe that his intent was to --

14  was to obstruct, because some kind of way, he stole the

15  contents of my employee file, okay? He -- that picture

16  is my employee file at Caliber.

17  Q. And we'll discuss the BOLO in depth.

18  A. Yeah. We'll get to -- we'll get to that.

19  Q. But -- so you've got four things listed.

20  A. So that -- that's four. That's a good start.

21  Q. Okay. The BOLO was created after he had

22  wrapped up his investigation.

23  A. You telling me?

24  Q. Or do you know whether that is correct or not?

25  A. Is that a question to me?

## Page 35

1   Q. Yes.

2   A. Okay. So the question is: Do I know the day

3   he wrapped up the investigation?

4   Q. Do you know whether the BOLO was created after

5   the investigation was closed?

6   A. It's -- I think I plead that in here. So -- I

7   think I plead that in here. Yes. It was created, I

8   believe -- I mean, I wasn't there because that -- it's

9   dicey. Because this is happening day -- it wasn't a

10  month between -- it was not 30 days between the close of

11  the investigation and the creation of the BOLO. We

12  talking hours, days, and minutes between the two --

13  between those two events.

14  Q. Do you know whether the BOLO was created after

15  the investigation was closed?

16  A. I would have to refer to my -- to my

17  documentation to answer that question accurately.

18  Because I do not have that documentation in front of me

19  to conduct that research, I'm going to say I don't

20  recall.

21  Q. Okay. As far as never interviewing you or

22  never interviewing the suspects, you say that that

23  indicates an intent to deny you of equal protection.

24  How is that not just indicative of being lazy.

25  A. How is that not indicative of being lazy?

## Page 36

1   Q. Yeah.

2   A. I'm going to tell you why it's not indicative

3   of being lazy.

4   Q. That was the question.

5   A. Yes, sir.

6           So he did interview everybody that was set

7   up to protect Caliber. Caliber in-house counsel was

8   there to protect Caliber, you know. Caliber HR

9   director, Greenstreet, Michelle Greenstreet, who called

10  the police to my home. He -- I think he said he

11  interviewed Siskin as well. I think he just interviewed

12  Greenstreet and -- the short an answer to your question

13  is how do I know -- the question was: Why is that not

14  just laziness? Because if he was really lazy, he

15  wouldn't have interviewed anybody. You know, I mean,

16  because it's only -- interviewing only is -- is only

17  picking up the phone and making a phone call or sending

18  a e-mail. He didn't have to go into his car to drive

19  there, but he did a very thorough in his -- in his thing

20  that he wrote up, his police report, he did a very

21  thorough recitation of his interaction with Caliber

22  leadership, as well as the Frisco Police Department. So

23  he's not lazy.

24  Q. He didn't go interview anyone at Caliber,

25  correct? He picked up the phone and called them.

COI 00064

1     A. I wasn't with him. I don't know what he did.
2 But I know whatever he did, if he would've did the same
3 thing with the suspects, we probably wouldn't be
4 having -- he wouldn't even be listed, probably. He
5 wouldn't -- he would -- he would've shown some due
6 diligence, he wouldn't even probably been listed. Only
7 thing -- only thing a police officer can do is
8 investigate, right?
9     Q. Do you feel his investigation didn't comply
10 with what the City of Irving's Police Department expects
11 of its detectives?
12     A. Not sure I want to speculate.
13     Q. So you don't know?
14     A. Don't know for sure.
15     Q. Do you know what the City of Irving Police
16 Department expects of its detectives in investigations?
17     A. Because I have that -- I have that
18 documentation, okay? I do not have that documentation
19 with me, okay? And I think I have pleaded it in
20 these -- in some of my motions. But because I do not
21 have that documentation with me to give you a very
22 definitive answer with me, at the moment, I don't
23 remember.
24     Q. What documentation are you referring to?
25     A. That gave us the -- that gave me the -- three

1 documents. One of your -- one of the sergeants over
2 there gave me the general order and then he gave me two
3 more documents. I don't recall the name of them.
4     Q. Okay. So you agree, then, the department --
5 the police department has general orders you know for
6 sure that dictate how investigations are to be
7 conducted.
8     A. They have general orders.
9     Q. Do you know if those general orders dictate how
10 investigations are to be conducted?
11     A. They do not. They do not.
12     Q. Okay.
13     A. To the best of my knowledge.
14     Q. So as we sit here today, without that
15 documentation in front of you, you can't say whether
16 Detective Curtis's investigation, as you state it
17 occurred, complies with what the Irving Police
18 Department expects out of its detectives.
19     A. Say the question again.
20     Q. Sure. Without that documentation in hand --
21     A. Right.
22     Q. -- you can't say whether Detective Curtis
23 violated what the department expects out of its
24 detectives.
25     A. That's a true statement.

1     Q. Paragraph 19 on page 5 there, you say --
2     A. On this one? Paragraph 19, page 5?
3     Q. Yes, sir.
4     A. Curtis. Go ahead.
5     Q. I'm just going to move this just so it's not
6 confusing because I think we're done with that one.
7         "Curtis accepted the false story from
8 Lackey." Is that correct?
9     A. Yes.
10     Q. Okay. So Lackey was lying to Curtis? Is that
11 a fair statement?
12     A. That's a fact.
13     Q. And in the next sentence, you talk about "This
14 fabrication on the part of Lackey was intended to
15 obstruct a criminal investigation," correct?
16     A. Yes.
17     Q. And then next paragraph, there's a second
18 fabrication from Lackey to Curtis.
19     A. That's what I wrote.
20     Q. Then down in paragraph 23, you say, "Craig
21 Lackey, on more than one occasion, intentionally made
22 false or misleading material statements to the police
23 during a criminal investigation," correct?
24     A. That's true.
25     Q. And then you mention here in paragraph 25 where

1 you say that Curtis didn't talk to you or the alleged
2 assailants, and he reported the case closed, correct?
3     A. Wait. Say that again. On -- what --
4     Q. Paragraph 25.
5     A. Okay.
6     Q. That Curtis didn't speak to you or the alleged
7 assailants.
8     A. That --
9     Q. You see that?
10     A. I see that, yeah.
11     Q. And that he closed the case.
12     A. I see that, too.
13     Q. So is your complaint here that Curtis could've
14 and should've did more to investigate your complaints?
15     A. Yes.
16     Q. Paragraph 26, you talk about a meeting with
17 Curtis on March 5th of 2014.
18     A. Okay.
19     Q. Would you characterize that meeting as heated
20 between you and he?
21     A. Yes.
22     Q. This is one that occurred in the lobby of the
23 police building?
24     A. Yes.
25     Q. Says, "Curtis confirms that he listened to the

1 tapes of Barnes and the related phone calls and that
2 everything Barnes did was a common practice of the
3 Irving Police Department." That's your statement in
4 paragraph 26.
5     A. Okay.
6     Q. How did Curtis confirm that everything Barnes
7 did was a common practice of the Irving Police
8 Department?
9     A. Because I asked him.
10     Q. What did you ask him?
11     A. Well, I don't remember the words verbatim, but
12 you have -- you have a copy of the tape, right?
13     Q. Uh-huh.
14     A. Okay. So I don't remember the words verbatim,
15 but I was complaining to him about what she did. His
16 response was: She can do those things.
17     Q. Okay.
18     A. You know, you heard it. I told you the same
19 day that I heard it. I know we on deposition, you have
20 to put it on tape. Go ahead.
21     Q. Was there any other way that Curtis confirmed
22 that everything Barnes did was a common practice of the
23 Irving Police Department other than what you just
24 stated?
25     A. Not that I can recall as I'm sitting here.

1     Q. Okay.
2     A. I'd have to think about it. Did he reconfirm
3 her behavior in other ways and there -- were there other
4 sources of my confirmation that he supported, espoused,
5 what she did. I don't -- I have to think about that.
6     Q. Your next section on paragraph -- or excuse
7 me -- page 6 is entitled "Discussions With City of
8 Irving Policy" --
9     A. Wait a minute. What -- what paragraph?
10     Q. Page 6. It's the heading right there, the big
11 heading.
12     A. Okay.
13     Q. It's entitled "Discussions With City of Irving
14 Policy Makers Prior to Any Court Involvement."
15     A. Yes.
16     Q. And then you go on to say that you took the
17 following steps in 2014: You visited with the Police
18 Department and spoke with Les Moore, the legal adviser
19 for the City of Irving.
20     A. Right.
21     Q. Are you alleging that Mr. Moore is a policy
22 maker for the City of Irving?
23     A. Maybe not directly, but indirectly.
24     Q. How is he indirectly a policy maker for the
25 City of Irving?

1     A. Because he -- he's a legal adviser. He's in
2 the media a lot. I researched him to that degree. He's
3 in the media representing Irving Police Department
4 often. He does -- I forgot the name, what -- I forgot
5 what they call that, but he does, like, public speaking.
6 They -- so if he's -- if something's interacting with
7 him, policy makers should be aware of it.
8     Q. Okay. Is there anything else that would make
9 him a policy maker other than being the legal adviser
10 who's in the media frequently?
11     A. Not that I can think of without my documents --
12 without my resources with me. I don't have all my
13 resources here.
14     Q. What resources were you -- are you referring
15 to?
16     A. I have volumes of information that -- and
17 research, and this is just a distillation -- you know
18 that. This is just every -- it's just a distillation of
19 other things that I have.
20     Q. As we sit here today, can you identify with
21 specificity any times that Mr. Moore represented the
22 City of Irving in the media?
23     A. No. But I've seen -- I've -- I researched him,
24 but I can't -- the answer to your question is no.
25     Q. Next, you mention you spoke with Eric Curtis,

1 Detective Eric Curtis.
2     A. Right.
3     Q. Are you alleging that Detective Curtis is a
4 policy maker?
5     A. Somewhat, yes, I am alleging that.
6     Q. Okay. And how is Detective Curtis a policy
7 maker for the City of Irving?
8     A. He conducts training. He's a senior -- he's a
9 senior lead detective. He conducts training of other
10 detectives. He interacts with people higher up. And if
11 there is a disconnection between him and policy makers,
12 then -- but I can't say with specificity at this moment
13 what makes him -- or makes him or Les Moore, in police
14 terminology, a policy maker.
15     Q. So as we sit here today, the three things that
16 you said that would support Eric Curtis as a policy
17 maker is: one, he's a senior lead detective; two, he
18 trains other detectives; and three, he interacts with
19 others higher up. Is there anything else?
20     A. Not that I can think of right now because I do
21 not have my material with me to -- I'm just speculating.
22     Q. What other training did Eric Curtis do?
23     A. I'm sorry?
24     Q. What other training did he do? You said he
25 trained other detectives. How do you know that?

Page 45

1    A. Because of research I've conducted.

2    Q. Do you remember what that research is?

3    A. No.

4    Q. So as we sit here today at your deposition, you

5   can't say what other training he had done of other

6   detectives.

7    A. No, not at the moment.

8    Q. Are you sure of his title being a senior lead

9   detective?

10    A. Not at the moment.

11    Q. Subparagraph C there, you say you wrote e-mails

12   and made an appointment to speak with then Irving City

13   Attorney Candace Chappell.

14    A. Yes, I did.

15    Q. What evidence do you have to show that she was

16   ever Irving's city attorney?

17    A. She was. I mean, what evidence do I have to

18   show that?

19    Q. Uh-huh.

20    A. I don't have any with me at the moment, but --

21   you know, I don't have any with me in this room.

22    Q. So if I were to tell you she's never been

23   Irving's city attorney, she's always been an assistant

24   city attorney, you dispute that.

25    A. I wouldn't -- when I called the City Attorney's

Page 46

1   Office to try to tell them of the situation and the

2   process of exhausting my administrative remedies, they

3   referred me to her.

4    Q. Okay. So is that why you think she was the

5   Irving city attorney?

6    A. Yeah.

7    Q. Anything else to support that assertion?

8    A. What assertion?

9    Q. That she's the Irving city attorney.

10    A. I don't work there. I just called the Irving

11   City Attorney's Office, and I told them, some lady on

12   the phone, what I'm -- you know, this what happened, and

13   they said, Sure. Let me transfer you to Candace

14   Chappell.

15      I made an appointment to see her. She

16   never said she wasn't. In all the documentation and

17   e-mails that I sent to her, I referred to her as the

18   city attorney. I have e-mails to show that. She never

19   said, I -- wait a minute, I'm not the city attorney.

20   I'm the assistant city attorney.

21      She never said that, so . . .

22    Q. So you assumed, and she didn't correct you.

23    A. I'm sorry?

24    Q. So you assumed she was the city attorney, and

25   she didn't correct you.

Page 47

1    A. I did assume she was the city attorney because

2   I called to speak to the city attorney. I wrote e-mails

3   to her referring to her as the city attorney.

4    Q. Okay.

5    A. We don't -- we don't know who's assistant

6   and -- you know, we don't -- we don't work there.

7    Q. Right. Do you consider Ms. Chappell to be a

8   policy maker?

9    A. Possibly.

10    Q. Okay. Why would she be a policy maker for the

11   City of Irving?

12    A. I have to refer to my documentation which I do

13   not have here today.

14    Q. What documentation is that?

15    A. Oh, I don't have a name for the documentation.

16   It's just e-mails, it's just research material.

17    Q. So as we sit here today, you don't have

18   anything to establish Ms. Candace Chappell as a policy

19   maker for the City of Irving.

20    A. As we sit here in this moment, I do not have

21   that information in front of me.

22    Q. And you don't have any answer for me.

23    A. Well, that's the answer.

24    Q. You would need to refer to your information.

25    A. Yes.

Page 48

1    Q. Subsection D, "Williams wrote e-mails to the

2   Irving chief of police Bruce Jolley."

3    A. Right.

4    Q. Was he the chief of police?

5    A. Okay. Here we go again. These -- I've

6   got you -- let me -- let me answer your question. Let

7   me answer your question.

8    Q. The question is: Was he the chief of police?

9    A. I know the -- I know the question. I'm trying

10   to get an -- formulate an answer for you that is

11   accurate and addresses the -- the momentum of the

12   question.

13      Okay. Was he the chief of police? I don't

14   know.

15    Q. Thank you.

16    A. I mean, are you the city attorney? I mean, do

17   -- you know, do you work for -- I don't know.

18      MR. McCLAIN: Objection, nonresponsive.

19   There's not a question posed.

20    Q. (BY MR. McCLAIN) Let me pose the question this

21   way, Mr. Williams. Your constitutional violation that

22   you allege in this case is that you were denied your

23   constitutional right to equal protection, correct?

24    A. Yes.

25    Q. Do you know of any official city policy that

COI 00067

1 denies individuals their constitutional right to equal

2 protection? Is there a -- is there a specific written

3 policy that we can point to that says, yes, this

4 violates an individual's right to equal protection?

5 **A. I don't have it in front of me right at the**

6 **moment.**

7 Q. So as we sit here today, you can't point to a

8 specific policy that says that.

9 **A. I cannot -- I cannot point to a written policy**

10 **that says that.**

11 Q. Fair enough.

12 Compared -- in paragraph 48 there --

13 **A. 48?**

14 Q. Yes, sir. Page 10. You said, "Defendant City

15 of Irving has adopted an unconstitutional policy of

16 refusing to enforce the law that protects members of the

17 black community from criminal elements within the white

18 community," correct?

19 **A. Right.**

20 Q. Obviously, you're referring to your situation.

21 **A. Sir, just take that as it's -- as it's written.**

22 Q. In support of that statement that you make in

23 paragraph 48, you've got your situation where an

24 investigation was not done -- was not conducted

25 thoroughly, you claim, correct?

1 **A. It was not conducted thoroughly and -- you**

2 **could say that, yes.**

3 Q. Do you know of any other instances where the

4 City of Irving has refused to enforce the law that

5 protects members of the black community from criminal

6 elements within the white community?

7 **A. I do not have all of my information in front of**

8 **me, so I can't answer that question fully off the top of**

9 **my head, and I do not want to speculate.**

10 Q. So as we sit here today and I ask you for any

11 other situations or instances in which the City of

12 Irving has adopted an unconstitutional policy refusing

13 to enforce the law that protects members of the black

14 community from criminal elements within the white

15 community, you can't point to any.

16 **A. I do not have the information in front of me --**

17 Q. I understand.

18 **A. -- and I don't want to speak off the top of my**

19 **head and be incorrect. Because I would have to tell you**

20 **the case history, I'd have to tell you names, I would**

21 **have to tell you details that I do not have with me at**

22 **the moment.**

23 Q. Anything, any name, any situation other than

24 yours that supports the assertion in paragraph 48?

25 **A. I don't want to speculate. I don't want to say**

1 something John and it's Jane. I don't want to say -- I

2 don't want to say Smith and it's Smitty, you know.

3 Q. But that information would be contained in this

4 documentation that you're referring to?

5 **A. More than likely. Should be.**

6 Q. Same question for paragraph 49 where you say,

7 "The Defendants further adopted an open and widely

8 implemented unconstitutional policy of retaliating

9 against black people when they demand equal protection."

10 Other than your situation, do you have any

11 other instance in which this occurred?

12 **A. Same response as the previous response.**

13 Q. You're not able, as we sit here today, to point

14 to any with specificity.

15 **A. Because I do not have the material in front of**

16 **me.**

17 Q. Right.

18 **A. Not because they do not exist --**

19 Q. Correct.

20 **A. -- but because I do not have the information in**

21 **front of me.**

22 Q. So the answer to my question is no --

23 **A. No. No, no.**

24 Q. -- but it might be in the information that I

25 have.

1 **A. No. The answer to your question is what I**

2 **just -- what she just took down. It's not a rephrasing**

3 **of what you are stating.**

4 Q. Okay.

5 **A. The answer to the question is exactly what I**

6 **said, and it should be in the record.**

7 Q. Let me rephrase it, then. What other -- what

8 other instances can you point to that the City of Irving

9 adopted an open and widely implemented unconstitutional

10 policy of retaliating against --

11 **A. Say that first part again.**

12 Q. What other instances can you point to right now

13 that shows the City adopted an open and widely

14 implemented unconstitutional policy of retaliating

15 against black people when they demand equal protection?

16 **A. Right. I do not have the information in front**

17 **of me to give you an accurate response to that. If I**

18 **say something, I want it to be accurate. I don't want**

19 **to say something and come back later and say, no, I**

20 **meant this.**

21 MR. McCLAIN: Object as nonresponsive after

22 "I don't have the information."

23 Q. (BY MR. McCLAIN) Paragraph 50, "The Defendants

24 further adopted an open and widely implemented

25 unconstitutional policy of retaliating against black

1 people who dare file federal lawsuits."

2 Focus in on your instance.

3 **A. Okay.**

4 Q. What happened to you after you filed your

5 federal lawsuit?

6 **A. Well --**

7 Q. Strike that. That's a bad question.

8 **A. Yeah.**

9 Q. What actions did the City of Irving take

10 against you after you filed your federal lawsuit?

11 **A. They set in motion a series of events that led**

12 **to me being arrested -- falsely arrested based on**

13 **information and belief. That's one.**

14 **They defamed me horribly. They damaged my**

15 **career. They -- okay. What did I -- what did I just**

16 **mention? I said that they damaged my career, defamed**

17 **me, stole personal information about my mental health or**

18 **what -- it wasn't my mental health but something**

19 **somebody may have said about my mental health. Just**

20 **various forms of defamation; career sabotage; malicious**

21 **prosecution, helped to facilitate a malicious**

22 **prosecution.**

23 **I mean, and it's still being discovered as**

24 **we speak. The things that they have done is still being**

25 **uncovered. It's happened so -- it's happened so**

1 **frequently you can't write it fast enough. I can't file**

2 **the motions fast -- I can't amend enough.**

3 Q. You filed this lawsuit in May of '15, correct?

4 **A. Initially, I believe, yeah.**

5 Q. What actions did — so and you're claiming that

6 the City has "an open and widely implemented

7 unconstitutional policy of retaliating against black

8 people who dare file federal lawsuits."

9 **A. Right.**

10 Q. So you filed this federal lawsuit in May

11 of '15.

12 **A. Yes.**

13 Q. What actions did the City of Irving take after

14 you filed this lawsuit in May of '15?

15 **A. After that specific date.**

16 Q. Right. Because that would be retaliating for

17 that lawsuit, right?

18 **A. No. But let me answer your question.**

19 **Okay. Before I filed the federal lawsuit,**

20 **okay, I filed a internal affairs investigation. And so**

21 **what I should have said in this document -- I said as a**

22 **result of filing federal lawsuits. I should have**

23 **phrased that differently as just complaining including**

24 **federal lawsuits. I should've -- I should've said that.**

25 Q. Sure.

1 **A. So you know, it started with the -- with the**

2 **argument he and I had. Well, it actually started with**

3 **the -- with the phone call to Barnes, that -- and what I**

4 **mean by that, I'm -- okay. So the question you asked**

5 **me -- here, let's put this in perspective.**

6 Q. I just want you to —

7 **A. Yeah.**

8 Q. -- support your statement.

9 **A. I'm going to support it. "The Defendants**

10 **further adopted an open and widely" -- "widely**

11 **implemented unconstitutional policy of retaliating**

12 **against black people who dare file federal lawsuits."**

13 **Well, this -- this should be worded**

14 **slightly differently. Okay. What I really meant was**

15 **whenever you call for protection these things happen,**

16 **not -- a federal lawsuit was just one of them.**

17 **Well, a federal lawsuit is really an**

18 **advance -- after it gets to an advanced stage. This**

19 **happened at a very early stage with my first interaction**

20 **with them as a customer, you know, with me as a -- you**

21 **know, a citizen calling the police asking for -- calling**

22 **the Irving Police Department asking them for protection.**

23 Q. So we should just go with what you wrote, not

24 what you meant, because I have to go with what you

25 wrote. And what you wrote was --

1 **A. Well, I'm telling you what I meant.**

2 Q. Well, that's fine. And you can certainly argue

3 that you meant something different.

4 But as you say here, you state that we have

5 a "policy of retaliating against black people who dare

6 file federal lawsuits."

7 What specific actions did the City of

8 Irving take against you after you filed your lawsuit in

9 May of '15?

10 **A. Well, the lawsuit was first filed way before**

11 **that. It just -- it culminated into a federal lawsuit.**

12 **It started on the state level, just like a small-claims**

13 **thing, you know, when me and you met -- me, you, and my**

14 **son met in Frisco.**

15 Q. That wasn't a federal lawsuit, though, was it?

16 **A. Well, I know that. What I'm saying to you is**

17 **that, you know, it started there. I get your point.**

18 **What you're trying to do is hold me to exactly what I**

19 **said on this paper.**

20 Q. Sure.

21 **A. And you can do that if you want -- I mean, you**

22 **can do that, if that's your job to do that. But I'm**

23 **here telling -- I am here saying on the record that that**

24 **should've been phrased a little bit differently.**

25 MR. McCLAIN: I'm going to object as

COI 00069

Page 57

1 nonresponsive and ask my question again.
2    Q. (BY MR. McCLAIN) What actions were taken
3 against you by the City after you filed your federal
4 lawsuit?
5    A. I would have to go back to my documentation at
6 home and see exactly because I don't have the
7 information in my -- on my person.
8    Q. As we sit here today, you're unable to point to
9 any specific action the City took against you after you
10 filed your federal lawsuit, correct?
11    A. I would have to refer to my documentation to
12 see. I'm not saying I do not have incidents that
13 occurred after that day.
14    Q. Uh-huh.
15    A. I'm not saying that.
16    Q. Gotcha.
17    A. But what --
18    Q. What you are saying is you can't answer it
19 right now as we sit here.
20    A. Because I don't have the information in front
21 of me, and I don't want to be incorrect. It calls for
22 me to speculate. I don't want to -- you know, question
23 calls for speculation.
24    Q. Fair enough, Mr. Williams. I'm asking you to
25 answer the question, and you're saying you can't without

Page 58

1 the supplemental information that you may or may not
2 have --
3    A. I'm not going to sit here and say -- give you a
4 yes or no answer and then go home and say, oh --
5    Q. No.
6    A. -- they did this, they did this --
7    Q. I'm not asking you if you ever can provide it.
8 I'm saying, can you provide it right now? And the
9 answer to that question is no, you can't. Now, you
10 might be able to go home and find it, but as you sit
11 here right now, the answer is clearly no, you can't.
12    A. Well, I've given you -- I've given you my
13 response to your question.
14    Q. Fair enough.
15        Who are the City of Irving's policy makers?
16    A. The Irving City Council; the mayor; and in some
17 case, the chief of police participates in those -- in
18 the development of policy. The chief of police, based
19 on my research and -- you know, the best of my -- I'm
20 not a expert on it, but I'm not stupid either. But I
21 know the Frisco City Council makes policy, the mayor
22 should be involved in that policy-making, officers and
23 detectives -- senior officers and detectives in the
24 field participate in the development of policy.
25        There are two forms of policy within any

Page 59

1 police department. Today we're talking about the
2 Frisco -- I mean, the Irving Police Department. There
3 is unwritten policy, which are customs and traditions
4 that they all do, that is not written down and then
5 there are written policy that people follows. But I
6 think, based on my research, that the unwritten policy
7 is the one that's followed more than the written policy.
8        MR. McCLAIN: Object as nonresponsive.
9    Q. (BY MR. McCLAIN) We've covered written policy
10 and we've covered the unwritten policy. Now, I'm asking
11 about policy makers.
12    A. I just --
13    Q. And you listed City Council, mayor, potentially
14 chief of police, and then you started talking about
15 senior officers and detectives. Are you alleging that
16 police officers and detectives are policy makers for a
17 municipality?
18    A. What I am saying to you is, in a situation like
19 that, when you're making policy about police, when you
20 making policy that affects the everyday life of police
21 officers, city councilmen and mayors, they're not police
22 officers, so they don't sit up and say how long you take
23 to arrest a person for cocaine distribution because they
24 don't know.
25        But where do they get -- where do they get

Page 60

1 this input from? They get the input from people who are
2 in the field. You may not name Officer -- you know,
3 Sergeant John Doe who's been on the force for 25 years
4 as a policy maker, but Sergeant John Doe is making
5 policy.
6        How is he making policy? Well, he's --
7 he's talking to the chief of police. He's -- they're in
8 meetings, and he's influencing it like that. I mean, no
9 one's sitting on the city council for four years, you
10 know, who was maybe a business owner, you know, their
11 whole life is going to sit up and make policy in a
12 vacuum. That requires the input of other people. So
13 it's not as simply as is he crowned policy maker, you
14 know, is this person the crowned policy -- is this
15 person title policy maker. No.
16    Q. So I understand that you're saying police
17 officers, detectives, sergeants have input in policy-
18 making decisions. Is that a fair statement?
19    A. No. The fair statement is the statement I just
20 made, and I think I articulated it very clearly, is --
21 let me -- okay. I can't answer your question. But I'm
22 just trying to understand, is there something unclear
23 or --
24    Q. Certainly.
25    A. Okay.

COI 00070

## Page 61

1  Q. Irving City Council —

2  **A. Okay.**

3  Q. — policy maker. We agree with that.

4  **A. I said that. I said that.**

5  Q. That's why I said we agree.

6  **A. Oh, okay. I thought you was asking me do I**

7  **agree.**

8  Q. That's why I said we agree.

9  **A. Okay.**

10  Q. Mayor, we agree. Chief of police, I don't

11  necessarily agree with that, but you stated the chief of

12  police is a policy maker. Fine.

13       Then you said police officers out there on

14  the street. And I understood you to say they may not be

15  crowned in making policy, but they have input into

16  policy decisions. And I'm just asking if that's a fair

17  characterization.

18  **A. Yeah, let's talk about that fourth one. When I**

19  **say police officers in the street, this guy out here**

20  **doing tickets and arresting people for broken headlights**

21  **is not making policy for nobody. You know what I mean?**

22  **The guy that -- the guy that falsely arrested me, he**

23  **didn't make that policy.**

24       **What I'm saying is there is, within the**

25  **police department, a consortium of 15-year, 20-year**

## Page 62

1  **officers, senior officers and detectives. I don't know**

2  **their names, and I don't work within that world. You**

3  **know, I mean, I work in a completely different world,**

4  **you know. So there are senior members 15-, 20-year --**

5  **I'm just making those numbers up -- who do influence**

6  **policy.**

7       **Even the chief -- these people don't make**

8  **policy just out of the -- you know, out of the -- pull**

9  **it out of the sky. They get input from officers. They**

10  **get input from people who are out there, what they call,**

11  **risking their lives every day. You know, they're not**

12  **going -- they're not going to make the policy. They're**

13  **not going to give a gun -- give a gun and badge to a guy**

14  **and say, Go get the Mafia, without, you know, asking**

15  **them, How do you think is best that we enable you to get**

16  **the Mafia -- I'm just making that statement up -- or**

17  **what equipment do you need, or blah, blah, blah. So**

18  **yeah. It's not -- it's not as cut-and-dry like -- in**

19  **a -- in a -- what you trying to make it.**

20  Q. I agree that they have input --

21  **A. You do agree.**

22  Q. — to the policy makers.

23  **A. Well, then.**

24  Q. To the extent you're saying they are policy

25  makers themselves --

## Page 63

1  **A. No. No, no, I didn't say they're policy makers**

2  **themselves.**

3  Q. That's -- that's all I'm asking. That's all

4  I'm asking.

5  **A. They're not policy makers --**

6       THE REPORTER: Wait. One at a time.

7  Q. (BY MR. McCLAIN) And I think we're saying the

8  same thing, Mr. Williams. To the extent you say

9  senior officers and detectives have input into the

10  creation of policy, I totally agree. If you are also in

11  agreement that they are not themselves policy makers,

12  then we are in agreement, and we can move along.

13  **A. And let me give a nuance to that. Let me give**

14  **a slight nuance to that. That's written policy.**

15  Q. Fair enough.

16  **A. Now, there are customs and traditions that have**

17  **the force of policy --**

18  Q. Fair enough.

19  **A. -- that the City Council don't really disturb**

20  **that.**

21  Q. Gotcha.

22  **A. Because they -- it's working, you know.**

23       THE WITNESS: Is this water here?

24       MR. McCLAIN: We can take a break so you

25  can get a drink of water.

## Page 64

1       THE WITNESS: Is there some water in here?

2       MR. McCLAIN: I don't know.

3       THE WITNESS: Oh, don't worry about it.

4       MR. McCLAIN: There's a water fountain —

5       THE WITNESS: Keep going. Keep going.

6  There's a water fountain right outside the door?

7       MR. McCLAIN: Uh-huh.

8       THE WITNESS: Take one minute?

9       MR. McCLAIN: Sure.

10       (A break was taken from 3:00 p.m. to

11        3:01 p.m.)

12  Q. (BY MR. McCLAIN) How about this: Let's go to

13  page 13. I'm sorry. Yeah, page 13, paragraph 13.

14  **A. Got it.**

15  Q. "The facts show that the policy makers for the

16  City of Irving promulgated or ratified the actions of

17  Barnes and subsequently the actions of Curtis."

18       When you say right there the policy —

19  "that the policy makers for the City of Irving," who

20  specifically are you referring to?

21  **A. The City Council, mayor, the chief of police --**

22  **everyone I just said.**

23  Q. Well, we've got those three: City Council,

24  mayor, chief of police. Are you referring to anyone

25  else when you say, "The facts show that the policy

COI 00071

1 makers for the City of Irving . . ."?

2    A. Yeah. Who else am I referring to? Senior --

3 what -- in layman's terms, like, the word that comes to

4 mind is "dinosaurs," you know, people who have been in

5 the department for long periods of time and ratify the

6 actions of Barnes.

7         Nobody corrected Barnes until I launched an

8 internal affairs investigation. Even though the

9 department knew what she did, no -- actually, be --

10 actually, her actions were ratified by the people

11 surrounding her calling my employer, which is totally

12 out of her jurisdiction, without notifying anyone.

13    Q. When you reference the policy makers --

14    A. Right.

15    -- in paragraph 13, we're talking about City

16 Council, the mayor, the chief of police. And then you

17 said dinosaurs, people that had been there a long time?

18    A. It's a combination of -- it's a blend of the

19 two, sir. It is a blend of the two. It is a -- it is a

20 blend of very senior people in law enforcement who are

21 superior with a dotted line. Not necessarily superior

22 going straight up, but superior from an atmospheric

23 point of view that ratifies the deviant behavior or --

24 that ratifies the bad behavior on the part of other city

25 employees. It's a blend of the two. And now I guess

1 you say, well, why didn't I say that there, yeah.

2    Q. Who? I want -- who?

3    A. Who what?

4    Q. Who specifically are the policy makers you

5 refer to in paragraph 13?

6    A. I just told you.

7    Q. So senior people that are --

8    A. I just told you -- I told you the City

9 Council --

10    Q. Right.

11    A. -- didn't I? Do we -- do we need to write this

12 down? because you ask me the same questions over and

13 over.

14         MR. McCLAIN: Objection, nonresponsive.

15    Q. (BY MR. McCLAIN) Paragraph 13,

16 you specifically identify the policy makers for the City

17 of Irving.

18    A. Right.

19    Q. When I asked for their identities --

20    A. I don't know their names.

21    Q. Let me finish my question.

22    A. Sure.

23    Q. -- you identified the City Council --

24    A. I did.

25    Q. -- the mayor --

1    A. I did.

2    Q. -- chief of police.

3    A. I did.

4    Q. Who else specifically do you consider a policy

5 maker as stated in paragraph 13?

6    A. The group I just mentioned, senior people such

7 as Eric Curtis, such as Detective Eric Curtis.

8    Q. Okay. Anyone else?

9    A. No.

10    Q. So the policy makers you're referring to in

11 paragraph 13, City Council, the mayor, the chief of

12 police, and senior people in the police department.

13    A. Yes.

14    Q. And just specific identity for senior people,

15 we have Eric Curtis?

16    A. I know there's two more people. There's two

17 more senior officers I spoke with and complained to. I

18 forgot their names. I don't have their names with me,

19 but it was at least two more, at least two.

20    Q. Okay.

21    A. That I complained -- that I told the same story

22 to.

23    Q. Okay.

24    A. Sir, because the process is: I speak to the

25 young lady, the dispatcher; the dispatcher sent me to a

1 Web site; then there's a person who receives the Web

2 site complaint; then he talks to me and decides whether

3 to give it actually to a detective.

4    Q. Was that one of the senior people you're

5 referring to?

6    A. No. I'm just -- I'm just saying, along this

7 line, people are ratifying her behavior. No one is --

8 what's -- no one reported her for that. So they

9 ratified that by not -- because officers have a duty to

10 police themselves.

11    Q. For the identity of the policy makers in

12 paragraph 13, City Council, mayor, chief of police,

13 senior people. Eric Curtis is specifically identified

14 as a senior person, and we have two other individuals

15 that you can't remember --

16    A. Unnamed at the moment. Unnamed at the moment.

17    Q. Okay. Anyone else?

18    A. Not that I -- not that I can mention at the

19 moment.

20    Q. Was Barnes disciplined for her actions

21 involving your call?

22    A. Yes and no.

23    Q. Why do you say no?

24    A. No because -- I would say no, period. Not yes

25 and no. My answer to that question is no, she was not

## Page 69

1 disciplined.

2    Q.   Okay.  Why do you say that?

3    **A.   Because for what she did, the one day that she**

4 **was given off without pay does in no way deter or give**

5 **her an incentive to never do that again.**

6    Q.   So you agree that she was disciplined, but you

7 just don't think she was disciplined sufficiently?

8    **A.   You can word it like that if you want to.  I**

9 **don't think it was a discipline at all, but . . .**

10    Q.   All right.  Let's talk about the BOLO.  It's

11 your allegation that Detective Curtis conspired with

12 Lackey?

13         (Exhibit 3 marked.)

14    **A.   Excuse me?**

15    Q.   (BY MR. McCLAIN)  It's your allegation that

16 Detective Curtis conspired with Lackey to distribute

17 this BOLO; is that correct?

18    **A.   Yes.  Well, I don't know if it was Lackey**

19 **only --**

20    Q.   Okay.

21    **A.   -- but at a very minimum, those two people**

22 **conspired to create this BOLO, this fictitious BOLO.**

23    Q.   Your lawsuit, paragraph 18 on page 15, it says,

24 "The City of Irving conspired with Craig Lackey,

25 in-house legal counsel for Caliber."

## Page 70

1         And I'm assuming that Detective Curtis is

2 the City of Irving person you're referring to.

3    **A.   It could be more.**

4    Q.   Okay.  So when you say in paragraph 18 "the

5 City of Irving conspired" —

6    **A.   I'm just -- that's -- because you've already**

7 **established that he's not a named -- I guess you said**

8 **that, he's not a named litigant, so it's a moot point**

9 **now anyway.**

10         **But you're asking me who am I talking about**

11 **when I say "City of Irving."  I mean the City of Irving**

12 **for the purpose of this deposition.**

13    Q.   Well, who took those actions on behalf of the

14 City of Irving?

15    **A.   Someone in law enforcement.  Someone in the**

16 **city -- one or more people within the Irving Police**

17 **Department.**

18    Q.   And who were those people, if you know?

19    **A.   At least one of them was Eric Curtis.**

20    Q.   Okay.  And anyone else as you sit here today?

21    **A.   Anyone else what?**

22    Q.   Can you identify anyone else besides Eric

23 Curtis?

24    **A.   Not at this moment.**

25    Q.   Okay.  "Conspired with Craig Lackey, in-house

## Page 71

1 legal counsel for Caliber."

2         And then it goes down to paragraph 19.

3 "This conspiracy manifested itself in the form of a BOLO

4 that was distributed to police cars, prosecutors, and

5 other law enforcement agencies," correct?  So -- and the

6 BOLO that's Exhibit No. 3, this is the BOLO you're

7 referring to.

8    **A.   Yes.**

9    Q.   And this was the product of their conspiracy

10 against you.

11    **A.   One manifestation of it, as I said in this**

12 **document.**

13    Q.   Okay.  Well, that's the only manifestation you

14 alleged in paragraph 19, correct?

15    **A.   Okay.  Yeah.**

16    Q.   Why is this BOLO fictitious?

17    **A.   Well, because that's not my criminal history.**

18    Q.   Okay.

19    **A.   First of all, that's not my criminal history.**

20 **And the parts that is, is a false lie.  It's misleading.**

21 **The parts that -- I can see the traffic -- I can see the**

22 **drug part.  I can see some of this that happened like 30**

23 **years ago that I'll admit to.  It happened 30 years ago.  And that**

24 **that I'll admit to.  It happened 30 years ago.  And that**

25 **doesn't -- it -- I mean, anybody seeing this would**

## Page 72

1 think, like -- and it's released today in 2018 would

2 think, well, he just did this yesterday, and they got a

3 BOLO out against him; go find him.

4         **These things -- the ones -- the things that**

5 **did happen, 75 percent -- focusing on the criminal**

6 **history by itself, I can see one or two things here, but**

7 **then that was 30 years ago.**

8    Q.   Well, let's focus on this situation.  What on

9 here is accurate?

10    **A.   On what?**

11    Q.   On the criminal — on the criminal history.

12 Regardless of how long it occurred —

13    **A.   Right.  Right, right, right.  Traffic --**

14    Q.   — which ones are — which ones are accurate?

15    **A.   Traffic -- and I don't know which traffic they**

16 **talking about.**

17    Q.   Okay.

18    **A.   When they say "traffic," I mean, I don't know**

19 **what you're talking about.**

20    Q.   Okay.

21    **A.   So you know, I'll say that's inaccurate.**

22    Q.   Okay.

23    **A.   Because I'm -- it's not --**

24    Q.   Which ones are accurate?

25    **A.   Really none of them.  None of them.**

COI 00073

## Page 73

1  Q.  Okay.  So you don't have any sort of larceny on

2  your criminal history?

3      A.  No.  Excuse me.

4      Q.  No?

5      A.  No.

6      Q.  You don't have any sort of fraud on your

7  criminal history?

8      A.  Well, let's put it like this -- no, no, that

9  question is -- let me put it like this:  I don't know

10  what's on the criminal history, okay?  But I know I have

11  never been convicted of larceny, I have never been

12  convicted of fraud, and if I did, I didn't know about

13  it.

14          And I've never been -- I've been convicted

15  of -- I've been convicted of having a joint in 1988.  I

16  was convicted of that.  If they calling that a dangerous

17  drug, okay.  I was convicted of the joint.  I'll cop to

18  that.  And that was in 1988.

19          The disorderly conduct, I don't know what

20  you're talking about.  The obstructing police officer, I

21  don't know what you're talking about.  The robbery is a

22  lie.  And injury to a child is a lie.  The traffic,

23  well, I been stopped many times on traffic tickets.  I

24  don't know what you mean "traffic."

25      Q.  So you've never looked at you criminal history.

## Page 74

1      A.  Sir, I get background checks -- I been

2  getting -- just hear me.  Hear me, and let me finish.

3          To do the kind of work I do, I have to have

4  an immaculate criminal history.  I -- let me finish.  I

5  was working for Citigroup recent -- not -- in 2015,

6  actually, and they told me to go -- they told me to stop

7  working and go home.  And when I got home, I found -- I

8  asked them why.  And they said, There's something on

9  your criminal history that needs to be cleared up.

10          Okay.  You still with me?

11          Then I -- they said it was a check that was

12  passed in -- when I was like 19 years old, and I'm 55

13  today.  You know, it was 19 years old.  My point -- and

14  then they asked me to -- to go find out the disposition

15  of that, because we can't see the disposition of it.

16          I said, No problem.

17          I went down to the -- somewhere.  I went

18  down to the sheriff's department in Dallas.  I went down

19  to another courthouse in Dallas, the one that used to be

20  the old courthouse way up there where Lee Harvey Oswald

21  was shot.  I went there and got the -- and listen, the

22  people there says, We don't have nothing like that on

23  you.  Go tell Citibank to call us.  That's not true.

24          And they signed -- "they" meaning the City

25  of Dallas or sheriff's department or the police, you

## Page 75

1  know, the police people gave me documentation to take

2  back to Citigroup, and Citigroup cleared me.

3          So -- and I've been getting criminal

4  background checks since 1995.  I can't work without

5  them.  The companies I work -- so do I go do criminal

6  background checks on myself?  No.

7      Q.  Thank you.  That was the answer I was looking

8  for.

9          So you don't have any idea personally, if

10  you plug in Michael Durrell Williams and your date of

11  birth into the criminal history database, what comes up?

12      A.  Why would I do that?  No, I don't -- I don't do

13  that.

14      Q.  What's the last line in the BOLO say?

15      A.  "The BOLO is for informational purposes only,

16  and there is not an active warrant for Williams based on

17  this."

18      Q.  So according to the BOLO itself, it's stating

19  that there's no reason for you to be arrested based on

20  this BOLO.

21      A.  But I was.

22      Q.  But not because of what this says.

23      A.  That's not true.  It's because of what this

24  says.

25      Q.  Even though it says specifically "there is not

## Page 76

1  an active warrant for Williams based on this."

2      A.  That's at the very, very bottom.  They going

3  to -- after they read all this and they get all this,

4  they probably stopped reading by the time they get --

5  really, they probably stopped reading -- that's

6  nonresponsive.  Okay.  So ask the question again.

7      Q.  The question is:  Doesn't this BOLO

8  specifically say there's no active warrant for you?

9      A.  It says that.

10      Q.  Thank you.

11          Paragraph 38 on page 8.

12      A.  On page 8, going backwards?

13      Q.  Yes, sir.  Says, "The second part of the BOLO

14  was written by Caliber."

15      A.  Right.

16      Q.  What part are you referring to?

17      A.  The part after "During the" -- first paragraph,

18  "During the investigation," all the way down to

19  "license."  That's one part I'm referring to.

20          Second part I'm referring to is

21  "Williams" -- second part I'm referring to is paragraph

22  No. 3 of the BOLO starting at "Williams" going all the

23  way down to -- probably at least to "employees" if not

24  all the way down to "the location."

25      Q.  And what do you mean it was written by Caliber?

COI 00074

## Page 77

1  Do you mean, like, they drafted it up and sent it over
2  or --
3  A. Uh-huh.
4  Q. Yes?
5  A. Yes. I don't know if they sent it over. I
6  don't know how he got it. We still in -- we still in
7  discovery. But this is word for word -- some of this is
8  word for word based on what they told -- based on
9  discovery from Caliber case, from the Caliber case.
10  Q. I thought you didn't have discovery from that.
11  That was one of the contentions in the case.
12  A. No, I said discovery. What I really meant was
13  I got a -- I got some material from -- I think that was
14  the EEOC -- yeah, the EEOC, when their lawyers responded
15  to the EEOC. So I got it from the EEOC, but I didn't
16  get it from Caliber itself. You know what I mean?
17  Q. So earlier I had asked if you had seen any
18  information from Caliber to the EEOC --
19  A. No.
20  Q. -- and you couldn't remember.
21  A. No, no, no. That's not what you said. That's
22  not -- I remember the exchange exactly. Your question
23  to me was: Did I -- could I vouch for or attest to
24  statements that Caliber made about Barnes being
25  responsible for my firing. That was one. And that sort

## Page 78

1  of led down, well, what did you hear from Caliber? So I
2  didn't do discovery from Caliber, but what I did get was
3  a document from the EEOC with Caliber's response to my
4  EEOC complaint, which was a narrative.
5  Q. We'll let the record speak for itself on what
6  was asked or not asked. But regardless --
7  A. Sure.
8  Q. -- you do have information from Caliber to the
9  EEOC regarding your complaint.
10  A. Not regarding my complaint; regarding my
11  termination.
12  Q. Well, the complaint you made about your
13  termination. You complained to the EEOC that Caliber
14  fired you because of your race and your age and your
15  gender and your disability and all of that. Did you see
16  something from Caliber to the EEOC regarding that
17  complaint?
18  A. We spoke about my reason for firing. It wasn't
19  extensive. It wasn't extensive.
20  Q. Extensive or not, you saw something from
21  Caliber.
22  A. I saw something, but it wasn't the discovery
23  that I wanted to do.
24  .Q. All right. So the information that we
25  bracketed off here, you're alleging that's what was

## Page 79

1  written by at least Lackey from Caliber Home Loans.
2  A. Well, it could've been -- it could've been -- I
3  don't -- I didn't see them do it, but I know this is a
4  narrative that they had been advancing in other -- at
5  other times or other points throughout this saga. This
6  narrative that appears here is a duplicate of the
7  narrative that was other places.
8  Q. A brief narrative to the EEOC.
9  A. That's one, yes.
10  Q. Are there any others?
11  A. I mean, I'm trying to think. I think so, but I
12  can't remember exactly at the moment.
13  Q. What did Frisco arrest you for?
14  A. I don't know. Nothing. I'll take that back.
15  I retract that -- I retract that response. Frisco
16  arrested me for nothing.
17  Q. Okay. Have you seen any documentation from
18  Frisco regarding your arrest?
19  A. I'm suing them for it.
20  Q. Have you seen any documentation from Frisco
21  regarding your arrest?
22  A. No.
23  Q. As we sit here today, you can't state why
24  Frisco arrested you, even if it's why they claim it was
25  proper to arrest you.

## Page 80

1  A. He told me a story that's hard to even
2  write down. And I have it recorded. I recorded. He
3  didn't know I was recording him. But I cannot make
4  sense of what he was saying.
5  He told me a story that went something
6  like, well, he -- I'm handcuffed in the backseat of the
7  cruiser, and I said, Why am I being arrested again?
8  He said, They -- one of them said, A judge
9  is looking for you.
10  I said, For what?
11  He said, They -- they want you downtown.
12  Then I got -- then we got into an argument
13  about me locking my car and we got away from that. He
14  wouldn't let me lock my car.
15  Then we got to the station, right? He
16  didn't book me. And I said, Well, what'd you bring me
17  down here for?
18  He said this -- he said these words: There
19  was a warrant for your arrest, and -- at the
20  dispatcher's booth, and she told us that, and she said
21  the warrant had been taken away, so I'm going to take
22  you back to your car. That's exactly what he said.
23  Then I said, Okay. So how can I avoid this
24  happening again?
25  He said, You need to -- tomorrow morning,

COI 00075

Page 81

1  you need to go to the city courthouse and have the
2  clerks to remove that warrant.
3         I said, Okay.
4         I went to the -- I went -- made a beeline
5  to the city -- Frisco City Hall because I live two
6  blocks away from it. And I said, This man told me that
7  you issued a warrant for my arrest, and he took me to
8  jail and then let me go.
9         And she just fell out laughing. She said,
10  We haven't issued a warrant for your arrest. She said,
11  You have -- some kind of violation in 2011, but that's
12  been taken care of.
13         And that's the story, so help me God. It
14  went exactly like that. Or something like that. If I'm
15  missing something, it's very little.
16     Q. What was the criminal case you referred to that
17  had taken up years of your life --
18     A. Online impersonation.
19     Q. Is that all about?
20     A. I wish I could really say, but I can't say what
21  I really want to say. So when you say "what's that all
22  about," what do you mean? What do you want to know
23  about exactly?
24     Q. What is online impersonation?
25     A. Online impersonation is a crime that says if

Page 82

1  you post a picture of somebody on Facebook in their
2  name -- like, if I create a Facebook page called
3  "Lieutenant Eric Curtis," right, and I put a picture of
4  him on that page robbing a bank or something like
5  that -- it's created -- the law was created to prevent
6  people from defaming politicians, but it went out to
7  regular people.
8         But that -- it is 33.07, and it's exactly
9  as I described it.
10     Q. What were you accused of doing?
11     A. What? Well, I -- specifically, they said that
12  I posted a picture of my ex-wife on her Facebook page.
13     Q. And who is "they" that's saying that? Is this
14  Collin County?
15     A. Frisco PD and --
16     Q. Frisco PD? Collin County DA's office?
17     A. No. They threw it out. They didn't -- it's a
18  long story.
19     Q. Well, they didn't throw it out immediately,
20  right, because it ate up years of your life?
21     A. Yeah. You want to know -- well, what's the
22  next question? Just give me a next question. Because
23  it's a long, wiry story. I'm not --
24     Q. You said Frisco PD was involved. Are you
25  alleging the Collin County DA's office was involved in

Page 83

1  any way?
2     A. At first I thought they were but then I found
3  out they were not.
4     Q. Are you suing Frisco for this as well?
5     A. Yeah. I mean, excuse me. Yes.
6     Q. Is this part of your currently pending
7  litigation against them?
8     A. Part of it. Is one -- the mandamus action is
9  to get the results of the internal affairs investigation
10  to find out exactly why I was arrested, what legal --
11  the car was sitting stopped with the motor off.
12     Q. When did the DA's office dismiss the charges?
13     A. November 11, 2017.
14     Q. So six weeks ago.
15     A. Yeah.
16     Q. Are you alleging the City of Irving had any
17  role in this online impersonation charges?
18     A. Yes. Yes.
19     Q. What role did the City of Irving play?
20     A. This.
21     Q. The BOLO.
22         Anything else?
23     A. That I -- not that I know of. We still in the
24  process of researching. Because the case just got
25  dismissed six weeks ago, and so it's been -- you just

Page 84

1  don't know.
2     Q. So as we sit here today, though, the only thing
3  you can point to as far as the City of Irving being
4  connected to the online impersonation charges is the
5  BOLO; is that correct?
6     A. Yes.
7     Q. And as far as the false arrest that -- you
8  know, the one where they couldn't even tell you what you
9  were arrested for, are you alleging that the City of
10  Irving was connected to that?
11     A. Yes.
12     Q. Okay. And what was City of Irving's connection
13  to that?
14     A. Because -- it calls for speculation, really.
15     Q. Okay.
16     A. It calls for speculation because I can't say
17  definitively, but I know.
18     Q. Okay.
19     A. I know for sure. But until I've done
20  thoroughly the research and documentation, I don't want
21  to just . . .
22     Q. Fair enough. So as we sit here today, you
23  wouldn't be able to answer that question without
24  speculating; is that fair?
25     A. The question of --

COI 00076

Page 85

1    Q.  What was City of Irving's connection to the
2   false arrest in Frisco?
3    A.  It's speculation at this point.  But we -- but
4   it's not -- but we strongly believe -- no.  The question
5   was:  Beyond this BOLO, what is their involvement?  I
6   believe that the arrest was triggered because the
7   officer saw this.  I'm almost 99 percent sure it is
8   because of the officer saw this that he made --
9    Q.  And you say --
10   A.  -- that he made that approach, that initial
11  approach.
12   Q.  When you say "this," you're referring to
13  Exhibit --
14   A.  The BOLO.
15   Q.  Yeah, she can't tell that.  -- Exhibit 3, the
16  BOLO.
17   A.  Yes.
18   Q.  With regard to the false arrest in Frisco, is
19  there any other City of Irving connection at this time
20  other than your belief that the officers initially
21  approached you because of the BOLO?
22   A.  As -- in regards to that arrest, the only thing
23  I have right now is this BOLO as the reason -- as
24  Frisco -- as Irving's participation in that instigation
25  of that arrest.

Page 86

1    Q.  And that was June of 2015.
2    A.  Yes.
3    Q.  So that was a year and four -- so 16 months
4   after the BOLO was issued?
5    A.  The BOLO was issued -- I guess it was issued --
6    Q.  Upper left corner.
7    A.  Yeah, I got you.  So it's like a year later.
8    Q.  Well, it was issued March 31, 2014, correct?
9    A.  That says -- yeah, that's what it says.
10   Q.  And you were arrested June 17th, 2015.
11   A.  Yes.
12   Q.  What mental anguish have you suffered as a
13  result of the allegations set forth against the City of
14  Irving?
15   A.  What mental anguish?
16   Q.  Uh-huh.
17   A.  The fear that I can never call the police no
18  matter what's happening to me.  Let's take -- let's
19  take -- let's take away Eric Curtis, take away -- take
20  what happened with Eric Curtis away.  Take the BOLO
21  away.  Take those things away.  Just what she did that
22  night, I mean, that was a real situation.  I can't call
23  the police.
24       I mean, I don't call the police a lot.  I
25  can't even think of a time in my life that I needed the

Page 87

1   police other than that day.  But to know you can't call
2   them, or if you call them, they're going to -- they're
3   going to do something to you is -- that's -- unless you
4   been in that situation, it's very, very scary.
5        And then to see this BOLO produced on top
6   of it, for whatever reason -- for whatever reason or
7   however long it -- or whoever responded to it, but this
8   is how it got past the grand jury in Collin County.
9   Because other than that, I had a clean record.
10       And Isaura, my ex-wife, told them, I don't
11  want nothing to do with that.  I changed my mind.  You
12  know, she didn't appear before the grand jury.  So they
13  replaced her -- they replaced the victim with this.  I
14  mean, I'm theorizing, but I don't have a -- it's not
15  rocket science, you know.
16       And then -- but then after -- the Collin
17  County prosecutor went on maternity leave for a year,
18  you know.  And when she came back, we reviewed
19  everything, and she took a closer look at it.  She said
20  -- and she did a background check, you know, and they
21  dismissed it despite it going past the grand jury.
22       I was ready for a jury trial.  I -- they
23  offered me all kinds of plea bargains.
24   Q.  So my question was:  What kind of mental
25  anguish --

Page 88

1    A.  I just told -- okay.  What kind of mental
2   anguish?  My blood pressure --
3    Q.  Please let me finish the question.
4    A.  I'm sorry.  I'm sorry.
5    Q.  I think you're getting to what I'm looking for.
6   In response to my question, you said the fear of not
7   being able to call the police.
8    A.  Yes.
9    Q.  Okay.  Are there any other manifestations of
10  the mental anguish that you're claiming in this case?
11   A.  High blood pressure.  You mean how does it
12  physically manifest on me?
13   Q.  Sure.
14   A.  Nightmares.
15   Q.  Okay.
16   A.  The police came to my -- I think that was a
17  Caliber thing, but the police came to my house and
18  surrounded the house.  They were banging on the door
19  like this (descriptive sound).  And --
20   Q.  That was -- that wasn't Irving PD.
21   A.  Yeah.  I'm thinking.  That wasn't.
22       But your girl, that Stephanie Barnes, got
23  that -- that is Irving.  That was Frisco PD, okay, that
24  did that, but the Irving -- Stephanie -- she got that
25  whole ball rolling and called my employer, my employer

COI 00077

## Page 89

1 called the Frisco PD, the Frisco PD came to my house
2 beating on the door like this. And they went in front
3 of the lawn, like, set up and -- different -- not at the
4 roof, but just different places around the house. And I
5 just hit the deck.
6         And ever since then, I feel like somebody's
7 going to walk in the house. I don't feel safe. I mean,
8 this is -- this is -- I would feel safer if the Crips
9 were after me. I can call the police and get the Crips
10 arrested, a gang -- you know, that's a street gang.
11     Q. Yeah, I know the Crips.
12     A. You know, I can -- I can get them arrested.
13 But when it's the police themselves?
14         So let me keep going. So I told you about
15 the nightmares that I'm having. I'm not exaggerating
16 this either.
17     Q. Uh-huh.
18     A. You know, that's one thing. The constant fear
19 of don't want to go outside because I think I'm going to
20 get arrested for something or for nothing, that anxiety
21 that I live with every hour of the day. You know, I
22 don't go anywhere unless I have to because I don't know
23 if I'm going to be pulled over and they let me off two
24 years later or -- because of mistaken identity.
25         Okay. High blood pressure, you know. It

## Page 90

1 has -- I haven't been able to work. I haven't worked in
2 three -- you know that, right? I haven't worked in
3 three years, you know, consistently. I mean, I've had
4 contracts every now and then. And the fear of losing my
5 house, my reputation.
6     Q. Are you not able to work because of some
7 manifestation of the mental anguish or the pending
8 criminal charges? You said --
9     A. It was because of the pending criminal charges.
10 As of November 11th, I'm free again. I can go work
11 again.
12     Q. How long were those charges pending?
13     A. They were pending from, you know, two
14 thousand -- from March 2015 until November 11th, 2017.
15     Q. Okay.
16     A. So it's like two years and about three or four
17 months or something like that. Yeah.
18     Q. This mental anguish that you've listed out,
19 have you seen any sort of health-care provider for that?
20     A. Yeah.
21     Q. Who have you seen?
22     A. Well, I had to go to Parkland just the other
23 day because of the things I just talked to you about.
24 My blood pressure was sky-high, and I thought I was
25 going to have a heart attack. Even despite the

## Page 91

1 medication, it wouldn't go down. So they started
2 putting me on heavier and heavier -- stronger and
3 stronger -- I don't -- I can't speak medical terms to
4 you, but stronger and stronger doses of blood -- high
5 blood pressure remedy.
6         Before that, I saw --
7     Q. When was the Parkland visit?
8     A. That was two weeks ago, some -- I don't have
9 exact date, but I can give you the documentation. It's
10 recently, very, very recently.
11     Q. Did you go to the emergency room?
12     A. Yes.
13     Q. Okay. Sorry I interrupted. Are there other
14 people you've seen?
15     A. Yeah. You want their names?
16     Q. Uh-huh.
17     A. Dr. Goff. He's been my doctor.
18     Q. G-o-l-f?
19     A. Yeah, G-o-f-f, Dr. Goff. Then I was with --
20     Q. Real quick, what's Dr. Goff's first name?
21     A. Gary.
22     Q. What kind of doctor is he?
23     A. Oh, he's a general -- generalist, general.
24     Q. Is he your primary care physician?
25     A. Well, I haven't been able to afford him, so for

## Page 92

1 me, it's been -- I get to see the doctor when I come
2 across enough money to see the doctor. I don't have
3 health care.
4     Q. And when you say "the doctor," are you
5 referring to Dr. Goff?
6     A. Any of them.
7     Q. Who else would you see?
8     A. Dr. Penmetcha.
9     Q. How do you spell that?
10     A. P, as in Paul, -e-n, as in Nancy, -m, as in
11 Michael, -e-t, as in Tom, -c-h-a. I went to see him.
12     Q. And do you know Dr. Penmetcha's first name?
13     A. No.
14     Q. Probably not too many Dr. Penmetcha's. Okay.
15     A. Then I was with --
16     Q. Dr. Penmetcha is -- how do you see him?
17     A. Well, he's a -- he's a doctor that deals with
18 rheumatoid arthritis. But he can attest to the high
19 blood pressure as well because, remember, when I got --
20 when I -- part of my lawsuit against them, against
21 Caliber, was medical, remember? And at that time, I had
22 came down with rheumatoid arthritis and lupus, they
23 thought. And I asked them to -- could I have some time
24 off to deal with that, and they said no. I asked them
25 could I work from home, and they said no.

COI 00078

## Page 93

1      So it's -- and I had another doctor,
2  Southwest Medical Center. It's a lady. I forgot her
3  name.
4      Q. The high blood pressure, was it in existence
5  before –
6      A. No.
7      Q. -- December 2013?
8      A. No. Well, was it -- wait. Wait. I'm sorry.
9  I'm sorry. I didn't let you finish. So your --
10     Q. Your high blood pressure, had you been
11  diagnosed with that prior to December of 2013?
12     A. No. No. I don't think so. No, no, no, no,
13  no. Because when I went to -- because when Caliber --
14  when Caliber -- all that stuff happened with Caliber, I
15  produced -- I went to the emergency department to see
16  what was wrong with me. And the only thing they
17  diagnosed me with was lupus and rheumatoid arthritis.
18     Now, keep listening. I took that
19  documentation directly to Caliber, okay? In that
20  documentation, I was not prescribed anything for high
21  blood pressure. I was not -- high blood pressure
22  hadn't -- wasn't present at that time.
23     Q. Okay. So as far as getting previous medical
24  information from you, Dr. Goff would be the person that
25  would have that?

## Page 94

1      A. He has -- he has a good log, and also that lady
2  at -- I forgot her name -- at Southwest Medical Center,
3  she's got it. But it's in -- it's in -- they have --
4  these -- Caliber asked for that, too. Well, you want to
5  get it for yourself.
6      Okay. So that lady -- I forgot her name,
7  that -- it's another lady at -- she had a good -- that's
8  when it really got into fruition, like in 2014,
9  actually, I went to see her. But Goff, he's been really
10  good at treating that, Penmetcha can attest to it, and
11  your people -- I mean Parkland, that was, I think,
12  two -- that was very, very recently.
13     Q. As far as the nightmares and fear of going
14  outside, fear of police officers --
15     A. Yeah.
16     Q. -- and being arrested, who else can attest to
17  that?
18     A. Well, attest to it, I don't know.
19     Q. Okay. And so you -- since you left Caliber in
20  February of 2014, you have not worked other than the
21  occasional contract job?
22     A. Well, what's happening is I'll -- I know I got
23  the criminal thing on my record, you know, but sometimes
24  they'll let you slide, depending on whether or not --
25  and I'm trying depending -- I was -- I'm banking on them

## Page 95

1  letting me slide. And next thing, you get a call into
2  the HR office, and they say, What's this?
3      Q. And when they say "what's this," they're
4  referring to the online impersonation charges?
5      A. Yeah, what's this. And I write -- they ask me
6  to go home and write a long letter about what happened.
7  And then I write them a long letter about what happened,
8  they say insurance company or they legal department
9  won't allow it, and they fire me. But that's after
10  working for about a month and a half or two months,
11  sometimes three months.
12     So that happened with Bank of America. I
13  was rehired there, and they issued me a letter saying,
14  We can't hire you because of that reason. And if you
15  get that cleared up, come back.
16     That happened with a company called One
17  Technologies. And I got a job there, full-time,
18  permanent, paying really good. You know, they asked me
19  to write a letter about what happened with the online
20  thing, blah, blah, blah, blah, blah. And they was going
21  to -- they was going to hire me, but it took so long.
22  They were like, How long is it going to take?
23      I'm like, Any day now, any day now.
24      And that went on for like a year. And they
25  just, like, went on, hired somebody else. But they gave

## Page 96

1  me a letter, and I had my lawyer in the case, my
2  criminal lawyer, to write them a letter stating blah,
3  blah, blah, blah, blah, you know, what's happening, what
4  the outcome was going to be, and we are hopeful he's
5  going to be dismissed. So we been doing that for a long
6  time with everybody. And -- see . . .
7      Q. So you weren't actually fired by these guys;
8  you were just not hired.
9      A. Say this again.
10     Q. You weren't necessarily hired and then fired
11  when they discover the online impersonation; you just
12  weren't hired.
13     A. That's a good question. So with -- there's
14  been about seven occasions like that. So on some I was
15  hired and fired.
16     Q. Okay. Who was that?
17     A. Who hired me and then fired me?
18     Q. Uh-huh.
19     A. Bank of America --
20     Q. Okay.
21     A. -- because I was hired. I was on-boarded and
22  everything.
23     Q. Okay.
24     A. And then they -- then -- but they didn't -- but
25  I never walked into the building, though. I don't know

COI 00079

## Page 97

1  if that constitutes hiring and firing.
2         And who else? And One Technologies, they
3  hired me.
4      Q. Okay.
5      A. Okay. Then I worked another place, a weird
6  little place. I forgot -- I worked someplace else, too.
7  I have to go back and look up that -- those names. I
8  just did some freelance work, and I was working there
9  for weeks, months, and they fired me.
10     Q. But you don't remember who that was?
11     A. I have to go back and -- I have to go back
12  and -- I have to go back and get it.
13     Q. You said there are about seven occasions, and
14  you've listed Bank of America, One Technologies, and
15  this one --
16     A. Well, not seven. Maybe -- I don't want to
17  speculate. I have to -- I can get -- but if the
18  question -- if you want from me a listing of places
19  that -- if you have a specific question for me, let me
20  answer it, because I don't want to speculate too much.
21     Q. Well, you just said that there was about --
22     A. I know. I know.
23     Q. -- seven occasions where this pending criminal
24  charge --
25     A. Right.

## Page 98

1      Q. -- either got you fired or got you prevented
2  from being hired.
3      A. That's true. That is true.
4      Q. So --
5      A. It is about seven. It is about seven.
6      Q. So I'm just looking for identities.
7      A. Huh?
8      Q. I'm just looking for who the seven are.
9      A. I have to look them up because some -- I mean,
10  I'm constant -- I'm just, like, rapid-fire. I'm
11  constantly looking. You know, so when they said no, I
12  put it out of my mind, go to the next company, you know.
13  So I think that was -- I don't want to speculate. I
14  have to look it up.
15     Q. So each of these seven, are you saying they
16  specifically identified the pending criminal charges as
17  a reason not to hire you?
18     A. Yes.
19     Q. And you have documentation from them to --
20     A. Slow down. Slow down. Slow down. Sometimes
21  it's a phone call.
22     Q. Okay.
23     A. Okay. Sometimes it's not, like, a long letter
24  like, Dear John, da, da, da, but about three of them
25  there was a Dear John letter. Okay. The other four is

## Page 99

1  just -- there were -- okay. So how I work is: It's me,
2  then there's a recruiting firm, then there's the actual
3  employer, right? Right?
4      Q. I don't know.
5      A. And so -- I'm telling you. I'm telling you.
6         Then the recruiting firm does the
7  background check, and they won't -- because I don't --
8  guess they don't want to get sued or something. They'll
9  just call you on the phone and have a phone call
10  conversation with you, and they never write -- they
11  never write. They stop writing. All of a sudden -- all
12  of a sudden they refuse to write or e-mail anymore, and
13  everything we do is on the telephone.
14     Q. Okay. You allege in here that Detective --
15  excuse me -- Dispatcher Barnes is a supervisor of
16  dispatchers.
17     A. Isn't she?
18     Q. What information do you have to support that
19  statement?
20     A. I forgot where I got that information from, but
21  I was told -- I have some information -- I forgot where
22  I got the information from. I thought she was the
23  supervisor. I was told -- or I don't know. I don't
24  know where -- based on my research, I was led to believe
25  that she was the supervisor.

## Page 100

1      Q. As we sit here today, can you specifically
2  point me towards anything supporting your statement that
3  Dispatcher Barnes is a supervisor of dispatchers?
4      A. Not at this moment.
5      Q. Same question with Detective Curtis. You say
6  he's a supervisor of detectives. What information do
7  you rely on to support that statement?
8      A. Research.
9      Q. As we sit here today, can you identify anything
10  specific to support this statement?
11     A. No.
12     Q. In this paragraph, you state: "Defendant made
13  a public disclosure of private information by
14  distributing, publishing, and disclosing facts regarding
15  Plaintiff's employment information, physical and mental
16  health condition, financial status, and disciplinary
17  actions being taken against him at work."
18        What are you referring to there?
19     A. Well, it's a combination of what's in this BOLO
20  and what -- and this -- in the case against Irving?
21     Q. Yes, sir.
22     A. Okay. So the fact that I was -- it's a fact
23  that I was dismissed from Caliber, okay? So -- and it's
24  a fact that Caliber said some of these things. But that
25  was not -- these are the facts that I'm alleging that he

COI 00080

Page 101

1  exposed and shouldn't have.
2    Q. Okay. So I'm -- so in that paragraph that I
3  just read -- and it's paragraph 27 on page 28.
4    A. "Defendant made a public disclosure of private
5  information" --
6    Q. And I'm just making sure we're on the same
7  page. You're talking about the BOLO there; is that
8  correct?
9    A. Primarily, yes.
10   Q. Anything else?
11   A. Anything else what?
12   Q. Well, you said primarily the BOLO.
13   A. Oh. Well, I have to think about -- I have to
14 think about everything -- I have to think about if
15 there's something else.
16   Q. As we sit here right now, though, you can't
17 specifically identify anything other than the BOLO?
18   A. That's a true statement.
19   Q. Do you know of anyone else that the City has
20 retaliated against for complaining of abuse or police
21 corruption?
22   A. I did have a couple of incidents, but I don't
23 have them with me.
24   Q. So as we sit here today, you can't specifically
25 identify anyone --

Page 102

1    A. I can't speak it right here off the top of my
2  head, no.
3    Q. Do you know how BOLOs are published?
4    A. No. Not precisely.
5    MR. McCLAIN: Let's just take like a
6  3-minute break, get a drink of water. I think I'm close
7  to wrapping up, though, Mr. Williams.
8    THE WITNESS: I'm fine.
9    THE REPORTER: Off the record?
10   MR. McCLAIN: Sure. Please. Thank you.
11   (A break was taken from 3:56 p.m. to
12      4:00 p.m.)
13   Q. (BY MR. McCLAIN) So Mr. Williams, on the --
14 who was the chief of police at the time?
15   A. Wait. Say --
16   Q. Who was the Irving chief of police in late
17 2013, early 2014?
18   A. I thought it was Jolley.
19   Q. Okay. If I tell you that Larry Boyd was the
20 chief of police --
21   A. Boyd. Yeah, I remember -- I remember that
22 name, too.
23   Q. Okay.
24   A. I don't have it memorized.
25   Q. If I represent to you that Chief Larry Boyd was

Page 103

1  the chief of the Irving Police Department, would you
2  have any reason to dispute that?
3    A. I don't have no reason to dispute it. I don't
4  work there. I don't know. I wrote a letter to him,
5  too.
6    Q. What role did chief Larry Boyd play in the
7  allegations that you state in your complaint here?
8    A. What role that the chief of police played in
9  the allegations that I state. Well, either lack of --
10 lack of training, lack of oversight. There -- there
11 are -- a police chief has a responsibility. And it's
12 not they're just to be police chief. You know, he's not
13 there just to be the police chief, you know; he's there
14 to make sure that things like what she said, things like
15 what the internal affairs investigation results said
16 happened, doesn't happen.
17   Okay. The -- I think I wrote -- I wrote an
18 e-mail to him. Yeah. Well, okay. I wrote an e-mail to
19 -- well, I don't have it in front of me, but the name --
20 I do -- I mean, this has been years ago, right? And I'm
21 kind of stressed. You know, these -- so I wrote a
22 letter to Larry Boyd and that guy just fishing for who
23 to talk to, you know. Just like I -- like I called --
24 okay.
25   Let me ask you -- let me just ask you a

Page 104

1  question, man, because I know I'm rattling, I'm
2  rambling. So the -- the role -- what role did he play
3  in this -- what part of -- why should any of this be
4  contributed to him, basically, or what role did he play?
5  Lack of supervision, lack of certain things he should
6  know is happening or not happening. She was doing that
7  with impunity. Not reassigning the case when I asked
8  for the case to be reassigned to a detective who was
9  going to interview. These charges didn't come -- these
10 charges didn't come out of the blue. All this was given
11 to the Irving people, the City of Irving, in a good
12 faith effort to resolve it way before we came to court.
13   Now, people are masquerading as the city
14 attorney when they really assistant attorney or the
15 chief of -- or the assistant chief of police when they
16 really the chief of police and not guiding us in the
17 right way where we can solve our problems. That's the
18 real problem.
19   So the role that the chief played is his
20 inability to make sure that these departments run, lack
21 of oversight, lack of training. They're a
22 constitutional -- there are -- that's the role he
23 played.
24   Q. Okay. So the role that he played was failure
25 to train and supervise the police department; is that

COI 00081

## Page 105

1  fair?
2      A. Well, what I just said. You trying to make it
3  sound funny, but --
4      Q. I'm not trying to make it sound --
5      A. But what I just said, you know. And it's not a
6  three-word reply. It cannot be answered in three words
7  or five words --
8      Q. It doesn't need to be answered in five minutes
9  either.
10      A. Right.
11      Q. Surely we can find some happy middle ground.
12      Q. Okay. So I've answered it.
13      Q. So Chief Larry Boyd's involvement in this was a
14  lack of training, a lack of supervision, and not
15  reassigning the case when you requested it.
16      A. That's -- that's the -- it's a phrase that I
17  put in here. I forgot what it was. When you ratify
18  behavior by not responding to it or punishing
19  inadequate -- inadequate punishment for something that
20  could be repeatable, for a problem that has the
21  opportunity to repeat itself and get bigger. And that's
22  just in my words.
23      Q. So a failure to adequately punish Barnes's
24  behavior?
25      A. And Curtis.

## Page 106

1      Q. Okay. So his role was a lack of training, a
2  lack of supervision, not reassigning the case when you
3  requested it, and a failure to adequately punish both
4  Barnes and Curtis.
5      A. Probably more, but that's what I -- you know,
6  I'm sitting here in a deposition. I forgot I was
7  supposed to be -- I thought I was supposed to be here
8  tomorrow. So I'm not really prepared to -- well, I
9  couldn't -- I didn't know what answers you -- questions
10  you were going to ask me. And the questions that you're
11  asking me are ones that require specific answers, and I
12  don't have those answers me.
13      Q. As we sit here today, do you have any other
14  involvement for Chief Boyd other than the lack of
15  training, lack of supervision, not reassigning the case
16  when you requested it, and the failure to adequately
17  punish Barnes and Curtis?
18      A. And ratification of the negative behaviors.
19      Q. Well, I understood the ratification to be when
20  he failed to punish them adequately.
21      A. Right.
22      Q. Okay. Anything else besides those four things?
23      A. Not that I can think of at this moment.
24      Q. You said you thought you wrote an e-mail to --
25      A. Boyd, yeah.

## Page 107

1      Q. -- Boyd in --
2      A. I'm 99 -- I'm sure I remember the name. I've
3  contacted him. I can look on my cell phone. I've
4  contacted Larry Boyd of the Irving Police Department.
5  Candace Chappell. I didn't know you. I couldn't
6  contact the whole department, you know. I couldn't
7  contact everybody in the Irving Police Department.
8      Q. In Exhibit 1, which is -- there you go. Up at
9  the top, there's numbers as well. Page, you know, "x"
10  of 58.
11      A. Right.
12      Q. If you'll go to page 45 of 58.
13      A. Okay. I'm there.
14      Q. This is -- it's an e-mail string, but about
15  two-thirds of the way down is an e-mail from you to
16  Michael Goff regarding Barnes Investigation --
17      A. Right.
18      Q. -- dated June 13, 2014.
19      A. Right.
20      Q. The second paragraph, can you read that first
21  sentence to me?
22      A. "On about March 15th, 2014, I met in person
23  with city attorney office to speak with assistant" --
24  oh -- "city attorney Candace Chappell."
25      Q. Boom.

## Page 108

1      A. Okay.
2      Q. So she wasn't masquerading as the city
3  attorney --
4      A. Oh, you probably right. Probably right. But I
5  don't know. I don't know.
6      Q. But you agree words have meaning, right?
7      A. I mean, I -- I mean --
8      Q. Do words have meaning?
9      A. Come on, man --
10      Q. Do words have --
11          THE REPORTER: Wait. One at a time.
12          MR. McCLAIN: Sorry.
13      Q. (BY MR. McCLAIN) Do you agree that words have
14  meaning?
15      A. Yes.
16      Q. Just now you said that --
17      A. Right.
18      Q. -- Candace Chappell was masquerading as the
19  city attorney. Correct?
20      A. I still agree with that term, what I said.
21      Q. Well, in this e-mail dated June 13th of 2014,
22  you identified her as an assistant city attorney.
23      A. Okay.
24      Q. So you knew then she was an assistant city
25  attorney.

COI 00082

## Page 109

1    **A. But I -- should I have been speaking to the**

2  **city attorney? Should she have referred me to the city**

3  **attorney? It's her job to say you're not supposed to**

4  **speak with me, you're supposed to speak with him.**

5  **That's her job to say that.**

6    Q. Okay.

7    **A. So that is masquerading as the city attorney.**

8  **When somebody's bringing -- if somebody's bringing**

9  **something to you that you knew they should be bringing**

10  **to the attorney -- to the city attorney and you're not**

11  **telling them to take it to the city attorney, you're**

12  **entertaining their conversation and going back and --**

13  **however she did it, that still is masquerading as the**

14  **one to talk to.**

15    Q. No one's saying she couldn't have handled your

16  complaint.

17    **A. I'm sorry?**

18    Q. No one is saying she couldn't have handled your

19  complaint. That's well within her authority.

20    **A. Okay.**

21    Q. My point is: You identified her as the city

22  attorney.

23    **A. Right.**

24    Q. And she's not, and you knew it, correct?

25    **A. Well, I knew it from a layman's perspective. I**

## Page 110

1  **didn't know it, like, oh -- I didn't -- you know.**

2    Q. Fair enough.

3    **A. That's pretty good. That's some good research.**

4    Q. Thank you.

5    **A. I mean on my part, to be able to know that**

6  **she --**

7    Q. Oh, of course it was you.

8    **A. But she said I did not have an appointment.**

9  **Right. Right.**

10    Q. And as we sit here today, can you identify any

11  other individuals that the Irving Police Department has

12  failed to investigate their claims because of their

13  race?

14    **A. Not as I sit here at this moment.**

15    MR. McCLAIN: Okay. I think that's all I

16  have for you, Mr. Williams.

17    THE WITNESS: Okay.

18    MR. McCLAIN: So we will go off the record.

19  Thank you.

20    (Proceedings concluded at 4:10 p.m.)

21

22

23

24

25

## Page 111

1        IN THE UNITED STATES DISTRICT COURT

2     FOR THE NORTHERN DISTRICT OF TEXAS

              DALLAS DIVISION

3  MICHAEL WILLIAMS,    )

4      Plaintiff,     )

               ) CIVIL ACTION NO.

5  v.          ) 3:15-CV-1701-L-BH

               ) ECF

6

  CITY OF IRVING, TEXAS,    )

7  et al.         )

8      Defendants.   )

9

10        REPORTER'S CERTIFICATION

      DEPOSITION OF MICHAEL WILLIAMS

11         January 3, 2018

12    I, Jennifer L. Campbell, Certified Shorthand

13  Reporter in and for the State of Texas, hereby certify

14  to the following:

15    That the witness, MICHAEL WILLIAMS, was duly

16  sworn by the officer and that the transcript of the oral

17  deposition is a true record of the testimony given by

18  the witness;

19    I further certify that pursuant to FRCP Rule

20  30(e)(1) that the signature of the deponent:

21    _____ was requested by the deponent or a party

22  before the completion of the deposition and is to be

23  returned within 30 days from the date of receipt of the

24  transcript. If returned, the attached Changes and

25  Signature page contains any changes and the reasons

## Page 112

1  therefor;

2    __X__ was not requested by the deponent or a

3  party before the completion of the deposition.

4    I further certify that I am neither counsel

5  for, related to, nor employed by any of the parties or

6  attorneys to the action in which this proceeding was

7  taken. Further, I am not a relative or employee of any

8  attorney of record in this cause, nor am I financially

9  or otherwise interested in the outcome of the action.

10    Subscribed and sworn to on this the 17th day

11  of January, 2018.

12

13

14

        _____

15        Jennifer L. Campbell

        Texas CSR No. 8674

16        Expiration Date: 12/31/18

        Lexitas - Dallas

17        Firm Registration No. 459

        6500 Greenville Avenue, Suite 445

18        Dallas, Texas 75206

        (214) 373-4977

19

20

21

22

23

24

25

COI 00083

# City of Irving, Texas
# Certificate of City Secretary

THE STATE OF TEXAS §
COUNTY OF DALLAS §
CITY OF IRVING §

**C E R T I F I C A T I O N**

I, Shanae Jennings, City Secretary for the City of Irving, Texas, do hereby certify that I am the custodian of the records of the City of Irving, Texas, and that the attached document, Chapter 29-Police, of the City of Irving Code of Civil and Criminal Ordinances, is a full, true, and correct copy as the same appears of record in this office, and that I am the lawful possessor and have legal custody of said record.

**WITNESS MY HAND AND OFFICIAL SEAL** of the City of Irving, Texas this the 13th day of March 2018.

Shanae Jennings
City Secretary
City of Irving

Chapter 29 - POLICE[1]

ARTICLE I. - IN GENERAL[2]

Sec. 29-1. - Creation of police department.

There is hereby created a police department of the City of Irving, at the head of which shall be the chief of police. The police department shall be composed of the chief of the police department and other employees as the city council may provide.

(Ord. No. 4395, § 1, 4-26-84)

Sec. 29-2. - Civil service.

The City of Irving is governed by the applicable state statutes and city ordinances relating to civil service and such statutes and ordinances shall constitute the civil service regulations of the police department.

(Ord. No. 4395, § 1, 4-26-84)

**Cross reference—** Police civil service, § 27A-11 et seq.

**State Law reference—** Municipal civil service for firefighters and police officers, V.T.C.A., Local Government Code ch. 143.

Sec. 29-3. - Standards.

No person will be certified as a police officer who has not complied with the basic requirements established by the State of Texas for peace officers, those rules and regulations established by the civil service commission, and by the city acting through the chief of police.

(Ord. No. 4395, § 1, 4-26-84)

**State Law reference—** Peace officer training and certification, V.T.C.A., Occupations Code ch. 1701.

Sec. 29-4. - Chief of police.

(a)  The police department of the city shall consist of the chief of police and such members as the city council may provide.

(b) The chief of the police department shall be appointed by the chief executive and confirmed by the city council, the chief shall be under the control and supervision of the city manager and the city council may terminate or discipline the chief upon the recommendation of the city manager or upon its own motion.

(c) The chief of the police department shall carry out the functions of the police department relating to public safety and enforcement of ordinances, state and federal laws; organize the police department of the city in conformity with the laws of the State of Texas and ordinances of the city; and promulgate policies, procedures, rules, directives and orders for the administration of the department, including but not limited to discipline within the department.

(d) The chief of police shall have control of and responsibility for the management of the city jail system.

(e) The chief of the police department shall not be a member of the classified service and shall not be under civil service protection.

(Ord. No. 4395, § 1, 4-26-84; Ord. No. 5816, § 2, 6-21-90; Ord. No. 6008, § 2, 8-29-91)

Sec. 29-5. - Classification and appointment.

Classifications below the rank of chief of police shall be:

(a) Assistant chief of police.

(b) Captain.

(c) Lieutenant.

(d) Sergeant.

(e) Police officer.

Appointments made to the positions of captain, lieutenant, sergeant and police officer shall be filled by examination in accordance with Article 1269m. Appointments made to the position of assistant chief of police shall be made in accordance with Section 8A of 1269m.

(Ord. No. 4395, § 1, 4-26-84)

**Editor's note—** The police department schedule of civil service personnel, as amended from time to time, is on file in the office of the deputy city clerk.

Sec. 29-6. - Duties of policemen.

(a) Individual officers constituting the City of Irving police department are invested with all the power and authority given to them as peace officers under the laws of the State of Texas. Inherent with this power and authority is the obligation to preserve the peace; enforce the ordinances and regulations of the city, the laws of Texas and of the United States; take legal custody of offenders and secure the citizens from violence.

(b) All civil service personnel of the police department shall be bound by the most current directives, orders, rules, regulations and procedures for the operation of the police department as may be promulgated or as hereafter amended by the chief of police; and failure to abide thereby shall subject the violating personnel to such disciplinary action as may be determined by the chief of police within the limits of state law and city ordinance.

(Ord. No. 4395, § 1, 4-26-84)

Sec. 29-7. - Police reserves.

(a) *Establishment; composition.* An auxiliary police force to be known as police reserve is hereby established. It shall be composed of personnel who have volunteered to join the organization and whose applications for membership have been accepted and who have complied with all the rules, regulations and orders provided for the conduct and control of the members thereof. The police reserve shall be separate and distinct from the police department of this city but shall be headed by the chief of police.

(b) *Authority of chief of police; appointment of members.* The members of the police reserve shall be under the authority, control and command of the chief of police of the city, certified under the guidelines promulgated by the State of Texas, Texas Commission on Law Enforcement Officer Standards and Education.

(c) *Duties.* The duties of the police reserve force, subject at all times to the direction, supervision and control of the chief of police, shall be to assist the regular members of the police department of this city in the enforcement of law and the maintenance of peace and order. The chief shall promulgate policies, procedures, rules, directives and orders for the administration of the police reserve force, including but not limited to discipline within the police reserve force, and fix the specific duties of its members. He may change such orders from time to time, and he may require members of the police reserve force to obey the instructions of

regular police command in carrying out their duties. The chief of police may prescribe other duties than those mentioned herein to be performed by the police reserve force, not inconsistent with the provisions hereof.

(d) *Termination of membership.* Membership of any person may be terminated by the chief of police at any time for any cause deemed sufficient by the chief of police. Any member may resign from the police reserve force at any time, but it shall be his duty to notify the chief of his resignation.

(e) *Authority to diminish or expand membership.* The chief of police may by order diminish or expand the membership of the police reserve force as he deems fit, within the limits established in this article.

(f) *Power and authority of members.*

   (1) *Carrying of firearms.* Members of the police reserve force shall while on duty only carry firearms on the express written order of the chief of police.

   (2) *Breaking and entering.* No member of the police reserve force shall break into or otherwise forcefully enter upon any private property or enter the dwelling or habitation of another person without the consent of the owner or occupant except when immediately accompanied by a regular member of the police department of this city who then and there requests his aid in the enforcement of the law.

   (3) *Power of arrest.* A member of the police reserve force shall have the following powers of arrest and none others:

      a. For an offense committed in his presence.

      b. For a felony offense in accordance with Articles 14.03 and 14.04 of the Texas Code of Criminal Procedure.

      c. He may lend physical aid to any regular member of the police department in making any lawful arrest, when authorized by the chief of police, or requested by any regular member of the police department of this city.

      d. Pursuant to a warrant of arrest.

(Ord. No. 4395, § 1, 4-26-84)

**State Law reference—** Police reserve force, V.T.C.A., Local Government Code § 341.012.

Sec. 29-8. - Assistant chiefs: Sick leave.

Each assistant chief of police shall be entitled to accumulate and be paid for sick leave as are uniformed members of the police department who are under civil service protection. The assistant chiefs may elect to be paid for accumulated sick leave either at the time of becoming chief of the department or leaving the employ of the department. The dollar amount of accumulated sick leave shall be calculated using the compensation received by the assistant chief just before being promoted to chief of the department.

(Ord. No. 5816, § 4, 6-21-90)

Sec. 29-9. - Accumulation of vacation leave.

Civil service employees of the city police department may accumulate unused vacation leave from year to year provided that use of vacation leave shall be approved by the police department and that the maximum accumulation shall not exceed twice the annual rate of vacation leave.

(Ord. No. 6706, § 2, 11-16-95)

ARTICLE II. - RESERVED[3]

Secs. 29-10—29-12. - Reserved.

ARTICLE III. - SPECIAL POLICE OFFICERS

Sec. 29-13. - "Special police officer" defined.

The term "special police officer" as used in this article, shall include all private patrols, private guards, patrol system and services together with each member and employee thereof.

(Ord. No. 215, § 2)

Sec. 29-14. - License—Required.

It shall be unlawful for any person, either for himself, or as agent or representative of another, to engage in the business of a special police officer, seeking to protect two (2) or more establishments, unless property of the same person or corporation, either residence or business, within the city, without first having obtained a license therefor.

(Ord. No. 215, § 1)

Sec. 29-15. - Same—Application.

Every person, before engaging in a business set out in this article, shall make application upon a blank to be furnished by the chief of police of the city which shall include, among other things, the following information, and which shall be sworn to: Trade name of business, address thereof, whether owner, member or employee of the business, extent of area in which the business is to operate, whether or not applicant was ever convicted of a felony or has a police record, age of applicant, and if application is by a corporation, to be signed by a duly authorized officer, if by a partnership, the application shall be signed and verified by each individual composing or intending to compose such firm or partnership.

(Ord. No. 215, § 3)

Sec. 29-16. - Same—Fees.

In order to defray a part of the expense necessary to provide the surveillance, supervision and inspection of persons as required under the terms of this article, there is hereby fixed a license fee or police tax, which shall be collected from any person, providing protection for two (2) or more establishments, either residence or business, of fifty dollars ($50.00) per annum, and from each special police officer so engaged shall be collected a license fee or police tax of three dollars ($3.00) per annum. If application is granted during the calendar year, the fee shall be paid pro rata for the balance of the current year. In no event shall there be any refunds of license fees or police taxes paid under this section. The fee shall be paid to the assessor and collector of taxes of the city who shall issue a receipt therefor on a form prepared by him for that purpose.

(Ord. No. 215, § 6)

Sec. 29-17. - Same—Issuance.

Upon the filing of an application under this article, properly filled out, the chief of police of the city shall make or cause to be made such investigation as he may deem necessary to determine the fitness of the applicant for a license, then the chief of police shall, within ten (10) days, forward the application, with his recommendation, to the city manager and the city manager shall have authority to grant such license without further investigation, or shall have the authority to cause further investigation to be made before granting same or disapproving the application. Upon the granting of such license by the city manager, it shall be the duty of the applicant to present the action of the city manager to the assessor and collector of taxes of the

city, and upon the payment of the proper license fee, the assessor and collector of taxes shall accordingly issue the proper license permit on a form to be prescribed by the assessor and collector of taxes.

The city manager shall consider all licenses applied for under this article and approve or disapprove the same; provided, that upon refusal of the city manager to approve such application, the applicant may within ten (10) days thereafter, appeal to the city council, which shall within thirty (30) days thereafter accord to each applicant a hearing as to whether or not the license shall be granted.

No application may be approved when the district designated therein is already supplied with sufficient or ample police protection by the city or by a patrol service or system or both.

In approving or disapproving any license, the city manager shall consider the following:

    (a)   Whether the applicant has been convicted of a felony, or on renewal of license for the violation of any of the provisions of this article, during the year next preceding the filing of this application.

    (b)   Whether the applicant is not of good moral character or his reputation for being a peaceable law-abiding citizen is bad.

    (c)   Whether the applicant was a former member of the police department or formerly employed as a special police officer and released for cause.

    (d)   Such other lawful matters as he considers pertinent and proper in arriving at a fair and lawful conclusion with respect to such application for license.

Functions, powers and duties of the police department shall include among others, the following:

    (a)   To investigate qualifications for fitness of all applicants.

    (b)   To investigate and aid in the prosecution of all violations of this article and cooperate in the prosecution of offenders before any court having jurisdiction to hear the same.

    (c)   To fingerprint all applicants.

    (d)   To investigate conditions of police protection prevailing in the designated district of the applicant.

(Ord. No. 215, § 4)

Sec. 29-18. - Same—Revocation.

The city council shall have the right and authority to revoke and cancel any license issued under the provisions of this article for cause, upon the hearing duly had after five (5) days' notice to the licensee, and in addition to the general authority contained in this Code for the revocation of license, any license issued under the provisions of this article may be revoked by the city council for any of the following reasons:

> (a) If such licensee has knowingly violated any of the provisions of this article.
>
> (b) If any employee or operative of such licensee shall have knowingly violated any of the provisions of this article with permission and instructions from the licensee to do so.
>
> (c) If such licensee is convicted of any felony or of a misdemeanor involving moral turpitude.

(Ord. No. 215, § 8)

Sec. 29-19. - Public liability insurance required.

Before any license shall be issued as provided in this article, the applicant shall file with the city, and thereafter keep in full force and effect a policy of public liability insurance issued by an insurance company authorized to do business in the state, which policy shall be approved by the city council, insuring the public against any loss or damage that will result to any one person or property caused by the negligent or wilful acts of the licensee or his agents or employees in the performance of their duties as special police officers; provided, that the maximum amount of recovery in such policy of insurance specified shall not be less than the following sums: For bodily injury to one (1) or more persons or the death of one (1) or more persons in any one (1) accident, fifty thousand dollars ($50,000.00); for the injury or destruction of property in any one (1) accident, five thousand dollars ($5,000.00) on each property injured or destroyed by the parties, and a total of ten thousand dollars ($10,000.00) for each accidental injury to all of the property in any one (1) accident. It shall be the duty of such licensee and the insurance company to give notice to the city by filing a written notice of the expiration of the policy at least ten (10) days before the expiration thereof. The public liability policy shall provide that each cause of action shall survive in case of death of the injured persons for the benefit of the beneficiary of such person and that such policy shall be subject to successive recoveries during the time such policy may continue in effect, such public liability further providing that no action shall be thereon or

against the insurance company thereon until more than thirty (30) days after a final judgment in favor of the judgment creditor against the principal, such judgment not pending on appeal or writ of error and remaining unsatisfied. No action for indemnity against loss provided by the public liability policy shall be against the insurance company, unless brought within two (2) years from the date of the judgment.

(Ord. No. 215, § 5)

Sec. 29-20. - Duties; uniforms.

It shall be the duty of all persons licensed under this article to:

(a) Report and deliver to the chief of police daily all arrests made by their employees in writing.

(b) Obey orders of the chief of police in an emergency.

(c) When allowed to carry arms to only do so when on duty at the premises or district guarded.

(d) When on patrol or guard to wear proper uniforms, such uniforms of the special police officers shall be identical and shall be of a different color than those worn by the police department of the city and shall be approved by the chief of police.

(e) Badges and cap pieces shall be of a design approved by the chief of police.

(f) Each guard or patrolman shall wear a shoulder patch on the left sleeve, bearing the name of the patrol to which he belongs.

(Ord. No. 215, § 7)

# City of Irving, Texas
# Certificate of City Secretary

THE STATE OF TEXAS §
COUNTY OF DALLAS §
CITY OF IRVING §

**C E R T I F I C A T I O N**

I, Shanae Jennings, City Secretary for the City of Irving, Texas, do hereby certify that I am the custodian of the records of the City of Irving, Texas, and that the attached is a true and correct copy of the current City of Irving Home Rule Charter. The Charter was last amended at the May 11, 2013 Special Election and Canvassed by the City Council of the City of Irving, Texas on the 22nd day of May 2013.

**WITNESS MY HAND AND OFFICIAL SEAL** of the City of Irving, Texas this the 13th day of March 2018.

_____
Shanae Jennings
City Secretary
City of Irving

# CITY

# OF

# IRVING

# TEXAS

# CHARTER



Municipal Code Corporation • PO Box 2235 Tallahassee, FL 32316
info@municode.com • 800.262.2633
fax 850.575.8852 • www.municode.com

COI 00095

# PART I

# THE CHARTER*

## Article I.   Corporate Name

§  1.        Designated.

## Article II.   Municipal Boundaries

§  1.        Designated.
§  2.        Extension and alteration.
§  3.        Platting of property.

## Article III.   Corporate Powers

§  1.        Generally.
§  2.        Ordinances—Power to enact.
§  3.        Same—Style.
§  4.        Real estate; etc., owned by city.
§  5.        Authority to acquire or dispose of property.
§  6.        Exemption of public property from execution.
§  7.        City funds exempt from garnishment.
§  8.        Liability for negligence.
§  9.        City not required to give bond.
§  10.       Right of eminent domain.
§  11.       Establish, vacate, etc., streets, sidewalks, etc.; removal of obstructions, encroachments, etc., from streets, etc.
§  12.       Street improvements and assessments.
§  13.       Regulation of vehicles used for hire.
§  14.       Regulation of railroads.
§  15.       Regulation of public utilities and cable television service.
§  16.       Operation of public services or utilities by city.
§  17.       Purchase of gas, electricity, etc.
§  18.       Franchises.
§  19.       Transportation facilities.
§  20.       Parks, playgrounds, etc.
§  21.       Placement of wires, etc., underground.
§  22.       Fire department and prevention.
§  23.       Health regulations.

---

**\*Editor's note**—Set out herein is the Home Rule Charter of the City of Irving. The Charter was approved by the voters of the city on October 25, 1952. Amendments to the Charter have been included, and are indicated by an historical citation in parentheses following each amended or added section. A uniform system of capitalization has been employed in the Charter. Catchlines to sections and subsections have in some instances been slightly altered for clarity. A frontal analysis of the catchlines has been included for the convenience of the user.

The Charter was reprinted in its entirety in August 2013, incorporating the amendments of Ord. No. 2013-9464 as well as other nonsubstantive changes made by the city for consistency in language.

COI 00096

§ 24.    Police department.
§ 25.    Compromising and settling claims and lawsuits.
§ 26.    Contracts.
§ 27.    Zoning.
§ 28.    Licenses, billboards, buildings; penalty for violation of ordinance; wiring and plumbing inspections, etc.; and power to fix penalties for violation of all ordinances.
§ 29.    Power to define nuisance and fix penalties.
§ 30.    Power to fix penalties.
§ 31.    Public library.

**Article IV.    Officers and Elections**

§ 1.     Governing body.
§ 2.     Elective officers.
§ 3.     Mayor and city council members qualifications; filing of candidacy; official ballot; designation of city districts.
§ 4.     Election.
§ 5.     Judge of election; runoff election.
§ 6.     Date and conduct of election.
§ 7.     Qualifying of officers.
§ 8.     Term of office.
§ 8-A.   Candidacy of council member for office of mayor or different place on council.
§ 8-B.   Effect of board member, city employee, etc., seeking public office.
§ 9.     Vacancies in office of mayor or council member.
§ 10.    Mayor pro tem and deputy mayor pro tem.
§ 11.    Compensation of mayor and council member.
§ 11-A.  Effect of change of residence during term of office.
§ 12.    Duties of mayor generally.
§ 13.    Duties of city council generally.
§ 14.    Meetings of council generally.
§ 15.    Rules of procedure; attendance of council members at meetings.
§ 15-A.  Code of ethics.
§ 16.    Quorum of city council; minutes of council meetings; procedure for voting on and recording of enacted ordinances.
§ 17.    Enactment of ordinances generally.
§ 18.    "Emergency measure" defined; enactment of ordinances as emergency measures.
§ 19.    Ordinances in effect at time of adoption of Charter.
§ 20.    Pleading of ordinances; admissibility of ordinances as evidence.
§ 21.    Designation of depository for city funds.
§ 22.    Ordinance—Codification.
§ 23.    Same—Publication.
§ 24.    City secretary.
§ 25.    City attorney.

COI 00097

§ 26.  Municipal court—Created; jurisdiction; judge; clerk.
§ 27.  Same—Procedure generally.
§ 28.  Same—Appeals.
§ 29.  Nepotism.
§ 30.  Official bond of appointive officers or employees.
§ 31.  Audit and examination of city books and accounts.
§ 32.  Budget.

## Article V.   Taxes and Taxation

§ 1.   Property subject to taxation.
§ 2.   Levy and collection.
§ 3.   Supplemental assessment.
§ 4.   Franchises; taxation of.
§ 5.   Irregularity shall not invalidate.
§ 6.   Rendition.
§ 7.   Tax lien; liability for taxes.
§ 8.   Seizure to prevent removal.
§ 9.   Place of payment; demand unnecessary.
§ 10.  Tax title to personal property.
§ 11.  City may purchase.
§ 12.  Redemption by owner; vesting title.
§ 13.  Amendment of property description.
§ 14.  Prima facie evidence of tax levy and assessment.
§ 15.  State law on assessment applicable.
§ 16.  Assessment of property; joint, common and conflicting interest in real estate; separate assessment of.
§ 17.  Collection of taxes on undivided interest.
§ 18.  General state laws adopted.
§ 19.  Occupation tax.
§ 20.  Contract for collection of delinquent taxes.

## Article VI.   Recall

§ 1.   Procedure generally.

## Article VII.   Bonds, Warrants and Other Evidence of Indebtedness

§ 1.   Authority to issue.
§ 2.   Manner of issuance.

## Article VIII.   City Manager

§ 1.   Appointment.
§ 2.   Compensation.
§ 3.   Powers and duties.
§ 4.   Nepotism.
§ 5.   Reserved.
§ 6.   Reserved.

COI 00098

§ 7.    Reserved.
§ 8.    Reserved.
§ 9.    Reserved.

## Article IX.    General Provisions

§ 1.    "Qualified voter" defined.
§ 2.    Qualification of jurors.
§ 3.    Withholding of political contributions.
§ 4.    Construction of terms generally.
§ 5.    Charter deemed public act.
§ 6.    Procedure for amending Charter.
§ 7.    Severability of portions of Charter.
§ 8.    Employee retirement plan limitations.
§ 9.    Charter commentary.
§ 10.   Independent boards.
§ 11.   Irving special purpose agencies.

## Article X.    Adoption of Charter

§ 1.    Procedure.

## Article XI.    Initiative and Referendum

§ 1.    General authority.
§ 2.    Commence of proceeding; petitioners' committee; affidavit.
§ 3.    Petitions.
§ 4.    Procedure after filing.
§ 5.    Referendum petitions; suspension of effect of ordinance.
§ 6.    Action on petitions.
§ 7.    Results of election.
§ 8.    Initiative and referendum—Failure of city council to act.

COI 00099

## ARTICLE I.  CORPORATE NAME

### Sec. 1.  Designated.

All the inhabitants of the City of Irving, in Dallas County, Texas, as the boundaries and limits of said city are herein established, shall be a body politic, incorporated under and to be known by the name and style of the "City of Irving," with such powers, rights and duties as are herein provided.

## ARTICLE II.  MUNICIPAL BOUNDARIES

### Sec. 1.  Designated.

The boundaries of the City of Irving shall be the same as have been heretofore established and now exist pursuant to previous annexations and disannexations.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 2.  Extension and alteration.

The bounds and limits of the City of Irving shall be those as established and described in ordinances duly passed by the city council of the City of Irving in accordance with state law. The city may extend and alter the boundaries of the City of Irving by annexation with or without the consent of the inhabitants of the territory annexed so long as said annexation or disannexation is not inconsistent with the procedural rules prescribed by the Texas Local Government Code, as amended and as same may be hereinafter amended. The city council, may in its exclusive discretion and not being inconsistent with the procedural rules prescribed by the Texas Local Government Code, as amended and as same may be hereinafter amended, by ordinance exclude from the city any territory within the corporate limits of the city when and if at least sixty (60) percent of the inhabitants thereof qualified to vote for members of the council shall present a verified petition requesting that such territory be discontinued as a part of the city and tender to the city secretary with such petition a sum of money equivalent to that percentage of the then outstanding indebtedness of the city for bonds and warrants and a fair proportion of the then existing budget which the assessed value of all property within such territory on the tax rolls next preceding the presentation of such petition bears to the total value of all property on said rolls. The council shall

never, regardless of the facts and circumstances, be required to discontinue any territory as a part of the city except at its exclusive discretion expressed by ordinance. The city secretary shall at all times keep a correct and complete description of recent annexations or disannexations and may maintain a map showing all annexations and disannexations.
(Ord. No. 889; Ord. No. 5567, § 3, 1-23-89)

### Sec. 3.  Platting of property.

Hereafter every owner of any tract of land or lot situated within the corporate limits, or within five miles of said corporate limit who subdivides the same in two or more parts shall plat said property as required by Chapter 212 of the Texas Local Government Code, as amended or as may be hereinafter amended and by City of Irving ordinance.
(Ord. No. 5567, § 3, 1-23-89)

## ARTICLE III.  CORPORATE POWERS

### Sec. 1.  Generally.

(a) The City of Irving, made a body politic and corporate by the legal adoption of this Charter, shall have perpetual succession; may use a common seal; may sue and be sued; may contract and be contracted with; implead and be impleaded in all courts and places and in all matters whatever; may take, hold and purchase such lands, within or without the city limits, as may be needed for corporate purposes of said city, and may sell any real estate or personal property owned by it; perform and render all public service, and when deemed expedient may condemn property for corporate use, and may hold, manage and control the same; and shall be subject to all duties and obligations now pertaining to or incumbent upon said city as a corporation, not in conflict with the provisions of this Charter; and shall enjoy all rights, immunities, powers, privileges and franchises now possessed by said city and herein conferred and granted; and except as prohibited by the Constitution of the State of Texas or restricted by this Charter, the City of Irving shall have and may exercise all municipal powers, functions, rights, privileges and immunities of every name and nature whatsoever. In addition to the powers herein otherwise granted, the city shall have all powers enumerated in Chapter 51 Texas Local Government Code, and article 1175,

COI 00100

Revised Statutes of Texas, 1925, as heretofore amended as though such statutes were set forth herein. The City of Irving shall have all of the powers conferred by statutes and the Constitution to recover damages, costs and penalties, including, but not limited to, attachment, liens and foreclosure.

(b) The enumeration of particular powers by this Charter shall not be held or deemed to be exclusive, but, in addition to the powers enumerated therein or implied thereby, or appropriate to the exercise of such powers, it is intended that the City of Irving shall have, and may exercise, all powers which under the Constitution and statutes of the State of Texas it would be competent for the Chapter specifically to enumerate. All powers of the city, whether expressed or implied, shall be exercised in the manner prescribed by this Charter or, if not prescribed therein, then in the manner provided by ordinance or resolution of the council.
(Ord. No. 889; Ord. No. 7196, Amd. 7, 1-22-98; Ord. No. 2013-9464, Amd. 1, 5-22-13)

### Sec. 2. Ordinances—Power to enact.

The City of Irving shall have the power to enact and enforce all ordinances necessary to protect health, life and property, and to prevent and summarily abate and remove all nuisances, and preserve and enforce good government and order and security of the city and its inhabitants; and to enact and enforce ordinances on any and all subjects; provided that no ordinances shall be enacted inconsistent with the provisions of this Charter, or Constitution of the State of Texas; it being the intention to obtain by the adoption of this Charter, full power of local government, and the City of Irving shall have and exercise all powers of local self government granted to the cities having more than five thousand inhabitants by what is known as the Home Rule Amendment to the Constitution of the State of Texas (Article XI, Section 5, Texas Constitution), and to the Home Rule Enabling Act passed by the legislature of Texas, and now known as chapter 13 of title 28 of the Revised Civil Statutes of Texas of 1925, and Chapter 51, Texas Local Government Code.
(Ord. No. 7196, Amd. 7, 1-22-98)

### Sec. 3. Same—Style.

The style of all ordinances of the City of Irving shall be: "Be it ordained by the City Council of the City of Irving." but the same shall be omitted when the ordinances of the city are codified and published in book or pamphlet form by the City of Irving, or under the authority of its governing body.
(Ord. No. 889)

### Sec. 4. Real estate; etc., owned by city.

All real estate owned in fee simple title, or held by lease, sufferance, easement or otherwise, all public buildings, fire stations, parks, airports, streets and alleys; and all property, whether real or personal, of whatever kind, character or description now owned or controlled by the City of Irving shall vest in, inure to, remain and be the property of said City of Irving under this Charter; and all causes of action, choses in action, rights or privileges of every kind and character and all property of whatsoever character or description which may have been held and is now held, controlled or used by said City of Irving for public uses or in trust for the public, shall vest in and remain and inure to the City of Irving under this Charter, and all suits and pending actions to which the City of Irving heretofore was or now is a party, plaintiff, or defendant, shall not be affected or terminated by the adoption of this Charter, but shall continue unabated.
(Ord. No. 2013-9464, Amd. 2, 5-22-13)

### Sec. 5. Authority to acquire or dispose of property.

(a) The City of Irving shall have the power and authority to acquire by purchase, gift, device, deed, condemnation, lease or otherwise any character of property, real or personal, tangible or intangible, not denied by law to be used for public purposes, within or without its municipal boundaries, including any charitable or trust funds.

(b) The City of Irving shall have the power and authority to devise, deed, lease or otherwise dispose of any character of property, real or personal, tangible or intangible, unless prohibited by law.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 6. Exemption of public property from execution.

No public property or any other character of property owned or held by the City of Irving shall be subject to any execution of any kind or nature.

COI 00101

## Sec. 7. City funds exempt from garnishment.

No funds of the City of Irving shall be subject to garnishment, and the City of Irving shall never be required to answer garnishment proceedings.

## Sec. 8. Liability for negligence.

(a) Before the City of Irving shall be liable for damages for personal injuries of any kind or for injuries to or destruction or damage to property of any kind, the person injured or the owner of the property so injured, damaged, or destroyed or someone in his behalf, shall give the mayor and city council notice in writing of such injury, damage or destruction, not later than six (6) months after the same has been sustained, stating in such written notice when, where and how the injury, damage or destruction occurred, the apparent extent thereof, the amount of damage sustained, the amount for which the claimant will settle, the street and residence number of the claimant at the time and date the claim was presented and the actual residence of such claimant for the six months immediately preceding the occurrence of such injuries, damage or destruction, and the names and addresses of the witnesses upon whom he relies to establish his claim; and a failure so to notify the mayor and city council within the time and manner provided herein shall exonerate, excuse and except the city from any liability whatsoever.

(b) Neither the mayor, any city council person, the city manager, city secretary, city attorney nor any other officer or employee of the City of Irving or any employee of any firm, corporation or association employed by the City of Irving shall have authority to waive any provision of this section; however, the city council by five (5) or more affirmative votes may waive the six (6) months notice provision requirement.
(Ord. No. 889; Ord. No. 5567, § 3, 1-23-89)

## Sec. 9. City not required to give bond.

It shall not be necessary in any suit or proceeding in which the City of Irving is a party for any bond, undertaking or other security to be demanded or executed by or on behalf of the city in any of the state courts, but all such actions, suits, appeals or proceedings shall be conducted in the same manner as if such bond had been given, and the City of Irving shall be liable as if the security or bond had been duly executed.

## Sec. 10. Right of eminent domain.

The City of Irving shall have the right of eminent domain for public purposes whenever the governing authority shall deem it necessary; and to take any private property, within or without the city for any municipal purposes that may be authorized by law and to pay for same as may be required by law. The power herein granted for the purpose of acquiring private property shall include the power of improvement and enlargement of water works, including water supply, riparian rights, standpipes, water sheds, dams, the construction of supply reservoirs, wells, parks, squares, and pleasure grounds, airports, and for the purpose of strengthening or improving the channel of any stream, branch, draw or drain, or the straightening or widening or extension of any street, alley, avenue, boulevard or other public highway. In all cases where the city seeks to exercise the power of eminent domain it shall be controlled as nearly as practicable by the laws governing the condemnation of property by home rule municipalities. The power of eminent domain hereby conferred shall include the right of the governing authority of the city, when so expressed, to take the fee in the land so condemned, and such power of authority shall include the right to condemn public property for such purpose.
(Ord. No. 5567, § 3, 1-23-89)

## Sec. 11. Establish, vacate, etc., streets, sidewalks, etc.; removal of obstructions, encroachments, etc., from streets, etc.

The City of Irving shall have the power to lay out, establish, open, alter, widen, lower, extend, grade, abandon and improve streets, alleys, sidewalks, squares, parks, public places and bridges and regulate the use thereof and require the removal from streets, sidewalks, alleys, and other public property or places all obstructions, telegraph, telephone, or other poles, carrying electric wires or signs, and all fruit stands, showcases and encroachments of every nature or character upon any said streets and sidewalks, and to vacate and close private ways; and when a street or alley has been vacated or aban-

COI 00102

doned the city shall have the right to sell the same as now provided by the general laws of the State of Texas.

### Sec. 12. Street improvements and assessments.

The act by the legislature of the State of Texas in 1927 and shown as chapter 106, Acts of the First Called Session of the Fortieth Legislature, together with all amendments thereof, said Act with amendments being shown as article 1105b, Vernon's Annotated Civil Statutes of the State of Texas, is hereby embraced in and made a part of this Charter.

### Sec. 13. Regulation of vehicles used for hire.

The city council shall have the power by ordinance or otherwise to license, operate and control the operation of all character of vehicles used for hire using public streets, including motorcycles, automobiles, trucks, trailers, buses, or like vehicles; and to prescribe the speed of the same, the qualifications of the operators of the same, routing of the same, and the lighting of the same by night; and to provide for the giving of bond or other security for the operation of same.
(Ord. No. 889; Ord. No. 5567, § 3, 1-23-89)

### Sec. 14. Regulation of railroads.

The city council shall have the power by ordinance or otherwise to direct and control, within the city limits, the speed of engines, locomotives and motor cars operating on railroad tracks, the construction of railroad tracks, turnouts and switches, and the regulation of the grade thereof and the use of streets, and regulating unusual and excessive noises, and to regulate by ordinance all signal lights and safety devices at street crossings.
(Ord. No. 889)

### Sec. 15. Regulation of public utilities and cable television service.

(a) To the extent allowed by state law, the City of Irving shall regulate all aspects of rates and services prohibited by all public utilities enjoying a franchise from the City of Irving.

(b) Any company, corporation or person who may be engaged in furnishing to the inhabitants of the City of Irving any light, power, gas, or telephone service shall on or before the first day of April of each year file with the city secretary of the City of Irving a sworn written report of all gross earnings from their operations within the corporate limits of the City of Irving for the preceding twelve-month period of time.

(c) The City of Irving shall regulate all rates and services provided by cable television companies enjoying a franchise from the City of Irving when not prohibited by state or federal legislation or regulation. The City of Irving may audit the said companies.
(Ord. No. 889; Ord. No. 5567, § 3, 1-23-89)

### Sec. 16. Operation of public services or utilities by city.

The city shall have power to build, construct, purchase, own, lease, maintain and operate, within or without the city limits, light and power systems, water systems, sewer systems, sanitary disposal equipment and appliances, natural gas systems, parks and swimming pools, fertilizer plants, abattoirs, any other public service or utility; power to mortgage and encumber such system or systems; and all the powers which the city might exercise in connection with such public utilities and public services under Article 1175 of Vernon's Texas Civil Statutes as amended, or as may be hereinafter amended or codified, Section 51.072 of Chapter 51 of the Local Government Code, as well as under any other laws of the State of Texas pertinent or applicable thereto, including the power to demand and receive compensation for service furnished for private purposes, or otherwise, and with full and complete power and right of eminent domain proper and necessary to carry out efficiently said objects.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 17. Purchase of gas, electricity, etc.

The city shall have the power to purchase electricity, gas, oil, or any other article or service essential to a proper conduct of all the affairs of the city and of its inhabitants on such terms as the city council may deem proper, for sale and distribution to the inhabitants of the city or adjacent territory; provided that no contract of purchase binding the city shall be valid unless authorized by an election at which a majority of those voting shall favor the making of such contract.
(Ord. No. 889)

COI 00103

## Sec. 18. Franchises.

(a) The right to control easement, use and ownership and title to the streets, highways, public thoroughfares and property of the city, its avenues, parks, bridges and all other public places and property, are hereby declared to be inalienable except by ordinance duly passed by a majority of all members of the city council, and no grant of any franchise or lease, or right to use the same, either on, through, along, across, under or over the same, by any private corporation, association or individual shall be granted by the city council for a longer period than thirty (30) years unless submitted to the vote of the legally qualified voters of the city-provided, however, that when any application is made for any grant of franchise, lease, right or privilege by any person or corporation, if requested by the applicant, the council shall submit it, at an election called for that purpose, the expense of which shall be borne by the applicant, and if the majority of the votes cast at said election shall be in favor of making the grant as applied for, said grant shall be made for a term of years as specified in the ordinance calling said election.

(b) The city council may, of its own notion, submit all of such applications to an election at which the people shall vote upon the propositions therein submitted, the expense of such election in all cases to be borne by the applicant.

(c) No franchise shall ever be granted until it has been approved by a majority of the city council, after having been read in full at three (3) regular meetings of the city council, nor shall any such franchise, grant or privilege ever be made unless it provides for adequate compensation or consideration therefor to be paid to the city.

(d) Every such franchise or grant shall make adequate provision, by way of forfeiture of the grant or otherwise, to secure efficiency of public service at reasonable rates and to maintain the property devoted to the public service in good repair throughout the term of grant of said franchise.

(e) No franchise grant shall ever be exclusive.

(f) The city council may prescribe the forms and methods of the keeping of accounts of any grantees under franchise, provided that the forms and methods of keeping such accounts have not already been prescribed by a state or federal agency.
(Ord. No. 889)

## Sec. 19. Transportation facilities.

(a) *Generally.* The securing of transportation facilities and services for passengers and freight within the City of Irving, between the City of Irving and the City of Dallas, between the City of Irving and other municipal corporations within Dallas County, and between the City of Irving and other cities and towns in the State of Texas and the United States is declared to be a public purpose. To provide for any and all modes of transportation facilities or services, the City of Irving, acting by and through its governing body, may grant franchises or may acquire, maintain and operate any or all of such transportation facilities or services and use public funds for such purposes, and issue warrants, assignments of revenues, and issue revenue or tax bonds for such purposes.

(b) *Airports.* The City of Irving, acting by and through its governing body, shall have the power, alone, or with the United States, the State of Texas, Dallas County, the City of Dallas, or any other municipal corporation to acquire, establish, maintain and operate an airport or airports, within or without the corporate limits of the city, and landing fields, radio beams, beacons and other apparatus, buildings, equipments and appurtenances necessary or convenient therefor, and to make suitable charges for their use.

(c) *Docks, channels, etc.* The City of Irving, acting by and through its governing body, shall have the power, alone, or with the United States, The State of Texas, Dallas County, the City of Dallas, or any other municipal corporation, to acquire, establish, maintain and operate yacht basins, channels, bridges slips, piers, docks, and warehouses, on, near, or adjacent to the water front of the City of Irving; to control, maintain, improve and regulate the use of channels, docks, piers, bridges and slips adjacent thereto; to license, regulate and control the landing, anchorage, mooring, and movement of vessels, boats and barges within the harbors of the City of Irving; to employ such persons as are necessary to effectuate the provisions of this section; and to fix the toll and charges to be made for the use of such facilities and provide for their collection.
(Ord. No. 889)

## Sec. 20. Parks, playgrounds, etc.

The City of Irving shall be authorized to acquire land for parks and playgrounds by gift, deed, devise,

COI 00104

condemnation, lease, purchase or otherwise and to have exclusive control of all city parks and playgrounds, whether within or without the city limits, and to control, regulate and remove all obstructions and prevent all encroachments thereupon; to provide for raising, grading, filling, terracing, landscape gardening, erecting buildings, swimming pools and wading pools, and other structures, providing amusements therein, for establishing walks and paving driveways around, in and through said parks, playgrounds, and other public grounds, speedways, or boulevards owned by it, and lying both outside and inside the municipal boundaries.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 21. Placement of wires, etc., underground.

The city council may require the placing of all wires or overhead construction of public utilities within the business area or fire limits of the city under the surface of the ground under such regulations as may be prescribed by the city council from time to time.
(Ord. No. 889)

### Sec. 22. Fire department and prevention.

(a) The City of Irving shall have the power by ordinance to establish and maintain a fire department and to prescribe the duties of the members of said department, and regulate their conduct and their salaries. The head of the fire department of said city shall be known and designated as the "Fire Chief." The other sworn members thereof shall be known as "Firefighters" or "Fire Prevention Specialists." Qualified Fire Marshals of said department shall have power to arrest.

(b) The city council shall have power to adopt any ordinance or regulation having for its purpose the prevention of fires or the removal of fire hazards; to provide means for protection against conflagrations and may declare all dilapidated buildings to be nuisances and hazards and direct the same to be repaired, removed or abated in such manner as the city council may prescribe; it may also by ordinance regulate, prescribe, govern or forbid the transportation, use, or storage of lumber, building material or any kind of flammable, combustible, toxic or explosive goods, wares, and merchandise of any and every kind within certain limits and prescribe certain limits within which such materials may be transported, used or stored.
(Ord. No. 889; Ord. No. 5567, § 3, 1-23-89; Ord. No. 2013-9464, Amd. 3, 5-22-13)

### Sec. 23. Health regulations.

(a) The city council shall have the power to provide by ordinance for a health department and to establish all necessary rules and regulations protecting the health of the city.

(b) The city council is authorized to regulate, license and inspect persons, firms, corporations, common carriers, or associations operating, managing, or conducting any hotel or any other public sleeping or eating place, or any place or vehicle where food or drink or containers therefor, of any kind is manufactured, prepared, stored, packed, served, sold or otherwise handled within the city limits of said city, or any manufacturer or vendor of candies or manufactured sweets; and shall have the power to prescribe health regulations with reference to any and all workers or employees hired or used in any of said places or vehicles, or about said places and vehicles; or who deliver products to and from said places and vehicles; and shall have the power to inspect, license and regulate the sanitary condition of said places and vehicles and to condemn all articles not wholesome or fit for human consumption.
(Ord. No. 889; Ord. No. 5567, § 3, 1-23-89)

### Sec. 24. Police department.

The City of Irving shall have the power by ordinance to establish and maintain a police department and to prescribe the duties of the members of said department, and regulate their conduct and their salaries. The head of the police department of said city shall be known and designated as "Chief of Police," and the other sworn members thereof shall be known as "Police Officers." Said officer or officers shall have power to arrest.
(Ord. No. 2013-9464, Amds. 2, 3, 5-22-13)

### Sec. 25. Compromising and settling claims and lawsuits.

The city council of the City of Irving shall have the power and authority to compromise and settle any

COI 00105

and all claims and lawsuits of every kind and character in favor of or against the said city, including suits by said city to recover delinquent taxes.
(Ord. No. 889)

**Sec. 26. Contracts.**

(a) No contract shall ever be made which binds the city to pay for personal services to be rendered for any stated period of time; but all contracts for personal services shall be restricted to the doing of some particular act or thing, and upon its completion no further liability shall exist on the part of the city, with the exception of officers and heads of departments specifically mentioned herein.

(b) Nor shall the city or anyone acting as its agent make any contract for services for the municipality for more than one year unless the contract contains a provision which authorizes the city to terminate the contract at the end of each twelve (12) month period.

(c) The City of Irving may contract for the use, acquisition, or purchase of any property and finance said acquisitions pursuant to the authority vested in governmental agencies by virtue of Chapter 252 and Chapter 271 Texas Local Government Code, as amended or as may be hereinafter amended.

(d) No contract shall be made that binds the city to pay reimbursable expenses unless that contract provides that the council or council's designee may review, examine or audit all documents supporting such reimbursement.
(Ord. No. 4754, § 1, 8-15-85; Ord. No. 7196, Amd. 9, 1-22-98; Ord. No. 2013-9464, Amds. 2, 4, 5-22-13)

**Sec. 27. Zoning.**

The city council shall have the full power and authority to zone property located within the corporate limits of the City of Irving.
(Ord. No. 5567, § 3, 1-23-89)

**Sec. 28. Licenses, billboards, buildings; penalty for violation of ordinance; wiring and plumbing inspections, etc.; and power to fix penalties for violation of all ordinances.**

(a) In addition to the powers hereinbefore specifically enumerated, the city council of the City of Irving shall have the power to license any lawful business, occupation or calling that is susceptible to the control of the police power; to license, regulate, control, or prohibit the erection of signs or billboards within the corporate limits of said city; to provide for the regulation and control of electricians, plumbers and gas fitters and electrical and plumbing works, and to require efficiency in the same; to provide for the inspection of weights, measures and meters and fix a standard of such weights, measures and meters, and to require conformity to such standards to provide penalties for failure to use or conform to the same; and to provide for inspection fees; to provide for the issuance of permits for erecting all buildings, for the inspection of the construction of buildings in respect to proper wiring for electrical lights and other electrical appliances, piping for gas, flues, chimneys, plumbing, and sewer connections; and to enforce proper regulations in regard thereto; require the construction of fire escapes for all public buildings, and to determine the sufficiency and regulate the safety of all exits and fire escapes provided for public buildings, of every kind and character; and to provide for the enforcement of all ordinances enacted by the city by a fine not to exceed the maximum allowed by state law.

(b) The city council shall be authorized to fix fines for failure of any person, firm, partnership, corporation, association or other entity to comply with any ordinance established by the city council or state law and the maximum fine shall be set by ordinance and only be limited by state law.
(Ord. No. 889; Ord. No. 4754, § 2, 8-15-85)

**Sec. 29. Power to define nuisance and fix penalties.**

The city council shall have the power to:

(a) To define all nuisances and prohibit the same within the city and outside the city limits for a distance of 5,000 feet; to have power to police all parks or grounds, speedways, or boulevards owned or leased by said city and lying both inside or outside said city; to prohibit the pollution of any stream, draw, drain or tributaries thereof, water deposit and reservoir, whether above or below the ground, which may constitute the source of storage of water supply, and to provide for policing the same, as well as to provide for the protection of any watersheds and the policing of

COI 00106

same; to inspect, license and regulate dairies, slaughter pens and slaughterhouses inside or outside the limits of the city from which meat or milk is furnished to the inhabitants of the city; to require property owners to make connection to the sewer system, when available.

(b) To provide for the fixing of penalties for failure of any person, firm, corporation or association to comply with any such rules and regulations so prescribed by the city council under the provisions of this section; it being the intention to vest in the city council not only the powers expressly enumerated in this section but all other powers reasonably necessary for the protection of the health of the City of Irving and its inhabitants.

(Ord. No. 5567, § 3, 1-23-89)

### Sec. 30. Power to fix penalties.

The city council shall be authorized to fix fines for failure of any person, firm, partnership, corporation, association or other entity to comply with any ordinance established by the city council or state law and the maximum fine shall only be limited by state law.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 31. Public library.

The City of Irving shall have the power to provide for a public library system and its maintenance.
(Ord. No. 5567, § 3, 1-23-89)

## ARTICLE IV.  OFFICERS AND ELECTIONS

### Sec. 1. Governing body.

The governing and law making body of the City of Irving shall consist of a mayor and eight (8) council members and said governing body shall be known as the city council.
(Ord. No. 889; Ord. No. 1588; Ord. No. 2013-9464, Amd. 2, 5-22-13)

### Sec. 2. Elective officers.

(a) The members of the city council of the City of Irving, which includes the mayor and eight (8) council members, shall be the only elective officers of the city, and they shall be elected and hold office and be compensated as herein provided. The mayor and council members shall be elected by the qualified voters of the entire city, but each council member shall be elected to and occupy a place on the council such places being numbered 1, 2, 3, 4, 5, 6, 7 and 8 respectively. The places of the council members shall be designated on the official ballot as Council Member Place 1, 2, 3, 4, 5, 6, 7 and 8.

(b) No person shall be eligible as a single member district candidate for Place 1, Place 3, Place 4, Place 5, Place 6, or Place 7 on the city council, unless that person is at the time a bona fide resident of that district and will have been for a period of at least twelve (12) months immediately prior to election day.

No person shall be eligible as an at-large candidate for Mayor, or Place 2 or Place 8 on the city council unless that person is at the time a bona fide resident of the city and will have been for a period of at least twelve (12) months immediately prior to election day.

All council members, including those from specific voting districts, should serve all residents, not just those from the council member's district. The mayor and the council members in Place 2 and Place 8 may reside in any portion of the city.
(Ord. No. 889; Ord. No. 1588; Ord. No. 4754, § 3, 8-15-85; Ord. No. 5567, § 3, 1-23-89; Ord. No. 7196, Amd. 2, 1-22-98; Ord. No. 2013-9464, Amd. 5, 5-22-13)

### Sec. 3. Mayor and city council members qualifications; filing of candidacy; official ballot; designation of city districts.

(a) No person shall be a candidate for the office of mayor or council member unless that person is a qualified voter of the City of Irving, shall have resided in the city for not less than one year immediately prior to election day, shall not be in arrears in the payment of taxes or other liabilities due the city, and shall be a bona fide resident of the city.

(b) A person wishing to become a candidate for mayor or place on the city council shall be placed on the official ballot upon the sworn application of the candidate and the signatures of at least twenty-five (25) voters of the city or one-half of one percent of the total vote received in the territory from which the

COI 00107

office is elected by all candidates for mayor in the most recent mayoral general election, whichever is greater, which the candidate shall swear as being true and correct signatures of those signing the application, addressed and delivered to the city secretary no later than the date authorized by the State Election Code, stating the office for which that person is a candidate and if for councilperson, the place for which that person is running, and stating that the candidate has resided in the city for at least one year prior to the election, and thereupon the names of such candidate shall be printed upon the official ballot.

If the person wishes to become a candidate for Place 1, 3, 4, 5, 6 or 7, said person's application shall also state the candidate is at the time a bona fide resident of the district for which the person seeks election and has been for a period of at least twelve (12) months immediately prior to election day.

The order in which the names of the candidates for mayor and each place on the city council shall appear on the official ballot shall be determined by lot, in a drawing held under the supervision of the city secretary.

(c) Until the boundaries of the districts are revised as provided herein, they shall have the same boundaries as set forth in the City of Irving Ordinance No. 2011-9292.

(d) At least once each ten (10) years after the adoption of this amendment, the city council shall by ordinance rearrange said districts so as to make all districts as nearly equal in population as possible. (Ord. No. 889; Ord. No. 1588; Ord. No. 2721, § 1, 12-19-74; Ord. No. 4754, § 3, 8-15-85; Ord. No. 5567, § 3, 1-23-89; Ord. No. 2013-9464, Amds. 2, 5, 6, 5-22-13)

### Sec. 4. Election.

The mayor and council members shall be elected by the qualified voters of the city, and the candidate receiving the majority number of votes cast for the place which that person seeks shall be elected to the respective office for which that person was a candidate. (Ord. No. 889; Ord. No. 4754, § 4, 8-15-85; Ord. No. 2013-9464, Amd. 5, 5-22-13)

### Sec. 5. Judge of election; runoff election.

(a) The city council shall be the judge of the election and qualification of its own members and of the mayor, subject to review of the courts in case of an election contest. The city council shall, as soon as practicable after an election, either at a called meeting for that purpose or at the next regular meeting date of said city council after each regular or special election, canvass the returns and declare the results of such election.

(b) Should any candidate running for mayor or council member fail to receive a majority vote of all votes cast in the regular municipal election for the office which the candidate seeks, then in that event it shall be the duty of the mayor to order a runoff election for every place or mayor to which no one was elected. Such runoff election between the two candidates who received the highest number of votes for each place or mayor to which no one was elected shall be voted on again, and the candidate who receives the majority of the votes cast for each such place or mayor in the runoff election shall be elected to such place or mayor. Should any person who was a candidate at the regular municipal election and who is entitled to become a candidate at the runoff election die, refuse or otherwise be unable to appear on the runoff election ballot, the candidate for such office standing next highest in the computation of votes for that office shall succeed to the rights of such candidate who failed to appear on the ballot at said runoff election. This method for selecting alternate runoff candidates shall be employed until there are two (2) candidates for each office in each runoff election and should there be only one candidate for office after the conclusion of this progress, that candidate shall be declared the winner. However, if at the date of the election, there is no runoff candidate left from those who sought to be elected to that place or mayor in the regular election, the city council shall declare no one elected to such place or mayor and shall call a special election on such date provided by the Texas Election Code to elect a person to such place or mayor and said special election shall be conducted pursuant to the Texas Election Code prescribing special elections to fill vacancies in municipal offices. (Ord. No. 2013-9464, Amds. 2, 6, 5-22-13)

### Sec. 6. Date and conduct of election.

The regular municipal election of the City of Irving shall be held in May on the designated uniform

COI 00108

election date or at such time as prescribed by state law or pursuant to the Texas Election Code. All city elections shall be governed, except as otherwise provided by this Charter, by the laws of the state governing general and municipal elections.

(Ord. No. 889; Ord. No. 1588; Ord. No. 7196, Amd. 2, 1-22-98; Ord. No. 2013-9464, Amd. 6, 5-22-13)

### Sec. 7. Qualifying of officers.

All officers of the city, whether elective or appointive, shall qualify by taking the oath prescribed by the Constitution of the State of Texas and by executing such bond as may be required under the provisions of this Charter and the ordinances and resolutions of the city.

(Ord. No. 889)

### Sec. 8. Term of office.

(a) The term for each council member, which includes the mayor and the persons holding each of the eight (8) other places on the city council, elected at a regular municipal election shall be three (3) years.

(b) A member of the city council ceasing to reside in the city during the term of office shall immediately forfeit that office.

(c) Seating of newly elected council members:

(1) Members of the city council elected at the regular election shall take office at the next city council meeting following the date the city council canvasses the returns and declares the results of the regular municipal election.

(2) Should a runoff election be necessary, members of the city council elected at the runoff election shall take office at the next city council meeting following the date that the city council canvasses the returns and declares the results of the runoff election.

(d) No member of the city council shall be elected for more than three (3) full consecutive terms of three (3) years each in the same position on the city council as a councilperson.

(e) A council member who has served three (3) full consecutive terms of three (3) years in the same place on the council may not run for another place on the city council for one (1) year after leaving office, except that in the case of the person holding office other than the mayor, that person may run for mayor. A mayor who has served three (3) full consecutive terms may not run for mayor or another place on council for one (1) year.

(Ord. No. 889; Ord. No. 1588; Ord. No. 4754, § 3, 8-15-85; Ord. No. 7196, Amd. 2, 1-22-98; Ord. No. 2013-9464, Amds. 2, 3, 7, 8, 5-22-13)

### Sec. 8-A. Candidacy of council member for office of mayor or different place on council.

If a member of the city council shall become a candidate for election to the office of mayor or for any place on the city council other than the specific office or place the person is then holding, that person shall forfeit that office or place on the council at the time said council member's successor is sworn into office. Further, if a member of the city council shall announce their candidacy, or shall in fact become a candidate, in any general, special or primary election, for any office of profit or trust under the laws of Texas or the United States other than the office then held, at any time when the unexpired term of the office then held shall exceed one (1) year, such announcement or such candidacy shall constitute an automatic resignation of the office then held, and the vacancy thereby created shall be filled pursuant to law in the same manner as other vacancies for such office are filled.

(Ord. No. 1331; Ord. No. 4754, § 3, 8-15-85; Ord. No. 7196, Amd. 4, 1-22-98)

### Sec. 8-B. Effect of board member, city employee, etc., seeking public office.

If a member of any board appointed by the city council, a city employee or appointive officer shall become a candidate for nomination or election to any public office, that person shall immediately forfeit the board position, employment or appointive office held under the City of Irving unless such prohibition is proscribed by state statute, Texas Constitution or the United States Constitution.

(Ord. No. 1331; Ord. No. 4754, § 3, 8-15-85)

### Sec. 9. Vacancies in office of mayor or council member.

(a) Vacancy created by any cause. In the event of a vacancy existing in the office of mayor or any council member from any cause, the vacancy shall

COI 00109

be filled at a special election called for such purpose within one hundred and twenty (120) days after said vacancy or vacancies exit. In the event any candidate for a vacancy fails to receive a majority of all votes cast for all the candidates for each such vacancy at such special election, the mayor shall order a runoff election to be held pursuant to the Texas Election Code prescribing special elections to fill vacancies in municipal office. Should a vacancy occur in the office of mayor, the mayor pro tem shall serve until the vacancy is filled by election.

(b) A member of the city council who is finally convicted of a felony shall immediately resign and forfeit the council member's office.

(c) The procedure for conducting a runoff election or special election, if necessary, to fill a vacant office shall be that set forth in subsection (b) of Section 5 above for regular municipal election runoffs and special elections.
(Ord. No. 889; Ord. No. 4754, § 3, 8-15-85; Ord. No. 7196, Amd. 2, 1-22-98; Ord. No. 2013-9464, Amds. 6, 9, 5-22-13)

### Sec. 10. Mayor pro tem and deputy mayor pro tem.

The city council shall select from among the eight (8) council members a mayor pro tem who shall perform all duties of the mayor in the mayor's absence or disability and a deputy mayor pro tem who shall perform all duties of the mayor pro tem in the mayor pro tem's absence or disability.
(Ord. No. 889; Ord. No. 1588; Ord. No. 4754, § 3, 8-15-85; Ord. No. 2013-9464, Amd. 10, 5-22-13)

### Sec. 11. Compensation of mayor and council member.

(a) The mayor shall receive a salary of twelve hundred dollars per month.

(b) Each council member shall receive a salary of nine hundred dollars per month.

(c) No member of the city council shall be entitled to receive reimbursement for expenses except for actual expenses incurred while in the performance of city council duties outside the municipal boundaries of the City of Irving.
(Ord. No. 889; Ord. No. 7196, Amd. 5, 1-22-98; Ord. No. 2013-9464, Amds. 2, 11, 5-22-13)

### Sec. 11-A. Effect of change of residence during term of office.

A member of the governing body of the City of Irving ceasing to reside within the district for which the member was elected shall automatically resign from the office, but shall continue to serve as a member of the governing body of the City of Irving until the member's successor is chosen at the next lawfully available regular or special municipal election, unless the member ceases to reside in the City of Irving as stated in Art. IV, Section 8(b). The special election called in this section must be called for an additional purpose and not solely to replace the council member who automatically resigned under these circumstances.
(Ord. No. 889; Ord. No. 2013-9464, Amd. 12, 5-22-13)

### Sec. 12. Duties of mayor generally.

The mayor of the City of Irving shall preside over the meetings of said city council and perform such other duties consistent with the office as may be imposed upon the mayor by this Charter and ordinances and resolutions passed in pursuance hereof. The mayor may participate in the discussion of all matters coming before the council and shall be entitled to vote as a member thereof on all legislative and other matters, but shall have no veto power. The mayor shall sign all contracts and conveyances made or entered into by the city and all bonds issued under the provisions of this Charter. The mayor shall be recognized as the official head of the city by courts for the purpose of serving civil process, by the governor for the purpose of enforcing military law, and for all ceremonial purposes. In time of danger or emergency, the mayor may with the consent of the council take command of the police and govern the city by proclamation and maintain order and enforce all laws.
(Ord. No. 889; Ord. No. 7196, Amd. 1, 1-22-98; Ord. No. 2013-9464, Amd. 2, 5-22-13)

### Sec. 13. Duties of city council generally.

(a) The city council shall have all powers necessary and incident to the proper discharge of the duties imposed upon it and is hereby invested with all powers necessary to carry out the terms of this Charter; it being intended that the city council and

COI 00110

mayor shall have and exercise all powers enumerated in this Charter or implied thereby and all powers that are or hereafter may be granted to municipalities by the Constitution or laws of the State of Texas.

(b) The compensation of all appointive officers and employees shall be fixed by the city council, who may increase or diminish such compensation at will. The city council may dispense with the services of any employee at any time upon a majority vote of the members of the city council.
(Ord. No. 889)

### Sec. 14. Meetings of council generally.

The city council shall hold at least one public meeting in each month at a time to be fixed by it for such meetings, and may hold as many additional meetings during the month as may be necessary for the transaction of the business of the city and its citizens.
(Ord. No. 889; Ord. No. 5567, § 3, 1-23-89)

### Sec. 15. Rules of procedure; attendance of councilmen at meetings.

The city council shall determine its own rules of procedure and may compel the attendance of its members.

### Sec. 15-A. Code of ethics.

Such code of ethics shall set forth appropriate standards of conduct for elected and appointed officials of the city, appointees to city boards and committees and persons employed by or under contract with the city, not otherwise preempted by state law. The code of ethics may address conflicts of interest, improper financial relationships or activities or other desired subject matter, and may prescribe such policies and procedures as may be deemed appropriate by the city council.
(Ord. No. 2013-9464, Amd. 13, 5-22-13)

### Sec. 16. Quorum of city council; minutes of council meetings; procedure for voting on and recording of enacted ordinances.

A majority of the city council shall constitute a quorum to do business, and the affirmative vote of at least five (5) of those attending any meeting at which there is a quorum present shall be necessary to adopt any ordinance or resolution. All meetings of the city council shall be conducted pursuant to Chapter 551 Texas Government Code (Texas Open Meeting Act) as amended or as may be hereinafter amended. The vote upon the passage of all ordinances and resolutions shall be taken by the "ayes" and "nays" recorded by voice vote or by electronic vote recording equipment and the vote shall be entered upon the minutes, and every ordinance or resolution, upon its final passage, shall be recorded in a book kept for the purpose and be authenticated by the signature of the presiding officer and the person performing the duties of city secretary.
(Ord. No. 1588; Ord. No. 4754, § 5, 8-15-85; Ord. No. 7196, Amd. 7, 1-22-98)

### Sec. 17. Enactment of ordinances generally.

Each proposed ordinance or resolution shall be introduced in written or printed form and shall not contain more than one subject which shall be clearly expressed in the title, except ordinances or resolutions making appropriations or authorizing the contracting of indebtedness of bonds or other evidence of indebtedness. All ordinances, resolutions or orders may be passed at any public meeting of the city council.
(Ord. No. 889; Ord. No. 2013-9464, Amd. 14, 5-22-13)

### Sec. 18. "Emergency measure" defined; enactment of ordinances as emergency measures.

An emergency measure is an ordinance for the immediate preservation of the public business, property, health or safety, or providing for the usual daily operation of municipal departments in which the emergency is set forth in such ordinance. No ordinance regulating the rate or rates to be charged for services furnished the public generally by public utilities shall be passed as an emergency measure, nor shall such an ordinance be finally passed on the date it is introduced, but must be passed and voted upon at two public meetings of the city council. No ordinance making a grant, renewal or extension of a franchise or other special privilege shall be passed as an emergency measure nor shall such an ordi-

COI 00111

nance be finally passed and voted on the date it is introduced, but must be passed and voted upon at three public meetings of the city council.
(Ord. No. 889; Ord. No. 5567, § 3, 1-23-89)

### Sec. 19. Ordinances in effect at time of adoption of Charter.

All ordinances of the City of Irving now in existence and not inconsistent with provisions of this Charter shall remain in full force and effect until altered, amended or repealed by the city council.
(Ord. No. 889)

### Sec. 20. Pleading of ordinances; admissibility of ordinances as evidence.

It shall be sufficient in all judicial proceedings to plead any ordinance of the city by caption without embodying the entire ordinance in the pleadings, and all pleaded ordinances or codes of ordinances shall be admitted in evidence in any suit and shall have the same force and effect as the original ordinance. Certified copies of the ordinances may also be used in evidence in lieu of original ordinances.

### Sec. 21. Designation of depository for city funds.

The city council is authorized to select a depository for city funds in accordance with Chapter 105 Texas Local Government Code as amended, and to follow all the terms and provisions of same.
(Ord. No. 889; Ord. No. 7196, Amd. 7, 1-22-98)

### Sec. 22. Ordinance—Codification.

The city council, or city manager if one should be appointed under the provisions of Article VIII herein, as soon as practicable after the adoption of this Charter, shall cause to be codified and properly entered and published in pamphlet form for public distribution or for anyone desiring same, the ordinances of the City of Irving, and may annually thereafter revise same and keep it up to date.
(Ord. No. 889)

### Sec. 23. Same—Publication.

The caption of each ordinance imposing any penalty, fine, or forfeiture shall after passage thereof be published in one issue of some newspaper of general circulation in the city, and proof of such publica-

tion shall be made by the printer or publisher of such paper making affidavit before some officer authorized to administer oaths. Such affidavit shall be filed with the city secretary and shall be prima facie evidence of such publication and promulgation of such ordinance so published; said ordinances shall take effect and be in full force and effect from and after the date of publication, unless otherwise expressly provided. Ordinances not required to be published shall take effect and be in force from and after the date of passage thereof unless otherwise provided.
(Ord. No. 889)

### Sec. 24. City secretary.

The city council shall appoint a city secretary. Pursuant to Section 150.021 of the Texas Local Government Code, the city secretary, as an appointee of the mayor and city council, may be required to reside within the city. The city secretary shall receive for services such compensation as the city council may fix. Unless excused by the city council for good cause, the city secretary shall attend all meetings of the city council and keep accurate minutes of its proceedings; the city secretary shall preserve and keep in order all books, papers, documents, records and files of the city council. The city secretary shall have custody of the seal of the city and shall affix same to such documents and obligations only of the city as the city secretary may be legally authorized so to do. The city secretary shall facilitate city elections as the chief election official for the city of Irving, but the city council shall engage an election administrator to work with the city secretary as provided by the Texas Election Code. Final approval of the city secretary's budget and the expenditure of the budgeted funds, as well as the classification and salary structure of city secretary's department employees, shall be the sole responsibility and prerogative of the city council. By approval of the city secretary's annual budget, administrative services required by other city departments in support of the approved budget are authorized. The city secretary shall hire, discharge and supervise other employees of such department.
(Ord. No. 889; Ord. No. 8575, Amd. 6, 11-8-05; Ord. No. 2013-9464, Amds. 3, 15, 16, 5-22-13)

### Sec. 25. City attorney.

The city council shall appoint a city attorney. The city attorney shall be a person admitted to the prac-

COI 00112

tice of law by the State of Texas and shall have practiced law for at least four years. The city attorney shall be the chief legal advisor of all offices, departments and agencies and of all officers and employees of the city in matters relating to their official powers and duties. The city attorney shall represent the city in all legal proceedings. The city attorney shall perform all services incident to the position as may be required by statute, by the City of Irving Charter, or by ordinance. Final approval of the city attorney's budget and the expenditure of budgeted funds, as well as the classification and salary structure of city attorney's department employees, shall be the sole responsibility and prerogative of the city council. By approval of the city attorney's annual budget, administrative services required by other city departments in support of the approved budget are authorized. The city attorney shall hire, discharge and supervise other employees of such department. (Ord. No. 2013-9464, Amds. 16, 17, 5-22-13)

### Sec. 26. Municipal court—Created; jurisdiction; judge; clerk.

There is hereby created and established a court to be known as the municipal court of the City of Irving which court shall have jurisdiction within the territorial limits of said city of all criminal cases arising under the ordinances of such city, and over violations occurring within areas over which the city exercises control pursuant to an agreement as authorized by Chapter 791 Texas Government Code as amended or as may be amended hereinafter, and shall have jurisdiction over such other matters as designated by the laws of the State of Texas. Said court shall have jurisdiction over all matters consistent with the laws of the State of Texas, and the ordinances of the City of Irving. It shall also have jurisdiction of violations of ordinances of the city enacted for the preservation of its water system, watersheds of the city's water supply and the purity of the water supply, its sewer disposal plant and its garbage dumping grounds, whether such offenses are committed inside or outside of the corporate limits of the City of Irving, and the commission of any nuisance within five thousand (5,000) feet of the corporate lines of the city, outside of the city limits.

(a) The judge of said court shall be known as the Judge of the Municipal Court and may be designated as recorder, and the judge's salary may be fixed by ordinance.

(b) The judge of said municipal court, regardless of what his title may be, shall have all powers provided for by the constitution, criminal statutes, the Code of Criminal Procedure, Family Code, and other laws of the State of Texas, as well as those powers and duties provided for the Charter and ordinance of the City of Irving. Said judge shall further have the power to punish for contempt to the same extent and under the same circumstances as the justices of the peace may punish for contempt of criminal cases.

(c) The judge of said court shall be a qualified voter of the city, shall be appointed by the city council and shall hold office at the pleasure of the city council.

(d) The clerk of said court and the deputies shall have the power to administer oaths and affidavits, make certificates, affix the seal of said court thereto, and generally do and perform any and all acts usual and necessary by clerks of courts in issuing process of said courts and conducting the business thereof.

(e) The city council of the City of Irving shall have the power to create and establish additional municipal courts by ordinance, and to appoint more than one judge of each municipal court, whether one or more, each of whom shall be a magistrate, and each judge of a municipal court, now existing or hereafter created, shall be appointed by and serve at the pleasure of the city council.

(f) The city council of the City of Irving shall have the power to appoint an additional person or persons meeting the qualification for such position to sit for the regular municipal judge or judges while the regular judge or judges may temporarily be absent or unable to act for any reason. The said appointee or appointees shall have all the powers and duties of the office and shall receive the compensation set by the city council. Said appointee or appointees shall serve only during the absence of the regular judge or judges of the municipal court.

(Ord. No. 889; Ord. No. 4754, § 6, 8-15-85; Ord. No. 7196, Amd. 7, 1-22-98; Ord. No. 8575, Amd. 7, 11-8-05; Ord. No. 2013-9464, Amds. 2, 6, 5-22-13)

COI 00113

### Sec. 27. Same—Procedure generally.

All complaints, prosecutions, the service of process, commitment of those convicted of offenses, the collection and payment of fines, the attendance and service of witnesses and juries, punishment for contempt, bail and the taking of bonds shall be governed by the provisions of title 2 of the Code of Criminal Procedure of the State of Texas applicable to corporation courts.

### Sec. 28. Same—Appeals.

Appeals from conviction in the municipal court shall lie to the county criminal court, and such appeals shall be governed by the same rules of practice and procedure as are provided by law in cases of appeals from the justice court to said county criminal court, as far as said rules are applicable; however, so long as the municipal court is a municipal court of record, appeals shall be governed by the rules of practice and procedure as are provided by law for the Irving municipal court of record.
(Ord. No. 7196, Amd. 10, 1-22-98)

### Sec. 29. Nepotism.

No person related, within the second degree by affinity or within the third degree by consanguinity to the mayor or any member of the city council shall be appointed to any office, position or clerkship or other service of the city whose salary is directly or indirectly paid from public funds or fees of office of the city; however, this section does not apply to the appointment, confirmation of an appointment, or vote for an appointment or confirmation of an appointment, or vote for an appointment or confirmation of an appointment of an individual to any office, position or clerkship or other service of the city, if the individual is employed in the position immediately before the election or appointment of the public official to whom the individual is related in a prohibited degree, and that prior appointment or employment of the individual is continuous for at least six (6) months prior to the election of the mayor or member of the city council to which the appointee or employee is related in a prohibited degree.
(Ord. No. 889; Ord. No. 7196, Amd. 11, 1-22-98)

### Sec. 30. Official bond of appointive officers or employees.

The city council of the City of Irving shall have the right to require bond from each appointive officer or employee of the city in such amounts as said city council may from time to time fix by ordinance or resolution and conditioned upon the faithful discharge of the duties of his office and accounting for all moneys, credits and things of value coming into the hands of such officer or employee; and all such bonds shall be signed as surety by some surety company authorized to do business under the laws of the state, and the premiums accruing thereon shall be paid by the City of Irving.
(Ord. No. 889)

### Sec. 31. Audit and examination of city books and accounts.

The city council shall cause audits annually to be made of the books and accounts of each and every department of the city. Such audits shall be made by a certified public accountant who shall be selected by the city council, and a contract entered into from year to year; such contract shall provide that the books and accounts of the city shall be audited at least annually; and such auditor's report to the city council shall be accessible to the public or for publication.
(Ord. No. 889)

### Sec. 32. Budget.

(a)  The fiscal year of the city shall begin on the first day of October and end on the last day of September of each calendar year.

(b)  The city manager, if one is appointed, shall prepare and submit to the city council a budget to cover all proposed expenditures of the city for the succeeding fiscal year. Such budget shall be prepared in conformity with Chapter 102 Texas Local Government Code.

(c)  No public money shall ever be spent or appropriated, except in case of an emergency or public calamity, unless funds are currently in the possession of the city to cover said expenditures or appropriation. No expenditure shall ever be made by the city except upon checks drawn upon the account, for which a previous appropriation shall have been made, and countersigned by the mayor or the city manager, if one is appointed.

COI 00114

(d) The city manager must submit a structurally balanced budget annually, and must submit a financial report to the city council at least quarterly.
(Ord. No. 889; Ord. No. 7196, Amd. 7, 1-22-98; Ord. No. 2013-9464, Amds. 2, 3, 5-22-13)

## ARTICLE V. TAXES AND TAXATION*

### Sec. 1. Property subject to taxation.

All property, real, personal or mixed, lying and being within the corporate limits of the city on the first day of January, shall be subject to taxation, excepting such property as may be exempt from taxation under the Constitution, and the laws of the State of Texas. It shall be the duty of the tax assessor and collector on or before the first day of July of each year or as soon thereafter as practicable, to make and return to the city council a full and complete list and assessment of all property, both real and personal, held, owned or situated in the city on the first day of January of each year and not exempt from municipal taxation.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 2. Levy and collection.

(a) The city council shall have full power to provide by ordinance for the prompt collection of taxes assessed, levied and imposed under the Charter, and is hereby authorized to enforce the collection of the same against all property subject to taxation and the owners thereof as provided by law. Unless otherwise provided by ordinance and Charter, all property in the city liable to taxation shall be assessed in accordance with the provisions of the general laws of the state insofar as applicable.

(b) The city council shall have the power and it is hereby authorized and made its duty to levy annually for general purposes and for the purpose of paying interest and providing the sinking fund on the bonded

*Editor's note—Ord. No. 5567, § 3, adopted January 23, 1989, amended Article V of the Charter to read as set out herein. Former Art. V, §§ 1—11, was concerned with similar provisions which had been approved by the voters on October 25, 1952, as amended by Ord. No. 889. The new provisions, §§ 1—20 were adopted at an election held on January 21, 1989, as Amendment No. 26.

indebtedness of the City of Irving now in existence or which may hereafter be created an ad valorem tax on all real, personal or mixed property within the territorial limits of said city and upon all franchises granted by the city to any individual or corporation not exceeding a total of one dollar and fifty cents ($1.50) on the one hundred dollars ($100.00) assessed valuation of said property. If for any cause the city council shall fail, neglect or refuse to pass a tax ordinance for any one year levying taxes for that year, then and in that event the tax levying ordinance last passed shall and will be considered in force and effect as the tax levying ordinance for the year for which the city council failed, neglected or refused to pass such ordinance, and the failure so to pass such ordinance for any year shall in no wise invalidate the tax collections for that year.

(c) The city councilperson or any other officer of the city shall never extend the time for the payment of taxes or remit, discount or compromise any tax legally due the city, nor waive the penalty that may be due thereon by any person, but the city council may by ordinance provide for the remission, discount, compromise or waiver of penalty to all persons legally owing any taxes where such remission, discount, compromise or waiver of penalty is for any particular and specified year or years and applies equally to all persons, firms, or corporations owing taxes to the city for such year or years; provided, however, that this provision shall not prevent the compromise of any tax suit.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 3. Supplemental assessment.

If the tax assessor and collector shall discover any real or personal property which was subject to taxation for any previous year, and which from any cause has escaped taxation for the year, he/she shall assess the same in a supplement to his/her next assessment roll at the same rate under which such property should have been assessed for such year, stating the year, and the taxes thereon shall be collected the same as other assessments; provided, that such supplement roll may be made at any time and reported to the city council for its approval, and any number of such rolls may be made that may be necessary. The taxes assessed in such supplement rolls for years previous to the approval of such rolls shall be due at once upon the approval of such rolls

COI 00115

by the city council and such taxes may bear interest at the rate specified by statute from the date on which the same would have been delinquent if levied and assessed, and if the same shall not be paid within thirty (30) days after the date of such approval, the tax assessor and collector shall proceed to collect the same as provided by this Charter and applicable state law. Provided, that a misnomer of or failure to name the owner in the assessment rolls shall not affect the validity of the assessment of any taxes; and provided, further, that when such taxes have not been attempted to be assessed for such previous year, such taxes shall bear interest only from date of the approval of the supplemental rolls. The tax assessor and collector may in any year reassess property which, because of irregularity in the assessment of any previous year, may have been improperly assessed; such reassessment shall be at the value at which it should have been assessed in any such year, and property owners of such property shall take notice of such reassessment, if made prior to the first of April of any year, but if made after such date, notice shall be given by the tax assessor and collector of the raising of an assessment. Any property owner whose property has been reassessed may appeal to the board of equalization as in case of an original assessment.
(Ord. No. 5567, § 3, 1-23-89; Ord. No. 2013-9464, Amd. 6, 5-22-13)

### Sec. 4. Franchises; taxation of.

All rights, privileges and franchises, heretofore or hereafter granted to and held by any person, firm or corporation, in the streets, alleys, highways or public grounds or places in the city shall be subject to taxation by the city separately from and in addition to the other assets of such person, firm or corporation and the city council may require the rendition and assessment thereof accordingly.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 5. Irregularity shall not invalidate.

No irregularity in the time or manner of making or returning the city assessment rolls or the approval of such rolls shall invalidate any assessment.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 6. Rendition.

All property, real and personal, shall be rendered for taxation by the owner thereof or his agent, as provided by the laws of the state.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 7. Tax lien; liability for taxes.

A lien is hereby created on all property, personal and real, in favor of the City of Irving, for all taxes, ad valorem, occupation or otherwise. Said lien shall exist from January 1 in each year until the taxes are paid. Such lien shall be prior to all other claims, and no gift, sale, assignment or transfer of any kind, or judicial writ of any kind, can ever defeat such lien, but the tax assessor and collector may pursue such property, and whenever found may seize and sell enough thereof to satisfy such taxes.

In the event that personal property of the taxpayer is delivered into the actual or constructive possession of a receiver, trustee, or other person because of insolvency, bankruptcy, receivership or otherwise, between January 1 and the date that the taxes are actually levied, then and in that event the amount of the taxes due shall be the same as was levied for the prior year for the same property and shall be secured by a lien in that amount.

All persons or corporations owning or holding personal property or real estate in the city on the first day of January of each year shall be liable for all municipal taxes levied thereon for such year.

The personal property of all persons owing any taxes to the city is hereby made liable for all of said taxes, whether the same be due upon personal or real property, or upon both.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 8. Seizure to prevent removal.

If anyone against whom a personal tax is assessed, and which is due and unpaid, whether the same be delinquent or not, shall have removed out of the city, or shall be about to remove out of the city, or shall have removed or about to remove his personal property out of the city, it shall be the duty of the tax assessor and collector to proceed at once and col-

COI 00116

lect such taxes by seizure and sale of any personal property of such person to be found in the city, or anywhere in the State of Texas.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 9. Place of payment; demand unnecessary.

All taxes shall be payable at the office of the tax assessor and collector, Irving, Dallas County, Texas. No demand for such taxes shall be necessary but it is made the duty of the taxpayer to make payment of such taxes in cash within the time specified.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 10. Tax title to personal property.

A sale of personal property for delinquent taxes shall convey with it an absolute title, and the owner shall have no right to redeem the same.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 11. City may purchase.

The city shall have the right to become a purchaser of property at tax sales, and the city manager or the person designated by the city manager, may attend such sales and bid on behalf of the city.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 12. Redemption by owner; vesting title.

The owner of real estate sold for the payment of taxes, or his/her heirs or assigns or legal representative, may redeem the same within the time period provided by state law. If the real property is not redeemed within the time as herein provided, then the title shall become absolute in the purchaser.
(Ord. No. 5567, § 3, 1-23-89; Ord. No. 8575, Amd. 8, 11-8-05)

### Sec. 13. Amendment of property description.

In any suit by the city for the collection of any delinquent tax where it shall appear that the description of any property in the city assessment rolls shall be insufficient to identify such property, the city shall have the right to set up in its pleading a good description of the property intended to be assessed and to prove the same, and to have its judgment foreclosing its tax lien upon the same, and personal judgment against the owner, for such taxes, the same as if the property were fully described upon the assessment rolls.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 14. Prima facie evidence of tax levy and assessment.

The provisions herein for the collection of taxes shall not be construed to prevent the city from filing suit in any court of competent jurisdiction for the collection of any taxes due on real estate, as well as personal property, and for the enforcement of levies for such taxes, and the assessment rolls shall be prima facie evidence of the facts stated in said rolls and that all taxes assessed on such rolls have been regularly levied and assessed in accordance with the provisions of this Charter and the state law; and no irregularity in the manner of levying or assessing taxes shall invalidate the same unless it appears from affirmative proof that such irregularity operated injuriously to the taxpayer attempting to avoid the payment of such tax.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 15. State law on assessment applicable.

Unless otherwise provided by this Charter amendment and by ordinances passed thereunder, all property in such city liable to taxation shall be assessed and collected in accordance with the provisions of general laws of the state, insofar as applicable.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 16. Assessment of property; joint, common and conflicting interest in real estate; separate assessment of.

The tax assessor and collector shall not be required to make separate assessments of individual, joint, common or conflicting interest in any real estate, but the owner of such interest may furnish to the tax assessor and collector at any time before the 1st day of May of each year, and not thereafter, a written description of any parcel of land in which he has an interest less than the whole, showing the amount of his interest therein and the tax assessor and collector may thereupon assess such interest as a separate parcel and the remaining interest as a different parcel and proceed to fix the value of each.
(Ord. No. 5567, § 3, 1-23-89)

COI 00117

## Sec. 17. Collection of taxes on undivided interest.

The tax assessor and collector may receive the taxes on parts of any lots or parcels of real property or on an undivided interest therein, but no such taxes shall be received until the person tendering the same shall have furnished the tax assessor and collector a particular description of the particular part or interest on which payment is tendered, and the tax assessor and collector shall enter such specification in the name of the person paying and at the proper place in the assessment books, so that the part or interest on which payment has been made and the part or interest on which taxes remain unpaid may clearly appear.
(Ord. No. 5567, § 3, 1-23-89)

## Sec. 18. General state laws adopted.

In addition to the powers herein conferred with reference to the assessment and collection of taxes, the City of Irving shall have and may exercise all powers and authority now conferred or that may hereinafter be conferred upon cities by the laws of the State of Texas.
(Ord. No. 5567, § 3, 1-23-89)

## Sec. 19. Occupation tax.

The city council shall have the power to levy and collect taxes upon trades, professions, callings or other businesses carried on to the full extent permitted by the general laws of the State of Texas, to prescribe penalties for non-payment thereof, and to regulate the operation of any business, trade or calling or profession.
(Ord. No. 5567, § 3, 1-23-89)

## Sec. 20. Contract for collection of delinquent taxes.

The city council shall have the power to contract with any attorney-at-law for the collection of delinquent taxes owing the city.
(Ord. No. 5567, § 3, 1-23-89)

## ARTICLE VI. RECALL

### Sec. 1. Procedure generally.

(a) The mayor or any other member of the city council may be removed from office in the following manner:

Any qualified voter of the city may make and file with the city secretary an affidavit containing the name of the mayor or at-large member of the city council whose removal is sought. Any qualified voter of the single member district in which that qualified voter resides may make and file with the city secretary an affidavit containing the name of the voter's respective single member district council member whose removal is sought. The city secretary shall thereupon deliver to the voter making such affidavit copies of petition blanks for demanding such removal, printed forms of which the city secretary shall keep on hand. Such blanks shall be issued by the city secretary with the city secretary's signature thereto attached, and they shall be dated and addressed to the city council, indicate the person to whom issued, and state the name of the member whose removal is sought. A copy of the petition shall be recorded in a record book for that purpose to be kept in the office of the city secretary. A recall petition to be effective must be returned and filed with the city secretary within forty-five (45) days after the filing of the affidavit about a council member in a single member district or within sixty (60) days after the filing of the affidavit about a council member in an at-large district, and must bear the signatures of qualified voters of the district equal in number to at least 10 percent (10%) of those who were qualified voters for the person sought to be removed on the date of the last regular municipal election.

(b) Signatures to a recall petition need not all be appended to one paper, but to each such petition paper there shall be attached an affidavit of the circulator thereof, stating that each signature thereto was made in the petitioner's presence and is the genuine signature of the person whose name it purports to be. Each signer of a recall petition shall sign the signer's name in ink or indelible pencil and shall place after the signer's name the date when the signer's signature was made and the signer's residence by street and number, or other description to

COI 00118

identify the place. Recall petition papers provided by the city secretary shall be in a form which complies with the Texas Election Code.

(c) All papers and affidavits comprising a recall petition shall be assembled and filed with the city secretary as one instrument. Within thirty (30) days of the date of filing a recall petition the city secretary shall determine the sufficiency thereof and attach thereto a certificate showing the result of the city secretary's examination. If the city secretary shall certify that the petition is insufficient, the city secretary shall set forth in the certificate the particulars in which it is defective and shall at once notify the affiant of the findings.

(d) Upon finding of the insufficiency of a recall petition, the affiant shall not have the ability to file further affidavits for a recall election for the same purpose through the duration of the mayor or council member's term in office.

(e) If a recall petition, or amended petition shall be certified by the city secretary to be sufficient the city secretary shall at once submit it to the city council with the city secretary's certificate to that effect and shall notify the member whose removal is sought of such action. If the member whose removal is sought does not resign within five days of such notice the city council shall thereupon order and fix the date for holding a recall election. Any such election shall not be held less than sixty days after the petition has been submitted to the city council, and it may be held at the same time as any other general or special election within such period; but, if no election is held within such period, the city council shall call a special recall election to be held on the next uniform election date.

(f) The question of recalling any number of members of said city council may be submitted at the same election, but as to each member whose removal is sought a separate petition shall be filed and there shall be an entirely separate ballot. Candidates to succeed any members of the city council whose removal is sought shall be placed in nomination by petition signed, filed and verified as provided for nominating petitions for a regular municipal election; except that each petition paper shall specify that the candidate named therein is a candidate to succeed the particular member whose removal is sought.

(g) The ballots used in a recall election shall submit the two following propositions in the order indicated:

"For the recall of (name of mayor or council member);"

"Against the recall of (name of mayor or council member);"

The voter shall mark the box for or against the council member being named for recall. Under the propositions shall appear the word "candidates" and the direction. "Vote for one," and beneath this the names of the candidates nominated as hereinabove provided. The council member whose recall is sought shall not have the council member's name printed on the ballot as a candidate. Except that the space left for the names and dates shall be filled by the correct names and date, the ballots used in a recall election shall be in form substantially as follows:

RECALL ELECTION
City of Irving

_____(Month and day of Month)_____ 2____

_____
_____
_____

For the recall of _____
Against the recall of_____

CANDIDATES
Vote for one

_____
_____

Except as provided for in this section, ballots used in recall elections shall comply with the provisions of this Charter regarding ballots for a regular municipal election.

(h) If a majority of the votes cast on the question of recalling the mayor or a city council member be against recall, the council member shall continue in office for the remainder of the council member's unexpired term, and is not subject to recall for the remainder of the term in which the petition was filed. If a majority of such votes be for the recall of the council member on the ballot, the council member shall, regardless of any defect in the recall petition, be deemed removed from office. When the mayor or

COI 00119

a council member is removed from office by recall, the candidate to succeed such officer who receives the highest vote shall be declared elected to fill the unexpired term.

(i) If a mayor or council member in regard to whom sufficient recall petition is submitted to the city council shall resign within five days thereof, the place thus made vacant on the city council shall be filled by a special election.

(j) No recall shall be filed against the mayor or council member within six (6) months after taking office of the most recent term. No recall petition may be filed within 270 days of the end of the term of a mayor or council member.
(Ord. No. 889; Ord. No. 7196, Amd. 6, 1-22-98; Ord. No. 8575, Amd. 9, 11-8-05; Ord. No. 2013-9464, Amds. 2, 6, 18, 5-22-13)

## ARTICLE VII. BONDS, WARRANTS AND OTHER EVIDENCE OF INDEBTEDNESS

### Sec. 1. Authority to issue.

In keeping with the Constitution of Texas, and not contrary thereto, the City of Irving shall have the right to issue all tax bonds, revenue bonds, funding and refunding bonds, time warrants and other evidence of indebtedness as now authorized or as may hereafter be authorized by the laws of the State of Texas.
(Ord. No. 5567, § 3, 1-23-89)

### Sec. 2. Manner of issuance.

Bonds and warrants of the City of Irving, shall be issued in the manner provided by the laws of Texas.
(Ord. No. 5567, § 3, 1-23-89)

## ARTICLE VIII. CITY MANAGER

### Sec. 1. Appointment.

The governing body of the City of Irving shall appoint a city manager who shall be the administrative head of the municipal government and shall be responsible for the efficient administration of all departments. The city manager shall become a qualified voter of the city following the city manager's appointment and reside within the city limits.
(Ord. No. 889; Ord. No. 2013-9464, Amd. 19, 5-22-13)

### Sec. 2. Compensation.

The city manager, if one is appointed, shall receive a salary as set by the city council. The performance of the city manager shall be evaluated on an annual basis, or more often, as determined necessary by the city council.
(Ord. No. 889; Ord. No. 2013-9464, Amd. 20, 5-22-13)

### Sec. 3. Powers and duties.

The city manager shall also be the chief executive and shall see that the laws and ordinances of the city are enforced. The city manager shall appoint all appointive officers, or employees of the city (such appointments to be made upon merit and fitness alone), and may at will remove any officers or employees appointed by the city manager, except that the city judge, city attorney, and city secretary shall be appointed and removed from office by the city council, and employees reporting directly to boards of directors or via alternate operating structures as defined by ordinance. The city judge, city attorney, city secretary, and employees reporting directly to boards of directors or via alternate operating structures defined by ordinance shall solely hire, discharge and supervise their staff. The city manager shall exercise control and supervision over all other departments and offices that may be created by the council, and all officers and employees appointed by the city manager. The city manager shall attend all meetings of the council with the right to take part in the discussion, but having no vote. The city manager shall recommend in writing to the council such measures as the city manager may deem necessary or expedient. The city manager shall keep the council fully advised as to the financial condition and needs of the city, and perform such other duties as may be prescribed by this Charter or which may be required of the city manager by ordinance or resolution of the council.
(Ord. No. 889; Ord. No. 7196, Amd. 1, 1-22-98; Ord. No. 2010-9190, Amd. 2, 5-17-10; Ord. No. 2013-9464, Amds. 2, 21, 5-22-13)

COI 00120

## Sec. 4. Nepotism.

No person related within the second degree by affinity or within the third degree by consanguinity, to the city manager, shall be appointed to any official position, clerkship or service of the city whose salary is directly or indirectly paid from public funds or fees of office by the city; and this section does not apply if the individual has been employed in the position immediately before the appointment of the city manager.

(Ord. No. 7196, Amd. 12, 1-22-98)

## Sec. 5. Reserved.

**Editor's note**—Ord. No. 7196, Amd. 13, adopted Jan. 22, 1998, repealed § 5 in its entirety. Former § 5 pertained to official bond and derived from Ord. No. 889. This correction to the Charter was made with Supplement 23, August 2003.

(Ord. No. 889; Ord. No. 7196, Amd. 13, 1-22-98)

## Sec. 6. Reserved.

**Editor's note**—Ord. No. 2013-9464, Amd. 16, adopted May 22, 2013, renumbered Art. VIII, § 6 as Art. IX, § 10(a). The former § 6 pertained to the Irving Convention and Visitors Bureau. The historical notation has been retained with the amended provisions for reference purposes.

## Sec. 7. Reserved.

**Editor's note**—Ord. No. 2013-9464, Amd. 16, adopted May 22, 2013, renumbered Art. VIII, § 7 as Art. IX, § 10(b). The former § 7 pertained to the Irving Arts Center. The historical notation has been retained with the amended provisions for reference purposes.

## Sec. 8. Reserved.

**Editor's note**—Ord. No. 2013-9464, Amd. 16, adopted May 22, 2013, renumbered Art. VIII, § 8 as part of Art. IX, § 11. The former § 8 pertained to the Irving Housing and Human Services Department and derived from Ord. No. 8575, Amd. 3, adopted Nov. 8, 2005.

## Sec. 9. Reserved.

**Editor's note**—Ord. No. 2013-9464, Amd. 16, adopted May 22, 2013, renumbered Art. VIII, § 9 as part of Art. IX, § 11. The former § 9 pertained to the Irving Preservation Department and derived from Ord. No. 8575, Amd. 4, adopted Nov. 8, 2005.

## ARTICLE IX. GENERAL PROVISIONS

## Sec. 1. "Qualified voter" defined.

A "qualified voter," in a city election is a person who meets the requirements of the Texas Election Code to be a qualified voter.

(Ord. No. 4754, § 7, 8-15-85)

## Sec. 2. Qualification of jurors.

In any action or proceeding in which the City of Irving may be party at interest no person shall be an incompetent judge, justice, witness or juror by reason of his being an inhabitant, freeholder or taxpayer of the City of Irving.

## Sec. 3. Withholding of political contributions.

The city shall not withhold money from the pay of its employees for purposes of conveying those funds to political action committees.

(Ord. No. 2013-9464, Amd. 23, 5-22-13)

## Sec. 4. Construction of terms generally.

The use of the singular number includes the plural, and the plural the singular, and words used in the masculine gender include the feminine also, unless by reasonable construction, it appears that such was not the intention of the language.

## Sec. 5. Charter deemed public act.

This Charter must be deemed a public act and judicial notice shall be taken thereof in all courts.

## Sec. 6. Procedure for amending Charter.

This Charter may be amended at any time in accordance with the provisions applicable thereto contained in Chapter 9 Texas Local Government Code or any amendments thereto or any amendments that may be made hereafter thereto.

(Ord. No. 7196, Amd. 7, 1-22-98)

COI 00121

## Sec. 7. Severability of portions of Charter.

If any provision of this Charter violates any statutes or the Constitution of the State of Texas, or if any court holds such provisions for naught for any reason, the remaining provisions shall not be affected thereby and shall continue in effect.

## Sec. 8. Employee retirement plan limitations.

For employees participating in the Irving Firemen's Relief and Retirement Fund or the Texas Municipal Retirement System, the total annual amount of the City of Irving contribution for retirement benefits for such employees shall not exceed 16.75% of the total annual salaries of such employees. This section shall not limit any federal or state mandated contributions to any retirement benefit provision over which the city has no discretion to provide the required benefit.

Retirement benefits shall include a contribution to or for the Firemen's Relief and Retirement Fund and the Texas Municipal Retirement System, City of Irving Supplemental Benefit Plan, disability benefits, and medical insurance for retired employees.
(Ord. No. 4754, § 8, 8-15-85; Ord. No. 7196, Amd. 15, 1-22-98; Ord. No. 8575, Amd. 5, 11-8-05; Ord. No. 2013-9464, Amd. 25, 5-22-13)

## Sec. 9. Charter commentary.

Although this Charter may only be amended by a vote of the qualified voters of the city, portions of the Charter may become inoperative or inapplicable due to the passage of law at the state or federal level or due to court order. In such event, the city attorney may draft a commentary specifying the affected provisions of the Charter and the laws or orders which cause the Charter provisions to come into question. If approved by the city council, such commentary shall be published on the city's website or in a similar manner to give the citizen notice of the affected provisions.
(Ord. No. 2013-9464, Amd. 24, 5-22-13)

## Sec. 10. Independent boards.

(a) *Irving Convention and Visitors Bureau.* The city council may by ordinance provide that the management and operation of the Irving Convention and Visitors Bureau shall be conducted independently of the office of city manager and the general management of the city. Such ordinance may provide that the board of directors of the Irving Convention and Visitors Bureau shall have the exclusive right to appoint, remove and supervise the executive director of the bureau and may give the executive director the exclusive authority to hire, discharge and supervise the employees of the Irving Convention and Visitors Bureau.

The board of directors of the Irving Convention and Visitors Bureau shall recommend to the city council the bureau's annual budget and the manner and use of the expenditures and allocation of bureau revenues and funds. Final approval of the Irving Convention and Visitors Bureau budget and the expenditure of bureau funds, as well as the classification and salary structure of bureau employees, shall be recommended by the Irving Convention and Visitors Bureau board and shall be the sole responsibility and prerogative of the city council.

By approval of the bureau's annual budget, its expenditures and allocation of bureau revenues and funds, administrative services required by other city departments in support of the approved budget are authorized.

(b) *Irving Arts Center.* The city council may by ordinance provide that the management and operation of the Irving Arts Center shall be conducted independently of the office of city manager and the general management of the city. Such ordinance may provide that the Irving Arts Center board shall have the exclusive right to appoint, remove and supervise the executive director of the Irving Arts Center and may give the executive director the exclusive authority to hire, discharge and supervise the employees of the Irving Arts Center.

The Irving Arts Board shall recommend to the city council the Irving Arts Center's annual budget and the manner and use of the expenditures and allocation of arts center revenues and funds. Final approval of the Irving Arts Center budget and the expenditure of arts center funds, as well as the classification and salary structure of arts center employees, shall be recommended by the Irving Arts Center board and shall be the sole responsibility and prerogative of the city council.

COI 00122

By approval of the Irving Arts Center's annual budget, its expenditures and allocation of art center revenues and funds, administrative services required by other city departments in support of the approved budget are authorized.
(Ord. No. 8575, Amds. 1, 2, 11-8-05; Ord. No. 2013-9464, Amd. 16, 5-22-13)

### Sec. 11. Irving special purpose agencies.

To the extent the city council authorizes the creation or continued maintenance of special purpose agencies which have a majority of funding from sources other than the General Fund of the city, the city council may provide by ordinance for alternative methods of appointment, removal and supervision of the executive director and other employees of such agency, in which case the city manager's power to hire, supervise or remove such persons will be limited to the extent specified in such ordinance.
(Ord. No. 2013-9464, Amd. 16, 5-22-13)

## ARTICLE X. ADOPTION OF CHARTER

### Sec. 1. Procedure.

a. This Charter shall be submitted to the qualified voters of the City of Irving for adoption or rejection on October 25, 1952, at which election, if a majority of the qualified voters voting in such election shall vote in favor of the adoption of this Charter, it shall then immediately become the governing law of the City of Irving until amended or repealed.

b. It being impractical to submit this Charter by sections, it is hereby prescribed that the form of ballot to be used in such election shall be as follows, to wit:

FOR THE ADOPTION OF THE CHARTER

AGAINST THE ADOPTION OF THE CHARTER

c. The present city council of the City of Irving shall call an election in accordance with the provisions of the general laws of the state governing such elections, and the same shall be conducted and the returns made and results declared as provided by the laws of the State of Texas governing municipal elections, and in case a majority of the votes cast at such election shall be in favor of the adoption of such

Charter, then an official order shall be entered upon the records of said city by the city council of Irving declaring the same adopted, and the city secretary shall record at length upon the records of the city, in a separate book to be kept in his office for such purpose, such Charter as adopted, and such secretary shall furnish to the mayor a copy of the Charter which copy of the Charter shall be forwarded by the mayor as soon as practicable, to the secretary of state under the seal of the city together with a certificate showing the approval of the qualified voters of such Charter.
(Ord. No. 889)

## ARTICLE XI. INITIATIVE AND REFERENDUM

### Sec. 1. General authority.

(a) *Initiative.* The registered voters of the city shall have power to propose lawful ordinances to the council, and if the council fails to adopt an ordinance so proposed without any change in substance, to adopt or reject it at a city election provided that such power shall not extend to the budget or capital program or any ordinance relating to zoning, appropriation of money, levy of taxes or salaries of city officers or employees.

(b) *Referendum.* The registered voters of the city shall have the power to require reconsideration by the council of any adopted ordinance and, if the council fails to repeal an ordinance so reconsidered, to approve or reject it at a city election, but such power shall not extend to the budget or capital program, zoning, or any emergency ordinance relating to appropriation of money, levy of taxes or salaries of city officers or employees.
(Ord. No. 2013-9464, Amd. 22, 5-22-13)

### Sec. 2. Commence of proceeding; petitioners' committee; affidavit.

(a) Any five (5) registered voters may commence initiative or referendum proceedings by filing with the city secretary an affidavit stating they will constitute the petitioners' committee and be responsible for circulating the petition and filing it in proper form, stating their names and addresses and specifying the address to which all notices to the committee are

COI 00123

to be sent, and setting out in full the proposed initiative ordinance or citing the ordinance sought to be reconsidered.

(b) Within two (2) working days after the affidavit of the petitioners' committee is filed, the city secretary shall issue the appropriate petition blanks to the petitioners' committee.
(Ord. No. 2013-9464, Amd. 22, 5-22-13)

### Sec. 3. Petitions.

(a) Initiative and referendum petitions must be signed by registered voters of the city equal in number to ten percent (10%) of the total number of registered voters registered to vote at the last regular election.

(b) An initiative petition that is filed with the city secretary shall include a financial impact statement of the estimated financial consequences of the proposed initiative.

(c) All papers of a petition shall be uniform in size and style and shall be assembled as one instrument for filing. Each signature shall be executed in ink and shall be followed by the address of the person signing. Petitions shall contain or have attached thereto throughout their circulation the full text of the ordinance proposed or sought to be reconsidered.

(d) Each paper of a petition shall have attached to it when filed an affidavit executed by the person circulating it stating that he or she personally circulated the paper, the number of signatures thereon, that all the signatures were affixed in his or her presence, that he or she believes them to be the genuine signatures of the persons whose names they purport to be and that each signer had an opportunity before signing to read the full text of the ordinance proposed or sought to be reconsidered.

(e) Referendum affidavits must be filed within thirty (30) days after adoption by the council of the ordinance sought to be reconsidered, and referendum petitions must be filed within thirty (30) days after issuance of the appropriate petition blanks to the petitioners' committee.

(f) Initiative petitions must be filed within thirty (30) days after issuance of the appropriate petition blanks to the petitioners' committee.
(Ord. No. 2013-9464, Amd. 22, 5-22-13)

### Sec. 4. Procedure after filing.

(a) Within ten (10) working days after the petition is filed with the city secretary, the city secretary shall complete a certificate as to the sufficiency of the petition. The city secretary shall determine the sufficiency of the petition in accordance with state law. If the petition is found to be insufficient, the city secretary shall specify in writing the particulars wherein it is defective and shall send a copy of the certificate to the petitioners' committee by registered mail. A petition certified insufficient for lack of the required number of valid signatures may be amended once if the petitioners' committee files a notice of intention to amend it with the city secretary within two (2) working days after receiving the copy of the city secretary's certificate and files a supplementary petition upon additional papers within ten (10) days after receiving the copy of such certificate. Such supplementary petition shall comply with the requirements of subsections (a) and (b) of section 3 and within five (5) working days after it is filed the city secretary shall complete a certificate as to the sufficiency of the petition as amended and send a copy of such certificate to the petitioners' committee by registered mail as in the case of an original petition. If a petition or amended petition is certified sufficient and the petitioners' committee does not elect to amend or request council review under subsection (b) of this section within the time required, the city secretary shall present the city secretary's certificate to the council at the next regularly scheduled council meeting on which the item may appear on the agenda, and the certificate shall then be a final determination as to the sufficiency of the petition.

(b) A final determination as to the sufficiency of a petition shall be subject to court review. A final determination of insufficiency even if sustained upon court review shall not prejudice the filing of a new petition for the same purpose.
(Ord. No. 2013-9464, Amd. 22, 5-22-13)

### Sec. 5. Referendum petitions; suspension of effect of ordinance.

When a referendum petition is filed with the city secretary, the ordinance sought to be reconsidered shall be suspended from taking effect. Such suspension shall terminate when:

(a) There is a final determination of insufficiency of the petition;

COI 00124

(b)    The petitioners' committee withdraws the petition;

(c)    The council repeals the ordinance; or

(d)    Thirty (30) days have elapsed after a vote of the city on the ordinance.

(Ord. No. 2013-9464, Amd. 22, 5-22-13)

### Sec. 6.  Action on petitions.

(a)  When an initiative or referendum petition has been finally determined sufficient, the council shall promptly consider the proposed initiative or referendum ordinance in the manner provided herein or reconsider the referred ordinance by voting its repeal. If the council fails to adopt a proposed initiative ordinance without any change in substance within sixty (60) days or fails to repeal the referred ordinance within thirty (30) days after the date the petition was finally determined sufficient it shall submit the proposed or referred ordinance to the voters of the city. The election must be held on the next available general election date as established by state law, which election is called for any purpose than initiative or referendum.

(b)  Copies of the proposed or referred ordinance shall be made available at the polls.

(c)  An initiative or referendum petition may be withdrawn at any time prior to the date the election is called by filing with the city secretary a request for withdrawal signed by at least four (4) members of the petitioners' committee. Upon the filing of such request, the petition shall have no further force or effect and all proceedings thereon shall be terminated.

(Ord. No. 2013-9464, Amd. 22, 5-22-13)

### Sec. 7.  Results of election.

(a)  If a majority of the registered voters, voting on a proposed initiative ordinance, vote in its favor, the ordinance shall be considered adopted upon certification of the election results and shall be treated in all respects in the same manner as ordinances of the same kind adopted by the council. If conflicting ordinances are approved at the same election, the one receiving the greatest number of affirmative votes shall prevail to the extent of such conflict.

(b)  Referendum. If a majority of the registered voters, voting on a referred ordinance, vote against it, the ordinance shall be considered repealed upon certification of the election results.

(Ord. No. 2013-9464, Amd. 22, 5-22-13)

### Sec. 8.  Initiative and referendum—Failure of city council to act.

In case all of the requirements of this Charter shall have been met and the council shall fail or refuse to receive the petition or discharge any other duties imposed upon the council by the provision of this Charter with reference to initiative and referendum, then a district judge of Dallas County, Texas, shall discharge any of such duties herein provided to be discharged by the person performing the duties of the city secretary or by the council.

(Ord. No. 2013-9464, Amd. 22, 5-22-13)

COI 00125

# CHARTER COMPARATIVE TABLE

| Ordinance Number | Date | Section | | Disposition Art./Sec. | |
|---|---|---|---|---|---|
| 2721 | 12-19-84 | 1 | | IV | 3(c) |
| 4754 | 8-15-85 | 1 | | III | 26(b)—(d) |
| | | 2 | | III | 28 |
| | | 3 | | IV | 2—4, 5(b), 8, 8-A, 8-B, 9, 10 |
| | | 5 | | IV | 16 |
| | | 6 | | IV | 26 |
| | | 7 | | IX | 1 |
| | | 8 | | IX | 8 |
| 5567 | 1-23-89 | 3 | | II | 1—3 |
| | | | | III | 5, 8, 10, 13, 15, 16, 20, 22, 27, 29—31 |
| | | | | IV | 2(b), 3(b), 14, 18 |
| | | | | V | 1—20 |
| | | | | VII | 1, 2 |
| 7196 | 1-22-98 | Amd. 1 | | IV | 12 |
| | | | | VIII | 3 |
| | | Amd. 2 | | IV | 2(b) |
| | | | | | 3(b), (d) |
| | | | | | 6 |
| | | | | | 8(a) |
| | | | Added | | 8(d), (e) |
| | | | | | 9(a), (b) |
| | | Amd. 4 | | IV | 8-A |
| | | Amd. 5 | | IV | 11 |
| | | Amd. 6 | | VI | 1(a) |
| | | Amd. 7 | | III | 1(a) |
| | | | | | 2 |
| | | | | IV | 16 |
| | | | | | 21 |
| | | | | | 26 |
| | | | | | 32(b) |
| | | | | IX | 6 |
| | | Amd. 9 | | III | 26(c) |
| | | | Rpld | | 26(d) |
| | | Amd. 10 | | IV | 28 |
| | | Amd. 11 | | IV | 29 |
| | | Amd. 12 | | VIII | 4 |
| | | Amd. 13 | Rpld | VIII | 5 |
| | | Amd. 14 | Rpld | IX | 3 |
| | | Amd. 15 | | IX | 8 |
| 8575 | 11- 8-05 | Amds. 1—4 | Added | VIII | 6—9 |
| | | 5 | | IX | 8 |
| | | 6 | | IV | 24 |
| | | 7 | | IV | 26 |
| | | 8 | | V | 12 |
| | | 9 | | VI | 1 |

COI 00126

| Ordinance Number | Date | Section | | Disposition Art./Sec. | |
|---|---|---|---|---|---|
| 2010-9190 | 5-17-10 | Amd. 2 | Rpld | IV | 25 |
| | | | | VIII | 3 |
| 2013-9464 | 5-22-13 | Amd. 1 | | III | 1 |
| | | Amd. 2 | | III | 4 |
| | | | | | 24 |
| | | | | | 26 |
| | | | | IV | 1 |
| | | | | | 3(a) |
| | | | | | 3(c) |
| | | | | | 5(b) |
| | | | | | 8(b) |
| | | | | | 11(d) |
| | | | | | 12 |
| | | | | | 26(a) |
| | | | | | 26(c) |
| | | | | | 32 |
| | | | | VI | 1(a) |
| | | | | | 1(c) |
| | | | | | 1(g), (h) |
| | | | | | 1(j) |
| | | | | VIII | 3 |
| | | Amd. 3 | | III | 22 |
| | | | | | 24 |
| | | | | IV | 8(a) |
| | | | | | 8(d) |
| | | | | | 24 |
| | | | | | 32 |
| | | Amd. 4 | | III | 26(d) |
| | | Amd. 5 | | IV | 2(b) |
| | | | | | 3(b), (c) |
| | | | | | 4 |
| | | Amd. 6 | | IV | 3(b) |
| | | | | | 5(b) |
| | | | | | 6 |
| | | | | | 9(a) |
| | | | | | 26(a) |
| | | | | V | 3 |
| | | | | VI | 1(e) |
| | | Amd. 7 | | IV | 8(d) |
| | | Amd. 8 | | IV | 8(e) |
| | | Amd. 9 | | IV | 9(b) |
| | | Amd. 10 | | IV | 10 |
| | | Amd. 11 | | IV | 11(a), (b) |
| | | Amd. 12 | | IV | 11-A |
| | | Amd. 13 | Added | IV | 15-A |
| | | Amd. 14 | | IV | 17 |
| | | Amd. 15 | | IV | 24 |
| | | Amd. 16 | Rnbd | VIII | 6 |
| | | | as | IX | 10(a) |
| | | | Rnbd | VIII | 7 |
| | | | as | IX | 10(b) |
| | | | Rnbd | VIII | 8, 9 |
| | | | as | IX | 11 |
| | | | | IV | 24, 25 |
| | | Amd. 17 | | IV | 25 |
| | | Amd. 18 | | VI | 1(a)—(d) |
| | | | | | 1(h) |

CHTCT:2

COI 00127

# CHARTER COMPARATIVE TABLE

| Ordinance Number | Date | Section | | Disposition Art./Sec. | |
|---|---|---|---|---|---|
| | | | | | 1(j) |
| | | Amd. 19 | | VIII | 1 |
| | | Amd. 20 | | VIII | 2 |
| | | Amd. 21 | | VIII | 3 |
| | | Amd. 22 | Added | XI | 1—8 |
| | | Amd. 23 | | IX | 3 |
| | | Amd. 24 | | IX | 9 |
| | | Amd. 25 | | IX | 8 |

COI 00128

# CHARTER INDEX

Section

## A

**ABATEMENT**
Removal of obstructions, encroachments, etc., from streets, etc. .................... III.11
Taxes and taxation
Seizure to prevent removal ............. V.8

**ACTIONS. See: SUITS, ACTIONS AND OTHER PROCEEDINGS**

**AGENCIES. See: DEPARTMENTS AND OTHER AGENCIES OF CITY**

**AGREEMENTS. See: CONTRACTS AND AGREEMENTS**

**AIRPORTS AND AIRCRAFT**
Transportation facilities
Airports ........................... III.19(b)

**APPEALS**
Municipal court ......................... IV.28

**AUDITS**
Officers and employees
Audit and examination of city books and accounts ....................... IV.31

## B

**BILLBOARDS. See: SIGNS AND BILLBOARDS**

**BOARDS, COMMISSIONS AND COMMITTEES**
Independent boards...................... IX.10
Irving Arts Center .................... IX.10(b)
Irving Convention and Visitors Bureau ... IX.10(a)
Officers and employees
Effect of board member, city employee, etc., seeking public office.......... IV.8-B

**BOATS, DOCKS AND WATERWAYS**
Transportation facilities
Docks, channels, etc. ................. III.19(c)

**BOND ISSUANCE/ISSUES**
Bonds, warrants and other evidence of indebtedness
Authority to issue.................... VII.1
Manner of issuance ................... VII.2

**BONDS, SURETY OR PERFORMANCE**
City not required to give bond ............. III.9
Officers and employees
Official bond of appointive officers or employees ........................ IV.30

**BONDS, WARRANTS AND OTHER EVIDENCE OF INDEBTEDNESS**
Authority to issue ...................... VII.1
Manner of issuance..................... VII.2

**BUDGET. See: FINANCE**

Section

**BUILDINGS AND BUILDING REGULATIONS**
Licenses, billboards, buildings; penalty for violation of ordinance; wiring and plumbing inspections, etc.; and power to fix penalties for violation of all ordinances ......... III.28

## C

**CABLE COMMUNICATIONS**
Public utilities and cable television service, regulation of ....................... III.15

**CHARTER, ADOPTION OF**
Charter deemed public act ............... IX.5
Construction of terms generally .......... IX.4
Procedure ............................ X.1
Procedure for amending Charter ......... IX.6
Severability of portions of Charter ........ IX.7

**CHARTER, GENERALLY**
Charter commentary .................... IX.9

**CITY ATTORNEY**
Provisions re .......................... IV.25

**CITY COUNCIL**
Candidacy of councilmember for office of mayor or different place on council .... IV.8-A
Compensation of mayor and councilmember IV.11
Duties of city council generally ........... IV.13
Initiative and referendum
City council to act, failure of ........... XI.8
Mayor and city councilmembers qualifications; filing of candidacy; official ballot; designation of city districts ........... IV.3
Meetings of council generally ............. IV.14
Quorum of city council; minutes of council meetings; procedure for voting on and recording of enacted ordinances...... IV.16
Rules of procedure; attendance of councilmen at meetings................... IV.15
Vacancies in office of mayor or councilmember IV.9

**CITY MANAGER**
Appointment .......................... VIII.1
Compensation.......................... VIII.2
Nepotism ............................ VIII.4
Powers and duties ..................... VIII.3

**CITY SECRETARY**
Provisions re .......................... IV.24

**CLAIMS**
Compromising and settling claims and lawsuits .............................. III.25

**COMMISSIONS AND COMMITTEES. See: BOARDS, COMMISSIONS AND COMMITTEES**

**COMPENSATION, SALARIES, ETC.**
City council
Compensation of councilmember ....... IV.11

COI 00129

| | Section | | Section |
|---|---|---|---|
| **COMPENSATION, SALARIES, ETC. (Cont'd.)** | | **CORPORATE POWERS (Cont'd.)** | |
| City manager | | Zoning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | III.27 |
| Compensation . . . . . . . . . . . . . . . . . . . . . . | VIII.2 | | |
| Mayor | | **D** | |
| Compensation of mayor. . . . . . . . . . . . . . . | IV.11 | | |
| | | **DEEDS AND TITLES** | |
| **CONFLICTS OF INTEREST** | | Taxes and taxation | |
| Taxes and taxation | | Redemption by owner; vesting title. . . . . . . | V.12 |
| Assessment of property; joint, common | | Tax title to personal property. . . . . . . . . . . | V.10 |
| and conflicting interest in real estate; | | | |
| separate assessment of . . . . . . . . . . | V.16 | **DEPARTMENTS AND OTHER AGENCIES OF** | |
| | | **THE CITY** | |
| **CONTRACTS AND AGREEMENTS** | | Irving special purpose agencies . . . . . . . . . . | IX.11 |
| Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . | III.26 | | |
| Taxes and taxation | | **DESIGNATION** | |
| Contract for collection of delinquent taxes | V.20 | City council | |
| | | City councilmembers qualifications; filing | |
| **CORPORATE NAME** | | of candidacy; official ballot; designa- | |
| Designated . . . . . . . . . . . . . . . . . . . . . . . . . | I.1 | tion of city districts . . . . . . . . . . . . . | IV.3 |
| | | Mayor | |
| **CORPORATE POWERS** | | Mayor qualifications; filing of candidacy; | |
| Authority to acquire or dispose of property . . | III.5 | official ballot; designation of city dis- | |
| City funds exempt from garnishment . . . . . . . | III.7 | tricts . . . . . . . . . . . . . . . . . . . . . . . . . . | IV.3 |
| City not required to give bond . . . . . . . . . . . . | III.9 | Municipal boundaries. . . . . . . . . . . . . . . . . . | II.1 |
| Compromising and settling claims and law- | | Officers and employees | |
| suits . . . . . . . . . . . . . . . . . . . . . . . . . . . . | III.25 | Designation of depository for city funds . . | IV.21 |
| Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . | III.26 | | |
| Establish, vacate, etc., streets, sidewalks, etc. | III.11 | **DISTRICTS** | |
| Exemption of public property from execution | III.6 | City council | |
| Fire department and prevention. . . . . . . . . . . | III.22 | City councilmembers qualifications; filing | |
| Franchises. . . . . . . . . . . . . . . . . . . . . . . . . . . | III.18 | of candidacy; official ballot; designa- | |
| Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . | III.1 | tion of city districts . . . . . . . . . . . . . | IV.3 |
| Health regulations . . . . . . . . . . . . . . . . . . . . | III.23 | Mayor | |
| Liability for negligence. . . . . . . . . . . . . . . . . . | III.8 | Mayor qualifications; filing of candidacy; | |
| Licenses, billboards, buildings; penalty for vi- | | official ballot; designation of city dis- | |
| olation of ordinance; wiring and plumb- | | tricts . . . . . . . . . . . . . . . . . . . . . . . . . . | IV.3 |
| ing inspections, etc.; and power to fix | | | |
| penalties for violation of all ordinances | III.28 | **DOCKS. See: BOATS, DOCKS AND WATER-** | |
| Operation of public services or utilities by city | III.16 | **WAYS** | |
| Ordinances | | | |
| Power to enact. . . . . . . . . . . . . . . . . . . . . . | III.2 | **DUTIES** | |
| Style . . . . . . . . . . . . . . . . . . . . . . . . . . . . | III.3 | City council | |
| Parks, playgrounds, etc. . . . . . . . . . . . . . . . . | III.20 | Duties generally. . . . . . . . . . . . . . . . . . . . . | IV.13 |
| Placement of wires, etc., underground. . . . . . | III.21 | City manager | |
| Police department . . . . . . . . . . . . . . . . . . . . . | III.24 | Powers and duties. . . . . . . . . . . . . . . . . . . . | VIII.3 |
| Power to define nuisance and fix penalties . . | III.29 | Mayor | |
| Power to fix penalties. . . . . . . . . . . . . . . . . . . | III.30 | Duties generally. . . . . . . . . . . . . . . . . . . . . | IV.12 |
| Public library . . . . . . . . . . . . . . . . . . . . . . . . . | III.31 | | |
| Public utilities and cable television service, | | **E** | |
| regulation of . . . . . . . . . . . . . . . . . . . . . | III.15 | | |
| Purchase of gas, electricity, etc. . . . . . . . . . . | III.17 | **ELECTIONS** | |
| Railroads, regulation of . . . . . . . . . . . . . . . . . | III.14 | City council | |
| Real estate; etc., owned by city . . . . . . . . . . | III.4 | Quorum of city council; minutes of council | |
| Removal of obstructions, encroachments, etc., | | meetings; procedure for voting on and | |
| from streets, etc. . . . . . . . . . . . . . . . . . | III.11 | recording of enacted ordinances . . . | IV.16 |
| Right of eminent domain. . . . . . . . . . . . . . . . . | III.10 | Date and conduct of election . . . . . . . . . . . . | IV.6 |
| Street improvements and assessments . . . . . | III.12 | Elective officers . . . . . . . . . . . . . . . . . . . . . . | IV.2 |
| Transportation facilities . . . . . . . . . . . . . . . . . | III.19 | Initiative and referendum | |
| Airports . . . . . . . . . . . . . . . . . . . . . . . . . . . | III.19(b) | Election, results of . . . . . . . . . . . . . . . . . . . | XI.7 |
| Docks, channels, etc. . . . . . . . . . . . . . . . . | III.19(c) | Judge of election; runoff election . . . . . . . . . | IV.5 |
| Generally . . . . . . . . . . . . . . . . . . . . . . . . . | III.19(a) | Provisions re . . . . . . . . . . . . . . . . . . . . . . . . | IV.4 |
| Vehicles used for hire, regulation of . . . . . . . | III.13 | "Qualified voter" defined . . . . . . . . . . . . . . . . | IX.1 |

COI 00130

# CHARTER INDEX

Section

**ELECTIONS (Cont'd.)**
Recall
Procedure generally . . . . . . . . . . . . . . . . . .   VI.1

**ELECTRICITY**
Purchase of gas, electricity, etc. . . . . . . . . . .   III.17

**EMERGENCIES**
Officers and employees
"Emergency measure" defined; enactment
of ordinances as emergency mea-
sures . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   IV.18

**EMINENT DOMAIN**
Right of. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   III.10

**EMPLOYEES. See: OFFICERS AND EMPLOY-
EES**

### F

**FACILITIES**
Transportation facilities . . . . . . . . . . . . . . . . .   III.19

**FINANCE**
City funds exempt from garnishment . . . . . . .   III.7
Officers and employees
Budget. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   IV.32
Designation of depository for city funds . .   IV.21
Political contributions, withholding of . . . . . . .   IX.3
Taxes and taxation . . . . . . . . . . . . . . . . . . . . . .   V.1 et seq.
See: TAXES AND TAXATION

**FIRE PREVENTION AND PROTECTION**
Fire department and prevention. . . . . . . . . . .   III.22

**FRANCHISES**
Provisions re . . . . . . . . . . . . . . . . . . . . . . . . . . .   III.18
Taxes and taxation
Franchises; taxation of . . . . . . . . . . . . . . . .   V.4

### G

**GAS**
Purchase of gas, electricity, etc. . . . . . . . . . .   III.17

### H

**HEALTH AND SANITATION**
Health regulations . . . . . . . . . . . . . . . . . . . . . .   III.23

**HOUSING**
Officers and employees
Effect of change of residence during term
of office. . . . . . . . . . . . . . . . . . . . . . . . . . .   IV.11-A

### I

**IMPROVEMENTS. See: PUBLIC WORKS AND
IMPROVEMENTS**

**INITIATIVE AND REFERENDUM**
Action on petitions . . . . . . . . . . . . . . . . . . . . . .   XI.6
City council to act, failure of . . . . . . . . . . . . .   XI.8

Section

**INITIATIVE AND REFERENDUM (Cont'd.)**
Commence of proceeding; petitioners' com-
mittee; affidavit . . . . . . . . . . . . . . . . . . . . .   XI.2
Election, results of . . . . . . . . . . . . . . . . . . . . . .   XI.7
General authority . . . . . . . . . . . . . . . . . . . . . . .   XI.1
Initiative . . . . . . . . . . . . . . . . . . . . . . . . . . . .   XI.1(a)
Referendum . . . . . . . . . . . . . . . . . . . . . . . .   XI.1(b)
Petitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   XI.3
Procedure after filing . . . . . . . . . . . . . . . . . . . .   XI.4
Referendum petitions; suspension of effect of
ordinance. . . . . . . . . . . . . . . . . . . . . . . . . . .   XI.5

**INSPECTIONS**
Licenses, billboards, buildings; penalty for vi-
olation of ordinance; wiring and plumb-
ing inspections, etc.; and power to fix
penalties for violation of all ordinances   III.28

### L

**LEGAL PROCEEDINGS. See: SUITS, ACTIONS
AND OTHER PROCEEDINGS**

**LEGAL PROCESSES. See: WRITS, WAR-
RANTS AND OTHER PROCESSES**

**LIABILITY**
Liability for negligence . . . . . . . . . . . . . . . . . . .   III.8
Taxes and taxation
Tax lien; liability for taxes . . . . . . . . . . . . . .   V.7

**LIBRARIES**
Public library . . . . . . . . . . . . . . . . . . . . . . . . . .   III.31

**LICENSES AND PERMITS**
Licenses, billboards, buildings; penalty for vi-
olation of ordinance; wiring and plumb-
ing inspections, etc.; and power to fix
penalties for violation of all ordinances   III.28

**LIENS**
Taxes and taxation
Tax lien; liability for taxes . . . . . . . . . . . . . .   V.7

### M

**MAPS. See: SURVEYS, MAPS AND PLATS**

**MAYOR**
Compensation of mayor . . . . . . . . . . . . . . . . .   IV.11
Duties of mayor generally . . . . . . . . . . . . . . . .   IV.12
Mayor pro tem and deputy mayor pro tem . . .   IV.10
Mayor qualifications; filing of candidacy; offi-
cial ballot; designation of city districts .   IV.3
Vacancies in office of mayor . . . . . . . . . . . . . .   IV.9

**MEETINGS**
Meetings of council generally . . . . . . . . . . . . .   IV.14
Quorum of city council; minutes of council
meetings; procedure for voting on and
recording of enacted ordinances. . . . . . .   IV.16
Rules of procedure; attendance of council-
men at meetings. . . . . . . . . . . . . . . . . . . . .   IV.15

COI 00131

**Section**

MUNICIPAL BOUNDARIES
Designated ........................... II.1
Extension and alteration ................. II.2
Platting of property ..................... II.3

MUNICIPAL COURT
Appeals .............................. IV.28
Created; jurisdiction; judge; clerk .......... IV.26
Procedure generally .................... IV.27
Qualification of jurors ................... IX.2

**N**

NEPOTISM
City manager.......................... VIII.4
Provisions re ......................... IV.29

NUISANCES
Power to define nuisance and fix penalties .. III.29

**O**

OBSTRUCTIONS
Removal of obstructions, encroachments, etc.,
from streets, etc.................... III.11

OCCUPATION TAX
Provisions re ......................... V.19

OFFICERS AND EMPLOYEES
Audit and examination of city books and ac-
counts.......................... IV.31
Budget .............................. IV.32
City council .......................... IV.3 et seq.
See: CITY COUNCIL
City manager.......................... VIII.1 et seq.
See: CITY MANAGER
City secretary ......................... IV.24
Designation of depository for city funds..... IV.21
Effect of board member, city employee, etc.,
seeking public office ................ IV.8-B
Effect of change of residence during term of
office............................ IV.11-A
Elections ............................ IV.2 et seq.
See: ELECTIONS
"Emergency measure" defined; enactment of
ordinances as emergency measures .. IV.18
Employee retirement plan limitations ....... IX.8
Governing body ....................... IV.1
Mayor ............................... IV.3 et seq.
See: MAYOR
Municipal court ....................... IV.26 et seq.
See: MUNICIPAL COURT
Nepotism ............................ IV.29
Official bond of appointive officers or employ-
ees ............................ IV.30
Ordinances, resolutions, etc. .............. IV.17 et seq.
See: ORDINANCES, RESOLUTIONS,
ETC.
Qualifying of officers ................... IV.7
Term of office ........................ IV.8

**Section**

ORDINANCES, RESOLUTIONS, ETC.
Charter, adoption of
Procedure........................ X.1
Enactment of ordinances generally ........ IV.17
Initiative and referendum
Referendum petitions; suspension of ef-
fect of ordinance ................ XI.5
Ordinance
Codification ...................... IV.22
Ordinances in effect at time of adoption of
Charter........................ IV.19
Ordinances
Power to enact...................... III.2
Taxes and taxation
General state laws adopted............. V.18

OWNERS
Taxes and taxation
Redemption by owner; vesting title....... V.12

**P**

PARKS AND RECREATION
Parks, playgrounds, etc. ................. III.20

PERFORMANCE BONDS. See: BONDS,
SURETY OR PERFORMANCE

PERMITS. See: LICENSES AND PERMITS

PERSONAL PROPERTY
Taxes and taxation
Tax title to personal property........... V.10

PLATS. See: SURVEYS, MAPS AND PLATS

PLUMBING
Licenses, billboards, buildings; penalty for vi-
olation of ordinance; wiring and plumb-
ing inspections, etc.; and power to fix
penalties for violation of all ordinances .. III.28

POLES AND WIRES
Licenses, billboards, buildings; penalty for vi-
olation of ordinance; wiring and plumb-
ing inspections, etc.; and power to fix
penalties for violation of all ordinances .. III.28
Placement of wires, etc., underground...... III.21

POLICE DEPARTMENT
Provisions re .......................... III.24

POWERS
City manager
Powers and duties..................... VIII.3

PROCEEDINGS. See: SUITS, ACTIONS AND
OTHER PROCEEDINGS

PROCESSES. See: WRITS, WARRANTS AND
OTHER PROCESSES

PROPERTY
Authority to acquire or dispose of property .. III.5

COI 00132

CHARTER INDEX

Section

PROPERTY (Cont'd.)
    Municipal boundaries
        Platting of property . . . . . . . . . . . . . . . . . . .    II.3
    Taxes and taxation . . . . . . . . . . . . . . . . . . . . .    V.1 et seq.
      See: TAXES AND TAXATION

PUBLIC PLACES. See: STREETS, SIDEWALKS
    AND OTHER PUBLIC PLACES

PUBLIC PROPERTY
    Exemption of public property from execution    III.6

PUBLIC SERVICES
    Operation of public services or utilities by city    III.16

PUBLIC WORKS AND IMPROVEMENTS
    Street improvements and assessments . . . . .    III.12

PUBLICATION
    Ordinances, resolutions, etc.
        Ordinance—Publication . . . . . . . . . . . . . . .    IV.23

PURCHASES AND PURCHASING
    Purchase of gas, electricity, etc. . . . . . . . . . .    III.17
    Taxes and taxation
        City may purchase . . . . . . . . . . . . . . . . . . .    V.11

R

RAILROADS AND TRAINS
    Railroads, regulation of . . . . . . . . . . . . . . . . . .    III.14

REAL ESTATE
    Real estate; etc., owned by city . . . . . . . . . . .    III.4
    Taxes and taxation
        Assessment of property; joint, common
          and conflicting interest in real estate;
          separate assessment of . . . . . . . . . .    V.16

RECALL
    Procedure generally . . . . . . . . . . . . . . . . . . . . .    VI.1

RECORDS AND REPORTS
    City council
        City councilmembers qualifications; filing
          of candidacy; official ballot; designa-
          tion of city districts . . . . . . . . . . . . . . .    IV.3
        Quorum of city council; minutes of council
          meetings; procedure for voting on and
          recording of enacted ordinances . . .    IV.16
    Mayor
        Mayor qualifications; filing of candidacy;
          official ballot; designation of city dis-
          tricts . . . . . . . . . . . . . . . . . . . . . . . . . . .    IV.3
    Officers and employees
        Audit and examination of city books and
          accounts . . . . . . . . . . . . . . . . . . . . . . .    IV.31

RECREATION. See: PARKS AND RECREATION

REMOVAL. See: ABATEMENT

REPORTS. See: RECORDS AND REPORTS

Section

RESIDENCES, RESIDENTIAL. See: HOUSING

RESOLUTIONS. See: ORDINANCES, RESO-
    LUTIONS, ETC.

RIGHTS
    Right of eminent domain . . . . . . . . . . . . . . . . .    III.10

S

SALARIES. See: COMPENSATION, SALARIES,
    ETC.

SANITATION. See: HEALTH AND SANITATION

SECRETARY. See: CITY SECRETARY

SIDEWALKS. See: STREETS, SIDEWALKS AND
    OTHER PUBLIC PLACES

SIGNS AND BILLBOARDS
    Licenses, billboards, buildings; penalty for vi-
      olation of ordinance; wiring and plumb-
      ing inspections, etc.; and power to fix
      penalties for violation of all ordinances    III.28

STREETS, SIDEWALKS AND OTHER PUBLIC
    PLACES
    Establish, vacate, etc., streets, sidewalks, etc.    III.11
    Removal of obstructions, encroachments, etc.,
      from streets, etc. . . . . . . . . . . . . . . . . . . .    III.11
    Street improvements and assessments . . . . .    III.12

SUITS, ACTIONS AND OTHER PROCEED-
    INGS
    Compromising and settling claims and law-
      suits . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    III.25

SURETY BONDS. See: BONDS, SURETY OR
    PERFORMANCE

SURVEYS, MAPS AND PLATS
    Municipal boundaries
        Platting of property . . . . . . . . . . . . . . . . . . .    II.3

T

TAXES AND TAXATION
    Amendment of property description . . . . . . . .    V.13
    Assessment of property; joint, common and
      conflicting interest in real estate; sepa-
      rate assessment of . . . . . . . . . . . . . . . . .    V.16
    City may purchase . . . . . . . . . . . . . . . . . . . . . .    V.11
    Collection of taxes on undivided interest . . . .    V.17
    Contract for collection of delinquent taxes . . .    V.20
    Franchises; taxation of . . . . . . . . . . . . . . . . . . .    V.4
    General state laws adopted . . . . . . . . . . . . . .    V.18
    Irregularity shall not invalidate . . . . . . . . . . . .    V.5
    Levy and collection . . . . . . . . . . . . . . . . . . . . . .    V.2
    Occupation tax . . . . . . . . . . . . . . . . . . . . . . . . .    V.19
    Place of payment; demand unnecessary. . . .    V.9
    Prima facie evidence of tax levy and assess-
      ment . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    V.14

COI 00133

## IRVING CITY CODE

| | Section |
|---|---|
| **TAXES AND TAXATION (Cont'd.)** | |
| Property | |
| Amendment of property description . . . . . | V.13 |
| Assessment of property; joint, common and conflicting interest in real estate; separate assessment of . . . . . . . . . . | V.16 |
| Property subject to taxation. . . . . . . . . . . . | V.1 |
| Property subject to taxation . . . . . . . . . . . . . | V.1 |
| Redemption by owner; vesting title . . . . . . . . | V.12 |
| Rendition . . . . . . . . . . . . . . . . . . . . . . . . . . . | V.6 |
| Seizure to prevent removal . . . . . . . . . . . . . . | V.8 |
| State law on assessment applicable. . . . . . . . | V.15 |
| Street improvements and assessments . . . . . | III.12 |
| Supplemental assessment . . . . . . . . . . . . . . . | V.3 |
| Tax lien; liability for taxes . . . . . . . . . . . . . . . | V.7 |
| Tax title to personal property . . . . . . . . . . . . . | V.10 |
| **TELEVISION** | |
| Public utilities and cable television service, regulation of . . . . . . . . . . . . . . . . . . . . . . | III.15 |
| **TITLES. See: DEEDS AND TITLES** | |
| **TRAFFIC AND VEHICLES** | |
| Transportation facilities . . . . . . . . . . . . . . . . . . | III.19 |
| **TRAINS. See: RAILROADS AND TRAINS** | |
| **TRANSPORTATION. See: TRAFFIC AND VEHICLES** | |
| **U** | |
| **UTILITIES** | |
| Operation of public services or utilities by city | III.16 |
| Public utilities and cable television service, regulation of . . . . . . . . . . . . . . . . . . . . . . | III.15 |
| **V** | |
| **VEHICLES FOR HIRE** | |
| Vehicles used for hire, regulation of . . . . . . . . | III.13 |
| **VEHICLES. See: TRAFFIC AND VEHICLES** | |
| **VOTING. See: ELECTIONS** | |
| **W** | |
| **WARRANTS. See: WRITS, WARRANTS AND OTHER PROCESSES** | |
| **WATERWAYS. See: BOATS, DOCKS AND WATERWAYS** | |
| **WIRES. See: POLES AND WIRES** | |
| **WRITS, WARRANTS AND OTHER PROCESSES** | |
| Bonds, warrants and other evidence of indebtedness | |
| Authority to issue . . . . . . . . . . . . . . . . . . . . | VII.1 |
| Manner of issuance . . . . . . . . . . . . . . . . . . | VII.2 |

| | Section |
|---|---|
| **Z** | |
| **ZONING** | |
| Provisions re . . . . . . . . . . . . . . . . . . . . . . . . . . | III.27 |

**COI 00134**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **MICHAEL WILLIAMS** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:15-CV-1701-L-BH** |
| | § | **ECF** |
| **CITY OF IRVING, TEXAS, et al.** | § | |
| **Defendants.** | § | **Referred to U.S. Magistrate Judge** |

## AFFIDAVIT OF SCOTT BROMLEY

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, a notary public in and for the State of Texas, on

this day personally appeared Thomas Scott Bromley, who is personally known to me, and who,

after being duly sworn according to law, upon oath deposed and said:

"My name is Scott Bromley; I am over eighteen years of age, of sound mind, and am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct. I am currently employed as a Police Officer for the Irving Police Department.

On January 9, 2014, Michael Williams attempted to file an on-line report alleging work place harassment by his co-workers at Caliber Home Loans. On January 21, 2014, I sought and received additional information from Williams regarding his allegations. Specifically, Williams' complaint was too voluminous for the area provided in the on-line report so I emailed Williams and asked him to email his full complaint to me. Once Williams complied with my request, I copied and pasted his entire email complaint into Incident Report No. 14-1763. This report was then forwarded to the Criminal Investigation Division for assignment to a detective.

Attached as Exhibit A is Williams' first attempt to file an on-line report. Attached as Exhibit B is my email interaction with Williams in which I seek and he provides additional information regarding his harassment complaint. Attached as Exhibit C is the final Incident Report No. 14-1763 that I complied based on the information presented by Williams.

Further affiant sayeth not."

$\mathcal{SPU} \#7_{\imath 2}$

SCOTT BROMLEY

**AFFIDAVIT OF SCOTT BROMLEY**

Page 1 of 2

THE STATE OF TEXAS        §
                          §
COUNTY OF DALLAS          §

Before me, the undersigned notary, on this day personally appeared SCOTT BROMLEY, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on August 9, 2016.

NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

REBECCA LYNN MADDUX
NOTARY PUBLIC
STATE OF TEXAS
COMM. EXP. 01-26-2017
NOTARY ID 1043705-7

**AFFIDAVIT OF SCOTT BROMLEY**                                    Page 2 of 2

# EXHIBIT

# A

COI 00137



**This incident has been reported to the
Irving Police Department
and is pending approval**

Irving Police Department
305 N. O'Conner Road
Irving, TX 75061
972-273-1010

## General Information

| | |
|---|---|
| Incident Type | Harassing Phone Call |
| Tracking Number | T14000034 |
| Report Date | 01/09/2014 04:40 PM |

## Reporting Person Information

| | |
|---|---|
| Name | Williams, Michael |
| Home Address | 7604 Acorn Lane, Frisco, TX 75034, US |
| Home Phone | 818-926-0929 |
| Mobile Phone | 818-926-0929 |
| Email | creativityandmagic@hotmail.com |
| Employer Name | Caliber Home Loans |
| Work Address | 3701 Regent Boulevard, IRVING, TX , US |
| Race | Black |
| Ethnicity | Non-Hispanic |
| Resident of Irving? | Nonresident |
| Sex | Male |
| DOB | 01/20/1963 |
| Driver License No | 34739496 |
| Licensing State | TX |

## Incident Information

| | |
|---|---|
| Incident Location | 3701 Regent Boulevard, IRVING, TX |
| Incident Time (start) | 12/17/2013 04:35 PM |
| Incident Time (end) | 12/17/2013 04:35 PM |

## Narrative

On Wednesday, 12/11/2013, Kenneth Baugh said, I'm going to catch her leaving work and shoot her in the Wal-Mart parking lot. Then send her shoes to Colombia. They need shoes in third world countries. Mike Shultz said, her and the kid.

Incident Description

On Tuesday, 12/17/2013, I was exiting the elevator on the fourth floor as Robert Murray and Kenneth Baugh were entering the same elevator. They both gave me a menacing stare, and somewhat blocking my way, and as I was passing them Robert Murray said, "should we shoot him in the head and then fire him, or should we fire him first and then shoot him in the head." Kenneth Baugh said, "shoot him in back of the head. . . the back".

Print This Report

COI 00138

# EXHIBIT

# B

COI 00139

-----Original Message-----
From: Michael Williams
Sent: Tuesday, January 21, 2014 7:41 AM
To: IPDCoplogicAdmin@cityofirving.org
Cc: sbromley@cityofirving.org
Subject: Re: REMINDER: Follow-up Required for Your Online Police Report
T14000034

Hello Mr. Bromley,

Sorry it took so long but here is the series of event I wanted you to review in connection with this case:

I started working as a "Business Intelligence Developer III" at Caliber Home Loans located at 3701 Regent Blvd in Irving, Texas on 08/05/2013.

At Caliber Home Loans, employees are blocked from accessing their personal email addresses. Websites such as Hotmail, Gmail, Yahoo or any of the email systems are not accessible from Caliber Home Loan workstations.

I have evidence that between 08/05/2013 and 08/09/2013 I emailed from my Hotmail email address to my Caliber email address several documents that allowed me respond to personal emergencies, pay household bills etc . .I worked from 8 am until 9 - 10pm at night.

1

These documents contained everything from my home address, HR and Insurance paperwork, SS#'s of family members, password lists, Banking, Credit Card and Immigration Information, Spouses work information, W2 forms, Day Care Providers, school teachers and account numbers to pay utility bills; even court documents concerning a divorce I had recently went through. Also my sons DOB, full name, and the hours and location where he attends school.

During 08/05/2013 and 08/13/2013, the very first week of my starting at Caliber, I began to hear many strange conversations and remarks swirling around me. And these remarks were coming from the Network Security Team section which was in the very next aisle to the right of the BI Team, my Team, aisle.

I heard a small group of guys mention the actual street name I grew up on, the name of the school I am in the process of enrolling into. My mother's full name, my sisters full name, my brother's and fathers full name. Then I heard the same group of guys mention my middle name (which is unique). I constantly heard references to the Country where my wife was born (Colombia). I them mention words from my password list. I kept hearing the same people making reference to the Spanish. I kept hearing references to child support and divorce; things I recently went through. Even my salary earnings from 2012. And the tone was always hostile. Then one day, I heard these same guys debating about the proper pronunciation of my wife's full maiden name (there are probably only three people in America with that first and last name combined). It was like someone was saying, "Hey, look over here." Then I started identifying who was making these remarks. It was always these three people, Robert Murray, Mike Schultz, Shawn X from the help desk; and later the Shawn guy was replaced by Kenneth Baugh; then shortly thereafter came Shannon Eernisse.

These guys used their privileges as Network Security Administrators to intercept my emails and copy documents from my computer to theirs for the purpose of being able to find out where me and my family lives.

On or about, 08/11/2013, Shawn X walked by my desk, looked at me and said, "Trayvon!", then reshaped his hand as to mimic a pistol, pointed the gun at me and made a shooting motion.

On the same day, Shawn was setting up a computer in the cubicle behind me for Manny Madrigal (a new employee). He said, laughing, "Michael, if you complain to HR, no one will listen." I said nothing. Then as he removed each piece of computer equipment from their boxes he would "slam" each piece of equipment onto the desk behind me. He removed the mouse and "banged" it violently onto the desk. He removed the keyboard and "banged" it violently onto the desk; you'd think he was breaking that keyboard in half. He removed the mouse pad and "flung" it onto the desk. Likewise with the computer monitor; kicking and stomping the empty boxes.

Week Two: Specific Incidents of Terroristic Threats On 8/13/2013. I sent an email to Manju Darbe, a co-worker, requesting the name of the Day Care provider in Irving where she takes her children. The same day Manju replied with an email from her Caliber email address to my Caliber email address with the name of the Day Care Provider, which was "Kids-R-Kids". Approximately one week later, I enrolled my six year old son in that school.

One day between 08/19/2013 and 08/22/2013, Mike Schultz, Robert Murray and Shawn, were loitering at the cubicle next to me, arms folded and looking directly at me and made the following statements.

Mike said, "his kid makes him vulnerable" Robert said, "his kids goes to school right here, right here on Regent, at 'Kids-R-Kids' (pointing in the direction of 'Kids-R-Kids' on Regent Blvd.). You know I studied explosives in the Marines, we could just pass by on lunch and toss a grenade on the playground, or setup a snipers nest to pick his kid off.

In August 2013, they acknowledged knowing where my son attended school.
Then in November 2013, they made this threat.
Week Three: On-going discussions regarding guns Robert and Kenneth boasting about being trained as snipers in the Marines.
Robert boasted about how he can hit a spine from a far away distance and make her head explode.

2

On Wednesday, 12/11/2013, Robert Murray, Kenneth Baugh and Mike Schultz were assembled at the cubicle of Tammy Walker, gossiping and staring at me as usual. Robert Murray lowered his voice and said, her name is *******, (they struggled over how to pronounce it) and she works at Wal-Mart and she goes in Sunday at 10 am. Mike Schulz said something back to him which I could not hear.

Then Kenneth Baugh said, lets catch her leaving work and shoot her in the Wal-Mart parking lot then send her shoes to Colombia. They need shoes in third world countries. Mike Shultz said, her and the kid. Kenneth Baugh said, we'd make Maurice (Maurice Pipkin: Chief Security Officer and their
manager) look real good. Robert Murray starts boasting, as usual, about he was a marksman in the United States Marine Corps. He went into how far away he could be from her and hit her spine and make her head explode. After that they went into a tirade against immigrants from other countries; or as they put it Third World countries.

Six days later, on Tuesday, 12/17/2013, I was exiting the elevator on the fourth floor as Robert Murray and Kenneth Baugh were entering the same elevator. They both gave me a menacing stare, and somewhat blocking my way, and as I was passing Robert Murray said, "should we shoot him in the head and then fire him, or should we fire him first and then shoot him in the head." Kenneth Baugh said, "shoot him in back of the head. . . the back".

Radha Thompson, Brian Schmidt and Maurice Pipkin did not start this Hate Group on this path, but once they saw them carrying out these attacks on me, they were amused by it and encouraged them to continue. They (Radha, Brian and Maurice) probably did not imagine it would go so far as the death threats, but it did.

I met with a Therapist, spoke with an attorney and met with a security specialists and among the handful of recommendations was to file a police report with the Irving Police Department.

On Saturday, 12/21/2013, after first visiting the Frisco PD, where I live, I called the Irving PD to see what is the process for filing a police report for a Terroristic Threat. I spoke with Officer Stephanie Barnes #C1661.
Officer Barnes started asking me questions to get me talking about the situation. She became personally interested in the story and began to give me legal advice. I told her that I was not calling for legal advice, I just wanted to know how to file the complaint. She said that she needed to know the details of the issue to know how to file the complaint. I told her a synopsis of the story.

Officer Barnes preempted my police report and called the Caliber security, then Caliber security notified the VP of Human Resources, Michelle Greenstreet.

The next day, Sunday, 12/22/2013, while me and my 6-year old son were in my home we heard someone pounding on the door, trying to break it down, like a drug raid in the worst part of the World was in process. My home was surrounded by what appeared to be Frisco SWAT Team members.

I waited until they left and used the landline in my home to call the Frisco Police Department (FPD). They told me that someone by the name of Michelle Greenstreet called them and said she believed that I was in the house dead or bleeding to death or the victim of a robbery. And she gave the police my home address and requested that the police go by the house to investigate.
So when the police came they were led to believe there may be a robbery or homicide in progress at my home. And they approached the house as such.
Michelle Greenstreet made up a lie to the police in order to get the police to come to my home on a Sunday afternoon; three days before Christmas 2013.
That proves that the highest level of managers at Caliber knew full well what my call to the Police was about.

At this point I had never complained to my managers nor Human Resources about the threats that were made towards me. Calibers response to the Irving PD call is evidence that Caliber Home Loans knew that death threats had been made towards me and my family. They probably had already developed a whole series of steps to take to counter my complaint or to cover-up these threats. I was due at work the next day, why not just wait until I return?

3

COI 00142

My wife is listed as an emergency contact person, why didn't they call her before calling the police? Everything I am alleging in this police report they already knew.

Are we to believe that every time an employee is unavailable on a Sunday (their off day), the President of the HR Department sends the police to their home? Why not try to call my emergency contact person that is in every employees HR file?

All of this has been a very traumatic experience for me and my family and as a result of all of this my family and I are in fear for our lives and at the
same time too traumatized to write about it. Sometimes I am afraid to
press charges and other times I am enthusiastic about it.

These are a group of ex-Military personnel with guns and who are also, Nazi-minded people. They are definitely a Hate Group.

What makes this threat imminent is that the frequency and relentlessness of the death threats towards my son, wife and family. And the fact that these people have all of my personal contact information, including social security numbers. Even if I were to sell my house and move they would be able to find me and my family. So the threat is always imminent; it never goes away. Since these people have acquired my information there have been many unexplained successful and unsuccessful logins to me and my wife's banking and utility accounts.

We never know when or where we will be shot or murdered. Our lifestyles have changed and we are always in fear for our lives and safety and confused about the law and our protection in public. I was advised to purchase a gun and carry a concealed weapon, but I do not want to have a gun in the house around my 6 year old son.

-----Original Message-----
From: TxIrvingPd@coplogic.com
Sent: Tuesday, January 21, 2014 6:28 AM
To: creativityandmagic@hotmail.com
Subject: REMINDER: Follow-up Required for Your Online Police Report
T14000034


We're sorry the following problem was found during review
of your submitted report T14000034:

You may email it to sbromley@cityofirving.org. I will review it and
determine if there is an offense.

Using the link below you will be logged back into your online report
to make the needed changes or add additional information. All of the
information you originally entered will still be there. You will
start at the initial page and be able to change the report type if
needed or make any of the above changes requested as you go through
the report process. At the end, you will be able to print a new
temporary copy of the corrected report including changes you have made.
Feel free to call us at 972-273-1010 if you have any questions.

This link will be valid for 8 days.

https://secure.coplogic.com/dors/changereport/104409600/b9e2fd0e118d161b67d9dc8c1a355015

4

COI 00143

Thank you,

Online Officer
Irving Police Department

COI 00144

# EXHIBIT

# C

COI 00145

# Incident Report
# Irving Police Department



305 N O'Connor Rd

Irving TX 75061

(972) 721-2437

**14-1763**

Reported Date
**01/23/2014**
Report Type
**TERR THR**
Officer
**BROMLEY, THOMAS**

## Administrative Information

| Agency | | | Report No | | Supplement No | Reported Date | | Reported Time | CAD Seq No |
|---|---|---|---|---|---|---|---|---|---|
| Irving Police Department | | | 14-1763 | | ORIG | 01/23/2014 | | 14:27 | 140110937 |

| Status | | Report Type | | |
|---|---|---|---|---|
| REPORT PENDING/INVESTIGATE | | TERRORISTIC THREATS | | |

| Location | | | | City | | Rep Dist | Area | Beat |
|---|---|---|---|---|---|---|---|---|
| 3701 REGENT BL | | | | Irving | | 6503 | PD2 | 65 |

| From Date | From Time | To Date | To Time | Officer |
|---|---|---|---|---|
| 08/20/2013 | 09:00 | 12/17/2013 | 09:00 | 712/BROMLEY, THOMAS |

| Assignment | | Entered by | Assignment | | RMS Transfer | Approving Officer |
|---|---|---|---|---|---|---|
| PATROL DIVISION | | 712 | PATROL DIVISION | | Successful | 366 |

| Approval Date | Approval Time |
|---|---|
| 01/23/2014 | 16:46:47 |

| # Offenses | Statute Code | Description | Complaint Type |
|---|---|---|---|
| 1 | 16020009 | TERRORISTIC THREAT F | |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| VIC | VIC | 1 | WILLIAMS, MICHAEL DURRELL | B | M | 01/20/1963 |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| VIC | 1 | I | WILLIAMS, MICHAEL DURRELL | 6052817 | B | M | 01/20/1963 |

## Summary Narrative

By the victim being placed in fear for his life due to threats from his coworkers.

# Incident Report
## Irving Police Department

**14-1763**

## COMPLAINANT/VICTIM 1: WILLIAMS,MICHAEL DURRELL

| Involvement | | Invl No | Type | | Name | | | | MNI |
|---|---|---|---|---|---|---|---|---|---|
| COMPLAINANT/VICTIM | | 1 | Individual | | WILLIAMS,MICHAEL DURRELL | | | | 6052817 |

| Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | |
|---|---|---|---|---|---|---|---|---|---|
| BLACK | MALE | 01/20/1963 | 51 | No | 5'10" | 175# | BLACK | BROWN | |

| Type | Address | | | | | City | | State | |
|---|---|---|---|---|---|---|---|---|---|
| HOME | 7604 ACORN LN | | | | | FRISCO | | TEXAS | |

| Type | | ID No | |
|---|---|---|---|
| Social Security Number | | 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 | |

| Phone Type | Phone No |
|---|---|
| Cell | (818)926-0929 |

| Employer/School | | Location |
|---|---|---|
| CALIBER HOME LOANS | | 3701 REGENT BL |

| City | | State |
|---|---|---|
| Irving | | TEXAS |

## Narrative

Initially VIC tried to report this as a harassment via online reporting but after reading his narrative it was apparent that there was more to this report than that. When I sent his online report back to him for clarification he stated that that he had tried to write a more complete narrative and it would not fit in the space provided by CopLogic. Because of this I asked VIC to email me his story.

VIC did so and I shared it with Sgt Rowan to get his opinion and to see if he wanted an investigator to contact VIC directly or a report to be taken first. Sgt Rowan asked me to take the report and send it on to CID.

I called VIC and let him know that a report was being done and that an investigator would be in contact with him sometime within the next couple of weeks.

Because VIC's story is involved and lengthy I decided instead of rewriting all his narrative from our email conversation to copy and paste his email in it's entirety:

"I started working as a "Business Intelligence Developer III" at Caliber Home Loans located at 3701 Regent Blvd in Irving, Texas on 08/05/2013.

At Caliber Home Loans, employees are blocked from accessing their personal email addresses. Websites such as Hotmail, Gmail, Yahoo or any of the email systems are not accessible from Caliber Home Loan workstations.

I have evidence that between 08/05/2013 and 08/09/2013 I emailed from my Hotmail email address to my Caliber email address several documents that allowed me respond to personal emergencies, pay household bills etc . .I worked from 8 am until 9 - 10pm at night.

These documents contained everything from my home address, HR and Insurance paperwork, SS#'s of family members, password lists, Banking, Credit Card and Immigration Information, W2 forms, Spouses work information, Day Care Providers, school teachers and account numbers to pay utility bills; even court documents concerning a divorce I had recently went through. Also my sons DOB, full name, and the hours and location where he attends school.

During 08/05/2013 and 08/13/2013, the very first week of my starting at Caliber, I began to hear many strange conversations and remarks swirling around me. And these remarks were coming from the Network Security Team section which was in the very next aisle to the right of the BI Team, my Team, aisle.

I heard a small group of guys mention the actual street name I grew up on, the name of the school I am in the process of enrolling into. My mother's full name, my sisters full name, my brother's and fathers full name. Then I heard the same group of guys mention my middle name (which is unique). I constantly heard references to the Country where my wife was born

| Report Officer | Printed At | |
|---|---|---|
| 712/BROMLEY,THOMAS | 05/14/2014 16:34 | Page 2 of 5 |

COI 00147

## Narrative

(Colombia). I them mention words from my password list. I kept hearing the same people making reference to the Spanish. I kept hearing references to child support and divorce; things I recently went through. Even my salary earnings from 2012. And the tone was always hostile. Then one day, I heard these same guys debating about the proper pronunciation of my wife's full maiden name (there are probably only three people in America with that first and last name combined). It was like someone was saying, "Hey, look over here." Then I started identifying who was making these remarks. It was always these three people, Robert Murray, Mike Schultz, Shawn X from the help desk; and later the Shawn guy was replaced by Kenneth Baugh; then shortly thereafter came Shannon Eernisse.

These guys used their privileges as Network Security Administrators to intercept my emails and copy documents from my computer to theirs for the purpose of being able to find out where me and my family lives.

On or about, 08/11/2013, Shawn X walked by my desk, looked at me and said, "Trayvon!", then reshaped his hand as to mimic a pistol, pointed the gun at me and made a shooting motion.

On the same day, Shawn was setting up a computer in the cubicle behind me for Manny Madrigal (a new employee). He said, laughing, "Michael, if you complain to HR, no one will listen." I said nothing. Then as he removed each piece of computer equipment from their boxes he would "slam" each piece of equipment onto the desk behind me. He removed the mouse and "banged" it violently onto the desk. He removed the keyboard and "banged" it violently onto the desk; you'd think he was breaking that keyboard in half. He removed the mouse pad and "flung" it onto the desk. Likewise with the computer monitor; kicking and stomping the empty boxes.
Week Two: Specific Incidents of Terroristic Threats
On 8/13/2013. I sent an email to Manju Darbe, a co-worker, requesting the name of the Day Care provider in Irving where she takes her children. The same day Manju replied with an email from her Caliber email address to my Caliber email address with the name of the Day Care Provider, which was "Kids-R-Kids". Approximately one week later, I enrolled my six year old son in that school.

One day between 08/19/2013 and 08/22/2013, Mike Schultz, Robert Murray and Shawn, were loitering at the cubicle next to me, arms folded and looking directly at me and made the following statements.

Mike said, "his kid makes him vulnerable" Robert said, "his kids goes to school right here, right here on Regent, at 'Kids-R-Kids' (pointing in the direction of 'Kids-R-Kids' on Regent Blvd.). You know I studied explosives in the Marines, we could just pass by on lunch and toss a grenade on the playground, or setup a snipers nest to pick his kid off.

In August 2013, they acknowledged knowing where my son attended school. Then in November 2013, they made this threat.
Week Three: On-going discussions regarding guns
Robert and Kenneth boasting about being trained as snipers in the Marines. Robert boasted about how he can hit a spine from a far away distance and make her head explode.

On Wednesday, 12/11/2013, Robert Murray, Kenneth Baugh and Mike Schultz were assembled at the cubicle of Tammy Walker, gossiping and staring at me as

COI 00148

## Narrative

usual. Robert Murray lowered his voice and said, her name is *******, (they struggled over how to pronounce it) and she works at Wal-Mart and she goes in Sunday at 10 am. Mike Schulz said something back to him which I could not hear.

Then Kenneth Baugh said, lets catch her leaving work and shoot her in the Wal-Mart parking lot then send her shoes to Colombia. They need shoes in third world countries. Mike Shultz said, her and the kid. Kenneth Baugh said, we'd make Maurice (Maurice Pipkin: Chief Security Officer and their manager) look real good. Robert Murray starts boasting, as usual, about he was a marksman in the United States Marine Corps. He went into how far away he could be from her and hit her spine and make her head explode. After that they went into a tirade against immigrants from other countries; or as they put it Third World countries.

Six days later, on Tuesday, 12/17/2013, I was exiting the elevator on the fourth floor as Robert Murray and Kenneth Baugh were entering the same elevator. They both gave me a menacing stare, and somewhat blocking my way, and as I was passing Robert Murray said, "should we shoot him in the head and then fire him, or should we fire him first and then shoot him in the head." Kenneth Baugh said, "shoot him in back of the head. . . the back".

Radha Thompson, Brian Schmidt and Maurice Pipkin did not start this Hate Group on this path, but once they saw them carrying out these attacks on me, they were amused by it and encouraged them to continue. They (Radha, Brian and Maurice) probably did not imagine it would go so far as the death threats, but it did.

I met with a Therapist, spoke with an attorney and met with a security specialists and among the handful of recommendations was to file a police report with the Irving Police Department.

On Saturday, 12/21/2013, after first visiting the Frisco PD, where I live, I called the Irving PD to see what is the process for filing a police report for a Terroristic Threat. I spoke with Officer Stephanie Barnes #C1661. Officer Barnes started asking me questions to get me talking about the situation. She became personally interested in the story and began to give me legal advice. I told her that I was not calling for legal advice, I just wanted to know how to file the complaint. She said that she needed to know the details of the issue to know how to file the complaint. I told her a synopsis of the story.

Officer Barnes preempted my police report and called the Caliber security, then Caliber security notified the VP of Human Resources, Michelle Greenstreet.

The next day, Sunday, 12/22/2013, while me and my 6-year old son were in my home we heard someone pounding on the door, trying to break it down, like a drug raid in the worst part of the World was in process. My home was surrounded by what appeared to be Frisco SWAT Team members.

I waited until they left and used the landline in my home to call the Frisco Police Department (FPD). They told me that someone by the name of Michelle Greenstreet called them and said she believed that I was in the house dead or bleeding to death or the victim of a robbery. And she gave the police my home address and requested that the police go by the house to investigate. So when the police came they were led to believe there may be a robbery or

## Narrative

homicide in progress at my home. And they approached the house as such. Michelle Greenstreet made up a lie to the police in order to get the police to come to my home on a Sunday afternoon; three days before Christmas 2013. That proves that the highest level of managers at Caliber knew full well what my call to the Police was about.

At this point I had never complained to my managers nor Human Resources about the threats that were made towards me. Calibers response to the Irving PD call is evidence that Caliber Home Loans knew that death threats had been made towards me and my family. They probably had already developed a whole series of steps to take to counter my complaint or to cover-up these threats. I was due at work the next day, why not just wait until I return? My wife is listed as an emergency contact person, why didn't they call her before calling the police? Everything I am alleging in this police report they already knew.

Are we to believe that every time an employee is unavailable on a Sunday (their off day), the President of the HR Department sends the police to their home? Why not try to call my emergency contact person that is in every employees HR file?

All of this has been a very traumatic experience for me and my family and as a result of all of this my family and I are in fear for our lives and at the same time too traumatized to write about it. Sometimes I am afraid to press charges and other times I am enthusiastic about it.

These are a group of ex-Military personnel with guns and who are also, Nazi-minded people. They are definitely a Hate Group.

What makes this threat imminent is that the frequency and relentlessness of the death threats towards my son, wife and family. And the fact that these people have all of my personal contact information, including social security numbers. Even if I were to sell my house and move they would be able to find me and my family. So the threat is always imminent; it never goes away. Since these people have acquired my information there have been many unexplained successful and unsuccessful logins to me and my wife's banking and utility accounts.

We never know when or where we will be shot or murdered. Our lifestyles have changed and we are always in fear for our lives and safety and confused about the law and our protection in public. I was advised to purchase a gun and carry a concealed weapon, but I do not want to have a gun in the house around my 6 year old son."

No further at this time.